RECEIPT # 57192
AMOUNT $ ___
SUMMONS ISSUED 1 2
LOCAL RULE 4.1 ___
WAIVER FORM ___
MCF ISSUED ___
BY DPTY. CLK. _m_
DATE 7-12-04

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: |
| | ) |
| CHARLES R. DALL'ACQUA and | ) |
| PROTOCOL MARKETING GROUP, | ) |
| | ) |
| Defendants. | ) |

04  11540 DPW

MAGISTRATE JUDGE _Collings_

COMPLAINT AND DEMAND FOR TRIAL BY JURY

Harte-Hanks, Inc., as and for its Complaint and Demand for Trial by Jury, alleges:

**Jurisdiction and Venue**

1.      The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a)(1) because (a) there is diversity of citizenship between the plaintiff and the defendants, and (b) the amount in controversy exceeds $75,000.

2.      Venue in this Court is proper, pursuant to 28 U.S.C. § 1391(a)(2), as the conduct giving rise to this action occurred, and will continue to occur, primarily in the Commonwealth of Massachusetts, and pursuant to 28 U.S.C. § 1391(c), as defendant Protocol Marketing Group is a resident of Massachusetts.

**Factual Allegations**

**The Parties**

3.     Plaintiff, Harte-Hanks, Inc. ("Harte-Hanks"), is a Delaware corporation with a principal place of business in San Antonio, Texas. Harte-Hanks conducts business and maintains an office and employees in the Commonwealth of Massachusetts. Harte-Hanks is a worldwide direct and targeted marketing company.

4.     Defendant Protocol Marketing Group ("Protocol") is, upon information and belief, a corporation with a principal place of business in Illinois. Upon information and belief, Protocol conducts business and maintains an office and employees in the Commonwealth of Massachusetts and is subject to service of process in the Commonwealth of Massachusetts. Protocol is a competitor of Harte-Hanks.

5.     Upon information and belief, defendant Charles Dall'Acqua is and at all relevant times has been a resident of Annapolis, Maryland. Dall'Acqua is the Chief Executive Officer ("CEO") of Protocol. Upon information and belief, in his capacity as CEO of Protocol, Dall'Acqua has conducted substantial activities in the Commonwealth of Massachusetts, including, but not limited to, the solicitation of at least one Harte-Hanks employee for employment at Protocol.

**The Relationship Between Harte-Hanks And Defendant Dall'Acqua**

6.     Dall'Acqua was employed in Maryland by Harte-Hanks, in various positions, from approximately 1982 to March 2004, when he was terminated. Before he was terminated, Dall'Acqua was a Senior Vice-President and was one of the top five executives of the company.

7.     In or about January 2002, in an effort to ensure that all employment records and agreements were consistent throughout the company and were and in compliance with company policy, Harte-Hanks undertook a review of all such records and agreements.

8.     On or about January 25, 2002, in connection with this review and pursuant to Harte-Hanks's standard practice and policy, Dall'Acqua was asked to sign and did sign a Confidentiality/Non-Disclosure Agreement (hereinafter the "Agreement"). A true and correct copy of the Agreement is attached hereto as Exhibit A.

9.     By and through paragraph 5 of the Agreement, Dall'Acqua agreed that he would "not at any time during or for a period of two years subsequent to [his] employment with Harte-Hanks attempt directly or through others to influence any employee of Harte-Hanks to terminate their employment with Harte-Hanks or to recruit Harte-Hanks employees for other employment."

10.     By and through paragraph 10 of the Agreement, Dall'Acqua agreed that "the obligations under this agreement shall survive after the termination of [his] employment relationship with Harte-Hanks."

11.     Paragraph 10 of the Agreement provides that "[i]n the event of a breach or threatened breach of this agreement, Harte-Hanks shall be entitled to a preliminary and/or permanent injunction restraining such breach."

12.     Paragraph 12 of the Agreement provides that the "Agreement shall be interpreted in accordance with the laws of the state where [defendant Dall'Acqua was] employed without giving effect to its conflict of law principles."

13.     On or about March 5, 2004, Dall'Acqua's employment with Harte-Hanks was terminated.

**The Relationship Between Harte-Hanks And John Martus**

14.    John Martus is a former Harte-Hanks employee.

15.    In late 2003, while Martus was working at Harte-Hanks's Baltimore office, Harte-Hanks offered him a promotion to a new position within the Company, with an increase in salary and benefits.  The offer was conditional on Martus's relocating to Massachusetts, at Harte-Hanks's expense.  Martus accepted the offer, moved to Massachusetts (at Harte-Hanks's expense), and began to work at Harte-Hanks's offices in Billerica.

16.    On or about October 10, 2003, Martus executed a Non-Compete Agreement with Harte-Hanks.  A true and correct copy of Martus's Non-Compete Agreement is attached hereto as Exhibit B.

17.    By and through paragraph 2 of the Non-Compete Agreement, Martus agreed that

> For so long as Employee [Martus] is employed by Employer [Harte-Hanks] and for a period of one (1) year after the termination of Employee's employment for any reason whatsoever, whether voluntary or involuntary, Employee shall not, without prior written consent of Employer, directly or indirectly, whether as an employee, officer, trustee, consultant, owner, partner, coventurer, agent, advisor or otherwise, render services to any "competing organization" that does or seeks business (whether by soliciting customers of Employer or otherwise) in any of the businesses engaged in by Employer in which Employee worked or was involved at Employer.  For purposes of this agreement, a "competing organization" shall be any business involved in the same or substantially similar business as Employer or which competes in any way with the business of Employer, either directly or indirectly as a contractor or subcontractor.

18.    By virtue of his position as Controller, Martus had access to and knew proprietary and confidential information concerning Harte-Hanks's business, including information concerning employee salaries, product and service costs, and pricing.

**Dall'Acqua's Breach Of His Own Agreement**

19.    Upon information and belief, in or about April-May 2004, Dall'Acqua contacted Martus at Harte-Hanks's offices in Billerica, Massachusetts and/or Martus's home and solicited Martus to leave the employment of Harte-Hanks and to become a Massachusetts employee of Protocol.

20.    Upon information and belief, Dall'Acqua solicited Martus by telephone and/or e-mail on several occasions while Martus was located in Massachusetts. Further, upon information and belief, Martus was interviewed by the Massachusetts-based Controller of Protocol and visited Protocol's Massachusetts facility.

21.    Dall'Acqua's solicitation succeeded. Martus resigned from Harte-Hanks and began work at Protocol in or about May 2004. Upon information and belief, Martus is still employed at Protocol.

**Harte-Hanks's Post-Breach
Communications With Dall'Acqua**

22.    Harte-Hanks learned of Dall'Acqua's solicitation of Martus and of Martus's employment by its competitor Protocol on or about May 24, 2004.

23.    By letter dated June 8, 2004, Paul Steven Hacker, Vice-President, Legal and Secretary of Harte-Hanks, notified Dall'Acqua that his actions with respect to Martus were in

direct violation of the Agreement. A true and correct copy of the June 8, 2004 letter is attached hereto as Exhibit C.

24.    Mr. Hacker's June 8 letter also informed Dall'Acqua that, in the event of any further breaches, Harte-Hanks would pursue all available legal remedies for all breaches.

25.    On or about June 17, 2004, Mr. Hacker received a letter from Susan C. Levy of the Chicago law firm of Jenner & Block. A true and correct copy of Ms. Levy's letter is attached hereto as Exhibit D.

26.    Ms. Levy indicated that her firm had been retained to represent Dall'Acqua and Protocol.

27.    Ms. Levy indicated that Dall'Acqua "ha[d] advised [her firm] that [the Agreement] was never presented to him for signature, he did not sign and would not have signed this document, and his purported signature on this document was forged and unauthorized." The assertions concerning the Agreement are false.

28.    Ms. Levy also wrote, "neither Mr. Dall'Acqua nor Protocol intends to abide by any term of this purported agreement."

29.    Ms. Levy also threatened that "[i]f Harte-Hanks tortiously interferes with any of [defendants'] rights [with respect to employees] on the basis of this questionable document, [Dall'Acqua and Protocol] will seek all appropriate legal relief."

30.    Dall'Acqua and Protocol thus indicated, based on a false assertion that the Agreement was "forged and unauthorized," that they have no intention of honoring the Agreement.

**Dall'Acqua's and Protocol's Wrongful Conduct
With Respect to Martus's Non-Compete Agreement**

31.    Upon information and belief, Dall'Acqua and, through Dall'Acqua, Protocol, were

aware in April-May 2004 that Martus was bound by a Non-Compete Agreement with Harte-

Hanks.  Upon information and belief, Protocol knew when it offered employment to Martus that

his employment by Protocol was proscribed by the Non-Compete Agreement.

**COUNT I**
**(Breach of Contract v. Dall'Acqua)**

32.    Plaintiff repeats and incorporates by reference herein the allegations in paragraphs

1 through 31 above.

33.    The Agreement is an enforceable contract.

34.    Dall'Acqua breached the Agreement by soliciting Martus for employment at

Protocol.

35.    Plaintiff has suffered and will continue to suffer damages as a result of

Dall'Acqua's breach.

**COUNT II**
**(Preliminary Injunction v. Dall'Acqua)**

36.    Plaintiff repeats and incorporates by reference herein the allegations in paragraphs

1 through 35 above.

37.    There is a strong likelihood that Harte-Hanks will be successful on the merits of

its claim for breach of contract against Dall'Acqua.

38.    Harte-Hanks will suffer irreparable harm if Dall'Acqua is not enjoined from

further breach(es) of the Agreement.

39.     The risk of irreparable harm to Harte-Hanks in the absence of relief outweighs any

probable harm to Dall'Acqua as a result of the requested injunctive relief.

## Count III
### ( Intentional Interference With Contractual Relations
### v. Dall'Acqua and Protocol Marketing Group)

40.     Plaintiff repeats and incorporates by reference herein the allegations in

paragraphs 1 through 39 above.

41.     Martus's Non-Compete Agreement is an enforceable contract that precluded and

precludes Martus from working for Protocol.

42.     Upon information and belief, when Dall'Acqua solicited Martus, and when

Dall'Acqua and Protocol hired Martus, they were aware of Martus's Non-Compete Agreement

with Harte-Hanks and were aware that it precludes Martus from working for Protocol.

43.     By recruiting and hiring Martus notwithstanding this knowledge, Dall'Acqua and

Protocol acted in an improper manner and intentionally interfered, and continue to interfere, with

Harte-Hanks's advantageous contractual relationship with Martus.

44.     Upon information and belief, Dall'Acqua and Protocol's interference with Harte-

Hanks's contractual relationship with Martus was done with a wrongful motive, to wit, to

exploit, among other things, the confidential and proprietary information concerning Harte-

Hanks that Martus possesses.

45.     Harte-Hanks has suffered and will continue to suffer damages as a result of

defendants' wrongful interference.

## Count IV
### (Preliminary Injunction v. Protocol Marketing Group)

46.    Plaintiff repeats and incorporates by reference herein the allegations in paragraphs 1 through 45 above.

47.    There is a strong likelihood that Harte-Hanks will be successful on the merits of its claim against Protocol for intentional interference with contractual relations.

48.    Harte-Hanks will suffer irreparable harm if Protocol is not enjoined from aiding and abetting further breach(es) of the Agreement and/or hiring additional Harte-Hanks employees through wrongful raiding tactics in violation of valid non-petition agreements.

49.    The risk of irreparable harm to Harte-Hanks in the absence of relief outweighs any probable harm to Protocol as a result of the requested injunctive relief.

WHEREFORE, Harte-Hanks respectfully requests:

1.    On Count I, judgment in its favor in an amount to be determined at trial, as well as such other relief as is just and proper;

2.    On Count II, an injunction prohibiting and restraining Dall'Acqua from "attempting directly or through others to influence any employee of Harte-Hanks to terminate their employment with Harte-Hanks or to recruit Harte-Hanks employees for other employment";

3.    On Count III, judgment in its favor in an amount to be determined at trial, as well as such other relief as is just and proper; and

4.    On Count IV, an injunction prohibiting and restraining Protocol from soliciting any Harte-Hanks employees.

## Demand for Trial by Jury

Harte-Hanks respectfully demands a trial by jury on all issues so triable.

Dated:  July 12, 2004

Respectfully submitted,

HARTE-HANKS, INC.,

By its attorneys,

David B. Chaffin
BBO No. 549245
Kathleen A. Kelley
BBO No. 562342
HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
(617) 330-5000

422003.061804