UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CHARLES R. DALL'ACQUA and )<br>PROTOCOL MARKETING GROUP, )<br>)<br>Defendants. ) | Civil Action No.<br><br>04 11548 DPW |

## MEMORANDUM IN SUPPORT OF PLAINTIFF'S
## MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Harte-Hanks, Inc., submits this memorandum in support of its motion for a preliminary injunction.

### Preliminary Statement

Defendant Charles R. Dall'Acqua was a Senior Vice-President of Harte-Hanks. In January 2002, Dall'Acqua entered into a Confidentiality/Non-Disclosure Agreement (the "Agreement") with Harte-Hanks, whereby he promised that for two years after the end of his employment with Harte-Hanks he would not "attempt directly or through others to influence any employee of Harte-Hanks to terminate their employment with Harte-Hanks or to recruit Harte-Hanks employees for other employment." Dall'Acqua left Harte-Hanks in March. He has not kept his promise.

Dall'Acqua now is the Chief Executive Officer of Protocol Marketing Group, a direct competitor of Harte-Hanks. Within weeks of his departure from Harte-Hanks, Dall'Acqua began

recruiting Harte-Hanks employees to join him at Protocol. His efforts succeeded with at least one now former Harte-Hanks employee in Massachusetts.

Upon learning of Dall'Acqua's breach, Harte-Hanks reminded him of his obligations under the Agreement, hoping that he would agree to breach no more and that the matter would end there. Unfortunately, he was having none of it. He responded not by denying that he had been soliciting Harte-Hanks employees, but by claiming that "he did not sign [the Agreement] and would not have signed [the Agreement], and his purported signature on [the Agreement] was forged and unauthorized." Notably, his signature on the Agreement looks exactly like his signature on other documents in his Harte-Hanks personnel file. Not content to rest on his specious claim that his signature had been "forged and [was] unauthorized," Dall'Acqua went on to say that "neither [he] nor Protocol intends to abide by any terms of [the Agreement] . . .," and to threaten that if "Harte-Hanks tortiously interferes with any of [his and Protocol's rights to solicit and hire employees] on the basis of this questionable document, [he] will seek all appropriate legal relief."

Given Dall'Acqua's position, it is a near certainty that his employee raiding will continue unless he is made to stop. Harte-Hanks requests the Court's assistance in making him stop. It seeks, in specific, a preliminary injunction prohibiting Dall'Acqua from any further solicitation of Harte-Hanks personnel.

## Statement of Facts[1]

**The Parties**

Harte-Hanks is a Delaware corporation with a principal place of business in San Antonio, Texas. Harte-Hanks conducts business and maintains an office and employees in the Commonwealth of Massachusetts. Harte-Hanks is a world-wide direct and targeted marketing company. (Blythe Dec., ¶ 2.)

Defendant Protocol is, according to its website, a corporation with a principal place of business in Illinois. Protocol conducts business and maintains an office and employees in the Commonwealth of Massachusetts, and is subject to service of process in the Commonwealth of Massachusetts. Protocol is a competitor of Harte-Hanks. (Blythe Dec. at ¶ 3.)

Defendant Dall'Acqua is and at all relevant times has been a resident of Annapolis, Maryland. Dall'Acqua is, as noted, the Chief Executive Officer ("CEO") of Protocol. In his capacity as CEO of Protocol, Dall'Acqua has conducted substantial activities in the Commonwealth of Massachusetts, including, but not limited to, the solicitation of at least one Harte-Hanks employee for employment at Protocol. (Dernoga Dec., ¶¶ 5, 8.)

**The Relationship Between Harte-Hanks And Defendant Dall'Acqua**

Dall'Acqua was employed in Maryland by Harte-Hanks, in various positions, from approximately 1982 to March 5, 2004, when he was terminated. Before he was terminated, Dall'Acqua was a Senior Vice-President and, as such, one of the top five executives of the company. (Blythe Dec. at ¶ 4.)

---

[1] This Statement of Facts is based on and supported by the accompanying declarations of Elaine Dernoga ("Dernoga Dec."), Paul Steven Hacker ("Hacker Dec."), and Dean H. Blythe ("Blythe Dec.").

3

**The Agreement**

In or about January 2002, in an effort to ensure that all employment records and agreements were consistent throughout the company and were and in compliance with company policy, Harte-Hanks undertook a review of all such records and agreements. In this connection, on or about January 25, 2002, Dall'Acqua was asked to sign and did sign a Confidentiality/Non-Disclosure Agreement (the "Agreement"). (Blythe Dec. at ¶¶ 5, 6; Dernoga Dec. at ¶¶ 6, 7.)

By and through paragraph 5 of the Agreement, Dall'Acqua agreed that he would "not at any time during or for a period of two years subsequent to [his] employment with Harte-Hanks attempt directly or through others to influence any employee of Harte-Hanks to terminate their employment with Harte-Hanks or to recruit Harte-Hanks employees for other employment." By and through paragraph 10 of the Agreement, Dall'Acqua agreed that "the obligations under this agreement shall survive after the termination of [his] employment relationship with Harte-Hanks." Paragraph 10 of the Agreement provides that "[i]n the event of a breach or threatened breach of this agreement, Harte-Hanks shall be entitled to a preliminary and/or permanent injunction restraining such breach." Under paragraph 12 of the Agreement, because Dall'Acqua worked in Maryland, the Agreement is to be interpreted in accordance with the laws of Maryland. (Blythe Dec. at ¶ 6 and Ex. A at ¶¶ 5, 10, 12.)

**Dall'Acqua And John Martus**

John Martus is a former Harte-Hanks employee. In late 2003, while Martus was working at Harte-Hanks's Baltimore office, Harte-Hanks offered him a promotion to a new position within the Company, with an increase in salary and benefits. The offer was conditional on Martus's relocating to Massachusetts, at Harte-Hanks's expense. Martus accepted the offer,

4

moved to Massachusetts (at Harte-Hanks's expense), and began to work at Harte-Hanks's offices in Billerica. (Blythe Dec. at ¶¶ 8, 9.) On or about October 10, 2003, in connection with this promotion, Martus executed a non-competition agreement with Harte-Hanks, by which he agreed, in substance, that he would not work for a Harte-Hanks's competitor for a period of one year following his separation from Harte-Hanks. (Blythe Dec. at ¶ 10 and Ex. B, ¶ 2.)

By virtue of his former position at Harte-Hanks, Martus had access to and knows proprietary and confidential information concerning Harte-Hanks's business, including information concerning employee salaries, product and service costs, and pricing. (Blythe Dec. at ¶ 11.)

**Dall'Acqua's Breach Of His Agreement**

In or about April-May 2004, Dall'Acqua contacted Martus at Harte-Hanks's Massachusetts office and/or Martus's home and solicited Martus to leave the employment of Harte-Hanks and to become an employee of Protocol. (Dernoga Dec. at ¶ 8.) Dall'Acqua's solicitation succeeded. Martus resigned from Harte-Hanks and began work at Protocol's Massachusetts office in or about May 2004. Harte-Hanks understands that Martus is still employed at Protocol. (Dernoga Dec. at ¶ 8; Blythe Dec. at ¶ 12.)

**Harte-Hanks's Post-Breach Communications With Dall'Acqua**

Harte-Hanks learned of Dall'Acqua's solicitation of Martus and of Martus's employment by its competitor Protocol on or about May 24, 2004. By letter dated June 8, 2004, Paul Steven Hacker, Vice President, Legal and Secretary of Harte-Hanks, notified Dall'Acqua that his actions with respect to Martus were in direct violation of the Agreement. (Hacker Dec. at ¶ 3 and

Exhibit A.) Mr. Hacker advised Dall'Acqua that in the event of any further breaches, Harte-Hanks would pursue all available legal remedies for all breaches. (Hacker Dec. at ¶ 4.)

On or about June 17, 2004, Mr. Hacker received a letter from Susan C. Levy of the Chicago law firm of Jenner & Block. Ms. Levy indicated that her firm had been retained to represent Dall'Acqua and Protocol and that Dall'Acqua "ha[d] advised us that [the Agreement] was never presented to him for signature, he did not sign and would not have signed this document, and his purported signature on this document was forged and unauthorized." (Hacker Dec. at ¶ 5 and Exhibit B.) This assertion is false. (Dernoga Dec. at ¶¶ 6, 7; Hacker Dec. at ¶ 6 and Exhibit C.) Ms. Levy also wrote, "neither Mr. Dall'Acqua nor Protocol intends to abide by any term of this purported agreement." She also threatened that "[i]f Harte-Hanks tortiously interferes with any of [defendants'] rights [with respect to employees] on the basis of this questionable document, [Dall'Acqua and Protocol] will seek all appropriate legal relief." Dall'Acqua and Protocol thus indicated, based on a false assertion that the Agreement was "forged and unauthorized," that they have no intention of honoring the Agreement. (Hacker Dec. at ¶ 5 and Exhibit B.)

<u>**Argument**</u>

**DALL'ACQUA SHOULD BE PROHIBITED FROM FURTHER SOLICITATION OF <u>HARTE-HANKS PERSONNEL</u>**

A.  **The Standard**

"A party seeking a preliminary injunction must establish that (1) it is substantially likely to succeed on the merits of its claim; (2) absent the injunction there is a 'significant risk of irreparable harm;' (3) the balance of hardships weighs in its favor; and (4) the injunction will not

harm the public interest." Oxford Global Resources, Inc. v. Guerriero, 2003 WL 23112398, * 4 (D. Mass. 2003) (quoting J.P. Lund Trading ApS v. Kohler Co., 163 F.3d 27, 33 (1st Cir. 1998) and TEC Engineering Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 544 (1st Cir. 1996)). "Likelihood of success is the main bearing wall of the four-factor framework." Ross-Simonds of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996). Harte-Hanks easily establishes each of these elements.

**B.      Application Of The Standard**

    **1.      Harte-Hanks Will Prevail on the Merits**

Under Maryland law,[2] an employee's agreement to refrain from post-employment solicitation of the employer's customers and/or employees is enforceable. See, e.g., Fowler v. Printers II, 89 Md. App. 448, 459-66, 598 A.2d 794, 799-802 (1991) (agreement for non-solicitation of customers reasonable and enforceable and agreement for non-solicitation of workers enforced and remanded for further findings on breach/damages), cert. denied, 335 Md. 619, 602 A.2d 710 (1992); Intelus Corp. v. Barton, 7 F. Supp.2d 635, 642 (D. Md. 1998) (reasonable non-solicitation agreements enforceable); 1 Covenants Not to Compete: A State-by State Survey, p. 1214 (Brian M. Malsberger et al. eds., 3d ed. 2002 & Supp. 2003) (reasonable "anti-employee raiding covenants" enforceable). And they are enforceable even where they are not signed at the start of employment. "[T]he continuation of at-will employment for a substantial period of time is adequate consideration for a non-solicitation agreement." Mona

---

[2] As noted, the Agreement provides that it is to be interpreted in accordance with the laws of the state where Dall'Acqua was employed, Maryland. The parties' choice of Maryland law should be honored. See, e.g., Oxford Global Resources, Inc., 2003 WL 23112398, * 4 (citing Morris v. Watsco, Inc., 385 Mass. 672, 674-74, 433 N.E.2d 886, 888 (1982)) (absent a violation of Massachusetts public policy, Massachusetts courts will honor parties' choice of law).

Electric Group Incorporated v. Truland Service Corporation, 56 Fed. Appx. 108, 110, 2003 WL 40748, * 2 (4th Cir. 2003) (interpreting Maryland law and citing Simko v. Graymar, 55 Md. App. 561, 563, 464 A.2d 1104, 1107 (Md. Ct. Spec. App. 1983)).

Harte-Hanks's research reveals no post-Fowler decision by the Maryland courts in which an agreement prohibiting post-employment solicitation of fellow employees was directly at issue. Numerous courts elsewhere, however, have considered such agreements and held that they are enforceable. See, e.g., Sunstates Refrigerated Services, Inc. v. Griffen, 216 Ga. App. 61, 449 S.E.2d 858, 859 (1994) (non-solicitation agreements relating to customers or management employees enforceable); Atmel Corporation v. Vitesse Semiconductor Corporation, 30 P.3d 789, 793-94 (Colo. App. 2001) (non-solicitation agreement relating to employees enforceable to prevent signer from initiating contact with employees); Loral Corp. v. Moyes, 174 Cal. App. 3d 268, 280, 219 Cal. Rptr. 836, 844 (1985) (agreement for non-solicitation of employees enforceable, even in light of statute prohibiting most non-compete agreements); Smith, Barney, Harris, Upham & Co. v .Robinson, 12 F.3d 515, 518-19 (5th Cir. 1994) (agreement prohibiting non-solicitation of employees does not violate state statute prohibiting agreements "not to engage in any competing business for himself, or as an employee of another"); Robinson v. Jardine Insurance Brokers International, Limited, 856 F. Supp. 554, 558-59 (N. D. Cal. 1994) (anti-interference/ solicitation provision did not violate California statute precluding anti-competitive activity); Balasco v. Gulf Auto Holding, Inc., 707 So.2d 858, 859 (Fla. App. 2d 1998) (non-solicitation agreement permissible, as it only slightly impeded defendant's hiring activities); Totino v. Alexander & Associates, Inc., 1998 WL 552818, *8 (Tex. App. 1998) (anti-solicitation agreement had minor impact on competition). As one expert has observed:

> Such [non-solicitation/interference] provisions are less anti-competitive than covenants not to compete, because they do not prevent the former employee or company from competing altogether, but merely require that he, she or it hire help in some other manner or from some other source. Such a provision is not a per se violation of federal anti-trust law. But such a provision may be subject to some of the same strictures as those which are imposed on covenants not to compete, because they do place some limitation on the competitive freedom of the person or company whose solicitation activities are limited thereby.
>
> However, it has been held that even a state statute which prohibits most employment covenants not to compete does not prohibit a non-solicitation [non-interference] clause in an employment agreement.

2 Louis Altman, Callmann on Unfair Competition, Trade Secrets & Monopolies § 16.44 (4th ed. 2004). Under this authority, it will not be open to Dall'Acqua to argue that Maryland law does not permit post-employment restrictions on employee raiding. Nor will he be able to argue either that the Agreement fails for a lack of consideration or that it is unreasonable. He was a high-ranking officer of Harte-Hanks. Pursuant to company policy that he was in a position to influence, he was asked to agree, and did agree, not to solicit Harte-Hanks's personnel for two years after his employment ended. He stayed at Harte-Hanks for over two years after signing, and he was well paid. He left Harte-Hanks with extensive knowledge of Harte-Hanks's business, strategies, and personnel, and with, therefore, the capacity to damage Harte-Hanks unfairly. Under these circumstances, there is adequate consideration, see, e.g., Mona Electric Group Incorporated, 56 Fed. Appx. at 110, 2003 WL 40748 at * 2 (continued employment sufficient consideration for post-employment restriction), and the non-solicitation provision is an eminently reasonable restraint. See, e.g., Intelus Corp., 7 F. Supp. 2d at 642 (reasonable non-solicitation agreements should be enforced).

Dall'Acqua seems to have appreciated that the law and the facts are against him, for he resorts to a specious argument that depends on neither. He claims that he never signed the Agreement and that the signature on it is "forged and unauthorized." A simple comparison of the signature with his signature on other documents in his personnel file reveals that this claim is fabricated.

Thus, Harte-Hanks will establish that the Agreement is enforceable. It will also establish that Dall'Acqua breached. The evidence to date, including Dall'Acqua's failure to deny that he solicited Martus, demonstrates that Dall'Acqua has done that which the non-solicitation Agreement prohibits him from doing. Indeed, it proves more than that: Dall'Acqua has all but said that he intends to do it again.

### 2.    Harte-Hanks Will Be Irreparably Harmed Absent Relief

Numerous courts have enjoined former employees from engaging in activity prohibited by a voluntary "anti-raiding" Agreement. See, e.g., Sunstates Refrigerated Services, Inc., 215 Ga. App. at 61, 449 S.E.2d at 859; Atmel Corporation, 30 P.3d at 793-94; Loral Corp, 174 Cal. App. 3d at 280, 219 Cal. Rptr. at 844; Robinson, 856 F. Supp. at 558-59; Totino, 1998 WL 552818 at *8. These decisions undoubtedly reflect a recognition of the value of very good employees: Very good employees possess rare qualities and abilities, and they generally represent a substantial employer investment in training and experience. They are not fungible. To lose one is to suffer an irreparable harm. See generally A.W. Chesterton & Co. v. Chesterton, 907 F. Supp. 19, 23-24 (D. Mass. 1995) (injunctive relief appropriate where damages for breach difficult to quantify).

Dall'Acqua is the CEO of Protocol. He undoubtedly does not spend a great deal of time recruiting low-level employees or waste his time recruiting unqualified candidates. Therefore, were he to make good on the threat that his lawyer's letter represents, it would be Harte-Hanks's best and brightest whom he would target. Were he to succeed, Harte-Hanks would lose irreplaceable employees and be irreparably harmed. He should be enjoined. See, e.g., Sunstates Refrigerated Services, Inc., 215 Ga. App. at 61, 449 S.E.2d at 859; Atmel Corporation, 30 P.3d at 793-94; Loral Corp, 174 Cal. App. 3d at 280, 219 Cal. Rptr. at 844; Totino, 1998 WL 552818 at * 8-9.

### 3.     Any Potential Harm to Dall'Acqua is Slight

The injunction that Harte-Hanks requests would not restrict Dall'Acqua's employment. He would remain free to work wherever and for whomever he chooses. He would be prohibited only from pirating Harte-Hanks's employees, a tiny segment of the national workforce. But for the fact that the injunction would deny him an unfair shortcut to very good employees, no harm would befall him. Dall'Acqua agreed not to take that shortcut over two years ago.[3] See, e.g., Intelus Corp., 7 F. Supp.2d at 642 (business people should be held to their contractual obligations); Totino, 1998 WL 552818 at *8 (non-recruitment agreement has minimal impact on freedom to compete).

### 4.     Public Policy Is Served, Not Harmed

"[T]he public has an interest in the enforcement of reasonable restrictive covenants." Intelus Corporation, 7 F. Supp.2d at 642. The restriction Harte-Hanks seeks to enforce is narrow

---

[3] It is worth pointing out that Dall'Acqua finds himself in this position only because of his response to Harte-Hanks's request that he honor the Agreement. Had Dall'Acqua been more truthful and reasonable in response to Harte-Hanks's request, this matter might well have been resolved amicably.

and reasonable. It will have little or no effect on competition. A limited restriction on the activities of <u>one</u> individual is sought. Harte-Hanks does <u>not</u> seek, through enforcement of the Agreement, to prevent its employees from exploring other employment opportunities, or even to prevent those employees from working with or for Dall'Acqua. Harte-Hanks merely seeks to ensure that Dall'Acqua honors his agreement not to raid its workforce. <u>See, e.g., Totino</u>, 1998 WL 552818 at *8 ("[t]he nonrecruitment covenants here do not restrict current A&A employees from leaving A&A or working with the individual appellants. The individual appellants simply may not recruit or solicit the A&A employees."). Holding an experienced and sophisticated businessman to his bargain promotes the public interest. It does not harm it. <u>See, e.g., Intelus Corp.</u>, 7 F. Supp. 2d at 642; 2 Louis Altman, <u>Callmann on Unfair Competition, Trade Secrets & Monopolies</u> § 16.44 (4th ed. 2004).

## Conclusion

For the foregoing reasons, Harte-Hanks respectfully requests that the Court issue a preliminary injunction prohibiting Dall'Acqua from "attempt[ing] directly or through others to

influence any employee of Harte-Hanks to terminate their employment with Harte-Hanks or to recruit Harte-Hanks employees for other employment."

Dated: July 12, 2004                                                          Respectfully submitted,

                                                HARTE-HANKS, INC.,

                                                By its attorneys,

                                                David B. Chaffin
                                                BBO No. 549245
                                                Kathleen A. Kelley
                                                BBO No. 562342
                                                HARE & CHAFFIN
                                                160 Federal Street
                                                Boston, MA 02110
                                                (617) 330-5000

422004.062804