UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No.: |
| ) | |
| CHARLES R. DALL'ACQUA and ) | |
| PROTOCOL MARKETING GROUP, ) | 04-11540 DPW |
| ) | |
| Defendants. ) | |

### DECLARATION OF ELAINE DERNOGA

I, Elaine Dernoga, state:

1. I am over the age of 21. I reside in Gambrills, Maryland. The statements in this declaration are based on my personal knowledge, unless otherwise indicated.

2. I am a Human Resources Administrator at Harte-Hanks, Inc. ("Harte-Hanks"), in Glen Burnie, Maryland. I have worked for Harte-Hanks for approximately eight and one-half years.

3. Several years ago I worked with John Martus, a Controller in the Accounting Department at Harte-Hanks in Baltimore, Maryland. Approximately 2 1/2 years ago, Mr. Martus transferred to another Maryland location of Harte-Hanks. Mr. Martus and I have, however, kept in touch since then.

4. Mr. Martus relocated to Massachusetts in or about December 2003.

5. Charles Dall'Acqua was employed by Harte-Hanks from approximately 1982 to March 2004, finishing his employment at Harte-Hanks as a Senior Vice-President. Mr.

Dall'Acqua was terminated from Harte-Hanks on or about March 5, 2004, and subsequently became the Chief Executive Officer of Protocol Marketing Group, an Illinois company. (Protocol's website so indicates.) To the best of my knowledge, Mr. Dall'Acqua still resides in Maryland, as he did when he worked for Harte-Hanks.

6. I was Mr. Dall'Acqua's assistant at Harte-Hanks from January 1996 to March 2004. Beginning in February 2000, Mr. Dall'Acqua did not maintain an office at Harte-Hanks's Maryland location, and I therefore would deliver (and receive) his mail either (1) via FedEx, (2) by meeting him at the airport when he was traveling and delivering mail to and collecting mail from him, or (3) by meeting with him when he would stop by the Harte-Hanks office and, again, delivering mail to and collecting mail from Mr. Dall'Acqua.

7. Pursuant to this regular course of business, I would have delivered the Agreement to Mr. Dall'Acqua for his signature, and I would also have received the signed Agreement from him. My signature appears next to his as the Authorized Harte-Hanks Representative on this Agreement. I am familiar with Mr. Dall'Acqua's signature. The signature on the Agreement is his. My practice was to sign and date the executed agreements when I received them back from the employees, and to file them in the appropriate personnel files.

8. I spoke with Mr. Martus on or about May 24, 2004 concerning his future employment plans. Mr. Martus informed me that Mr. Dall'Acqua had contacted him and offered him a position at the Massachusetts office of Protocol Marketing Group, which position Mr. Martus had accepted. Mr. Martus said that Mr. Dall'Acqua had first contacted him about the position via telephone calls to Harte-Hanks's office and Mr. Martus's home, both in Massachusetts.

2

9. Mr. Martus also indicated that he interviewed with the Protocol Controller in Massachusetts, and viewed Protocol's Massachusetts facility prior to taking the position with Protocol.

10. Mr. Martus informed me that Mr. Dall'Acqua had instructed him; "If anyone asks when I contacted you, be sure to say that it was after I was terminated."

11. After leaving Harte-Hanks in March 2004, Mr. Dall'Acqua asked me if I might be interested in a position with Protocol. I told Mr. Dall'Acqua that I was happy at Harte-Hanks.

SIGNED UNDER THE PENALTIES OF PERJURY
ON THIS 7th DAY OF JULY, 2004.

*Elaine Dernoga* (signature)
Elaine Dernoga

422004.062904

3