UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CHARLES R. DALL'ACQUA and )<br>PROTOCOL MARKETING GROUP, )<br>)<br>Defendants. )<br>) | Civil Action No. 04-11548-DPW |

**DEFENDANT CHARLES R. DALL'ACQUA'S RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

Defendant Charles R. Dall'Acqua ("Dall'Acqua") submits this response in opposition to Harte-Hanks, Inc. ("Harte-Hanks") Motion for Preliminary Injunction against him.

## I.   INTRODUCTION

Harte-Hanks seeks a preliminary injunction against Dall'Acqua to prevent him from soliciting Harte-Hanks' employees based on a purported Confidentiality/Non-Disclosure Agreement he allegedly executed on January 25, 2002 (the "Purported Dall'Acqua Agreement"). However, the Motion should be denied because Harte-Hanks cannot establish the most important essential element of a preliminary injunction -- likelihood of success on the merits. As Dall'Acqua advised Harte-Hanks before they filed this Motion and as established herein, Dall'Acqua never signed the Purported Dall'Acqua Agreement, and the signature on the agreement is a forgery. Submitted herewith is the affidavit of Ellen Mulcrone Schuetzner ("Schuetzner"), a forensic document examiner certified by the American Board of Forensic Document Examiners with over twenty years of experience in the field, in which she states that there are significant differences between the signature on the Purported Dall'Acqua Agreement

1

and signatures known to be executed by Dall'Acqua. Schuetzner concluded that the signature on the Purported Dall'Acqua Agreement may be an attempt to simulate or trace Dall'Acqua's signature, and there is no evidence to indicate that Dall'Acqua signed the Purported Dall'Acqua Agreement. Dall'Acqua has also submitted his affidavit stating that he did not sign, and had never seen prior to June 8, 2004, the Purported Dall'Acqua Agreement. Further, when Dall'Acqua was terminated by Harte-Hanks on March 5, 2004, he was offered severance in exchange for executing a noncompetition and nonsolicitation agreement, indicating that he did not have such an agreement with Harte-Hanks prior to then. As such, the Court should deny Harte-Hanks' Motion for Preliminary Injunction against Dall'Acqua.

## II.    STATEMENT OF FACTS

**A.    Dall'Acqua's Employment With Harte-Hanks**

Harte-Hanks is a Delaware corporation with its principal place of business in San Antonio, Texas. (Compl. ¶ 3). Harte-Hanks is a worldwide direct and targeted marketing company. (Id.) Dall'Acqua began his employment with Harte-Hanks in approximately 1982, and remained with Harte-Hanks until his employment was terminated by Harte-Hanks on March 5, 2004. (Dall'Acqua Aff., attached hereto as Exhibit 1, at ¶ 3). At the time of his termination, Dall'Acqua was a Corporate Officer and Senior Vice-President of Harte-Hanks. (Id. at ¶ 4).

While he was employed by Harte-Hanks, Dall'Acqua did not have a written employment contract with Harte-Hanks. Dall'Acqua was not asked or required to sign, and did not sign, any restrictive covenants of any type prohibiting him from soliciting Harte-Hanks' employees at any time during his employment with Harte-Hanks. (Id. at ¶ 5).

On March 4, 2004, Richard Hochhauser, the CEO of Harte-Hanks, informed Dall'Acqua that Harte-Hanks was terminating his employment, and that there would be no severance

package. (Id. at ¶ 6). On March 5, 2004, Harte-Hanks' corporate attorney Dean Blythe called Dall'Acqua, and orally offered Dall'Acqua severance for five months or until he found a new job, whichever was earlier, contingent on Dall'Acqua signing a noncompetition and nonsolicitation agreement. Dall'Acqua declined the offer. (Id. at ¶ 7).

**B.    Dall'Acqua's Employment with Protocol**

Protocol Services, Inc. ("Protocol")[1] is an Illinois corporation with its principal place of business in Deerfield, Illinois. In mid-January, 2004, Robert Froetscher ("Froetscher"), Chairman of the Board of Protocol, began discussions with Dall'Acqua, while he was still employed by Harte-Hanks, regarding his possible employment by Protocol as President and CEO. (Froetscher Aff., attached hereto as Exhibit 2, at ¶ 2). During Froetscher's interviews with Dall'Acqua, Froetscher asked Dall'Acqua if he had any restrictive covenants with his employer, Harte-Hanks. Dall'Acqua told Froetscher that he did not. (Id. at ¶ 3; Dall'Acqua Aff. at ¶ 8).

In early March 2004, Dall'Acqua informed Froetscher that he had been terminated by Harte-Harks on March 5, 2004. (Froetscher Aff. at ¶ 4). Approximately two to three weeks after Dall'Acqua's termination by Harte-Hanks, Dall'Acqua received and accepted a job offer from Protocol. (Dall'Acqua Aff. at ¶ 8; Froetscher Aff. at ¶ 5). Dall'Acqua began employment as President and CEO of Protocol on March 25, 2004. (Dall'Acqua Aff. at ¶ 8; Froetscher Aff. at ¶ 5).

**C.    Dall'Acqua Hires John Martus**

In April 2004, Dall'Acqua contacted Martus, who was then working as Controller at Harte-Hanks' Data Process Unit in Massachusetts, about taking a job with Protocol as Controller. (Dall'Acqua Aff. at ¶ 9; Martus Aff., attached hereto as Exhibit 3, at ¶ 5). This was

---

[1] Plaintiff has incorrectly identified Defendant Protocol Services, Inc. as "Protocol Marketing Group" herein.

the first time that Dall'Acqua had spoken to Martus about leaving his employment by Harte-Hanks. (Dall'Acqua Aff. at ¶ 9; Martus Aff. at ¶ 5).

During Dall'Acqua's discussions with Martus, Dall'Acqua asked Martus if he had any restrictive covenants with Harte-Hanks which would prevent him from working for Protocol. (Dall'Acqua Aff. at ¶ 10; Martus Aff. at ¶ 6). Martus told Dall'Acqua that Martus had executed a confidentiality and non-solicitation of employees agreement, but no non-compete agreement with Harte-Hanks. (Dall'Acqua Aff. at ¶ 10; Martus Aff. at ¶ 6). In May of 2004, Martus was offered and accepted the position of Controller with Protocol, commencing on June 15, 2004. (Dall'Acqua Aff. at ¶ 11; Martus Aff. at ¶ 7).

**D.    Communications Between Harte-Hanks and Martus**

On May 24, 2004, Martus gave Harte-Hanks two weeks' notice of his resignation, and informed them that his last day of employment would be June 4, 2004. (Martus Aff. at ¶ 8). Shortly thereafter, Dean Blythe, Harte-Hanks' corporate attorney, asked Martus if he was going to work for Protocol, and Martus told Blythe that he was. (Id.) From May 24, 2004, until June 4, 2004, Martus' last day of work for Harte-Hanks, Martus continued his job duties for Harte-Hanks. (Id.) On June 4, 2004, Martus attended an exit interview for Harte-Hanks. (Id.) Through his last day of work for Harte-Hanks, no one from Harte-Hanks said anything to Martus about his intended employment by Protocol violating any agreement with Harte-Hanks. (Id.)

On or about June 9, 2004, Martus received via federal express a letter from Paul Hacker, Vice President, Legal and Secretary of Harte-Hanks, reminding him of his Confidentiality/Non-Disclosure Agreement with Harte-Hanks which Martus had executed on December 15, 2003 (the "Martus Confidentiality Agreement"), and enclosing a copy of same. (Martus Aff. at ¶ 9 and

4

Exs. A and B thereto). The letter made no mention of and enclosed no copy of the purported Non-Compete Agreement between Martus and Harte-Hanks. (Id.).

**E.     Communications Between Harte-Hanks and Dall'Acqua**

On or about June 8, 2004, Dall'Acqua received via facsimile a letter from Paul Hacker which accused Dall'Acqua of violating a Confidentiality/Non-Disclosure Agreement Dall'Acqua had allegedly executed on January 25, 2002 (the "Purported Dall'Acqua Agreement"). (Dall'Acqua Aff. at ¶ 12 and Exs. A and B thereto). Mr. Hacker enclosed a copy of the Purported Dall'Acqua Agreement with this letter. (Id.).

Dall'Acqua did not sign the Purported Dall'Acqua Agreement, and had never seen the Purported Dall'Acqua Agreement prior to his receiving Mr. Hacker's letter dated June 8, 2004. (Dall'Acqua Aff. at ¶ 13). Dall'Acqua does not believe that the signature on the Purported Dall'Acqua Agreement looks like his signature, as (1) the curves are different; (2) the letters are not connected the way they are in his signature; (3) the signature is above the signature line, whereas Dall'Acqua generally signs on the signature line; and (4) the signature also appears to be done in a felt tipped pen, whereas Dall'Acqua generally uses a fine-tipped pen to sign documents. (Dall'Acqua Aff. at ¶ 14). Furthermore, on January 25, 2002, the date Dall'Acqua purportedly signed the Purported Dall'Acqua Agreement, Dall'Acqua was traveling to Baltimore from Kansas City on business. (Dall'Acqua Aff at ¶ 16 and Ex. D thereto).

**F.     Dall'Acqua's Attorneys Advise Harte-Hanks that the Purported Dall'Acqua Agreement is a Forgery**

On June 17, 2004, Susan C. Levy, counsel for Protocol and Dall'Acqua, responded to Hacker's letter. Her letter informed Hacker that Dall'Acqua had never signed nor seen the Purported Dall'Acqua Agreement and that the document was forged and unauthorized. (Compl. ¶¶ 25-30 and Ex. D thereto). Levy requested that Harte-Hanks provide evidence that Dall'Acqua

had in fact signed the Purported Dall'Acqua Agreement, and of the circumstances under which he allegedly signed the Purported Dall'Acqua Agreement. Levy told Harte-Hanks that until Harte-Hanks provided such evidence, neither Dall'Acqua nor Protocol intended to abide by the terms of the purported agreement. (Compl. Ex. D).

On July 8, 2004, Carla Rozycki ("Rozycki"), counsel for Dall'Acqua and Protocol, spoke with Kathleen Kelley ("Kelley"), counsel for Harte-Hanks, via telephone. (Rozycki Aff., attached hereto as Exhibit 4, at ¶ 2). Rozycki informed Kelley that Dall'Acqua was adamant that he was not presented with nor did he sign the Purported Dall'Acqua Agreement and that Dall'Acqua was traveling on the day he purportedly signed the agreement. (Id. at ¶ 3). Rozycki suggested that Kelley check for an expense report for the date Dall'Acqua purportedly signed the agreement, and talk to Elaine Dernoga ("Dernoga"), Dall'Acqua's former secretary, who appeared to have signed the Purported Dall'Acqua Agreement on behalf of the company. (Id. at ¶ 4). Kelley indicated that she had already spoken to Dernoga, and that Dernoga confirmed that the signature on the Purported Dall'Acqua Agreement was Dall'Acqua's. However, Kelley also told Rozycki that Dernoga did not recall witnessing Dall'Acqua signing the Agreement. (Id. at ¶ 5). Kelley made no mention to Rozycki of an alleged Non-Compete Agreement between Martus and Harte-Hanks. (Id. at ¶ 7).

### G.   Harte-Hanks Files Suit

On July 12, 2004, Harte-Hanks filed the instant lawsuit and Motion for Preliminary Injunction alleging that Dall'Acqua violated the Purported Dall'Acqua Agreement. For the first time, Harte-Hanks alleged that Dall'Acqua tortiously interfered with Harte-Hanks' contractual relationship with Martus by inducing him to breach a purported Non-Compete Agreement allegedly executed between Martus and Harte-Hanks (the "Purported Martus Non-Compete

6

Agreement"). The Purported Martus Non-Compete Agreement, which heretofore had never been mentioned by Harte-Hanks or its lawyers in any of its communications with Dall'Acqua, Protocol, Dall'Acqua's and Protocol's attorneys (Levy and Rozycki), or Martus, was first attached to Harte-Hanks' Complaint. (Compl. Ex. B). Martus does not recall signing the Purported Martus Non-Compete Agreement, and does not recall seeing the Purported Martus Non-Compete Agreement until after it was filed as an attachment to this Complaint on or about July 12, 2004. (Martus Aff. at ¶ 12).

**H.     A Certified Forensic Document Examiner Has Concluded the Signature on the Purported Dall'Acqua Agreement is Not Authentic.**

Ellen Mulcrone Schuetzner, a certified forensic document examiner, conducted a handwriting analysis to determine the authenticity of Dall'Acqua's alleged signature on the Purported Dall'Acqua Agreement. (Schuetzner Aff., attached hereto as Exhibit 5, at ¶ 2). Schuetzner conducted visual and microscopic examinations of a photocopy of the signature on the Purported Dall'Acqua Agreement, comparing it to samples of known Dall'Acqua signatures. Schuetzner followed the Guideline for the Examination of Handwritten Items. (Id. at ¶¶ 3-4).

Schuetzner found significant differences between the questioned signature and the known signatures, which included dissimilarities in the design of the letterforms, connecting strokes between letters, height proportions in the ascenders and descenders in the letters, and the ending stroke. (Id. at ¶ 5). Due to the pictoral similarities and the significant differences found between the questioned and known signatures, Schuetzner surmised that the questioned signature may be an attempt to simulate or trace an authentic signature. (Id. at ¶ 6). Schuetzner concluded that there is no evidence to indicate that the person who prepared the Dall'Acqua signatures on the samples known to be authentic (Dall'Acqua) executed the questioned signature on the Purported Dall'Acqua Agreement. (Id. at ¶ 7).

7

### III.     ARGUMENT

**A.     This Court Should Deny Harte-Hanks' Motion for Preliminary Injunction**

**1.     Standards for Preliminary Injunction**

"A preliminary injunction is an extraordinary equitable remedy.  It requires intervention by the Court on an emergency basis, without the usual careful procedures and litigation methods -- the exchange of information in discovery, evidentiary hearings, the full and complete briefing of the issues.  As such the law imposes on plaintiffs the substantial burden of convincing the Court that they are likely to succeed ultimately and further, that if emergency relief is not granted, they will be 'irreparably' harmed." Comfort ex rel Newmyer v. Lynn School Committee, 100 F. Supp. 2d 57, 60 (D. Mass. 2000) (citing Boston's Children First v. City of Boston, 62 F. Supp. 2d 247, 253 (D. Mass. 1999)); see also Dupont v. Dubois, 187 F.3d 621 (table), 1998 WL 1085819 (1st Cir. July 15, 1998) ("[A] preliminary injunction is an extraordinary remedy that may be granted only by a clear demonstration by a plaintiff of the merits of such a request").

"The test is a four part one:  The Court must find: (1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; *and* (4) that the public interest will not be adversely affected by the granting of the injunction." (emphasis added) Lynn School Committee, 100 F. Supp. 2d at 60-61 (citing Planned Parenthood League v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981)). "Likelihood of success is the main bearing wall of the four-factor framework." Ross-Simonds of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996); see also Cohen v. Brown

University, 991 F.2d 888, 903 (1st Cir. 1993) ("likelihood of success at trial is particularly influential in the preliminary injunction calculus").

Harte-Hanks cannot meet its substantial burden with regard to all of these elements. Most significantly, Harte-Hanks cannot demonstrate that it would likely succeed on the merits of its claim, because the Purported Purported Dall'Acqua Agreement, on which Harte-Hanks' motion is premised, is a forgery.

### 2. Harte-Hanks Has Failed to Show that It Has a Likelihood of Success on the Merits

#### a. The Signature on the Purported Dall'Acqua Agreement Is Not Authentic

The burden of establishing the validity of a signature is on the party claiming validity (here, Harte-Hanks). The signature is presumed to be authentic and authorized, unless the other party (here, Dall'Acqua) raises a genuine issue of validity or authenticity of the signature. Walsh v. Menton, 1994 WL 879470 (Mass. Super. Sept. 23, 1994). See also, Wolfe v. Madison National Bank, 352 A.2d 914, 916-17 (Md. App. Ct. 1976); Metropolitan Mortgage Fund, Inc. v. Basiliko, 407 A.2d 773, 777 (Md. App. Ct. 1979). [2]

Here, Dall'Acqua has submitted his affidavit and the affidavit of a certified forensic document examiner establishing that the Dall'Acqua signature on the Purported Dall'Acqua Agreement is not authentic. That is more than enough to overcome the presumption of authenticity. See Metropolitan Mortgage Fund, 407 A.2d at 777-78 (denials under oath by

---

[2] Harte-Hanks contends that the Purported Dall'Acqua Agreement contains a choice of law provision whereby the Purported Dall'Acqua Agreement is to be interpreted in accordance with the laws of Maryland, the state where Dall'Acqua was employed. Because the Purported Dall'Acqua Agreement is not authentic, Dall'Acqua does not concede that Maryland law should be followed; Massachusetts provides the governing law. Nonetheless, except where otherwise indicated, there are no significant differences between applicable Massachusetts and Maryland law.

9

defendants that they had signed promissory notes was sufficient to overcome presumption and require plaintiff to prove the validity of the signatures); Wolfe, 352 A.2d at 916-17 (defendant's statement that she did not remember signing document or seeing it before was sufficient to overcome presumption of authenticity); see also Espositio v. Fascione, 299 A.2d 165 (R.I. 1973) (defendants testified that one of the defendants did not sign documents and presented court with samples of her signature; this overcame presumption of authenticity and plaintiff was required to prove authenticity of the signature). As Dall'Acqua has overcome the presumption of authenticity, Harte-Hanks has the burden of proving the authenticity of Dall'Acqua's signature on the Purported Dall'Acqua Agreement. Harte-Hanks has failed to make any such showing. See Metropolitan Mortgage Fund, 407 A.2d at 778 (after defendants met their burden to overcome presumption of authenticity, plaintiff failed to prove authenticity of signatures, even though court could not conclusively state that signatures were invalid).

Despite notice that Dall'Acqua challenged the authenticity of his alleged signature on the Purported Dall'Acqua Agreement, Harte-Hanks asserts that "[a] simple comparison of the signature [on the Purported Dall'Acqua Agreement] with his signature on other documents in his personnel file reveals that this claim is fabricated." (Id. at p. 10). To the contrary, Dall'Acqua believes that such a simple comparison leads to the opposite conclusion (Dall'Acqua Aff. at ¶ 14), and a certified forensic document examiner agrees (Schuetzner Affidavit at ¶¶ 5-7). Harte-Hanks also offers the lay opinion of Dall'Acqua's former secretary, Dernoga, that the signature is his, while she admittedly did not witness Dall'Acqua sign the Purported Dall'Acqua Agreement. (See Dernoga Dec., filed concurrently with the Complaint). Dernoga is not a certified forensic document examiner; her lay opinion is irrelevant, inadmissible and insufficient

to rebut Dall'Acqua's unequivocal denial that he signed the Purported Dall'Acqua Agreement and supporting opinion of certified forensic document examiner Schuetzner.

Harte-Hanks has not shown that it has a likelihood of success on the merits. The burden of *proving* the authenticity of the signature lies with Harte-Hanks. Instead, Dall'Acqua has proved that the signature is a fake.

### b. In Any Event, There Was No Consideration for the Restrictive Covenant

Harte-Hanks also cannot establish a reasonable likelihood of success on the merits because it cannot establish that the restrictive covenant was supported by consideration. In order for a restrictive covenant to be enforceable, it must be supported by consideration and reasonably necessary to protect the legitimate business interests of the employer. Becker v. Bailey, 299 A.2d 835, 838 (Md. 1973); Sherman v. Pfefferkorn, 135 N.E. 568 (Mass. 1922); Avallone v. Elizabeth Arden Sales Corp., 183 N.E.2d 496 (Mass. 1962).

Here, there was no consideration for the restrictive covenant contained in the Purported Dall'Acqua Agreement. Harte-Hanks argues that Dall'Acqua's continued employment with Harte-Hanks after his alleged signature on the Purported Dall'Acqua Agreement serves as adequate consideration for the non-solicitation provision in the Purported Dall'Acqua Agreement, citing two Maryland cases in support. (Plaintiff's Memorandum in Support, at pp. 7-8, citing Mona Electric Group Incorporated v. Truland Service Corporation, 56 Fed. Appx. 108, 110, 2003 WL 40748, *2 (4th Cir) and Simko v. Graymar, 55 Md. App. 561, 563, 464 A.2d 1104, 1107 (Md. Ct. Spec. App. 1983)). However, these cases are contrary to recent governing Massachusetts' authority.

In Rellstab v. John Hancock Financial Services, Inc., No. 011281B, 2004 WL 1040748 (Mass. Super. March 24, 2004), the court held that consideration "more than merely continued

11

employment" was necessary to enforce a restrictive covenant. Similarly, in Ikon Office Solutions, Inc. v. Belanger, 59 F. Supp. 2d 125, 131 (D. Mass. 1999), applying Massachusetts law, the court held that "the courts now appear to refuse to enforce non-competition and non-solicitation agreement when the only purported consideration is the employee's continued employment," and that "in order for a restrictive covenant to withstand scrutiny, some additional consideration [other than continued employment] ought pass to an employee upon the execution of a post-employment agreement."

The only consideration for the Purported Dall'Acqua Agreement asserted by Harte-Hanks is Dall'Acqua's continued employment. Thus, under Massachusetts law, the restrictive covenant is unenforceable for lack of consideration.

**3.     The Balance of Equities Favors Dall'Acqua Rather Than Harte-Hanks.**

Harte-Hanks contends that if the preliminary injunction is granted, the potential harm to Dall'Acqua is slight, as he would only be prohibited from soliciting Harte-Hanks' employees. (Plaintiff's Memorandum in Support, p. 11). However, that argument ignores that Dall'Acqua did not sign the Purported Dall'Acqua Agreement or agree to the restrictions contained therein. Thus, the harm to Dall'Acqua if the preliminary injunction is granted is that Dall'Acqua will be prohibited from contacting and recruiting Harte-Hanks' employees -- competitive conduct that he has every right to pursue. The restrictions sought by Harte-Hanks would serve as an unwarranted restraint on competition. Dall'Acqua should be free to recruit Harte-Hanks employees, as he agreed to no restriction against such activity. Further, employees of Harte Hanks should be free to change employers (absent any enforceable restrictive covenants to the contrary) as they wish. As such, the balance of equities favors Dall'Acqua.

### 4. Public Policy Would Be Harmed By The Issuance of the Preliminary Injunction.

Harte-Hanks alleges that public policy favors the enforcement of reasonable restrictive covenants. To the contrary, "[t]he general policy considerations are that at-will employees should be allowed to change employers freely and competition should be encouraged." Augat, Inc. v. Aegis, Inc., 565 N.E.2d 415, 419 (Mass. 1991). See also, Holloway v. Faw Casson & Co., 552 A. 2d 1311, 1319 (Md. Ct. App. 1989) (restrictive covenants should not be used "as a sword to defeat the efficient competitor"). Public policy favors Dall'Acqua.

## IV. CONCLUSION

Harte-Hanks has failed to establish that it has a likelihood of success on the merits. Dall'Acqua has proven that he did not sign the Purported Dall'Acqua Agreement; it is a fake. Moreover, the Purported Dall'Acqua Agreement is not supported by adequate consideration. Given the probability that Dall'Acqua will succeed on the merits, a preliminary injunction would serve as an unwarranted restraint on lawful competition by Dall'Acqua and on the rights of Harte-Hanks' employees to change employers freely. The equities favor Dall'Acqua, and a preliminary injunction would be against the public policies of both Massachusetts and Maryland.

For all of the foregoing reasons, Dall'Acqua respectfully requests that this Court deny Harte-Hanks' Motion for Preliminary Injunction.

Dated: July 30, 2004 Respectfully submitted,

CHARLES R. DALL'ACQUA

By: */s/ John F. Rooney, III*
　　　John F. Rooney III
　　　Angela L. Lackard
　　　MELICK, PORTER & SHEA, LLP
　　　28 State Street
　　　Boston, MA  02109
　　　(617) 523-6200

　　　Susan C. Levy
　　　Carla J. Rozycki
　　　Darren M. Mungerson
　　　JENNER & BLOCK, LLP
　　　One IBM Plaza
　　　Chicago, IL  60611
　　　(312) 222-9350

　　　Attorneys for Defendants Charles R.
　　　Dall'Acqua and Protocol Services, Inc.

14

## CERTIFICATE OF CONSULTATION

      Pursuant to Rule 7.1(A) of the Local Rules of this Court, I certify that counsel conferred in a good faith attempt to resolve or narrow the issues presented by the Plaintiff's motion, but were unable to do so.

                                          */s/ John F. Rooney, III*  
                                          John F. Rooney, III