UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| HARTE-HANKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.04-11548-DPW |
| | ) | |
| CHARLES R. DALL'ACQUA and | ) | |
| PROTOCOL MARKETING GROUP, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY MEMORANDUM IN FURTHER SUPPORT OF
PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

Dated: August 9, 2004

HARTE-HANKS, INC.,

By its attorneys,

David B. Chaffin
BBO No. 549245
Kathleen A. Kelley
BBO No. 562342
HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
(617) 330-5000

**Preliminary Statement**

Defendants' position boils down to the internally inconsistent argument that Harte-Hanks has not shown a likelihood of success on the merits because Mr. Dall'Acqua's signature on the non-solicitation agreement is a forgery and, even if it is not a forgery, the agreement is not supported by adequate consideration. Defendants do not dispute that if the agreement is enforceable, he has breached it and, unless stopped, will continue to breach it. Nor do they deny that absent injunctive relief, Harte-Hanks will be irreparably harmed. Nor do they make much of an effort to show that the balance of the harms tips their way or that the public interest would be adversely affected were an injunction to issue. Very little, therefore, is at issue.

In support of the forgery claim, Defendants offer a handwriting expert's affidavit, in which it is said that there are differences between the signature on the agreement and other signatures by Mr. Dall'Acqua, that the "signature **may be** an attempt to simulate or trace an authentic signature," and that "there is **no evidence** to indicate that the person who prepared the signature" in the agreement prepared the other signatures by Mr. Dall'Acqua. They also offer Mr. Dall'Acqua's assertions that he did not sign and had never seen the agreement, that the signature on the agreement is different (in specific respects) from his signature, and that, apparently, he could not have signed the agreement because he was traveling on the date the agreement bears. The inadequate-consideration argument is simply that the sole consideration for the agreement was continued employment, and, under Massachusetts law, continued employment is insufficient consideration to support an agreement such as is at issue.

Short work can be made of the consideration argument. Under the argument, Maryland law applies. Under Maryland law, continued employment is adequate consideration. (Further, Defendants misread Massachusetts law. Further still, Mr. Dall'Acqua had consideration in

spades. His salary alone was well over $300,000. He made hundreds of thousands of dollars more by exercising options on Harte-Hanks stock.)

The forgery argument, while not as quickly dispatched, is no less flawed. In the pages that follow, Harte-Hanks demonstrates, based principally on Mr. Dall'Acqua's own records, that his suggestion that he could not have signed the agreement because he was traveling on the date in question is false. Mr. Dall'Acqua is thus shown to have bent, if not broken, the truth, which alone would justify a finding against him.

In the pages that follow, Harte-Hanks also provides a detailed and heavily documented account of the events and circumstances surrounding the execution and handling of the agreement. The account demonstrates that (a) Mr. Dall'Acqua was well aware of, and supported, the company-wide effort to have employees sign agreements such as the one at issue, and was shown drafts of the agreements before he signed; (b) just days before Mr. Dall'Acqua signed, Elaine Dernoga, who was and is the Human Resources Administrator for the Harte-Hanks office that was Mr. Dall'Acqua's base of operations, and who was Mr. Dall'Acqua's assistant, was specifically tasked with having Mr. Dall'Acqua and two other vice presidents sign confidentiality/non-solicitation agreements; (c) the two other vice presidents signed their agreements two days before Mr. Dall'Acqua signed his; (d) Mr. Dall'Acqua's agreement bears Ms. Dernoga's signature, and she would not have signed it had Mr. Dall'Acqua not signed first; (e) Mr. Dall'Acqua's agreement was retrieved recently by Ms. Dernoga from Mr. Dall'Acqua's personnel file, where it had been for over two years; (f) the agreement would never have been added to the file had Ms. Dernoga not obtained Mr. Dall'Acqua's signature and then signed it herself; and (g) the file was under lock and key and accessible only to Ms. Dernoga from the time it was placed in the file until it recently was faxed to Harte-Hanks's home offices in exactly the

2

form it is in today. Notably, in the typical forgery case, the document bears a single challenged signature. The agreement here bears two signatures. To accept Mr. Dall'Acqua's argument, one must explain away the presence of Ms. Dernoga's signature or accept that Ms. Dernoga forged Mr. Dall'Acqua's signature and is lying. There is no explanation for the presence of Ms. Dernoga's signature on the agreement other than that Mr. Dall'Acqua signed it too. Ms. Dernoga did not forge the signature, and she is not lying.

In the pages that follow, Harte-Hanks also demonstrates that it is simply not true that, as Mr. Dall'Acqua claims, the signature on the agreement does not look, to the untrained eye, like his signature. Most of the things that he claims are distinctive about the signature in question appear in other examples of his signature.

In the pages that follow, and through its separate motion to strike, Harte-Hanks also demonstrates both that the **admissible** opinion of its handwriting expert is that the signature on the agreement is Mr. Dall'Acqua's, and that Defendants' expert's opinion is not admissible because it is neither probative nor reliable. Harte-Hanks's expert arrived at his opinion in a scientifically sound and methodologically reliable fashion; Defendants' expert did not. Harte-Hanks's expert refrained from opining as to issues that are beyond a handwriting expert's ken; Defendants' expert did not. Most important, Harte-Hanks's expert opines as to the salient issue; Defendants' expert does not.

In the end, the Court should be in this position with respect to the one issue as to which there is any real dispute: On the one hand, it will have a denial by a defendant who not only has a motive to prevaricate, but also has been shown to have prevaricated, and a weak, if not worthless, opinion from Defendants' expert. On the other, the Court will have extensive evidence that Mr. Dall'Acqua signed the agreement, extensive evidence inconsistent with a

finding of forgery, a credible and admissible opinion that the signature is Mr. Dall'Acqua's, and the patent implausibility, given all the circumstances, of the claim that someone at Harte-Hanks forged the signature. Under these circumstances, the decision as to the forgery claim will be, it is respectfully submitted, easy.[1]

It bears repeating that Defendants' focus is on the merits and that they say almost nothing about the harm that would befall Harte-Hanks were injunctive relief denied. There is a good reason for this. The prediction of employee cherry-picking that appears in Harte-Hanks opening brief has come true. Three days ago, the co-CFO of a major Harte-Hanks business unit submitted his resignation. He advised Harte-Hanks's CFO that he had been convinced by Mr. Dall'Acqua to leave Harte-Hanks for a position with Protocol. This gentleman, Joel Bakal, has been a star at Harte-Hanks. He has been among the top five of the 200 accountants at Harte-Hanks. Losing him will have immediate adverse consequences at Harte-Hanks. Replacing him will be very difficult, if not impossible, and very costly. Mr. Bakal is at least the second valued employee whom Harte-Hanks has lost due to Mr. Dall'Acqua's breach. (Supplemental Declaration of Dean H. Blythe, ¶¶ 8-10.) Clearly, Mr. Dall'Acqua is using non-public information concerning qualifications and compensation to strip Harte-Hanks of valued employees. Clearly, his flouting of the non-solicitation agreement has badly hurt Harte-Hanks and, if not stopped, will hurt it further.

---

[1]     Even if the decision were not easy, injunctive relief would still be appropriate. Because the irreparable harm element is not challenged, Harte-Hanks's burden with respect to the merits is lessened.

**Statement of Additional Facts**[2]

**November-December 2001 – The Company-Wide
Effort To Have Employees Sign Agreements And Mr.
Dall'Acqua's Knowledge Of And Role In The Effort**

In late 2001, Harte-Hanks's management, Human Resources Department, and Legal

Department undertook a review of company employment records and agreements, with an eye to

ensuring that they were consistent throughout the management and executive ranks of the

company and in compliance with company policy. Various Harte-Hanks managers discussed

appropriate agreements to be obtained and identified employees who would be required to sign

the agreements. (Gray Dec., ¶ 3; Blythe Dec., ¶ 5.) Drafts of these agreements, including

confidentiality/non-solicitation agreements like the one at issue, were provided to Mr.

Dall'Acqua. Mr. Dall'Acqua supported having employees sign such agreements. (Gray Dec., ¶¶

4, 5.)

**January 2002 – Mr. Dall-Acqua's Signature Of The Agreement**

In January 2002, Ms. Dernoga was the Human Resources Administrator at the Glen

Burnie, Maryland, office of Harte-Hanks. She also was Mr. Dall'Acqua's assistant. As Human

Resources Administrator, she was responsible for implementing and administering personnel

policies applicable to Harte-Hanks employees in Maryland. She was also responsible for

maintaining the personnel files for those employees. (Supp. Dernoga Dec., ¶ 2.)

At all relevant times (i.e., since January 2002), the personnel files for Harte-Hanks's

Maryland employees, including Mr. Dall'Acqua, have been in a file cabinet in Ms. Dernoga's

---

[2]    The Statement of Additional Facts is based on and supported by declarations previously submitted and the accompanying supplemental declarations of: Elaine Dernoga ("Supp. Dernoga Dec."), Paul Steven Hacker ("Supp. Hacker Dec."), Dean H. Blythe ("Supp. Blythe Dec.") and original declarations of Willa J. Gray ("Gray Dec."), James Davis ("Davis Dec."), Charles M. Howard ("Howard Dec."), and Charles M. Shure ("Shure Dec.").

5

office in Glen Burnie. The cabinet is always locked, except when Ms. Dernoga accesses it, and she has the only key. She keeps the key to the cabinet on her key ring, which she keeps with her at all times. She does not permit anyone access to the cabinet because the personnel files contain confidential information concerning employees' salary, benefits, bonuses, etc. Ms. Dernoga keeps her office locked when she is not in the Glen Burnie offices. During office hours, her office door is left open, but the file cabinet is locked except when she is accessing it. Ms. Dernoga has never seen any evidence that the file cabinet or any of its contents have been tampered with. When the offices are closed, they are locked, and only authorized personnel with a key can enter. The offices have never been burglarized. (Supp. Dernoga Dec., ¶¶ 3, 4.)

In January 2002, Ms. Dernoga received an e-mail from Chuck Platto, an attorney who advises Harte-Hanks, outlining company policy with respect to the review of employee agreements and the plan for making Harte-Hanks's employment records and agreements consistent. Mr. Platto attached to his e-mail copies of standard Confidentiality/Non-Disclosure Agreements for regular employees and "temps," a standard Non-Compete Agreement, and an "explanatory memo of reasons for confidentiality/non-disclosure agreements." Ms. Dernoga forwarded a copy of the e-mail, with attachments, to her Human Resources counterpart in Philadelphia on January 22, 2002. (Supp. Dernoga Dec., ¶¶ 5-7.)

As Human Resources Administrator for Harte-Hanks in Maryland, it was Ms. Dernoga's job to make sure that the three vice presidents in her area – Mr. Dall'Acqua, Kevin Sweeney, and Charles Howard – signed the Confidentiality/Non-Disclosure Agreement that was attached to Attorney Platto's memorandum and to maintain the executed agreements in the respective personnel files. (Supp. Dernoga Dec. at ¶ 8.) Pursuant to her normal practice, Ms. Dernoga would have delivered Mr. Platto's memo, and the agreements to be signed, to Messrs.

Dall'Acqua, Sweeney, and Howard soon after she received the documents from Mr. Platto, and asked each of them to sign and return the agreement to her. Ms. Dernoga believes she followed this procedure in connection with Mr. Platto's memorandum and the agreements of Messrs. Dall'Acqua, Sweeney, and Howard. It was Ms. Dernoga's job to have the three gentlemen to sign these agreements, and it would have been an extreme deviation from her customary practice not to have accomplished it. In fact, had one of them failed or refused to sign, she would have followed up as to why he had not, and she is quite sure she would have a memory of the discussion of the reason for the failure or refusal. Consistent with all this, Ms. Dernoga received originals of the Confidentiality/Non-Disclosure Agreements signed by Messrs. Sweeney and Howard on January 23, 2002, the day after she sent Mr. Platto's memorandum to her Philadelphia counterpart. (Copies of their agreements are submitted herewith, as is a declaration from Mr. Howard attesting to his signature of his agreement; Mr. Sweeney is no longer with the company.) Ms. Dernoga countersigned these agreements on behalf of Harte-Hanks and filed them in the appropriate personnel files, where they have been until recently. (Supp. Dernoga Dec., ¶¶ 9, 10; Howard Dec., ¶¶ 1-4.)

Ms. Dernoga also countersigned and dated the Confidentiality/Non-Disclosure Agreement bearing Mr. Dall'Acqua's signature and placed it in his personnel file. She dated it January 25, 2002. This is, of course, the same date that appears under Mr. Dall'Acqua's signature. This and other facts lead Ms. Dernoga to believe that Mr. Dall'Acqua delivered the signed document to her in person, although she does not specifically recall him doing so. Her inability to recall him doing so is understandable, for they exchanged documents hundreds of times over the eight years she worked as his assistant. She also does not recall seeing Mr. Dall'Acqua sign the agreement. **She is certain, however, that she did not sign the document**

**on his behalf. She is also certain that the signature appears to her to be Mr. Dall'Acqua's, and she is very familiar with his signature. Ms. Dernoga would not have signed the agreement or placed it in Mr. Dall'Acqua's personnel file unless she had received it under circumstances indicating to her that he had signed it. The agreement was under lock and key and accessible only to Ms. Dernoga from 2002 until recently.** (Supp. Dernoga Dec., ¶ 11.)

### Mr. Dall'Acqua's Travel Excuse Flies In The Face Of The Documentary Evidence

Mr. Dall'Acqua traveled extensively. He did not maintain an office at the Glen Burnie offices. Ms. Dernoga delivered his mail, memoranda, reports, etc. to him on a regular basis, either in person (at the Glen Burnie office when he stopped by, at the Baltimore-Washington International Airport ("BWI") in connection with an arrival or departure, at Mr. Dall'Acqua's home, or at some other location suggested by Mr. Dall'Acqua) or via FedEx it to him wherever he was. When she met with Mr. Dall'Acqua in person, it generally involved an exchange of documents rather than just a delivery. Mr. Dall'Acqua would give Ms. Dernoga notes or documents that she was to work on, file, etc. at the same time she delivered his items to him. Ensuring that Mr. Dall'Acqua received his mail, notice of phone calls, etc., was an important part of Ms. Dernoga's job as his assistant, and she took the responsibility very seriously. (Supp. Dernoga Dec., ¶ 12.)

It has long been Ms. Dernoga's practice to maintain spreadsheets showing the miles she puts on her car for business purposes in order to document her requests for reimbursement for the miles. The spreadsheets confirm the occurrence of regular off-site meetings with Mr. Dall'Acqua to exchange mail and documents. In addition to the trips for which she sought

reimbursement, Ms. Dernoga at times also met Mr. Dall'Acqua at BWI on her way to or from work, depending on the time of Mr. Dall'Acqua's flights (coming or going). As the airport was on the route between her home to the office, she did not charge Harte-Hanks for mileage in connection with these meetings, and she did not record her miles. (Supp. Dernoga Dec., ¶¶ 13, 14.)

When Ms. Dernoga met Mr. Dall'Acqua at the airport, she usually met him at the upper level, across from the entrance to the garage where Mr. Dall'Acqua parked his car. Mr. Dall'Acqua did not check luggage during his business trips, and he therefore did not need to go to the baggage check area, which was on the lower level. (He frequently spoke of never checking bags; he was a seasoned traveler.) Depending on how busy the airport was, Mr. Dall'Acqua and Ms. Dernoga would meet for some period of time to discuss business issues or would just exchange mail/documents and leave. (Supp. Dernoga Dec. at ¶ 15 .)

The expense reimbursement form and receipts that were submitted by Mr. Dall'Acqua for the week ending Friday, January 25, 2002, and the records of Mr. Dall'Acqua's cellphone usage that day, rule out Mr. Dall'Acqua's suggestion that he could not have signed the agreement that day because he was traveling. Mr. Dall'Acqua's itinerary called for him to arrive in Baltimore at 5:12 p.m. His cellphone records indicate that he arrived a bit early, showing that he placed a call at 5:06 p.m. The receipt he submitted for parking shows that he exited the garage at the airport at 5:28 p.m. (when, according to the cellphone record, he promptly placed another call). There was, therefore, a window of time that day during which Mr. Dall'Acqua was at BWI and during which he and Ms. Dernoga could have met. The window was at the close of the business day and is consistent with Ms. Dernoga's having met with him on her way home, which is consistent, in

9

turn, with her mileage log showing no entry for January 25, 2002. (Supp. Dernoga Dec., ¶¶ 16, 17.)

**The Circumstantial Evidence Corroborates
That The Signature Is Mr. Dall'Acqua's**

In summary, the evidence shows that Ms. Dernoga was engaged in obtaining the three vice presidents' signatures during the week ending January 25, 2002. It also shows that this was part of a broader effort to have personnel sign confidentiality and non-solicitation and/or non-competition agreements, and that Mr. Dall'Acqua was well aware of, and supported, this effort. The evidence also shows that Mr. Dall'Acqua's travel on January 25, 2002, is not inconsistent with his having signed the agreement that day; on the contrary when his actions that day are traced, they show his presence at BWI for a window of time during which a meeting very well could have occurred pursuant to Ms. Dernoga's practice of meeting him at BWI to exchange documents. The evidence also shows that Ms. Dernoga would not have signed the agreement unless Mr. Dall'Acqua had signed it first. And it shows that Ms. Dernoga would not have placed his agreement in his personnel file unless she had received it under circumstances that led her to believe that he had signed it. Further, the evidence is that the agreement was in Mr. Dall'Acqua's personnel file, under lock and key and accessible only to Ms. Dernoga, from January 2002 until recently, when Ms. Dernoga sent it, in the same form, to Harte-Hanks's main offices in Texas (under the circumstances described below). Ms. Dernoga, the only person who had access to the agreement, and the only person who could have forged Mr. Dall'Acqua's signature categorically denies that she forged Mr. Dall'Acqua's signature. (Supp. Dernoga Dec., ¶ 18; Supp. Hacker Dec., ¶ 7.)

**Mr. Dall'Acqua's Compensation**

Over the last six years of his employment at Harte-Hanks, Mr. Dall'Acqua's salary and bonus were:

| YEAR | BASE SALARY | BONUS | TOTAL |
|------|-------------|-------|-------|
| 1998 | $255,000 | $148,000 | $403,000 |
| 1999 | $275,000 | $40,000 | $315,000 |
| 2000 | $300,000 | $148,000 | $448,000 |
| 2001 | $320,000 | -------- | $320,000 |
| 2002 | $320,000 | $5,000 | $325,000 |
| 2003 | $320,000 | $22,000 | $342,000 |
| 2004 | $340,000 | ------- | $340,000 |

(Supp. Hacker Dec., ¶ 2.)  In addition, he was granted options for tens of thousands of shares of Harte-Hanks stock (which is listed on the New York Stock Exchange) and exercised many of those options, reaping hundreds of thousands of dollars in profit.  (Supp. Hacker Dec., ¶ 2.)

**February-March 2004 – Mr. Dall'Acqua Is Fired**
**For Soliciting Employees To Join Him Elsewhere**

In or about February-March 2004, it came to Harte-Hanks's attention that Mr. Dall'Acqua had been telling other Harte-Hanks executives that he could obtain attractive positions for them at the company with which he was considering taking a position.  Based on this behavior, Harte-Hanks terminated Mr. Dall'Acqua on March 5, 2004, effective immediately.  (Supp. Blythe Dec., ¶¶ 2-5; Davis Dec., ¶¶ 2-5.)

**May 2004 – Mr. Dall'Acqua's Raiding**

In May 2004, Harte-Hanks received indications that Mr. Dall'Acqua again was soliciting Harte-Hanks employees, this time for his new company, defendant Protocol Services, Inc.  Paul

Steven Hacker is Harte-Hanks's Vice President, Legal and Secretary. He works at Harte-Hanks's headquarters in San Antonio. He investigated the reports concerning Mr. Dall'Acqua's solicitation and sought any agreements between Mr. Dall'Acqua and Harte-Hanks that might cover it. Mr. Hacker was advised that Mr. Dall'Acqua had signed a Confidentiality/Non-Disclosure Agreement that would apply. He contacted Billie Gray, a Vice President of Human Resources at Harte-Hanks who works out of the St. Petersburg, Florida office, and asked her about Mr. Dall'Acqua's agreement/file. He was told that the agreement would be in Mr. Dall'Acqua's personnel file, which was in Maryland. Ms. Gray said that she would help get the agreement to Mr. Hacker. (Supp. Hacker Dec., ¶¶ 4-6; Dernoga Supp. Dec., ¶ 19.)

Ms. Gray sent Ms. Dernoga an e-mail on May 28, 2004 (the Friday before the Memorial Day weekend), asking if Mr. Dall'Acqua had signed the Confidentiality/Non-Disclosure Agreement and asking Ms. Dernoga to forward it if he had. Ms Dernoga was out of the office when the email came in and did not have access to the file, but she was able to respond to the email. She told Ms. Gray that she thought he had signed the agreement and said that she would retrieve it on Monday (she forgot that the office would be closed due to the holiday). (Supp. Dernoga Dec., ¶¶ 19-20.)

On Tuesday, June 1, 2004, Ms. Dernoga took the agreement out of Mr. Dall'Acqua's personnel file, which was in the cabinet described above, and personally faxed it to Faye Sowell, Mr. Hacker's assistant. Ms. Dernoga used the fax machine in her own office. The number of the machine is (410) 412-1801. (Supp. Dernoga Dec., ¶¶ 21, 22; Supp. Hacker Dec., ¶ 7.) The document Ms. Sowell received from Ms. Dernoga is a copy of the agreement on which Harte-Hanks sues; in other words, it bears Mr. Dall'Acqua's signature. It also bears the number (410) 412-1801. (Supp. Dernoga Dec., ¶¶ 22, 23; Supp. Hacker Dec., ¶ 7.)

<u>Argument</u>

## DEFENDANTS' ARGUMENTS
## <u>ARE UNAVAILING</u>

Defendants' opposition is unusual, for they place nearly all of their eggs in a merits basket. They do not contend that Harte-Hanks would not be irreparably harmed were Mr. Dall'Acqua to continue (as he has, even since the opposition was filed) poaching Harte-Hanks's best employees. Nor do they argue with any conviction that the balance of the hardships tilts toward Mr. Dall'Acqua. Indeed, their argument on this subject is largely a re-argument of their claims concerning the enforceability of the agreement and does not independently assess the relative hardships. In any event, given Defendants' apparent concession of the irreparable harm issue and Mr. Dall'Acqua's continued poaching, they cannot win on this issue. Defendants' argument as to the public interest is a throwaway.

With respect to the merits, the battle is one of fact, not law, with one exception. That exception – the lack of consideration argument – is hardly worth mentioning. It will be addressed first, however, so that the argument below will end on the only issue of interest – whether Mr. Dall'Acqua's forgery claim will permit him to evade an injunction that will stop him from cherry-picking Harte-Hanks's employees while unfairly armed with confidential information concerning competencies and compensation.

## A.    Defendants' Lack Of Consideration
## Argument Is Fatally Flawed

Defendants' argument as to consideration is that even if Mr. Dall'Acqua did sign the agreement, it is unenforceable because he was paid nothing to sign, and continued employment is inadequate consideration for such an agreement. Through the hole in this argument a truck could pass. The argument assumes the agreement was executed and is in effect. The agreement

contains a choice-of-law provision that is enforceable. Under the provision as applied to Mr. Dall'Acqua, Maryland law applies. Under Maryland law, continued employment is sufficient consideration for a restrictive covenant.[3] (All of this was explained at pages 7-8 of the Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment.)

**B.    Defendants' Forgery Claim Is Meritless**

Harte-Hanks is required to show a likelihood of success on the forgery issue, but it "need not demonstrate that there is no chance that it will lose." A.W. Chesterton Co. v. Chesterton, 907 F. Supp. 19, 22 (D. Mass. 1995). A sliding scale applies with respect to the merits: "The greater the harm the less emphasis need be placed on the likelihood of success on the merits." Aerovox, Inc. v. Parallax Power Components, LLC, 281 B.R. 419, 433 (Bankr. D. Mass. 2002) (citing A-Copy, Inc. v. Michaelson, 599 F.2d 450, 451 (1st Cir. 1978)). At most, Harte-Hanks need show only that the "probable outcome[]" is that the forgery claim will be rejected by the trier of fact. See, e.g., Campbell Soup Co. v. Giles, 47 F.3d 467, 472 (1st Cir. 1995) (at preliminary injunction stage, court determinations are only statements as to probable outcomes) (citations omitted). As noted, Defendants do not dispute that Harte-Hanks will be irreparably harmed, nor, for the reasons discussed above, could they. Accordingly, less emphasis need be placed on the likelihood that Harte-Hanks will succeed. This is not to say, however, that Harte-Hanks is in need of a diminished emphasis on the merits. A close examination of the evidence indicates that it weighs heavily in Harte-Hanks's favor. Defendants have not rebutted the presumption.

---

[3]        Defendants' attempt to inject Massachusetts law into the mix is more cherry picking.

1. **The evidence that Mr. Dall'Acqua signed the agreement is compelling.**

a.     Ms. Dernoga is very familiar with Mr. Dall'Acqua's signature, and she has sworn that the signature on the agreement appears to be Mr. Dall'Acqua's. By virtue of her familiarity with Mr. Dall'Acqua's signature, Ms. Dernoga's opinion that the signature on the agreement is his is an admissible, probative lay opinion as to the genuineness and authenticity of the signature. See, e.g., United States v. Scott, 270 F.3d 30 (1st Cir. 2000).

b.     The signature on the agreement is, to the naked eye, nearly identical to other unchallenged examples of Mr. Dall'Acqua's signature. Compare Complaint and Demand for Trial by Jury ("Complaint"), Ex. A at 2 with Declaration of Paul Steven Hacker, July 5, 2004 ("Hacker Dec."), Ex. C, and Affidavit of Ellen Mulcrone Schuetzner ("Schuetzner Aff."), Ex. C, last two pages.

c.     The circumstantial evidence corroborates that Mr. Dall'Acqua signed the agreement on January 25, 2002. As noted above, in the months leading up to January 25, 2002, a push was underway at Harte-Hanks to have certain employees execute confidentiality, non-solicitation, and/or non-competition agreements; Mr. Dall'Acqua was not only aware of this push, he had seen drafts of the proposed agreements and had supported the effort. (This is documented.) Shortly before January 25, 2002, Ms. Dernoga, who was the Human Resources Administrator for the Maryland office that was Mr. Dall'Acqua's home base, was tasked with getting the three vice presidents who worked in Maryland, Messrs. Dall'Acqua, Sweeney, and Howard, to sign such agreements. (This is documented.) Ms. Dernoga obtained the signatures of Messrs. Sweeney and Howard, who worked in, not out-of, the Maryland office, on January 23, 2002, and she counter-signed their agreements that day. (This is documented.) These

documented circumstances obviously are consistent with and corroborative of Mr. Dall'Acqua's having signed the agreement on January 25, 2002.

        **d.**      Other testimony by Ms. Dernoga corroborates that Mr. Dall'Acqua signed the agreement. (1) The suggestion by Mr. Dall'Acqua that he did not sign the agreement necessarily implies that Ms. Dernoga would not have accomplished her assignment to have the three vice presidents sign their respective agreements. As Ms. Dernoga has explained, this was not her way. She is, as Mr. Dall'Acqua's attempt to hire her away from Harte-Hanks after eight years as his assistant indicates, very conscientious. She would not have simply dropped the ball on this assignment. Further, she has no memory of Mr. Dall'Acqua's having refused to sign. (2) As Ms. Dernoga has explained, her practice is to sign and file an agreement only after the employee has signed. Given this practice, the presence of her signature on Mr. Dall'Acqua's agreement indicates that she received it back from Mr. Dall'Acqua with his signature on it and then signed, dated, and filed it. (3) As Ms. Dernoga has explained, she retrieved the original of Mr. Dall'Acqua's agreement from his personnel file on June 1, 2004, and personally faxed it to Texas, using the fax machine in her office. The document received in Texas has Mr. Dall'Acqua's signature on it. As Ms. Dernoga has explained, Mr. Dall'Acqua's personnel file, including the agreement, have been under lock and one key for years. There is no evidence whatsoever that anyone else had access to his file after January 25, 2002. Ms. Dernoga swears that Mr. Dall'Acqua's signature was on the agreement when she pulled it from the file. Under these circumstances, if the signature is a forgery, Ms. Dernoga is lying. And, unless she is an expert forger (If the signature is a forgery, it clearly is a good one; Defendants' expert could only say that it "may be" a forgery.), a forger had to be involved. And, unless Ms. Dernoga has ready access to expert forgers, she had to find one to do the forgery. This scenario, on which Mr.

Dall'Acqua's forgery claim depends, is beyond the realm of reason; indeed, only a conspiracy theorist would give it any credence. Also beyond the realm of reason is any claim that Ms. Dernoga is lying. Unlike Mr. Dall'Acqua (who also may have simply forgotten that he signed the agreement), she has no motive to lie. Further, what she has said indicates that she is not lying. If she really wanted to put the wood to Mr. Dall'Acqua by lying, why did she not make up a better lie? Why has she not said that she recalls having seen him sign the agreement? Better yet, why did she not gin up a non-competition agreement that could be used to force Mr. Dall'Acqua to leave his new job entirely? She is not lying.

      e.      Finally, a handwriting expert, Charles M. Shure, swears that his examination of the original signature revealed no indication of a forgery or tracing and that it is more likely than not to probable that the signature on the agreement is Mr. Dall'Acqua's. (Shure Dec.) His opinion, which is only summarized here, is, in contrast to the opinion offered by Defendants' expert, admissible, credible, and probative in that it is based on appropriate methodology, addresses only matters as to which such an expert should be opining, offers an opinion as to the issues that are actually presented, and does not go too far.

      **2.**      **The "evidence" in support of the forgery claim is thin gruel.**

      a.      Defendants' "proof" includes three assertions by Mr. Dall'Acqua.[4]

---

[4]      Mr. Dall'Acqua also says that on March 5, 2004, the day after he was terminated, Dean Blythe, Harte-Hanks's CFO, said that Harte-Hanks would pay him five months of severance (i.e., over $130,000) if Mr. Dall'Acqua would sign a noncompetition and nonsolicitation agreement. (Defendants' Memo at 3.) The suggestion, apparently, is that this offer would have been unnecessary if the agreement at issue was in place. The suggestion is incorrect. Mr. Blythe admits that he spoke with Mr. Dall'Acqua, but says that he was unaware at the time that Mr. Dall'Acqua had signed the agreement at issue, and he explains why he was unaware. Mr. Blythe told Mr. Dall'Acqua that the company would pay him severance if he would sign an agreement that would contain non-competition and non-solicitation provisions. (Supp. Blythe Supp. Dec., ¶¶ 6, 7.) (With Mr. Blythe, as with Ms. Dernoga, his statements are credible because if he were lying, the lie would be better. If he were lying, Mr. Blythe would be denying that the conversation took place at all.) Notably, the conversation was well before Ms. Dernoga sent Mr. Dall'Acqua's agreement to the home offices in Texas, where Mr. Blythe works and lives.

First, he says that he was not asked to sign any restrictive covenants of any sort, that he did not sign the agreement, and that he never saw the agreement before June 2004. How convenient. Does Mr. Dall'Acqua, who was involved in and supported the push to sign executives to restrictive agreements, really expect the trier of fact to believe that he escaped that push unscathed? Does he really expect the trier of fact to ignore his motive to deny? Even before he was offered the job with Protocol, Mr. Dall'Acqua was attempting to persuade Harte-Hanks employees to join him at his prospective new employer. Now that he is with Protocol, he is poaching with a vengeance. Clearly, he sees great value in being able to hire the best and brightest away from Harte-Hanks. And well he should. Since he knows who is good and how much they make, he can avoid the risks that blind recruiting entails and, more important, he can negotiate compensation armed with information that usually is not available to a hirer. Indeed, he values this poaching so much that he has continued to do it while Harte-Hanks's motion for a preliminary injunction is pending. Timid and unmotivated to deny Mr. Dall'Acqua is not.

Second, he says that he was traveling on January 25, 2002, the obvious implication being that he therefore could not have signed the agreement that day. As discussed above, Mr. Dall'Acqua's own expense report and cellphone records demonstrate that this is not true. (Notably, Mr. Dall'Acqua submitted with his opposition papers only the cover page of the expense report. He did not submit the garage receipt that shows him leaving the airport garage at 5:28 p.m., smack in the middle of commuting time.)

Third, he says that the signature on his agreement does not look, apparently to his eye, like his actual signature because (a) the curves are different, (b) the letters are not connected the way they are in his signature, (c) the signature is above the line, and (d) the signature is in felt tip pen. There are two problems with these alleged distinctions. The first is that, to the untrained

18

eye, his signatures vary. (Schuetzner Aff., Ex. C.)  The second is that, to the untrained eye, (a) the curves of the signature on the agreement are the same as the curves of other samples of his signature (compare Complaint, Ex. A at 2 with Hacker Dec., Ex. C, and Schuetzner Aff., Ex. C, last two pages), (b) the letters of the signature on the agreement are connected in the same way that the letters are connected in other samples (id.), and (c) in other samples, the signature is above the line (Schuetzner Aff., Ex. C, first, third, eighth, and ninth pages).  (Harte-Hanks has not yet found another signature in felt tip pen, but the search continues.)

      **b.**     The only other "proof" of any moment that Defendants offer in support of the forgery claim is a handwriting expert's opinion.  When the opinion is evaluated against the standards for admissibility of expert testimony and parsed, it does not pass muster.  The legal insufficiency of her opinion is demonstrated in Harte-Hanks's separate motion to strike and, to avoid duplication, will not be discussed in detail here.  Assuming the motion to strike is not granted in its entirety, Mr. Dall'Acqua would still be left with little in the way of evidence supporting his position.

     Ms. Schuetzner says three things.  First, she points out that there are differences between the signature on the agreement and other "known" signatures by Mr. Dall'Acqua.  (Schuetzner Aff., ¶ 5.)  This proves nothing, because there unquestionably are also differences among the "known" signatures.  She then says that the signature on the agreement "may be an attempt to simulate or trace an authentic signature."  (Id., ¶ 6.)  This is speculation, not proof.  She also says that "there is no evidence to indicate that" the person who signed Mr. Dall'Acqua's "known" signatures also signed the agreement.  (Id., ¶ 7.)  This statement obviously is based on the prior two statements (especially the first), which are, as noted, fatally flawed.  It falls with them.  Further, she is not competent to opine as to the state of the evidence.  The statement is as to a

subject that is not within the ken of a handwriting expert.  To advance the ball, opinions to a

reasonable degree of certainty as to (1) whether the document is a forgery and (2) whether the

signature is Mr. Dall'Acqua's are needed.  Ms. Schuetzner offers neither.

## Conclusion

For the foregoing reasons, and the reasons set forth its first memorandum of law, Harte-

Hanks respectfully requests that the Court issue a preliminary injunction prohibiting Dall'Acqua

from "attempt[ing] directly or through others to influence any employee of Harte-Hanks to

terminate their employment with Harte-Hanks or to recruit Harte-Hanks employees for other

employment."[5]

Dated: August 9, 2004                             HARTE-HANKS, INC.,

By its attorneys,

David B. Chaffin
BBO No. 549245
Kathleen A. Kelley
BBO No. 562342
HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
(617) 330-5000

422004.0804

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the
above document was served upon the
attorney of record for each other party
by mail/hand on

---

[5]      In the alternative, in the unlikely event that the Court considers the "question [to be] close," Harte-Hanks requests an evidentiary hearing at the Court's earliest opportunity.  See, e.g., Rosario-Urdaz v. Rivera-Hernandez, 350 F.3d 219, 223 (1st Cir. 2003).

20