UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., <br><br> Plaintiff, <br><br> v. <br><br> CHARLES R. DALL'ACQUA and <br> PROTOCOL MARKETING GROUP, <br><br> Defendants. | Civil Action No.: 04-11548-DPW |

## SUPPLEMENTAL DECLARATION OF ELAINE DERNOGA

I, Elaine Dernoga, state, under the penalties of perjury:

1. I am over the age of 21. I submit this declaration to supplement the information provided in my previous (July 7, 2004) declaration. The statements in this supplemental declaration are based on my personal knowledge, unless otherwise indicated.

2. In January 2002, in addition to my duties as assistant to Mr. Dall'Acqua, I was employed as Human Resources Administrator at the Glen Burnie, Maryland office of Harte-Hanks. I was responsible for implementing and administering personnel policies applicable to Harte-Hanks employees in Maryland, and I was also responsible for the personnel files on those employees.

3. From January 2002 to the present, all personnel files for Harte-Hanks's Maryland employees, including the personnel file of Mr. Dall'Acqua, were in a file cabinet in my office in Glen Burnie. This file cabinet was always locked, except when I accessed it, and I had the only

key. I kept the key to the cabinet on my key ring, which I kept with me at all times. My car and home keys are also on the ring, so I had to take the ring with me whenever I left the office. I did not permit anyone access to the cabinet because the personnel files contained confidential information concerning the employees' salaries, benefits, bonuses, etc. I never noticed any evidence that the file cabinet or any of its contents were ever tampered with. The offices were never burglarized.

4. In January 2002, there were approximately twenty-five people employed at the Glen Burnie offices. From then until now, no other Human Resources employees has had access to the file cabinet containing the personnel files. When the office was closed, the offices were locked, and only authorized individuals with keys to the suite could enter. Within the suite, my office was locked when I was not there. During office hours, my office would be open, but, again, the file cabinet was locked unless I was accessing it.

5. In or about January 2002, I received an e-mail from Chuck Platto, an attorney who represented Harte-Hanks, to which were attached copies of standard Confidentiality/Non-Disclosure Agreements for regular employees and "temps," a standard Non-Compete Agreement, and an "explanatory memo of reasons for confidentiality/non-disclosure agreements." Attached hereto as Exhibit A are true and correct copies of the e-mail memorandum, and attached agreements, that I received from Mr. Platto at that time.

6. While I do not recall the exact date of Mr. Platto's memo (and it is not dated) the agreements attached to the memo indicate that they had last been edited (in Microsoft Word) on January 9, 2002 (the Confidentiality Agreement) and January 10, 2002 (the Non-Compete Agreement). Based on this and other facts and circumstances (some of which are described

below), I am quite certain that the memorandum and the documents were sent to me after that time.

7. I recently reviewed my e-mail from that general period that is still available on my computer. I located a January 22, 2002 e-mail from myself to my Human Resources counterpart in Philadelphia, Terry Sykes, by which I forwarded a copy of Mr. Platto's memorandum to Ms. Sykes. To the best of my recollection, and logically, the exchange with Ms. Sykes occurred shortly after my original receipt of Mr. Platto's memo. Attached hereto as Exhibit B is a true and correct copy of the January 22, 2002 e-mail from me to Terry Sykes.

8. As Human Resources Administrator for Harte-Hanks in Maryland, it was my job to make sure that the three vice-presidents in my area -- Mr. Dall'Acqua, Kevin Sweeney, and Charles Howard -- signed the Confidentiality/Non-Disclosure Agreement that was attached to Attorney Platto's memo. My job was to handle the administrative side of the transaction, i.e., to obtain the executed agreements and to maintain them in the respective personnel files.

9. My normal procedure would have been to deliver Mr. Platto's memo, and the agreements to be signed, to Messrs. Dall'Acqua, Sweeney, and Howard relatively soon after I received those documents from Mr. Platto. I would have asked each of them to return the agreement to me after it was signed. I believe I followed this normal procedure in connection with Mr. Platto's memorandum. (I certainly have no reason to believe otherwise. Indeed, since it was my job to get these three gentlemen to sign these agreements (and, as Mr. Dall'Acqua can attest, I am persistent and conscientious), it would have been an extreme deviation from my customary process not to have accomplished this job. In fact, had one of them failed or refused to sign, I would have followed up as to why he had not, and I am quite sure I would have a

memory of the discussion of the reason for the failure or refusal.) Consistent with this, I received originals of the Confidentiality/Non-Disclosure Agreements signed by Messrs. Sweeney and Howard on January 23, 2002, the day after I sent a copy of Mr. Platto's memo to Ms. Sykes. I countersigned those documents on behalf of Harte-Hanks and filed them in the gentlemen's personnel files, where they sit today. (Copies are attached hereto as Exhibit C.)

10. In fact, I do recall that Mr. Howard objected to one of the paragraphs in the Confidentiality/Non-Disclosure Agreement which dealt with patent rights and ownership. I recall that when he raised his concern the paragraph was changed.

11. I also countersigned the Confidentiality/Non-Disclosure Agreement bearing Mr. Dall'Acqua's signature, and placed it in his personnel file. I placed the date January 25, 2002, under my signature, which is, of course, the same date as was used by Mr. Dall'Acqua. This leads me to believe that Mr. Dall'Acqua likely delivered the signed document to me in person. I do not recall the specific exchange, which was one of hundreds I had with Mr. Dall'Acqua over the years we worked together. Nor do I recall seeing Mr. Dall'Acqua sign the agreement. **I can state unequivocally, however, that (a) I did not sign the document on his behalf, (b) his signature looks like his signature, and I am very familiar with his signature, (c) the agreement has been under lock and key and accessible only to me since 2002, and (d) it is highly unlikely that anyone else had access to the document during the brief period between Mr. Dall'Acqua's receipt of it (unsigned) from me under the circumstances described below and my placing of it in his personnel file. I can also say unequivocally that the signature on the document is mine and that I would not have signed the document or placed it in his personnel file unless I had received it under circumstances indicating to me**

4

**that he had signed it and returned it to me. In other words, I would not have countersigned the document (and filed it) unless I had every reason to believe that Mr. Dall'Acqua had signed it.**

12. Mr. Dall'Acqua traveled much more than did Messrs. Sweeney and Howard. As I mentioned in my previous declaration, he did not maintain an office at the Glen Burnie offices. I would, therefore, deliver his mail, memoranda, reports, etc. to him, either in person (at the Glen Burnie office when he stopped by, the Baltimore-Washington International Airport in connection with an arrival or departure, Mr. Dall'Acqua's home, or another location suggested by Mr. Dall'Acqua) or, at his request, via FedEx to wherever he was. If I met with Mr. Dall'Acqua in person, it was a two-way exchange of documents. Mr. Dall'Acqua would deliver notes or documents that I was to work on, file, etc. to me at the same time I delivered his items to him. Ensuring that Mr. Dall'Acqua received his mail, notice of phone calls, etc., was an important part of my job as his assistant, and I took the responsibility very seriously. In the eight years I worked for Mr. Dall'Acqua, he never reprimanded me for failing to deliver his mail, etc. to him.

13. It has long been my practice to maintain a record of the business miles I put on my car, entered into a Microsoft excel spreadsheet, for purposes of obtaining reimbursement from the company. I have reviewed those records in connection with this matter, and the entries support my prior statement that I often met Mr. Dall'Acqua off-site to exchange mail and documents. Attached hereto as Exhibit D is a true and correct copy of that spreadsheet, reflecting entries from 2001 to the present.

14. In addition to the trips listed on Exhibit D, I would also (quite often) meet Mr. Dall'Acqua at the B.W.I. Airport on my way to or from work, depending on the time of Mr.

Dall'Acqua's flights (coming or going). As the airport was on the way from my home to the office, I did not charge Harte-Hanks for mileage on those occasions and I did not record the miles.

15. When we met at the airport, I would usually meet Mr. Dall'Acqua at the upper level, because I would be less likely to be shooed away by a police officer there than I would at the lower deck. Mr. Dall'Acqua did not check luggage during his business trips, and he therefore did not need to go to the baggage check area, which was on the lower level. Also, the upper deck was directly across from the garage where Mr. Dall'Acqua generally parked his car while traveling. It was a convenient spot for our meetings. Depending on how busy the airport was, Mr. Dall'Acqua and I might meet for some time to discuss business issues, or we might just exchange mail/documents and leave.

16. I have reviewed the expense reimbursement form that was submitted by Mr. Dall'Acqua for the week ending Friday, January 25, 2002, the date of the Confidentiality/Non-Disclosure Agreement at issue, because I understand that it has been suggested that Mr. Dall'Acqua could not have signed the document on that day because he was traveling. A copy of this form, along with the back-up receipts that went with it, is attached hereto as Exhibit E. I have also reviewed his cellphone call record for the same period. A copy of this record is attached hereto as Exhibit F.

17. The chronology indicated by these records rules out Mr. Dall'Acqua's suggestion that he could not have signed on January 25, 2002, because he was traveling. On the contrary, they indicate that there was plenty of time that afternoon for us to meet and for me to obtain his signature. His cellphone records show that he made a call at 5:06 p.m. (indicating he was on the

ground at B.W.I. by that time), and the receipt for the garage shows an exit time of 5:28 p.m. Clearly, there was sufficient time for us to have met in that interval. Further, the time is consistent with my having met with him on the way home, which is consistent with my mileage log showing no entry for January 25, 2002.

18.     To summarize, the documents submitted with this declaration show that I was engaged in obtaining the three vice presidents' signatures during the week ending January 25, 2002. They also show that there was plenty of time for me to have met with Mr. Dall'Acqua on January 25, 2002, and obtained his signature. Further, as noted, I would not have placed Mr. Dall'Acqua's agreement in his personnel file unless I had received it from him signed. Further still, the agreement has been in that file, under lock and key, with me being the only person with a key, from January 2002 until recently, when I sent it to Harte-Hanks's main offices in Texas (but not before taking it from the file and faxing it there in exactly its current condition, under the circumstances described below). In short, the only person who could have forged or replicated Mr. Dall'Acqua's signature is me. I deny that I forged or replicated his signature.

19.     I first became aware that Harte-Hanks was inquiring about Mr. Dall'Acqua's Confidentiality/Non-Disclosure Agreement through a May 28, 2004 (the Friday before the long Memorial Day week-end) e-mail from Billie Gray. Ms. Gray is a Vice-President of Human Resources at Harte-Hanks, who at the time was responsible for the 13 Harte-Hanks units under Mr. Dall'Acqua's management. Ms. Gray works out of the Jacksonville, Florida office of Harte-Hanks. Ms. Gray asked me in the e-mail to check and see if Mr. Dall'Acqua had signed a non-compete agreement. Attached hereto as Exhibit G is a true and correct copy of Ms. Gray's May 28 e-mail, which I retrieved from my computer.

20. I was out of the office when Ms. Gray's email came in. I responded that I believed he had, and that I would check his personnel file. (Obviously, I forgot that the office would be closed the following Monday.) I returned to the office after the long weekend on Tuesday, June 1, 2004. Attached hereto as Exhibit H is a true and correct copy of my response to Ms. Gray's May 28 e-mail, which I retrieved from my computer system.

21. When I went into the office on June 1, I went to Mr. Dall'Acqua's personnel file and pulled out the Confidentiality/Non-Disclosure Agreement bearing Mr. Dall'Acqua's signature. The cabinet was locked, as usual, and I used my key to access the personnel file. The agreement that I pulled out of Mr. Dall'Acqua's personnel file looks exactly like the agreement that has been submitted in this case. In other words, it had his signature on it. I did not change it.

22. I have a fax machine in my office. It is the Human Resources executive fax, with a number of (410) 412-1801. After I pulled Mr. Dall'Acqua's agreement from his file, I personally walked it over to my fax machine and faxed it to Faye Sowell, assistant to Paul Steven Hacker, the Harte-Hanks attorney I had been told was handling the matter. Attached hereto as Exhibit I is a true and correct copy of my June 1, 2004 e-mail to Ms. Gray, confirming that delivery, which e-mail I retrieved from my computer system.

23. Mr. Dall'Acqua's Confidentiality/Non-Disclosure Agreement went directly from his personnel file, where it had been placed by me in January 2002, to the fax machine to be sent

to Mr. Hacker. No one else had access to or handled the agreement at that time. Further, no one else had ever inquired about the Confidentiality/Non-Disclosure Agreement signed by Mr. Dall'Acqua, from January 2002 to May 2004.

SIGNED UNDER THE PENALTIES OF PERJURY<br>
THIS 9th DAY OF AUGUST 2004.

*Elaine Dernoga*
Elaine Demoga

422004.0802

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 8/9/04

9