UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., Plaintiff, v. CHARLES R. DALL'ACQUA and PROTOCOL MARKETING GROUP, Defendants. | Civil Action No.: 04-11548-DPW |

**DECLARATION OF CHARLES M. SHURE**

I, Charles Shure, state, under the penalties of perjury:

1. I am over the age of 21. I am a Certified Document Examiner. A copy of my Curriculum Vitae is attached hereto as Exhibit A.

2. I have been retained to conduct an analysis on behalf of the plaintiff in this case, Harte-Hanks, Inc., of the signature appearing on a Confidentiality/Non-Disclosure Agreement (the "Questioned Signature"), which signature is dated January 25, 2002. A copy of the document containing the Questioned Signature is attached hereto as Exhibit B.

3. In conducting my analysis, I reviewed the original Questioned Signature, as well as original signatures of Charles R. Dall'Acqua, the individual who purportedly created the Questioned Signature, on five Stock Option Agreements, dated 9/3/02, 1/8/02, 1/9/01, 8/30/99, and 1/12/99. I am informed that the signatures of Mr. Dall'Acqua appearing on these Stock Option Agreements are authentic and undisputed. Copies of the documents containing the known

signatures of Charles Dall'Acqua are attached hereto as Exhibit C1 through C5, respectively.

4. I conducted visual and microscopic examination of the Questioned Signature. The Questioned Signature provided for my review was an original signature of good quality. Microscopy was warranted on this original document, so as to review consistency of pressure and quality of line. I conducted the microscopic inspection of the Questioned Signature using a 7 to 30-power zoom stereoscopic microscope.

5. There is no indication that the Questioned Signature is the result of an attempt to trace an authentic signature of Charles Dall'Acqua. The strokes used to form the Questioned Signature are natural and fluid, which would not usually be the case if the Questioned Signature were indeed traced. Tracings will normally exhibit some of certain characteristics, such as stops and starts, slow motion, pressure points, blunt ends, corrugations, and/or tremors, and those characteristics were not present in the Questioned Signature. I can state to a reasonable degree of certainty that the Questioned Signature is not traced.

6. I have also conducted a comparison between the Questioned Signature and the sample known signatures of Charles Dall'Acqua provided for such comparison, also utilizing the same level of microscopy used on the Questioned Signature. There is no indication that the Questioned Signature is a replication/forgery, or that it falls outside the known range of the writer's observed variations. The Questioned Signature possesses sufficient elements of correspondence to the sample signatures -- in baseline, slant, letter size and formation, quality of line and consistency of pressure -- to indicate that the Questioned Signature is authentic, and there are no significant unlikenesses between the Questioned Signature and the sample signatures reviewed.

7. While the Questioned Signature varies in some respects from the known signatures, the variations do not fall outside of the realm of normal and expected variations in authentic signatures for this writer. In fact, the known signatures contain variations between and among themselves similar to the variations noted in a comparison of the Questioned Signature to the known signatures.

8. It is my professional opinion that, based on the review I have conducted thus far, the Questioned Signature is at least more likely than not/probably an authentic signature of the subject, Charles R. Dall'Acqua.

9. In addition to conducting my own review of the Questioned Signature and comparing that Questioned Signature to the known signatures provided, I have also been required to review the July 21, 2004 report of Ellen Mulcrone Schuetzner (the "Report"), a forensic document examiner "retained by counsel for Charles R. Dall'Acqua to conduct a handwriting analysis to determine the authenticity of Dall'Acqua's signature on a document," which was attached as an exhibit to the July 22, 2004 Affidavit of Ellen Mulcrone Schuetzner.

10. The exhibits attached to the Affidavit were copies of (A) Ms. Schuetzner's CV, (B) the document containing the Questioned Signature, (C) twenty-two "undisputably authentic" sample signatures of Charles Dall'Acqua, and (D) the Report.

11. According to the Report, Ms. Schuetzner (hereinafter the "Examiner") relied in her analysis on two copies of the document containing the Questioned Signature, copies of nine documents containing sample signatures of Charles Dall'Acqua, and six original checks signed by Charles Dall'Acqua.

12. In reviewing the version of Ex. A to the Affidavit available to me (a printout of the

PDF document electronically filed with the Court), I note that the document containing the Questioned Signature relied on by the Examiner was a copy of good quality, possibly what is known as a "first generation" copy, i.e., a copy of the original Questioned Signature. (In connection with the Report, I received only one copy of the document containing the Questioned Signature in PDF format, not two copies as referenced in the Report.)

13. In reviewing the version of Ex. C to the Affidavit available to me (printouts of the PDF documents filed electronically with the Court), I note that the sample signatures relied on by The Examiner were: Eight copies of signatures, including those that had been faxed (K-1, K-2, K-3, K-4, K-5, K-7, K-8, and K-9); eight copies of signatures on expense reports (K-6); and six original checks signed by Charles Dall'Acqua (K-10 through K-15).

14. I further note that of the eight expense reports included at K-6, the five reports dated 12/2/01 did not contain what I would describe as this writer's signature, but rather what appear to be initials only. Only the three reports dated 3/10/02 contained presumed signatures.

15. I note that the Examiner had not seen the original Questioned Signature, at least as of the writing of the Report.

16. I note that the Examiner reportedly conducted "visual and microscopic examinations of Exhibits Q-1 and K-1 through K-15." (Ex. D, Report at 2.)

17. It is my opinion that the use of microscopy on photocopies is not warranted or beneficial unless the fact or quality of the copying process itself is in question. Microscopic examination of photocopies is irrelevant and possibly misleading in this case, as line quality, pressure characteristics, and/or certain ink aspects -- the factors one normally seeks to clarify through microscopic examination of original documents -- are not determinable from even good

quality black and white copies. In addition, microscopic examination would enhance stray marks from copiers and fax machines on copies such as those available for examination by the Examiner in this case, which would not only fail to help but would likely hinder the analysis.

18. I note that the examiner reportedly conducted her examinations "following the Guideline for the Examination of Handwritten Items." (Ex. D, Report at 2.) I do not know to what "Guideline" the Examiner refers in this statement, but I do know that (1) there is to my knowledge no universally-accepted or adopted "Guideline for the Examination of Handwritten Items," and (2) the standards and procedures accepted in the protocol for examination of signatures for authenticity do not include microscopic examination of rough fax copies of documents.

19. I note that the Examiner reportedly "found significant differences between the questioned and known signatures." (Ex. D, Report at 2.) In the discipline of handwriting examination, the term "differences" has a specific meaning: "Differences" in specimens would be physical dissimilarities seen in a comparison of a number of samples of writing/signatures which go beyond the normal variations of the subject writer, and could therefore be seen as an indication that someone other than the subject writer created the sample. A comparison of sample signatures from <u>any</u> writer will uncover some variations from one to the other, and that is natural: Those natural "variations," however, do not constitute "differences."

20. The amount of evidence an examiner will require to formulate a valid distinction between "differences" and "variations" will depend to some degree on the consistency of the subject writer's handwriting/signatures.

21. Charles Dall'Acqua's signature, as evidenced by the few known samples available

for my inspection, demonstrates wide variations. The evidence referenced in the Report as having been reviewed by the Examiner is insufficient to draw any valid conclusions with respect to the natural variations present in Charles Dall'Acqua's signatures, or to characterize any noted dissimilarity as a "difference," as that term is used within the discipline, with confidence.

22. I note that the Examiner found that "[d]ue to the pictorial similarities and the significant differences found between the questioned and known signatures, the questioned signature may be an attempt to simulate or trace an authentic signature." (Ex. D, Report at 3.) In my opinion, this is an invalid conclusion. As noted above (see ¶ 5), the Questioned Signature lacks any indication that it is traced: The characteristics that are normally present in a tracing are absent here. Also as noted (see ¶ 21, above), there was insufficient evidence to differentiate between variations and differences between the questioned Signature and the known signatures, and therefore insufficient evidence to conclude anything with respect to a "simulation."

23. I note that the Report states that "there is no evidence to indicate that the person who prepared the known Charles Dall'Acqua signatures on Exhibits K-1 through K-15 executed the questioned signature on Exhibit Q-1." (Ex. D, Report at 3.) This statement is inconsistent with the Examiner's recognition of "pictorial similarities" between the samples and the Questioned Signature, however: Such similarities are, in and of themselves, "evidence" that the Questioned Signature is authentic.

24. I note that the Report indicates that the Examiner has requested the original of the Questioned Signature, but has not requested any other information. (Ex. D, Report at 3.) It is my opinion that substantially more evidence is needed to legitimately arrive at and/or support the Examiner's conclusions here: For example, the only originals reportedly provided for inspection

were six checks signed by Charles Dall'Acqua over a 1 1/3-year period. These samples indicate (1) a gap from December 18, 2001 to December 30, 2002 (in which period the Questioned Signature was dated), where no samples were provided, (2) at least twenty-four checks written between December 6 (check # 1434) and December 18, 2001 (check # 1459) (the month before the date of the Questioned Signature), and (3) three different (and out of order) check series (#1394 on 10/1/01, ## 1411, 1434, and 1459 in November-December 2001, and ## 1265 and 1267 in December 2002-January 2003). The six checks reportedly reviewed constitute significant chronological (large gaps between samples and no checks at all in January 2002, the month of the Questioned Signature) and quantitative (six out of unlimited possible samples provided for inspection) deficiencies, which deficiencies are not acknowledged in the Report.

25. In summary, it is my opinion that, at least at the time the Report was completed, the evidence available to and reviewed by the Examiner was insufficient to justify and/or support the conclusions stated therein.

26. I reserve the right to amend or revise any expressed opinion in the event of the introduction of appropriate additional case evidence (which additional evidence is here recommended.)

SIGNED UNDER THE PENALTIES OF PERJURY
THIS 9th DAY OF AUGUST, 2004.

Charles M. Shure

422004.080504

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by mail-hand on 8/9/04



HARE AND CHAFFIN Fax:617-330-1996 Aug 9 '04 10:05 P.09
P.02