UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | )   Civil Action No.  04-11548-DPW |
| v. | ) |
| CHARLES R. DALL'ACQUA and | ) |
| PROTOCOL MARKETING GROUP, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SUPPLEMENTAL AFFIDAVIT OF ELLEN MULCRONE SCHUETZNER

I, Ellen Mulcrone Schuetzner, under oath, state as follows:

1.    This Supplemental Affidavit is a supplement to my earlier affidavit which was executed on July 22, 2004.

2.    In preparing my earlier report, which is attached to my original affidavit as Exhibit D, I examined a copy of a Confidentiality/Non-Disclosure Agreement purportedly between Charles Dall'Acqua ("Dall'Acqua") and Harte-Hanks, Inc. ("Harte-Hanks"), dated January 25, 2002 (the "Purported Dall'Acqua Agreement"), which is attached to my earlier affidavit as Exhibit B. At the time that my report was prepared, I was not provided access to the original of the Purported Dall'Acqua Agreement.

3.    On August 6, 2004, I traveled from Chicago, Illinois to Boston, Massachusetts to review the original Purported Dall'Acqua Agreement and compare the signature on the original Purported Dall'Acqua Agreement to sample signatures of Dall'Acqua's, which I was told were undisputedly authentic. Copies of the documents containing the known signatures are attached to my original affidavit as Exhibit C. The original Purported Dall'Acqua Agreement was located at the offices of Harte-Hanks' counsel.

4.    I conducted visual and microscopic examinations of the original Purported Dall'Acqua Agreement and compared it to those signatures which were undisputedly authentic. These examinations were conducted following the Guideline for the Examination of Handwritten Items.

5.    Based upon my review of the original Purported Dall'Acqua Agreement and comparing the document to samples of signatures known to be Dall'Acqua's, I have supplemented my original report. A true and correct copy of the supplemental report I have prepared upon the conclusion of my analysis of the original Purported Dall'Acqua Agreement is attached hereto as Exhibit A.

6.    Based upon my findings, which are outlined in the attached supplemental report, it is my opinion that the questioned Dall'Acqua signature on the Purported Dall'Acqua Agreement is an attempted simulation of a genuine Dall'Acqua signature, and that there is no evidence to indicate that the person who prepared the known Charles Dall'Acqua signatures on the samples known to be authentic executed the questioned signature on the Purported Dall'Acqua Agreement.

I declare under penalty of perjury that the foregoing is true and correct.

Ellen Mulcrone Schuetzner

Subscribed and sworn to before me
this 9TH day of AUGUST, 2004

"OFFICIAL SEAL"
SEYMOUR I. SHEDLOW
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES 11/22/06

CHICAGO_1137497_2

# EXHIBIT A

# ELLEN MULCRONE SCHUETZNER

Forensic Document Examiner
PMB 161
6348 N. Milwaukee Avenue
Chicago, Illinois  60646-3728
(773) 774-5731

*American Academy of
Forensic Sciences
Fellow*

*American Board of Forensic
Document Examiners, Inc.
Diplomate*

August 9, 2004

Mr. Darren M. Mungerson
Jenner & Block
One IBM Plaza
Chicago, Illinois  60611-7603

Re:     **Charles Dall' Acqua Matter**

## SUPPLEMENTARY REPORT

Dear Mr. Mungerson,

The following described documents were submitted to the examiner.

### QUESTIONED

Q-1:    Two (2) copies of a Harte Hanks Confidentiality/Non-Disclosure
Agreement, dated 1/25/02, bearing a questioned Charles Dall'Acqua
Signature
The original Harte Hanks Confidentiality/Non-Disclosure Agreement was
examined in the office of Hare & Chaffin on August 6, 2004

### KNOWN

The following described documents bear signatures in the name of and purported
to be prepared by Charles Dall'Acqua.

K-1:    One copy of page 6 of an Agreement

K-2:    One copy of page 8 of an Agreement

Mungerson/Dall'Acqua
Page 2 of 5

K-3:    One copy of page 6 of an Agreement

K-4:    One copy of an Anne Arundel County Association of Realtors
        Addendum/Amendment, dated 11/9/01

K-5:    One copy of page 2 of a Permit Agreement, dated 11/16/01

K-6:    Copies of eight (8) Harte-Hanks Direct Marketing AMD Expense
        Reports, dated 12/2/01 and 3/10/02

K-7:    One copy of a memo to Merrill Lynch, dated 9/13/02

K-8:    One copy of a memo Re: Senior Management Bonus, dated 1/29/03

K-9:    One copy of a hand printed agreement, dated 7/24/03

Six (6) original Charles R. Dall'Acqua checks, further described as follows:

|        | Check # | Date     |
|--------|---------|----------|
| K-10:  | 1394    | 10/1/01  |
| K-11:  | 1411    | 11/8/01  |
| K-12:  | 1434    | 12/6/01  |
| K-13:  | 1459    | 12/18/01 |
| K-14:  | 1265    | 12/30/02 |
| K-15:  | 1267    | 1/1/03   |

Request

        It was requested that examinations be conducted to determine the
authenticity of the Charles Dall' Acqua signature on Exhibit Q-1.  Visual and
microscopic examinations of Exhibits Q-1 and K-1 through K-15 were conducted
to answer this request.   These examinations were conducted following the
Guideline for the Examination of Handwritten Items.

Mungerson/Dall' Acqua
Page 3 of 5

<u>Findings</u>

In the examination of the copies of the questioned signature, the examiner found some pictorial similarities and significant differences between the questioned and known signatures. Although the design of the questioned signature attempts to mimic the design of some of the known signatures, there are design differences that indicate that the questioned signature was prepared by another writer. These design differences include dissimilarities in the design of the letterform. The following are examples of some of the design differences between the questioned and known signatures:

-In the letter "h" in the first name of the questioned signature, the stroke that moves upward to form the hump of the "h", is retraced along the staff of the letter. In the known signatures, the hump of the "h" is formed in another direction with an undercurve from the bottom of the staff of the "h".
-In the connecting stroke of between the "C" and "h" in the questioned signature there is a small hump before the high entry to the staff of the "h". There is also as larger space between the "C" and "h" and a higher entry to the "h" than is found in the known signatures.
-The descending stroke of the "q" is proportionally shorter than the known descending stroke when compared to the rest of the signature.
-The ending stroke of the "q", the line that travels from the descender and moves to the right to end the letter, was prepared with an approximately straight line that moves upward to the right of the letter. In the known signatures, the ending stroke begins with a slight dip downward before rounding upward to end the letter.

The pictorial similarities indicate that the writer of the questioned signature had access to a genuine Dall' Acqua signature(s). Due to the difficulty in copying all the characteristics of the genuine signature, the writer was not able to fully imitate the characteristics of the known signatures.

*If the forger is to produce a perfect freehand imitation, he must imitate all the habits and qualities of the authentic signatures while simultaneously discarding all conflicting elements of his own writing. He must discover from detailed study of the model signature that is to be imitated all its salient factors and must know enough about the corresponding characteristics of his own writing to be able to eliminate*

Mungerson/Dall' Acqua
Page 4 of 5

> *their influence in his final product. Finally, this process involves writing*
> *the signature in the same natural way as the authentic signature. Failure*
> *often results because the forger has only a superficial idea of a few*
> *characteristics of both his own writing and the writing to be simulated or*
> *because his skill as a penman fails to measure up to that of the person*
> *whose writing is being imitated.*

>> Scientific Examination of Questioned Documents, pp. 183-185
>> Ordway Hilton

In the examination of the original questioned signature, the examiner noted additional differences between the questioned and known signatures. These differences include quality of the writing line, pen lifts and blunt beginning and ending strokes. The following are some examples of additional differences.

-Blunt beginning and ending strokes were found in the beginning of the "C", the beginning and ending of the middle initial, the beginning and ending of the last name. Some of the known signatures were also prepared with a fluid ink pen, similar to the questioned signature, however, tapered beginning and ending strokes were found.
-A pen lift was noted in the beginning stroke of the middle initial "R". In the straight stroke on the left side of the letter, there is a break in the line of the letter, indicating that the pen was lifted off the paper during its preparation. The beginnings of both strokes have blunt ends.
-At the bottom of the bowl of the "Q" where it meets the staff of the letter, there is an indication that there is a retracing of the stroke back to the left. This retracing may indicate that there is a pen lift between the bowl of the "Q" and the staff.
-At the bottom of the descender of the "Q", there is a heavy ink deposit that may indicate pen lift and/or hesitation. The descender also bears characteristics of slowness of movement with poorer line quality.

These characteristics of blunt beginning and ending strokes, pen lifts, and poorer line quality bear the indications of an attempted simulation or tracing of a genuine Dall'Acqua signature(s).

> *While it is reasonable to expect imitations will resemble in some ways the*
> *writing being imitated, they tend to deviate from the genuine in three*

Mungerson/ Dall' Acqua
Page 5 of 5

> *principal respects: form, line quality, and stroke continuity.*

> <u>Handwriting Identification: Facts and Fundamentals</u> p. 289
> Roy A. Huber and A.M. Headrick

In the examination of Exhibit Q-1, the examiner noted the presence of indented impressions on the first page of Exhibit Q-1. Indented impressions are marks left on paper from writing on previous sheets of paper. However, additional examinations are necessary to decipher the indented impressions. The examiner requests that the original Exhibit Q-1 be submitted to the examiner's office for additional testing with an electrostatic detection device to decipher the indentations. This procedure is a non-destructive test.

<u>Conclusion</u>

Based on the differences between the questioned and known Charles Dall' Acqua signatures it is the opinion of the examiner that the questioned Dall' Acqua signature on Exhibit Q-1 is an attempted simulation of a genuine Dall'Acqua signature(s). The examiner found no evidence that the person who prepared the known Charles Dall'Acqua signatures on Exhibits K-1 through K-15 executed the Charles Dall' Acqua signature on Exhibit Q-1.

The examiner also requests that the original Exhibit Q-1 be submitted to the examiner's office for additional testing.

Exhibit Q-1 is maintained by Hare & Chaffin. Exhibits K-1 through K-15 were given to Ms. Angela Lackard of Melick, Porter & Shea.

Respectfully submitted,

Ellen Mulcrone Schuetzner