UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **HARTE-HANKS, INC.** ) | |
| ) | |
| **Plaintiff,** ) | |
| v. ) | Civil Action No. 04-11548-DPW |
| ) | |
| **CHARLES R. DALL'ACQUA and** ) | |
| **PROTOCOL MARKETING GROUP,** ) | |
| ) | |
| **Defendants.** ) | |

### DEEFENDANTS' MOTION FOR SANCTIONS
### FOR HARTE-HANKS' SPOLIATION OF EVIDENCE

Defendants Protocol Services, Inc. and Charles R. Dall'Acqua, by their attorneys, respectfully seek entry of an Order sanctioning Harte-Hanks, Inc. for its spoliation of critical evidence.[1] Harte-Hanks recently confessed that Elaine Dernoga – the executive assistant who countersigned the alleged agreement and Harte-Hanks' lead witness at the preliminary injunction hearing – "lost" the originals of certain non-solicitation agreements signed by Harte-Hanks executives at the same time as the alleged Dall'Acqua agreement. Defendants' expert document examiner sought to conduct a forensic comparison of the paper characteristics of the alleged Dall'Acqua agreement with these other purportedly contemporaneous documents to show that they do not match. (This forensic testing is in addition to defendants' experts' analysis of the handwriting appearing of the alleged agreement.) Such forensic testing is particularly important here in that the expert's examination to date has already revealed that the alleged agreement does not match other allegedly contemporaneous Harte-Hanks' documents, and only matches a

---

[1] Defendants recently filed a motion to dismiss for lack of subject matter jurisdiction. As set forth therein, the Court lacks jurisdiction over this action because the parties are not completely diverse. Due to the egregiousness of plaintiff's spoliation of evidence, however, defendants believe it is important to bring this new development to the Court's attention for its consideration should there be any significant delay in its ruling on the motion to dismiss.

document dated more than 22 months later.  Due to Harte-Hanks' conduct, defendants are precluded from conducting such an examination and thereby denied additional powerful evidence that the alleged agreement is not authentic.

In this motion, defendants ask that the Court conduct an evidentiary hearing to determine the circumstances surrounding the loss of these documents, including whether Harte-Hanks' conduct was reckless and deliberate, and then sanction Harte-Hanks as appropriate for its spoliation of evidence.  Defendants also seek entry of an Order barring Dernoga (and anyone else involved in the spoliation) from handling original documents relevant to this litigation.

## STATEMENT OF FACTS

This case involves the authenticity of a non-solicitation agreement allegedly signed by Dall'Acqua and countersigned by Dernoga on January 25, 2002 (hereinafter "the alleged Dall'Acqua agreement" or "the alleged agreement").  Dall'Acqua's and Dernoga's testimony are directly at odds.  Dall'Acqua adamantly denies signing the agreement and testified as to why he would not have and could not have signed the agreement on January 25, 2002.  [See 7/23/04 Dall'Acqua Aff. ¶¶ 5-17.]  Dernoga contends the signatures are genuine, though she admits she does not recall anything surrounding the circumstances of the execution of the alleged agreement, including where or when Dall'Acqua or herself signed it.  [See 8/10/04 Hrg. Tr. at 19-20, 22-23, 27, 35.]  To overcome these deficiencies, Dernoga relies on the fact she executed other non-solicitation agreements as part of a company-wide initiative that same week in order to provide context for her testimony and to rebut Dall'Acqua's denials regarding the timing of the alleged agreement.  [See 8/9/04 Dernoga Supp. Decl. ¶ 18 ("[Other executives' agreements] show that I was engaged in obtaining three vice-presidents' signatures during the week ending January 25, 2002.  They also show that there was plenty of time for me to have met with Mr.

Dall'Acqua on January 25, 2002, and obtained his signature."); see also id. at ¶¶ 5-17.] Dernoga further explained her custom and practice of being very careful and precise, and testified that the alleged agreement remained in a locked file cabinet in her office in Maryland from January 2002 until June 2004. [See id. ¶¶ 9, 11, 18, 21-23.]

At the preliminary injunction hearing, the Court credited Dernoga's testimony and ruled in favor of Harte-Hanks. Among other findings, the Court held there was no opportunity for the forgery to occur given Dernoga's testimony that the alleged agreement was in her locked file cabinet until recently. [See 8/18/04 Hrg. Tr. at 83-86.] The Court, however, encouraged defendants to present "fuller testimony after fuller opportunities" regarding their position that the alleged agreement is a forgery. [Id. at 87.]

Picking up on the Court's invitation, defendants asked their certified document examiners – Peter Tytell and Ellen Mulcrone Schuetzner – to conduct forensic examinations of the alleged agreement and other related materials. Their work to date has uncovered compelling evidence undermining Dernoga's credibility and indicating the alleged agreement is a forgery. In addition, their work led defendants to uncover Harte-Hanks' document spoliation and the supposedly trustworthy Dernoga's leading role in that misconduct.

*Schuetzner's Indented Impressions Analysis*

Schuetzner's initial review was limited to a field examination of the alleged agreement in the offices of Harte-Hanks' attorney. Following the preliminary injunction hearing, however, Schuetzner conducted a thorough analysis in her laboratory. As part of her work, Schuetzner used an indentation materializer to analyze the indented impressions appearing on the alleged agreement. (Indented impressions are marks left on paper from writing on previous sheets of paper.) Schuetzner found a partial impression of a date that reads either "3/15/04" or "5/15/04"

3

on the second page of the alleged agreement.  [See Schuetzner Supp. Report II at 8 (attached hereto as Exhibit A).]   In addition, Schuetzner found decipherable indentations reading "Sewell" and "cc Dernoga" on the first page of the document.  [Id.]  Faye Sewell is the former secretary of Dean Blythe—the Harte-Hanks executive who offered Dall'Acqua a severance package in March 2004 conditioned on his agreeing to execute a non-solicitation agreement.  Sewell and Blythe worked in Harte-Hanks' San Antonio offices.

This evidence directly contradicts Ms. Dernoga's testimony that the alleged agreement remained in a locked file cabinet in her Maryland office from January 2002 until June 2004. [See 8/9/04 Dernoga Supp. Decl. at ¶ 18 ("[T]he agreement has been in that file, under lock and key, with me being the only person with a key, from January 2002 until recently [sometime after the Memorial Day holiday], when I sent it to Harte-Hanks' main offices in Texas[.]").]  It also constitutes powerful evidence regarding Harte-Hanks' opportunity to forge the agreement.

*Tytell's Forensic Examination of Paper Characteristics of Alleged Agreement*

Defendants' other expert document examiner, Peter Tytell, recently conducted a forensic examination of the paper characteristics of the alleged agreement.[2]  This examination involved the use of transmitted light, and long-wave and short-wave ultraviolet lamps.  Tytell compared the alleged agreement with the "known documents" generated and produced by Harte-Hanks (and relied upon by Harte-Hanks' experts).   Tytell's analysis revealed that the paper characteristics of the alleged agreement (from January 2002) did not match any Harte-Hanks

---

[2] Tytell also compared the alleged agreement with various known writings of Dall'Acqua.  Based on his review, Tytell concluded "with the highest degree of confidence" that the neither the signature nor the date ("1/25/02") on the alleged agreement was authentic.  [See Tytell Report at 13.]  Rather, he concluded they were simulations.  [Id.]   In his report, Tytell includes numerous illustrations (with arrows and other visual aids) of the stark differences between the signature and date on the alleged agreement and known signatures and dates.  Defendants invite the Court to review Tytell's report to consider his grounds for concluding "with the highest degree of confidence" the signature is a simulation.

documents from around that time.  [See Tytell Report at 3 (attached hereto as Exhibit B).]  To the contrary, the only match was with a document dated November 15, 2003—more than 22 months after Dall'Acqua and Dernoga allegedly signed it.  [Id.]

Based on Tytell's finding, defendants sought to compare the paper characteristics of the alleged agreement with the other non-solicitation agreements processed and countersigned by Dernoga the week of January 21, 2002.  (Copies of these agreements were exhibits to the supplemental declaration and second supplemental declaration Dernoga submitted to the Court on August 9 and 10, respectively.)  Given Dernoga's testimony that she distributed these agreements the very week she processed the alleged Dall'Acqua agreement, [see 8/10/04 Hrg. Tr. at 40, 43-44, 56, 59], defendants wanted Tytell to determine whether or not the paper characteristics matched.  Accordingly, defendants requested access to the originals of the other agreements.

*Harte-Hanks Belatedly Confesses Dernoga "Lost" Original Documents*

Defendants' request for these materials coincided with their disclosure to Harte-Hanks (for purposes of the parties' settlement discussions) of a draft of Tytell's expert report.   No doubt troubled by Tytell's compelling opinions, Harte-Hanks belatedly informed defendants that Dernoga has "lost" the original documents while flying to/from Boston only after defendants' counsel specifically requested access to the same.  Harte-Hanks has not provided any additional detail regarding the circumstances surrounding the loss of these documents, other than that they are continuing to check with the "lost and found" department at Logan Airport.

But for defendants' specific requests, it appears Harte-Hanks did not plan to report its loss of these important documents to the Court or defendants.  Harte-Hanks' silence on this issue is particularly disturbing (and hypocritical) in that at the same time it was hiding its misconduct,

5

it filed an emergency motion with the Court accusing defendants of failing to exercise due care in the handling of other original documents. (Unlike Harte-Hanks, however, defendants did not lose any originals or do anything to compromise their integrity.)

Harte-Hanks' "loss" of these important documents has severely prejudiced defendants and, as set forth below, should be sanctioned.

## ARGUMENT

**I.   HARTE-HANKS VIOLATED ITS DUTY TO PRESERVE CRITICAL EVIDENCE.**

A party in litigation has a general duty to preserve all evidence it knows or should know is potentially relevant to the case. See McGuire v. Acufex Microsurgical, Inc., 175 F.R.D. 149, 154 (D. Mass. 1997); Wm. T. Thompson Co. v. General Nutrition Corp., Inc., 593 F. Supp. 1443, 1455 (C.D. Cal. 1984). Courts define the scope of potentially relevant documents broadly. See Zubulake v. UBS Warburg LLC, 220 F.R.D. 212, 217-18 (S.D.N.Y. 2003) ("The broad contours of the duty to preserve . . . extend to any documents or tangible things made by individuals 'likely to have discoverable information that the disclosing party may use to support its claims or defenses' . . . [and] also includes documents prepared for those individuals [and to] information that is relevant to the claims or defenses of any party, or which is relevant to the subject matter involved in the litigation."); Wm. T. Thompson Co., 593 F. Supp. at 1455 ("[Litigant] under a duty to preserve what it knows, or reasonably should know, is relevant to the action, is reasonably calculated to lead to the discovery of admissible evidence, is reasonably likely to be requested during discovery, and/or is the subject of a pending discovery request.").

Here, there can be no dispute regarding the relevance and importance of these original agreements and Harte-Hanks' obligation to preserve them during the pendency of this litigation. The agreements were relied upon and attached to two separate declarations Ms. Dernoga

6

submitted to the Court in connection with her testimony at the preliminary injunction hearing. [See 8/9/04 Dernoga Supp. Decl. ¶¶ 9-10, 18 (and Exhibit C attached thereto); 8/10/04 Dernoga Second Supp. Decl. ¶ 4 (and Exhibit B attached thereto).]  Furthermore, at the hearing, Ms. Dernoga testified at length regarding these agreements, including the location of the originals.[3] [8/10/04 Hrg. Tr. at 13-22, 25, 38-41, 43-49.]  Finally, defendants formally requested copies of the agreements in its first request for production of documents.  [See Req. No. 6 of Dall'Acqua's 1st Req. for Produc. of Docs.]  Accordingly, Harte-Hanks had a duty to preserve these documents that it violated by allowing Dernoga to "lose" them under questionable circumstances.

## II.  HARTE-HANKS SHOULD BE SANCTIONED FOR ITS SPOLIATION OF EVIDENCE.

Sanctions are appropriate when a party destroys potentially relevant evidence. See Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 29 (1st Cir. 1998); see also McGuire, 175 F.R.D. at 153.  When a party has destroyed evidence, "[t]he intended goals behind excluding evidence, or at the extreme, dismissing a complaint, are to rectify any prejudice the non-offending party may have suffered as a result of the loss of evidence and to deter any future conduct, particularly deliberate conduct, leading to such loss of evidence." Id.  Some form of sanction is appropriate regardless of whether the evidence is lost as the result of a deliberate act or simple negligence. See Trull v. Volkswagen of America, Inc., 187 F.3d 88, 95-96 (1st Cir. 1999) (indicating that a finding of bad faith or comparable bad motive is not required to support a finding that exclusion of evidence is warranted); Sacramona v. Bridgestone/Firestone, Inc., 106 F.3d 444, 447 (1st Cir. 1997) (stating "bad faith is not essential" and "[i]f such evidence is

---

[3] Ms. Dernoga testified that she believed the originals were located at her office in Glen Burnie, Maryland.  [8/10/04 Hrg. Transcript at 49.]  If the originals were already "lost" at the time of the preliminary injunction hearing, additional sanctions against Harte-Hanks and Dernoga may be warranted.

mishandled through carelessness, and the other side is prejudiced, we think that the district court is entitled to consider imposing sanctions, including exclusion of the evidence").

Moreover, where potentially relevant evidence has been destroyed, remedies are appropriate regardless of whether a specific court order has been violated. Courts have authority, pursuant to their inherent powers, to remedy discovery abuses even in the absence of a violation of a written court order. See McGuire v. Acufex Microsurgical, Inc., 175 F.R.D. 149, 153 (D. Mass. 1997) (pursuant to its inherent powers, court "could dismiss the case, exclude evidence, or impose other sanctions as warranted by the conduct in question"); see also Zubulake v. UBS Warburg LLC, No. 02-Civ.-1243, 2004 WL 1620866, at *6 (S.D.N.Y. July 20, 2004); Computer Assocs. Int'l v. American Fundware, Inc., 133 F.R.D. 166, 168 (D. Colo. 1990); Telectron, Inc. v. Overhead Door Corp., 116 F.R.D. 107, 126-27 (S.D. Fla. 1987).

Courts have a variety of remedies available to redress the spoliation of evidence ranging from entry of a default judgment, to barring certain evidence, to giving an adverse inference jury instruction. See Collazo-Santiago, 149 F.3d at 29; see also Sacramona, 106 F.3d at 446 (barring evidence); Telectron, 116 F.R.D. at 131-35 (default judgment). In determining the appropriate remedy, courts should consider the primary objectives of such remedies: to remedy the effect of the discovery abuse, to punish the wrongdoing party, and to deter similar conduct by others. See id.; see also Telectron, 116 F.R.D. at 126. Powerful remedies are warranted where they are required to meet these objectives. See Metro. Opera Assoc., Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union, 212 F.R.D. 178, 220 (S.D.N.Y. 2003) 220 ("court[s] 'should not shrink from imposing harsh sanctions where . . .they are clearly warranted.'"). "What lies behind the sanctioning power is not merely, or perhaps even principally, the desirability of punishing a party or counsel for dilatory actions or inaction, but the necessity of invocation of an extreme

sanction, where justified, in order to deter others from similar conduct." Barreto v. Citibank, N.A., 907 F.2d 15, 16 (1st Cir. 1990) (citing National Hockey League v. Metropolitan Hockey Club, 427 U.S. 639, 643 (1976)).

Here, pending the Court's findings regarding the willfulness of Harte-Hanks' conduct, defendants submit some or all of the following sanctions are appropriate.

### A. Default Judgment

Courts consider three factors in determining whether to dismiss a claim as a remedy for discovery violations: (1) whether the party intentionally and in bad faith destroyed documents that it knew or reasonably should have known were relevant to the pending litigation, (2) whether the opposing party was prejudiced by the destruction of documents, and (3) whether lesser remedies would be inadequate to remedy the prejudice suffered by defendant, punish the wrongdoing party, and/or deter future similar acts of willful disregard for the rules of discovery. See Collazo-Santiago, 149 F.3d at 29; see also Computer Assocs. Int'l, 133 F.R.D. at 169; Telectron, 116 F.R.D. at 131. Here, should the Court find that Harte-Hanks acted willfully (which seems likely given what Harte-Hanks has revealed to date regarding its reckless handling of the originals), then default judgment is appropriate because the other elements are satisfied.

*Harte-Hanks Understood Relevance of Lost Documents*: As set forth in Section I above, Harte-Hanks was well aware of the significance of these documents. Indeed, it brought them to the Court's attention and relied on them in support of its motion for a preliminary injunction. [See Exhibit C attached to Dernoga Supp. Decl.; Exhibit B attached to Dernoga Second Supp. Decl.]

*Defendants Were Prejudiced By Loss of Documents*: Defendants have been severely prejudiced by Harte-Hanks' loss of the documents. First, without the originals of the other restrictive covenants purportedly processed by Ms. Dernoga at the same time as the alleged

9

Dall'Acqua agreement, Tytell cannot perform a forensic comparison of the alleged agreement and the other agreements to show the differences in their paper characteristics. Defendants believe this examination would have yielded additional evidence to reinforce the mounting proof they have accumulated (including the expert analysis conducted by defendants' two board-certified handwriting examiners) showing the alleged agreement is a forgery.[4]

Second, without the originals, defendants cannot determine whether or not Dernoga used the same purple gel pen on these other agreements as she used to sign the alleged Dall'Acqua agreement. Assuming she did not, that would have undermined Dernoga's claim that she processed the alleged agreement in the same general manner as the other agreements executed the week of January 21, 2002.

Finally, Harte-Hanks' misconduct has prejudiced defendants by causing them to divert resources to investigate and seek redress for Harte-Hanks' document spoliation. See Telectron, 116 F.R.D. at 132 ("[P]rejudice derives both from the irretrievable loss of materials relevant to [the plaintiff's] claims and from the delay, inconvenience and expense suffered by [the plaintiff] in investigating the sources and impact of [defendant's] document destruction scheme."); Wm. T. Thompson, 593 F. Supp. at 1454 (defendant's destruction of relevant records caused the

---

[4] Given Harte-Hanks' misconduct, defendants have been deprived of knowing precisely what the forensic examination of the various agreements would have shown. For example, without the originals, defendants are precluded from observing the presence of watermarks and indentations, characteristics that focus on the date of the documents' preparation. Under the circumstances, it is proper to infer that the testing would have been favorable to defendants. See Century ML-Cable Corp. v. Conjugal P'ship, 43 F. Supp. 2d 176, 184 (D.P.R. 1998) ("[T]he bad-faith destruction of a relevant document by itself 'gives rise to a strong inference that production of the document would have been unfavorable to the party responsible for its destruction.'"); Computer Assocs. Int'l, 133 F.R.D. at 170 ("[W]here a party destroys evidence after being put on notice that it is important to a lawsuit, and being placed under a legal obligation to preserve and produce it, the compelling inference is that the evidence would have supported the opposing party's case.").

plaintiff to divert substantial sums of money in attempting to discover and obtain the records the defendant wrongfully destroyed and in bringing motions and requests to the court for relief).

*Lesser Remedies Inadequate*:   If the Court determines Harte-Hanks' willfully destroyed documents, then the most appropriate sanction is entry of default judgment against Harte-Hanks. While Harte-Hanks has not been previously sanctioned in this litigation, a "district court is not required to fire a warning shot" through the imposition of lesser sanctions especially where there is intentional spoliation of vital evidence.  Hall Commodity Cycles Mgmt. Co. v. Kirsh, 825 F.2d 1136, 1138-39 (7th Cir. 1987); see also Computer Assoc., 133 F.R.D. at 170 ("No alternative sanction short of a default judgment would adequately punish [party] and deter future like-minded litigants."; "[a]ny lesser sanction would allow a party possessing evidence that would insure an adverse result to destroy that evidence with impunity, thus assuring defeat for the opponent while risking only a comparatively mild rebuke").

Any lesser remedy would poorly serve the objectives of punishing Harte-Hanks for its wrongdoing and deterring similar misconduct by others.  "One who anticipates that compliance with discovery rules, and the resulting production of damning evidence, will produce an adverse judgment, will not likely be deterred from destroying that decisive evidence by any sanction less than the adverse judgment he (or she) is tempted to thus evade."  Computer Assocs. Int'l, 133 F.R.D. at 169; see also Telectron, 116 F.R.D. at 136  ("If the putative destroyer of discoverable documents were ever to believe that his actions, at worst, would only result in the presentation before a jury of evidence surrounding that destruction, he might well conclude that an unfavorable inference as to document destruction would be less detrimental than allowing certain evidence to be presented at trial.").

11

### B.     Order Barring Certain Evidence

An additional remedy appropriate here is entry of an Order precluding Harte-Hanks from offering any evidence relating to the destroyed documents. In particular, Harte-Hanks should be precluded from presenting evidence or testimony relating to these other agreements to bolster Ms. Dernoga's testimony regarding what she assumes she must have done the week of January 21, 2002; to provide context for her efforts to obtain Dall'Acqua's signature on the alleged agreement; or to rebut Dall'Acqua's testimony that the agreement could not have been signed on January 25, 2002 because he was traveling that day. See Sacramona, 106 F.3d at 446 (1st Cir. 1997) (affirming district court's decision to exclude evidence as sanction for spoliation of evidence); see also Bergman v. United States, 565 F. Supp. 1353, 1373 (D.C. Mich. 1983) (prohibiting defendant from presenting evidence to controvert the plaintiff's evidence or to support portions of its defense); Jankins v. TDC Mgmt. Corp., Inc., 21 F.3d 436, 444-45 (D.C. Cir. 1994) (precluding defendant from introducing evidence at trial in opposition to particular claims for which it had particularly resisted discovery).

### C.     Adverse Inference Instruction

Finally, should any portion of Harte-Hanks' case survive and go to trial, the Court should give an adverse inference jury instruction. See Blinzler v. Marriot International, Inc., 81 F.3d 1148, 1159 (1st Cir. 1996); see also Zubulake, 2004 WL 1620866, at *13 (ordering that jury be given an adverse inference instruction with respect to e-mails that were deleted after the plaintiff filed suit); Vodusek v. Bayliner Marine Corp., 71 F.3d 148, 155 (4th Cir. 1995) (an adverse inference may be drawn against a party who destroys relevant evidence); Turner v. Hudson Transit Lines, Inc., 142 F.R.D. 68, 74-77 (S.D.N.Y. 1991) (same).

**WHEREFORE**, for the above stated reasons, defendants respectfully request that the Court (1) conduct an evidentiary hearing regarding the circumstances of the loss of these original documents; (2) enter an Order sanctioning Harte-Hanks for its spoliation of evidence; (3) enter an Order barring Ms. Dernoga (and anyone else involved in the loss of these documents) from handling any originals documents relevant to this litigation; (4) award defendants their attorneys fees and costs in bringing this motion; and (5) grant such other and further relief as it deems just.

          Respectfully submitted,

          CHARLES R. DALL'ACQUA and
          PROTOCOL SERVICES, INC.

          By:    */s/ John F. Rooney, III*

          John F. Rooney III
          Angela L. Lackard
          MELICK, PORTER & SHEA, LLP
          28 State Street
          Boston, Massachusetts  02109
          (617) 523-6200

          Susan C. Levy
          Daniel J. Winters
          JENNER & BLOCK LLP
          One IBM Plaza
          Chicago, Illinois  60611-7603
          (312) 222-9350

Dated: November 1, 2004