October 22, 2004

Mr. Daniel J. Winters
Jenner & Block
One IBM Plaza
Chicago, Illinois  60611-7603


Re:     **Harte-Hanks, Inc v.  Charles Dall' Acqua**

## SUPPLEMENTARY REPORT II

Dear Mr. Winters,

The following described documents were submitted to the examiner.

### QUESTIONED

Q-1:    One original Harte Hanks Confidentiality/Non-Disclosure Agreement, dated 1/25/02, bearing a questioned Charles Dall'Acqua signature


### KNOWN

The following described documents bear signatures in the name of and purported to be prepared by Charles Dall'Acqua.

K-1:    One copy of page 6 of an Agreement

K-2:    One copy of page 8 of an Agreement

K-3:    One copy of page 6 of an Agreement

Winters/Dall'Acqua
Page 2 of 9

K-4: One copy of an Anne Arundel County Association of Realtors Addendum/Amendment, dated 11/9/01

K-5: One copy of page 2 of a Permit Agreement, dated 11/16/01

K-6: Copies of eight (8) Harte-Hanks Direct Marketing AMD Expense Reports, dated 12/2/01 and 3/10/02

K-7: One copy of a memo to Merrill Lynch, dated 9/13/02

K-8: One copy of a memo Re: Senior Management Bonus, dated 1/29/03

K-9: One copy of a hand printed agreement, dated 7/24/03

Six (6) original Charles R. Dall'Acqua checks, further described as follows:

|        | Check # | Date     |
|--------|---------|----------|
| K-10:  | 1394    | 10/1/01  |
| K-11:  | 1411    | 11/8/01  |
| K-12:  | 1434    | 12/6/01  |
| K-13:  | 1459    | 12/18/01 |
| K-14:  | 1265    | 12/30/02 |
| K-15:  | 1267    | 1/1/03   |

K-16: Copies of two hundred (200) Charles R. Dall'Acqua checks, dated 9-17-01 through 5-2-02

K-17: One original Incentive Stock Option Agreement, dated 1-25-88

K-18: One original Non-Qualified Stock Option Agreement, dated 7-14-89

K-19: One original Incentive Stock Option Agreement, dated 1-2-91

K-20: One original Non-Qualified Stock Option Agreement, dated 1-1-92

K-21: One original Non-Qualified Performance Stock Option Agreement, dated 1-1-93

Winters/Dall'Acqua
Page 3 of 9

K-22:   One original Non-Qualified Stock Option agreement, dated 1-1-93

K-23:   One original Non-Qualified Stock Option Agreement, dated 7-23-93

K-24:   One original Non-Qualified Stock Option Agreement, dated 7-24-96

K-25:   One original Non-Qualified Performance Stock Option Agreement, dated 1-78-98

K-26:   One original Non-Qualified Stock Option Agreement, dated 8-30-99

K-27:   One original Non-Qualified Stock Option Agreement, dated 1-9-01

K-28:   One original Aetna Enrollment/change Request, dated 12-7-01

K-29:   One original Non-Qualified Stock Option Agreement, dated 1-8-02

K-30:   One original Form MW 507, dated 10-4-02

K-31:   One original signature page, dated 7-19-03

K-32:   One original Meeting Registration Form

K-33:   One original Change to Coverage form, dated 11-15-03

Request

It was requested that examinations be conducted to determine the authenticity of the Charles Dall' Acqua signature on Exhibit Q-1.  Visual and microscopic examinations of Exhibits Q-1 and K-1 through K-33 were conducted to answer this request.  These examinations were conducted following the American Society of Testing and Materials (ASTM) Guideline for the Examination of Handwritten Items.

Winters/Dall'Acqua
Page 4 of 9

The evidence was also evaluated using the discriminating elements of writing described in <u>Handwriting Identification: Facts and Fundamentals</u>, by Roy A. Huber and A.M. Headrick. The authors describe twenty-one (21) habits of handwriting that are evaluated to determine authorship of handwriting. The questioned and known signatures were evaluated using these elements of handwriting.

Examination of handwriting

In the examination of the copies of the questioned signature, the examiner found some pictorial similarities and significant differences between the questioned and known signatures. Although the design of the questioned signature attempts to mimic the design of some of the known signatures, there are design differences that indicate that the questioned signature was prepared by another writer. These design differences include dissimilarities in the design of the letterform. The following are examples of some of the design differences between the questioned and known signatures:

-In the connecting stroke of between the "C" and "h" in the questioned signature there is a small hump before the high entry to the staff of the "h" that is not found in any of the comparable known signatures.
-At least two (2) pen lifts were found in the questioned signature that were not found in the known signatures. A pen lift was found in the staff of the "R" and the bowl of the "q".
-The middle initial "R" starts higher on the baseline than the known "R"s.

The pictorial similarities indicate that the writer of the questioned signature had access to a genuine Dall' Acqua signature(s). Due to the difficulty in copying all the characteristics of the genuine signature, the writer was not able to fully imitate the characteristics of the known signatures.

> *If the forger is to produce a perfect freehand imitation, he must imitate all the habits and qualities of the authentic signatures while simultaneously discarding all conflicting elements of his own writing. He must discover from detailed study of the model signature that is to be imitated all its salient factors and must know enough about the*

Winters/Dall'Acqua
Page 5 of 9

> *corresponding characteristics of his own writing to be able to eliminate their influence in his final product. Finally, this process involves writing the signature in the same natural way as the authentic signature. Failure often results because the forger has only a superficial idea of a few characteristics of both his own writing and the writing to be simulated or because his skill as a penman fails to measure up to that of the person whose writing is being imitated.*
>
> <u>Scientific Examination of Questioned Documents</u>, pp. 183-185
> Ordway Hilton

In the examination of the original questioned signature, the examiner noted additional differences between the questioned and known signatures. These differences include quality of the writing line, pen lifts and blunt beginning and ending strokes. The following are some examples of additional differences.

-Blunt beginning and ending strokes were found in the beginning of the "C", the beginning and ending of the middle initial, the beginning of the last name. Some of the known signatures were also prepared with a fluid ink pen, similar to the questioned signature, however, tapered beginning and ending strokes were found.
-A pen lift was noted in the beginning stroke of the middle initial "R". In the straight stroke on the left side of the letter, there is a break in the line of the letter, indicating that the pen was lifted off the paper during its preparation.
-At the bottom of the bowl of the "Q" where it meets the staff of the letter, there is an indication that there is a retracing of the stroke back to the left. This retracing may indicate that there is a pen lift between the bowl of the "Q" and the staff.
-At the bottom of the descender of the "Q", there is a heavy ink deposit that may indicate pen lift and/or hesitation. The descender also bears characteristics of slowness of movement with poorer line quality.

According to Huber and Headrick, there are twenty-one (21) discriminating elements of handwriting that should be evaluated in a comparison of handwriting. The questioned and known signatures were evaluated for these elements.
   1.) Arrangement
   2.) Class of Allograph
   3.) Connections

Winters/Dall'Acqua
Page 6 of 9

    4.) Designs of Allographs and their Construction
    5.) Dimensions
    6.) Slant or Slope
    7.) Spacings
    8.) Abbreviations
    9.) Alignment
    10.) Commencements and Terminations
    11.) Diacritics and Puctuation
    12.) Embellishments
    13.) Legibility or Writing Quality
    14.) Line Continuity
    15.) Line Quality
    16.) Pen Control
    17.) Writing Movement
    18.) Consistency or Natural Variation
    19.) Persistency
    20.) Lateral Expansion
    21.) Word Proportions

       Based on examination of these elements of the questioned and known signatures, the examiner found that Huber and Headrick noted an importance in the examination of the connecting strokes. They write, *"Worth noting is that in the simulation of signatures, connections may be particularly important. The simulator may copy the letter designs but overlook a reasonable duplication of the manners in which letters are connected."* Page 98    Because there is a difference in the connecting stroke between the "C" and "h" in the questioned signature and the known signatures that bear a connecting stroke between these two letters, additional consideration must be given to this difference.

> *Whenever there is reason to suspect that a handwriting is a copy, the connecting strokes will amply repay close investigation. Almost invariably it will be found that whilst the copyist may have succeeded in reproducing the more obvious features of letter design, little care has been taken to introduce connecting strokes which will pass muster.*
>
> <u>Suspect Documents</u> Page 321-322
> Wilson R. Harrison

In the examination of the baseline habits as described under the classification of "Alignment", the examiner found a difference between the height of the middle initial "R" in the questioned and known. In the questioned signature, the bottom of the "R" is approximately 2 mm above the baseline. In the known signatures, the "R" usually starts at or below the baseline. Although there are some known middle initials that start above the baseline, none start more than 1 mm above the baseline. Huber and Headrick quote a study by McClary that says, *"The study confirmed that baseline alignment is a repetitious writing habit and reliable factor in handwriting comparisons for the purposes of identification or elimination. This is true more so with respect to signatures that are the more habitual of one's handwriting skills."* Page 113 Because baseline habits, like connecting strokes, may be overlooked in the copying of a signature, it is important to note the differences between the questioned and known signatures.

>*Alignment habit may be regarded as a relatively fixed characteristic of handwriting.*
>
>Suspect Documents page 335
>Wilson R. Harrison

Under the category of Commencements and Terminations, the characteristics of blunt beginning and ending strokes, pen lifts, and poorer line quality bear the indications of an attempted simulation or tracing of a genuine Dall'Acqua signature(s).

>*While it is reasonable to expect imitations will resemble in some ways the writing being imitated, they tend to deviate from the genuine in three principal respects: form, line quality, and stroke continuity.*
>
>Handwriting Identification: Facts and Fundamentals p. 289
>Roy A. Huber and A.M. Headrick

With regard to Line Continuity, Huber and Headrick write, *"Disconnections in spurious writings are much less obvious, and often patched, repaired, or retouched afterward… In the examination and study of signatures, disconnections or pen lifts are classic symptoms of simulation by tracing*

Winters/Dall'Acqua
Page 8 of 9

*methods."* Page 119  The examiner noted the two above described pen lifts in the questioned signature.  These pen lifts/pen stops were noted in the microscopic examination of the signature.

Examination of Indented Impressions

In the initial examination of Exhibit Q-1, the examiner noted the presence of indented impressions on the first page of Exhibit Q-1.  Indented impressions are marks left on paper from writing on previous sheets of paper.  The examiner requested that the original document be submitted for further examination.

Exhibit Q-1 was submitted to the examiner and examinations for indented impressions were conducted with an indentation materializer.  The examiner found indented impressions on both pages of Exhibit Q-1.

On Page 1 of Exhibit Q-1 on the left side of the page, the examiner found decipherable indentations that read "6/11/04", "Sewell", and "cc cc Dernoga". On the right side of the page, decipherable impressions of the hand printed words "other" and "said costs exceed" are present.  Toward the bottom left side of page1, there is a partial impression of a date "/04".

On Page 2 of Exhibit Q-1, the examiner found a partial impression of a date that reads either "3/15/04" or "5/15/04".  The examiner also found partial impressions from the indentations that appeared on page 1 of Exhibit Q-1.  Based on the indentations, it appears that page 2 was under page 1 when the indentations were made on page 1 and page 1 was under page 2 when the date indentation was made on page 2 of Exhibit Q-1.

The examiner conducted an examination of the indented impressions with Exhibits K-1 through K-16.  Due to the quality of the indented impressions, the examiner was limited in this comparison. The examiner did find style differences between the handwritten words "Sewell" and "Dernoga" indicating they may not have been prepared by the person who prepared Exhibits K-1 through K-16.  The other indented impressions are too limited to reach any conclusion regarding their authorship with regard to the known writing.

Winters/Dall'Acqua
Page 9 of 9

Conclusions

Based on the differences between the questioned and known Charles Dall' Acqua signatures it is the opinion of the examiner that the questioned Dall' Acqua signature on Exhibit Q-1 is an attempted simulation of a genuine Dall'Acqua signature(s).  The examiner found no evidence to indicate that the person who prepared the known Charles Dall'Acqua signatures on Exhibits K-1 through K-33 executed the Charles Dall' Acqua signature on Exhibit Q-1.

In the examination of the indented impressions on Exhibit Q-1, the examiner found dates and other words that indicate that Exhibit Q-1 was under a document(s) that was dated as 2004.

The examiner requests the right to supplement this report should additional documents become available for examination.  The original exhibits were returned to the office of Melick, Porter & Shea.

Respectfully submitted,

Ellen Mulcrone Schuetzner