PETER V. TYTELL  
DOCUMENT EXAMINER

116 FULTON STREET  
SUITE 2W  
NEW YORK, NY 10038–2712  
TEL: 212/233-5333  
FAX: 212/233-5336  
E-MAIL: TYPETER@AOL.COM

October 22, 2004

Report to

Daniel J. Winters, Esquire  
Jenner & Block LLP  
One IBM Plaza  
Chicago, IL  60611-7603

                                          Re: *Harte-Hanks, Inc. v. Charles R. Dall'Acqua  
                                                  and Protocol Marketing Group*

      At your request I have been conducting an examination and comparison of an agreement along with known writings of Charles R. Dall'Acqua for the purpose of determining whether or not the signature (and the date) on the agreement in question were written by the Charles R. Dall'Acqua of the knowns. This examination is based on over three decades of study and experience in the field of forensic document examination.[1]

### I.   QUESTIONED DOCUMENT

      A two-page Confidentiality/Non-Disclosure Agreement previously marked with a label on the first page as Plaintiff's Exhibit 1 was submitted for examination (the "Questioned Document").  On the second page of the Questioned Document there is a signature in black ink (the "Questioned Signature") with the date *1/25/02* in black ink below it (the "Questioned Date").  Another signature and date appear on the second page in light purple ink; a name is also written at the top of the first page in light purple ink.

      When received for examination the two pages of Questioned Document were attached with a staple at the top, approximately 1½ inches from the left edge of the paper. There were numerous empty staple holes in the upper left corner of each page; apparently they had previously been stapled, unstapled, and restapled a number of times. The Questioned Document was unstapled for non-destructive instrumental indentation examination and was not restapled; the removed staple was retained.

      Based on an initial examination of the original in question, it was determined that the questioned signature and questioned date provided sufficient material for a full examination.

---

[1] A copy of my professional resume, including a list of matters where I have appeared as an expert witness, is appended as Exhibit 1.

## II. KNOWN DOCUMENTS

Originals and photocopies[2] of various documents were submitted for comparison as samples of normal course of business handwriting (including *inter alia* signatures and dates), acknowledged by or otherwise attributable to Charles R. Dall'Acqua (the "Knowns"). The Knowns are dated 7/23/93 to 11/18/03, and can be summarized as follows:[3]

> Items previously marked as Defendant's Exhibit D-3 (22 items), dated from 10/1/01 to 7/24/03.
>
> Items previously marked as Plaintiff's Exhibits P-7-A through P-7-C and P-10-A through P-10-T (23 items), dated 7/23/93 to 11/18/03.
>
> Cancelled checks (200 items), dated 9/17/01 through 5/2/02.

Inter-comparison of the non-request, normal course of business signatures revealed no significant differences. The Known dates and other writings were reviewed for internal consistency and any significantly inconsistent material was not considered further in comparison with the questioned date.

The non-request, normal course of business standards provided sufficient comparable signatures and other appropriate known writing of Charles R. Dall'Acqua for a full examination.

## III. PURPOSES OF THE EXAMINATION

The purposes of the examination were: to determine, if possible, whether or not the Charles R. Dall'Acqua of the Knowns signed the Questioned Document; to determine, if possible, whether or not the Charles R. Dall'Acqua of the Knowns wrote the date in black ink on the Questioned Document; and to note any other significant features of the material submitted for examination.

## IV. NATURE OF THE EXAMINATION

The nature of the examination was non-destructive. The questioned and known documents were studied at various degrees of magnification with the aid of a stereoscopic microscope and hand magnifiers utilizing transmitted, incident, and oblique illumination as appropriate. Light sources of various spectral characteristics, specialized viewing filters, long-wave and short-wave ultraviolet lamps, and a special purpose closed circuit television system sensitive to the near infrared region of the spectrum for viewing reflected infrared and infrared luminescence (Visual Spectral Comparator, VSC-1) were also employed as needed. An electrostatic detection device (ESDA) was used for instrumental indentation examinations.

During this examination different aspects of the problem presented were analyzed. During each phase, the reliable principles and methods of forensic document examination were applied in accordance with the standard practices and procedures of the field.[4]

---

[2] As used here the term "photocopy" can include copies made with a variety of processes on "office copier" type machines, as well as telefacsimiles, microfilm blowbacks, etc.

[3] A more detailed list of the Knowns is appended as Exhibit 2.

[4] A leading standard in the field is ASTM E2290, *Standard Guide to Examination of Handwritten Items*. Rather than repeat the appropriate text of the standard in the body of this report, a copy of E2290 is attached as Exhibit 3. The elements of the writing considered in the examination, comparison, and evaluation of the questioned and known signatures and dates are among the features listed in the Note in § 7.12.4.

## V.    FINDINGS

### Paper Examination

The Questioned Document was prepared on plain, unwatermarked 20 pound bond (measuring 0.004" in thickness); this is the sort of paper commonly used in copiers and laser printers. When examined with transmitted light the look-through of both sheets of paper is regular with a noticeable vertical alignment and uniform formation.[5] When examined under long-wave and short-wave ultraviolet lamps the paper of the Questioned Document fluoresced quite brightly.

The paper of original documents in Plaintiff's Exhibit P-10 was compared to the paper of the Questioned Document. These Knowns are dated from 1/25/88 (Exhibit P-10-I) through 11/15/03 (Exhibit P-10-A). With one exception the paper of the Questioned Document was readily differentiated from the paper of all these Knowns, including being differentiated from the paper of the Knowns closest in date to the Questioned Document (i.e., Exhibit P-10-C, dated 12/5/01, Exhibits P-10-D and P-10-G, dated 12/7/01, as well as Exhibit P-10-T, dated 1/8/02). Only the paper of Plaintiff's Exhibit P-10-A showed the same fluorescence as the Questioned Document, also matching in thickness and in look-through.

Comparison of the paper of the Questioned Document with appropriate documents reliably dated from early January 2002 through the time the Questioned Document was first presented might reveal when this brightly fluorescent bond paper was in use in the office that produced the Questioned Document.

### Ink Examination

The Questioned Signature and the Questioned Date were written with black non-ballpoint ink. Other entries on both pages of the Questioned Document were written with a light purple non-ballpoint ink.

The ink line of Questioned Signature and the ink line of the Questioned Date do not show any dramatic variations in width that could be attributed to horizontal diffusion into the paper caused by inhomogeneous formation of the paper sheet or by inconsistent ink metering from a faulty writing instrument. Some strike-through of the black ink was observed on the reverse of the second page (i.e., black fluid ink soaking into and through the paper to appear on the reverse of the sheet).

Many of the Knowns were written with non-ballpoint ink of various kinds. Unlike the questioned writing, however, all writing in fluid inks found in the Knowns is characterized by good line quality, smooth curves, and rapid execution without any of the defects noted in the writing on the Questioned Document. This writing in the Knowns tends to illustrate that Charles R. Dall'Acqua was quite a competent writer with a pen using fluid ink.

---

[5] "**Look-Through.** The appearance of paper when viewed by transmitted light, thus disclosing the texture or *Formation* (*q.v.*) of the sheet."

"**Formation**. A property which is determined by the degree of uniformity of distribution of the solid components of the sheet with special reference to the fibers. It is usually judged by the visual appearance of the sheet when viewed by transmitted light. This property is very important, not only because of its influence on the appearance of the sheet but because it influences the values and uniformity of values of nearly al other properties."

*The Dictionary of Paper* 3rd ed. New York: American Paper and Pulp Association, 1965.

Further, the interaction of these fluid inks with the various grades of paper in the Knowns did not result in a pattern of ink strike-through like the one seen in the Questioned Document. It would, therefore, not be correct to attribute any and all defects in line quality in the Questioned Signature or Questioned Date merely to an interaction of the ink and paper without noting that abnormally slow writing could be a major factor.

The ink lines of the Questioned Signature and of the Questioned Date were compared using non-destructive optical methods, both non-instrumental visual examinations with dichroic filters and examination in the infrared region of the spectrum using specialized video equipment. The comparison of the ink of the Questioned Signature and of the Questioned Date by the optical techniques employed in this examination revealed no significant inexplicable differences and there is significant agreement in all observable aspects of the results. It was concluded that the ink of these entries match at this level of analysis.[6]

Given the similarities of the ink in the context of the Questioned Document, the Questioned Date was examined under a working hypothesis that it had been written by the same individual who wrote the Questioned Signature.

### Signature and Date Examination

In the analysis, comparison, and evaluation of the Questioned Signature and Questioned Date along with the Knowns significant differences were noted in basic writing habits. Among the significantly different elements of the writing are alignment; arrangement, relation to the baseline; continuity of movement; direction of strokes; formation; freedom of execution; line quality; method of production; positioning; pressure; proportion; rhythm; size; skill; slant or slope; spacing; speed; initial, connecting and terminal strokes; and range of variation. Some of these significant differences are discussed and illustrated below.

### The Known Signatures of Charles R. Dall'Acqua

The several hundred known signatures of Charles R. Dall'Acqua reviewed were dated over a period of almost sixteen years, beginning fourteen years before the 1/25/02 date of the Questioned Document. The examination revealed a rapidly written stylized signature, rather than a completely legible writing out of the name.

---

[6] However, from a technical viewpoint, these results only mean that these items are in ink of the same formula or of two similar formulas with the same nonvolatile components. It is possible that other, destructive analytical techniques might be able to further differentiate them. This conclusion does not eliminate the possibility that the items are in ink from different manufacturing batches or from different writing instruments.

Charles R. Dall'Acqua is capable of writing out his name relatively legibly in a hand printed style, and may even use this style of printing occasionally to sign a check, as seen below.[7]


Ck. 1485, dated 1/2/[02]

Review of the many Knowns indicates that the use of a hand printed style signature is the rare exception rather than the rule and is of little, if any, use for comparison in this matter. Moreover, as a methodological matter, forensic document examiners compare like with like; it would be inappropriate to compare separately written characters with a connected cursive style signature.

The Known signatures Charles R. Dall'Acqua are generally characterized by a tendency to rapid execution at the expense of legibility. As is seen in the writing of many people, the signatures of Charles R. Dall'Acqua show changes over the years. The changes in Mr. Dall'Acqua's signature follow a trend towards simplification and more rapid writing. Even the signature with the earliest date among the Knowns is simplified and abbreviated with only a few readily legible characters.


Ex. P-10-I — Agreement, as of 1/25/88

---

[7] The signature in this illustration is enlarged approximately twice life size, as are the other illustrations in this series. Tables with similarly enlarged illustrations of the Known Signatures and the relevant Known Dates arranged in chronological order are attached as Exhibit 4 and Exhibit 5, respectively. These tables include the items marked as Plaintiff's and Defendant's exhibits as well as the additional checks dated in January and February 2002.

Re *Harte-Hanks v. Dall'Acqua, et al.*          – 6 –                              October 22, 2004

    Over time the rapid execution of the signature has been further facilitated by greater simplification to the point that it resembles several abbreviations or initials rather than a full signature.



Ex. P-10-F — Registration Form, dated as faxed 9/2/03

    During the period of interest the signature appeared as a *Ch* for the first name, a sometimes legible middle initial *R*, and for the last name a large stylized formation resembling a capital *Y* at the top and a small *q* at the bottom.



Ex. P-10-C — Memo, dated 12/5/01

    As with any person's signature, there is variation between individual examples of Mr. Dall'Acqua's signature, for instance connecting the middle initial to the final formation in a Known dated just two days later than the signature illustrated above.



Ex. P-10-G — Ætna form, dated 12/7/01

    This variation involves modifying a letter form to increase speed through continuity of movement, even if it compromises legibility. It is an example of the writer's habitual trend to ever more rapid execution of the signature.

Re *Harte-Hanks v. Dall'Acqua, et al.*   – 7 –   October 22, 2004

### Comparison of the Questioned and Known Signatures

Although the Questioned Signature has some resemblance to Charles R. Dall'Acqua's known signatures in its overall appearance, it is significantly different in the more subtle details of its execution.

One of the axioms of forensic document examination is that the simulation of a signature involves a balance between form and speed. Achieving a satisfactory pictorial resemblance to a genuine signature requires careful copying or tracing of the model signature. The resulting lack of natural speed and fluency can be seen in the final product. This can be especially evident in strokes that should be long, smooth curves but are flattened out or are wavy and tremulous instead of even and firm, because the lines have been deliberately drawn instead of freely written. There may also be indications of abnormal hesitations or pen lifts as the writer (or rather drawer) considers the next movement. These are some of the faults that are collectively referred to as "poor line quality". An increase of speed can smooth out the stroke and improve the line quality, but the difficulty of accurately reproducing the model signature will increase as the simulator moves from drawing to writing. This usually results in a greater departure from the habitual forms of the genuine writing and a concomitant loss of pictorial similarity.

In a number of places abnormally slow execution has produced the tell tale signs of poor line quality. Unlike the smooth execution of the Known signatures (including many also written in fluid ink) there are several places in the questioned signature where the lines are not smooth. The Questioned Signature is illustrated below at approximately five times life-size. Note the uneven nature of long curved or straight lines indicated by the arrows:

1. The back of the C.
2. The up-stroke stem of the R.
3. The principal down-stroke of the last name.



Re *Harte-Hanks v. Dall'Acqua, et al.*   – 8 –   October 22, 2004

The waviness in the line of the principal down-stroke of the second name of the questioned signature is in marked contrast to the smooth curves found in the Knowns.



Questioned — Ex. P1, dated 1/25/02         Known — Ex. P10-G, dated 12/7/01

Examination of the principal down-stroke of the second name of the Questioned Signature (on the left) shows that it is formed with a carefully drawn line that is significantly uneven in the crooked lower portion where it bends to the right (*as indicated by the arrow*). This is in contrast to the rapidly written smooth curve typical of the known signatures, as seen in the down-stroke illustrated on the right. This contrast can be more easily seen in the illustration above, which shows an enlarged images (about ten times life size) of the down-stroke from the Questioned Signature and from a Known with two superimposed lines flanking each of them. Holding this page with the illustration nearly flat so that it is possible to look down the length of each edge can also aid in viewing this feature.

Re *Harte-Hanks v. Dall'Acqua, et al.*   – 9 –   October 22, 2004

In addition to the flaws of line quality noted above, comparison of the Questioned Signature with the Knowns revealed significant differences, including several in the formation of the *Ch* combination that is the first name of the Questioned Signature, which is illustrated here at approximately five times life size.



4. There is a marked discontinuity or "bump" in the connecting stroke of the *C* to the *h*. This is unlike any *Ch* combination found among the several hundred contemporaneous Known Signatures, where this connecting stroke is characterized by smooth continuous movement.

5. The down-stroke forming the staff of the *h* is a straight line from its top to the lowest point in the transition to the upstroke of the arc. This line lacks the rhythm of the curved strokes of the Knowns, which are bowed out gently to the left.

6. The transition from the down-stroke of the staff of the *h* into the arc is closed, with the convex upstroke overlapping the down-stroke almost to the top of the ark. In the Knowns this transition is open and the upstroke tends to be concave.

The degree to which these features of the Questioned Signature are at variance with the writing habits prevalent in the Knowns can be seen in the comparison of the Questioned Signature with a few of the contemporaneously dated Knowns illustrated below with arrows pointing to the relevant areas (images twice life-size).



Ex. P-1
Agreement,
dated 1/25/02



| Ex. P-10-D Enrollment Form dated 12/7/01 | Ex. P-10-G Ætna form dated 12/7/01 | Ex. D-3-A Check #1459 dated 12/18/54 (*sic*) | Ex. P-10-T Agreement, as of 1/8/02 |

The collection of Known Signatures in Exhibit 4 provides abundant additional examples of these and other significant differences between the Questioned Signature and the habitual signature writing style of Charles R. Dall'Acqua.

Re *Harte-Hanks v. Dall'Acqua, et al.*  – 10 –  October 22, 2004

### Comparison of the Questioned and Known Dates

Like the known signatures, the known dates are smoothly and rapidly executed, as can be seen in those illustrated below, taken from Plaintiff's Exhibit 10. The tendency to finish the diagonals and stems of the numerals *1* and *7* with a tailing hook to the right is a sign of rapidity and continuity of movement in the writing.



| Ex. P-10-C — Memo, dated 12/5/01 | Ex. P-10-D — Enrollment Form, dated 12/7/01 | Ex. P-10-G — Ætna form, dated 12/7/01 |

The line quality of the Questioned Date is significantly different from the Knowns, just as was seen in the Questioned Signature. Indeed, the Questioned Date is perhaps even more awkwardly executed than the Questioned Signature.

Re *Harte-Hanks v. Dall'Acqua, et al.*  – 11 –  October 22, 2004

The Questioned Dated is illustrated below at five times life size. The overall lack of continuity of movement and the slow, labored quality of the execution of specific portions of the Questioned Date are evident. The lower image of the reverse of the page shows where ink has penetrated all the way through the paper; this pattern of ink strike-through is generally an indication of slow pen movement. (The lower image has been laterally reversed to more easily see the relation of the ink seepage to slowly drawn areas of the Questioned Date.)

A. Both diagonals are slowly executed straight lines (rather than rapidly written strokes tending to curve to the right); this defect is analogous to the straight line of the staff of the *h* in the Questioned Signature. The diagonals also lack the rapid terminals of the Knowns. The pen hesitated so long at the end of the first diagonal that ink seeped through the paper.

B. The bowl of the numeral *5* has poor line quality. The abnormally slow writing has also resulted in ink seeping through the paper.





Re *Harte-Hanks v. Dall'Acqua, et al.*        – 12 –        October 22, 2004

As with the Questioned Signature, in addition to the poor line quality of slow pen movement, the Questioned Date has significant departures from other writing habits typical of the Knowns. These include two that are indicated by the arrows in the below, where the Questioned Date is illustrated at five times life size.

C. The numeral *1* lacks a terminal hook or even a slight bend at the end. It also is noticeably shorter than the other numerals.

D. The second diagonal stops well above the printed baseline; the diagonals of the known dates generally go through or at least touch the baseline.



Of course, the appropriate comparison material for the writing of a date consists of dates written contemporaneously with the one in question. A few such examples from the collection of Knowns, along with the Questioned Date, are illustrated below at twice life-size. The arrows indicate to the two particular features mentioned above; additional examples of these and other significant differences in the habitual manner Charles R. Dall'Acqua writes dates can be seen in collection of Known Dates in Exhibit 5.


Ex. P-1 — Agreement, dated 1/25/02



| Ck. #1492, dated 1/21/02 | Ck. #1493, dated 1/21/02 | Ck. #1494, dated 1/22/02 |
| Ck. #1495, dated 1/23/02 | Ck. #1505, dated 1/27/02 | Ck. #1480, dated 2/1/02 |

**Other Findings**

Preliminary examinations using side lighting grazing the surface of the paper revealed apparent indentations of writing on both pages of the Questioned Document. Examination with the ESDA (a non-destructive instrumental technique to visualize indented impressions) on each sheet of paper after unstapling yielded images of the latent impressions.

## VI. CONCLUSIONS

The findings from examination of the material submitted lead to the following determinations:

The black non-ballpoint ink of the Questioned Signature matches the black non-ballpoint ink of the Questioned Date at this level of analysis; that is, the ink of these two writings could not be differentiated by the suite of optical techniques used in this examination.

The paper of the Questioned Document does not match the paper of the contemporaneously dated Knowns. The paper of the Questioned Document only matches the paper of the most recently dated Known (Plaintiff's Exhibit P-10-A, dated 11/15/03); that is, the paper of these two documents could not be differentiated by the techniques used in this examination. Comparison of the Questioned Document with additional documents of known origin and date may provide a time frame for the creation of the Questioned Document.

The analysis, comparison, evaluation of the Questioned Signature (as well as of the Questioned Date) on page 2 of the Questioned Document (Plaintiff's Exhibit P-1) along with the appropriate known writings of Charles R. Dall'Acqua revealed significant differences in basic writing habits. There were also a number of examples of the features generally associated with simulated or imitated writing: a combination of slow writing leading to poor line quality, especially where the questioned item most resembles the Knowns, along with a departure from the writing habits evident in the Knowns where there is more rapid execution.

In combination these significant findings lead to the determination that neither the Questioned Signature nor the Questioned Date are the normal writing of Charles R. Dall'Acqua as reflected in the contemporaneous Knowns, but rather are simulations. It should be noted that in the opinion terminology used by forensic document examiners[8] this conclusion is stated with the highest degree of confidence expressed by a forensic document examiner in handwriting comparisons. This report may be supplemented if additional documents are submitted for examination.

Should presentation of these findings be required, illustrative charts demonstrating the bases for these determinations can be prepared.

Respectfully submitted,

Peter V. Tytell

---

[8] ASTM E1658 *Standard Terminology for Expressing Conclusions of Forensic Document Examiners.*