UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

HARTE-HANKS, INC.,

Plaintiff,

v.

CHARLES R. DALL'ACQUA and PROTOCOL MARKETING GROUP,

Defendants.

Civil Action No. 04 CV 11548 DPW

**OPPOSITION TO DEFENDANTS' MOTION FOR SANCTIONS FOR HARTE-HANKS' SPOLIATION OF EVIDENCE**

Plaintiff, Harte-Hanks, Inc. ("Harte-Hanks"), hereby opposes Defendants' Motion for Sanctions for Harte-Hanks' Spoliation of Evidence (the "Motion for Sanctions").

**Memorandum Of Reasons**

**I. Preliminary Statement**

Ms. Dernoga lost the originals of some documents. Until recently, his defense team, including his two experts, did not care one whit about these originals. Now they claim that the originals are crucial and that the case should be dismissed because they have been lost. Any way one slices it, Defendants' motion is an attempt to evade Mr. Dall'Acqua's day of reckoning by capitalizing on an error by Ms. Dernoga.

The attempt should fail. An innocent mistake is at issue, not the nefarious conduct that Defendants' shrilly allege, but do not establish. (It is curious indeed that Defendants do not submit a single affidavit in support of a motion that levels such serious charges.) And the

mistake does not prejudice Defendants, for the inquiry regarding paper that they want to make can be made without the purportedly all-important documents.

## II. Facts And Procedural History[1]

**Background**

In August, the Court conducted an evidentiary hearing on Harte-Hanks's motion for a preliminary injunction, which sought, of course, to enjoin further breaches of the non-solicitation provision of Mr. Dall'Acqua's Confidentiality/Non-Disclosure Agreement (the "Dall'Acqua Agreement"). Given Defendants' pre-hearing admissions and position, only one substantial issue was presented – whether Mr. Dall'Acqua's signature on the Dall'Acqua Agreement is genuine. The Court ruled on the motion from the bench on August 18, 2004. The Court found, on a provisional basis, that Mr. Dall'Acqua had signed the Agreement. Based on this finding and extensive findings with respect to the other elements of the test for injunctive relief, the Court prohibited Mr. Dall'Acqua and Protocol from soliciting any other Harte-Hanks employees until March 5, 2006, or until further order of the Court. The ruling from the bench was memorialized in an Electronic Order, entered August 18, as well as a Preliminary Injunction Order, entered August 25. (Transcript and Orders, Docket Nos. 24-26, 29-30, and 33; Preliminary Injunction Order, Docket No. 34.) Defendants did not appeal the ruling.

**The Other Agreements**

Before the August hearing, Ms. Dernoga gathered from the files in her office (and faxed to counsel) numerous documents relating to the assertions by Mr. Dall'Acqua that he had not

---

1 This Statement of Relevant Facts and Procedural History is based on and supported by items filed with or entered by the Court (referenced by Docket Number, where applicable) and the declarations of Kathleen A. Kelley ("Kelley Dec.") (Exhibit 1 hereto), Alan Robillard ("Robillard Dec.") (Exhibit 2 hereto), current and former Harte-Hanks employees ("Employee Decs.") (Exhibit 3 hereto), and Elaine Dernoga ("Dernoga Dec.") (Exhibit 4 hereto).

seen or signed, would not have signed, and could not have signed, the Dall'Acqua Agreement. Among the documents Ms. Dernoga located are Confidentiality/Non-Disclosure Agreements signed by herself and other current and former Harte-Hanks employees in January 2002 (the "Other Agreements").[2] (Dernoga Dec., ¶ 3; Employee Decs.) As with the Dall'Acqua Agreement, Ms. Dernoga had been responsible for obtaining the employees' signatures on the Other Agreements, and she had countersigned them (with the exception of her own) on behalf of Harte-Hanks. (Dernoga Dec., ¶ 4; Employee Decs.) Because the existence and dates of the Other Agreements corroborate Harte-Hanks's contentions with respect to, among other things, the push to have employees sign confidentiality (and other) agreements in January 2002 and the circumstances surrounding and timing of Mr. Dall'Acqua's execution of his agreement, copies of the Other Agreements were submitted before the August hearing. (Docket Nos. 15, 23.)[3]

**Ms. Dernoga's Loss Of The Other Agreements**

Ms. Dernoga was asked to come to the hearing on August 10 and to bring with her the originals of documents she had been faxing to counsel, including the Other Agreements. To attend the hearing on August 10, Ms. Dernoga made plans to travel from Baltimore to Boston on

---

2 The Other Agreements were signed by Elaine Dernoga, David Schultz, Richard Schwartz, Charley Howard, Johanna White, Jeanine Clark, Glenn Hecht, Colleen Vukov, Kevin Sweeney, and Fred Leary. Attached hereto as Exhibit 3 are declarations of all of these individuals except Ms. Vukov and Messrs. Sweeney and Leary, who are no longer employed by Harte-Hanks; efforts to reach them have been unsuccessful. Ms. Dernoga recently remembered that there are two other Harte-Hanks employees for whom she was responsible, Mark Whiteford and Michael Lincoln. Messrs. Whiteford and Lincoln worked out of the Baltimore office. The originals of their agreements are in the custody of counsel for Harte-Hanks.

3 Defendants claim that Ms. "Dernoga relies on" the Other Agreements "to overcome the [ ] deficiencies" in her testimony, viz., that "she does not recall [the] surrounding [ ] circumstances of the execution of the alleged agreement . . .." (Motion for Sanctions at 2.) There were no "deficiencies" in Ms. Dernoga's testimony. She merely testified to what she could remember and, to her credit, refused to stretch her memory. Furthermore, the originals of the Other Agreements bear no relation to her testimony. The very existence of the Other Agreements, which is not challenged, and not the originals of them or the paper on which they were printed originally, refutes Mr. Dall'Acqua's claim that there was no need to have him sign the Dall'Acqua Agreement in January 2002.

Monday, August 9.  In anticipation of the Monday travel, and knowing that she would be busy at work on Monday before catching her flight, on Friday, August 6, Ms. Dernoga placed the originals of the Other Agreements in a leather portfolio and the originals of the other documents in an envelope and took the portfolio and envelope home with her.  Her plan was to pack her suitcase over the weekend; to put it, the portfolio, and the envelope in her car; to leave them in her car during work on Monday; and then to drive to BWI on Monday afternoon.  (Dernoga Dec., ¶¶ 5, 6.)

Ms. Dernoga believes that she followed this plan on the 9th.  She believes now, having reconstructed the events of those days, that she went to BWI on the afternoon of the 9th with her suitcase, the portfolio, and the envelope.  (Dernoga Dec., ¶ 7.)

Ms. Dernoga was in some distress at the airport.  She rarely travels for business, she dislikes commercial flights, and she did not relish the thought of flying to Logan in light of, among other things, its association with the events of September 11, 2001.  She had never been to Boston before, had never testified before, had never met Harte-Hanks's outside or inside (Mr. Hacker) counsel in person before, and was nervous about the possibility that she might be called to testify.  In addition, she was upset in general about the case, as she was essentially being accused, by a man for whom she had worked for years, of committing forgery.  To make matters worse, when she travels, she insists on taking her own food with her (for reasons that are not relevant), and, when she got to the airport, she was surprised and dismayed to discover that she had forgotten to pack her food.  Therefore, while at the airport, she visited a shop and bought some items as substitutes.  (Dernoga Dec., ¶¶ 8, 9.)

After she arrived at Logan and was en route to her hotel, Ms. Dernoga realized that she did not have the portfolio containing the Other Agreements. (Dernoga Dec., ¶ 10.) Her first thought was that she had left the portfolio at BWI, but she was not sure. She also thought that she might have left the portfolio at her home or in her car.[4] She decided that she would check with lost and found at BWI, and search her home and car. Upon her return to Baltimore on the evening of August 10, Ms. Dernoga checked her car and home for the missing portfolio, but did not find it. Early the next morning, she went to lost and found at BWI, but had no luck there. She went to the office and checked it. Later, she followed up with lost and found at BWI, again with no success. The originals of the Other Agreements are, therefore, unavailable. Copies of the Other Agreements are on file. (Dernoga Dec., ¶ 11; Docket Nos. 15, 23.)

Notably, neither Ms. Dernoga nor anyone else on Harte-Hanks's side of the aisle had any inkling on August 10 that the actual paper of the Other Agreements would become an issue (such as it is). Indeed, by August 10, Ms. Schuetzner's original and supplemental reports had been submitted, and they say nothing about the paper of either the Dall'Acqua Agreement or the Other Agreements. (Dernoga Dec., ¶ 13; Docket Nos. 10, 22.)

**Defendants' Discovery Requests**

In September, Defendants served three separate requests for the production of documents (totaling 51 individual requests) and two sets of interrogatories on Harte-Hanks. Defendants did not inquire about and/or request the originals of the Other Agreements. On the contrary, only

---

[4]       During her testimony on August 10, Ms. Dernoga was asked if she had the original of one of the Agreements at her office. She answered "I most likely do." She mis-spoke, but she did believe at the time that the portfolio was in Baltimore and would be found or retrieved at some location there. (Dernoga Dec., ¶ 12.)

"copies" of confidentiality/non-disclosure agreements were requested (and then, not the Other Agreements in particular). (Kelley Dec., ¶ 2.)[5]

**Defendants' Expert Opinions/Reports Pre-October 19**

Ms. Schuetzner was retained by Defendants in July or August. Ms. Schuetzner has prepared three reports, dated August 7, August 12, and October 22. On August 12, Ms. Schuetzner testified. In August, Ms. Schuetzner opined with the highest degree of confidence that the Dall'Acqua signature on the Dall'Acqua Agreement is not genuine. In neither her August reports nor her testimony did Ms. Schuetzner suggest that the Other Agreements are relevant to her ability to arrive at an opinion concerning the signature, nor did she say anything about the paper of the original Dall'Acqua Agreement or of the Other Agreements. (Docket Nos. 10, 22, 29, 50.)

Peter Tytell was retained by Defendants in September. Mr. Tytell completed his first (preliminary) report on October 7, 2004. It is a lengthy, detailed document, complete with conclusion. In the report, Mr. Tytell says nothing about the Other Agreements. (They were not even mentioned as being relevant to his analysis, much less as central and/or crucial to it.) In the October 7 report, Mr. Tytell concluded – "with the highest degree of confidence" – that the Dall'Acqua signature on the Agreement is not genuine.[6] (Kelley Dec., ¶ 11, Ex. B.)

---

[5] Document Request No. 6 specifically requested "[c]opies of all Confidentiality/Non-Disclosure Agreements executed by employees of Harte-Hanks from July 2001 to the present." (Kelley Dec., ¶ 2.)

[6] Defendants suggest that a review of Mr. Tytell's Preliminary Report (for that is the only Tytell report in Harte-Hanks's possession prior to the October 20 telephone call with defense counsel discussed below) "troubled" Harte-Hanks in some way related to the originals of the Other Agreements, thus resulting in the disclosure of the loss of the documents. (Motion for Sanctions at 5.) This is fiction, as is so much of the speculation in the Motion for Sanctions. Mr. Tytell's Preliminary Report said not a word about the need for any paper examination, or about contemporaneous documents from Glen Burnie in general, or about the original Other Agreements in particular, being relevant to his examination of the Questioned Document. Mr. Tytell's observations about paper found their way into Mr. Tytell's report only <u>after</u> Harte-Hanks's counsel had **volunteered** that the original Agreements were not available.

**Defendants' Request For The Original Agreements**

By letter dated October 19, 2004, Angela Lackard, co-counsel for Defendants, requested, **for the first time**, that Harte-Hanks produce the originals of the Other Agreements. (Kelley Dec., ¶ 3, Ex. A.) The undersigned could simply have ignored the letter or rejected the request, for the deadline for service of document requests had long passed, and the parties were in the midst of a standstill for the purpose of discussing settlement. (Kelley Dec., ¶ 4.)

But they took the high road. On October 20, 2004, Mr. Chaffin and Ms. Kelley called Ms. Lackard about the request, knowing full well that the call could lead to disclosure of the loss of the originals of the Other Agreements. Mr. Chaffin reminded Ms. Lackard that the time for posing discovery requests had passed and that there was a standstill in effect, and he asked why Ms. Lackard had requested the originals of the Other Agreements. Ms. Lackard at first indicated only that Mr. Tytell "wanted to take a look at other agreements signed around the same time [as the Dall'Acqua Agreement]," and added that Mr. Tytell was "looking at the paper in connection with other paper." (Kelley Dec., ¶¶ 5-7.) Ms. Lackard said that she had anticipated that under the circumstances the originals would not be provided, and she said that she had written the letter so as to preserve the ability to seek to supplement Mr. Tytell's report. (Kelley Dec., ¶ 8.) Ms. Lackard then began to question Mr. Chaffin and Ms. Kelley about the whereabouts of the originals of the Other Agreements, and Mr. Chaffin responded. (Notably, Harte-Hanks's counsel could have simply ended the conversation or declined to answer the questions on any number of grounds, but they did not.) Ms. Lackard eventually worked her way to the "64,000 dollar" (as Mr. Chaffin put it) question, "Where are the originals now?" In response, Mr. Chaffin said, in words or substance, that Ms. Lackard should consider, in assessing the veracity of Mr. Chaffin's

prior statements to her that the Dall'Acqua Agreement is genuine, that the following information was being provided, whereupon he told her that the originals of the Other Agreements had been lost by Ms. Dernoga, apparently in connection with her trip to Boston to attend the hearing. (Kelley Dec., ¶¶ 9, 10.)[7]

**Mr. Tytell's Newly-Minted Fascination With Paper**

Two days after Mr. Chaffin advised Ms. Lackard of the loss of the originals of the Other Agreements, Mr. Tytell submitted his second (final) report. Suddenly, paper had become an issue:

> When examined with transmitted light the look-through of both sheets of paper is regular with a noticeable vertical alignment and uniform formation. When examined under long-wave and short-wave ultraviolet lamps the paper of the Questioned Document fluoresced quite brightly.
>
> The paper of the original documents in Plaintiff's P-10 was compared to the paper of the Questioned Document. These Knowns are dated from 1/25/88 ((P-10-I) through 11/15/03 (P-10-A). With one exception the paper of the Questioned Document was readily differentiated from the paper of all these Knowns, including being differentiated from the Knowns closest in date to the Questioned Document (i.e. Exhibit P-10-C, dated 12/5/01, Exhibits P-10-D and P-10-G, dated 12/7/01, as well as Exhibit P-10-T, dated 1/8/02.)
>
> Comparison of the paper of the Questioned Document with appropriate documents reliably dated from early January 2002 through the time the Questioned Document was first presented might reveal when this brightly fluorescent paper was in use in the office that produced the Questioned Document.

---

[7] Defendants' accusations that Harte-Hanks belatedly revealed the information concerning the Other Agreements, "confessed" the loss, and "did not plan to report its loss" are false. Defendants had never asked for the originals before, had never asked about the whereabouts of the originals before, and in fact had never made an issue of the originals before. And, when Defendants suddenly decided that they wanted the originals – and one wonders why they were wanted given the moral certainty their experts apparently had before the originals ever became an issue – Harte-Hanks, rather than sand-bagging, volunteered the information Defendants accuse it of hiding. Defendants' scurrilous attacks on Harte-Hanks and its counsel reveal a decided change in the tone of what previously had been relatively cordial proceedings, and one is left to wonder about the source and origin of the change.

(Docket No. 50, Ex. B at 3.)  Mr. Tytell of course knows nothing about the etiology of the "Known Dall'Acqua Samples" he used for comparison purposes; he does not know where, when, how, and/or by whom the documents bearing those known signatures were created, printed, and/or copied.  Nor does he know about the procedures at the Glen Burnie office regarding (a) the purchase and distribution of paper, or (b) Ms. Dernoga's capabilities and/or options concerning paper and/or printing.  Further, Defendants have never requested the category of documents Mr. Tytell identifies as being useful to the examination he describes. (Kelley Dec., ¶ 2.)

**Ms. Schuetzner's New Report**

As noted, Ms. Schuetzner has prepared a third report.  It says nothing about any need or desire to compare the paper of the original of the Dall'Acqua Agreement with the paper of the originals of the Other Agreements.  Indeed, neither the Other Agreements nor paper type factor into her report.  Nevertheless, her opinion is unqualified. (Docket No. 50, Ex. A.)

**The Motion For Sanctions**

The Motion for Sanctions couples baseless accusations of bad faith with claims of prejudice.  Even though their experts repeatedly opined "to the highest degree of certainty" before Defendants learned of the loss of the originals of the Other Agreements, Defendants claim that they have been "severely prejudiced by Harte-Hanks's loss . . .."  They claim that Mr. Tytell could have "compare[d] the paper  characteristics of the alleged agreement with the other non-solicitation agreements processed and countersigned by Dernoga the week of January 21, 2002 [, and] . . . determine[d] whether or not the paper characteristics matched.." (Motion for Sanctions at 4.)  As noted, this is an area of inquiry that Mr. Tytell proposed in his "final" report, but not in

its predecessor. Defendants also claim, even though neither of their experts has said a word about this, that they could "determine whether or not Dernoga used the same purple gel pen on these other agreements as she used to sign the alleged Dall'Acqua agreement," and, if she did not, such would constitute a departure from the "general manner" in which she handled the Agreements." (Motion for Sanctions at 10.)[8]

**Ms. Schuetzner's Error And Mr. Tytell's Wild Good Chase**

After reviewing the most recent Schuetzner and Tytell reports, one of Harte-Hanks's experts, Alan Robillard, performed the paper comparison that Mr. Tytell had proposed. He compared, based on a number of qualities and characteristics, the paper of the original Dall'Acqua Agreement with samples of documents generated by Ms. Dernoga on or about the date Mr. Dall'Acqua signed the Dall'Acqua Agreement. He compared based on (1) physical dimensions, including thickness, (2) color, (3) fluorescence when exposed to short and long wave ultraviolet light sources, (4) opacity/translucence when lighted from below, including the degree of uniformity of fibers throughout the paper, and (5) visual appearance of the wire pattern created during the paper-manufacturing process. He found that the paper of the original Dall'Acqua Agreement matched, based on all of these criteria, ten separate documents generated by Ms. Dernoga on or about the date Mr. Dall'Acqua signed. In other words, the paper of the Dall'Acqua Agreement is not, as Mr. Tytell suggests, different from other paper used by Ms. Dernoga on or about the relevant date. (Robillard Dec., ¶¶ 2, 8, 9.)

---

[8]    Defendants claim, without any expert support, that the originals of the Other Agreements were required to determine whether Ms. Dernoga used purple gel pens. As is true with the paper analysis Mr. Tytell proposes (see infra), absent a foundation that, given the passage of time, could never be laid, any difference in ink would not be probative. Since Defendants offer no expert support for their newly-minted desire for an ink analysis, and any such analysis would not have value, Harte-Hanks focuses herein on the paper alone.

Mr. Robillard also assessed Ms. Schuetzner's so-called indented writing analysis. Ms. Schuetzner has opined that indentations on the original Dall'Acqua Agreement make out the dates 3/15/04 or 5/15/04, which, Defendants claim, undercuts Ms. Dernoga's testimony that the agreement had been under lock and key from 2002 until June 1, 2004. Mr. Robillard determined that Ms. Scheutzner is in error. The indentation to which Ms. Schuetzner refers was made by the writing, on a covering piece of paper, of the date 7/15/04 (well after the original agreement was pulled from the file by Ms. Dernoga), matches precisely a document written by Charles Shure (Harte-Hanks's ill-fated first expert), and is, therefore, simply an artifact of the investigation of this case. Stated differently, there is a document on which Mr. Shure's handwriting appears, and the handwriting on this document accounts for many of the indentations on the original agreement, including the indented date. (Robillard Dec., ¶¶ 2-7.)[9] The "evidence" on which Defendants place such heavy reliance in their desperate attempt to prove a forgery is fatally flawed.[10]

---

[9] Ms. Schuetzner also mentions indentations suggesting the words "Faye Sowell," and Defendants point out that Ms. Sowell is Dean Blythe's assistant. First, as Ms. Dernoga pointed out in August, Ms. Sowell works for Mr. Hacker as well. Second, these indentations are accounted for by the fax cover sheet, dated June 1, 2004, under which Ms. Dernoga faxed the Dall'Acqua Agreement to Mr. Hacker (via Ms. Sowell) that day. (Robillard Dec., ¶¶ 4, 5, Ex. A; Dernoga Dec., ¶ 14, Ex. A.) These facts have been in the record since August.

[10] In Defendants' experts' defense, they did not have (because Defendants did not ask for) the paper samples that Messrs. Robillard and Richards utilized, nor did they have the Shure document that accounts for the indentations about which Ms. Schuetzner (and now Defendants) makes so much (because they did not ask for documents that account for the indentations). But one should not feel too sorry for Defendants: Their experts and they are simply reaping what they sowed by opining and making accusations without the benefit of all of the relevant data. As will become clear at trial, Defendants' experts' penchant for jumping to conclusions based on insufficient data infects all of the other bases for their conclusions. For example, other samples of Mr. Dall'Acqua's signature that Harte-Hanks has but Defendants do not (because they are handcuffed by their own refusal to meet the discovery deadlines) contain the very characteristics that Defendants' experts claim are distinctive to the signature on the Dall'Acqua Agreement.

## Argument

## SANCTIONS ARE NOT WARRANTED

### A. Introduction

Just as their experts have opined to the "highest degree of certainty" before seeing all of the data (see footnote 10, supra), Defendants have accused Harte-Hanks of bad faith before obtaining the facts concerning either the loss of the Other Agreements or the availability of other evidence that cures the alleged prejudice and that refutes Defendants' conspiracy theory with respect to the Other Agreements. Defendants jumped the gun, casting aspersions before picking up the phone to get an explanation for the loss or to explore remedial measures.

To make matters worse, Defendants have used the motion as a opportunity to attempt to poison the well. Even though only a small portion of only one of the five reports Defendants' experts have prepared is relevant to this motion, Defendants have filed both experts' final reports in their entirety and have described at some length the analyses (such as they are) their experts have conducted that have nothing whatsoever to do with the issue at bar.[11]

Further still, Defendants have welded their aspersions to a slanted presentation of the law. Notwithstanding the comprehensive body of First Circuit authority on spoliation, Defendants

---

[11] To be sure, Defendants have the right to defend themselves. But do they have the right to chase shadows? Would Defendants not be better off devoting their resources to discovery concerning the events of March 1, 2004 through June 1, 2004, the only period during which anyone at Harte-Hanks could possibly have had any motive to forge? Would they not be better off attempting to come up with evidence to explain the numerous facts and circumstances that show that a 2004 forgery scenario is truly the stuff of a secret agent novel? Shouldn't Defendants focus on discovery concerning the fact that in order to establish a forgery in 2004, they have to account for the facts that the mysterious forger would have to have known, among other things, (a) how to access both the form of the agreement on Ms. Dernoga's personal (and password-protected) computer U drive and her locked file cabinet, (b) how to reproduce Mr. Dall'Acqua and Ms. Dernoga's signatures so well as (i) to include in the Dall'Acqua forged signature a combination of characteristics that appear separately in diverse known Dall'Acqua signatures and (ii) to convince Ms. Dernoga that her signature is genuine, (c) how to select the form of agreement and date the signatures in order to make them consistent with the extensive surrounding events and circumstances, and (d) whether there had been discussions or correspondence in 2002 between Mr. Dall'Acqua and anyone else at Harte-Hanks that are inconsistent with his having executed the Dall'Acqua Agreement?

reach for and rely heavily on inapposite out-of-circuit cases. Notwithstanding the absence of, to Harte-Hanks's knowledge, a single First Circuit case in which a party was defaulted for spoliation, Defendants ask that Harte-Hanks be defaulted. Notwithstanding that the case that arguably is most on point, Jackson v.Harvard University, 721 F. Supp. 1397 (D. Mass. 1989), aff'd, 900 F.2d 464 (1st Cir. 1990), is a decision by this Court, Defendants never mention it.

**B. The Law**

In one of this circuit's leading cases on spoliation, Judge (now Justice) Breyer wrote:

> The general principles concerning the inferences to be drawn from the loss or destruction of documents are well established. When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out of the well-founded fear that the contents would harm him. Wigmore has asserted that nonproduction is not merely "some" evidence, but is sufficient by itself to support an adverse inference even if no evidence for the inference exists . . ..
>
> The adverse inference is based on two rationales, one evidentiary and one not. The evidentiary rationale is nothing more than the common sense observation that a party who has notice that a document is relevant to litigation and who proceeds to destroy the document is more likely to have been threatened by the document than is a party in the same position who does not destroy the document. The fact of destruction satisfies the minimum requirement of relevance: it has some tendency, however small, to make the existence of a fact at issue more probable than it would otherwise be. . . .
>
> The other rationale for the inference has to do with its prophylactic and punitive effects. Allowing the trier of fact to draw the inference presumably deters parties from destroying relevant evidence before it can be introduced at trial. The inference also serves as a penalty . . ..

Nation-Wide Check Corp. v. Forest Hills Distributors, Inc., 692 F.2d 214, 217-18 (1st Cir. 1982) (upholding use of adverse inference where defendant, with notice, intentionally destroyed checks that were sole evidence as to specific issues in dispute) (citations omitted).

The courts (district and appeals) in this circuit have recognized that a court has inherent power to apply (and not to apply) a broad range of sanctions in connection with the spoliation of evidence, the possible sanctions ranging from dismissal/default and preclusion of evidence to adverse inferences. See, e.g., McGuire v. Acufex Microsurgical, Inc., 175 F.R.D. 149, 153-54 (D. Mass. 1997) (recognizing plenary power and declining to apply sanctions due to absence of bad faith and prejudice). But, as noted, no court in this circuit has actually dismissed a claim or defaulted a party for failing to produce or destroying evidence, and it has been made clear that such relief would be appropriate only for the bad faith and prejudicial destruction of evidence. Id. at 156; Collazo-Santiago v. Toyota Motor Corp., 149 F.3d 23, 28-29 (1st Cir.1998).

Sanctions may be imposed only upon a showing that the party that destroyed the evidence in question had notice of the potential claim and of the evidence's potential relevance. See, e.g., Testa v. Wal-Mart Stores, Inc., 144 F.3d 173, 177 (1st Cir. 1998). In addition, given the remedial and punitive goals behind the approach to spoliation, some degree of fault (even negligence) by the party that destroyed the evidence and prejudice or potential prejudice to the opposing party must be shown. Collazo-Santiago, 149 F.3d at 28-29 ("of particular importance when considering the appropriateness of sanctions is the prejudice to the non-offending party and the degree of fault of the offending party"). Given the prejudice requirement, if curative measures are available and the party seeking sanctions fails to take advantage of them, this weighs against the imposition of sanction. See, e.g., Jackson, 900 F.2d at 468-69. Finally, the adverse inference that may be imposed as a sanction is permissive, not mandatory. "If, for example, the factfinder believes that the documents were destroyed accidentally or for an innocent reason, then the

factfinder is free to reject the inference." Blinzler v. Marriott International, Inc., 81 F.3d 1148, 1158-59 (1st Cir. 1996).

This Court applied these principles in Jackson. As the Court will recall, the case involved a claim by a former member of the faculty at the Harvard Graduate School of Business Administration that she had been denied tenure based on her gender. While her claim was pending, Harvard, apparently by accident, destroyed the files of certain male faculty members who had been granted tenure. When the destruction came to light, the Court offered the plaintiff an opportunity "to conduct further discovery in order to remedy the advantage that she contended defendants had previously obtained improperly from the privilege, the documentary destruction, and the discovery defaults . . .," which the plaintiff declined. Instead, the plaintiff sought a negative inference. The Court declined to draw the inference, explaining:

> I would, no doubt have reached a different conclusion if plaintiff had produced any evidence showing that defendants destroyed the subject records to avoid disclosure in this litigation. However, the drawing of a negative inference under the circumstances of this case, an act which would be all but a declaration of victory for plaintiff, is unwarranted. Here, the evidence shows merely that a person . . . made a mistake.

721 F. Supp. at 1412-13. Jackson appealed, and the First Circuit affirmed, ruling that the Court had not abused its discretion. It wrote:

> On this record, it was permissible for the court to conclude that the tardy production of records and the loss of evidence did not flow from defendants' consciousness that the documents would hurt their case. Once that finding was made, the court was entitled to treat it as an important part of the calculus of relief. . . . After all, where misconduct is not willful or intentional, "there seems less reason for an adverse presumption." . . . Preclusion and negative inference are grave steps, "by no means an automatic response to a delayed disclosure . . . [or] where failure to make discovery [is] not willful."
>
> In this situation, we think it was reasonable for the judge to conclude that "the sanction needed to be appropriate to the truth-finding process, not one that . . .

> served only further to suppress evidence." . . . The remedy devised – a continuance and an open run at further discovery – was a concinnous response to the problems created by the University's negligence.

900 F.2d at 469 (citations omitted).

**C. Sanctions Are Not Warranted**[12]

Usually a spoliation motion involves the complete destruction of evidence that is the sole source of information bearing on a point of contention. Here, by contrast, copies of the documents at issue are available, there is no dispute as to the authenticity of the copies, and alternative sources for the information as to the point in contention are available. Usually a spoliation motion involves an intentional destruction (although not necessarily one done with intent to hide evidence). Here, by contrast, the documents were simply lost. Usually, a spoliation motion involves the destruction of evidence as to which the relevance was known before the destruction. Here, by contrast, the documents were lost before the theory under which they allegedly are relevant was raised. These distinctions are significant.

**1. Dismissal/Default Or Substantial Preclusion Is Out Of The Question**

A productive starting point for the analysis of Defendants' motion is at the margin, viz., their request for extreme sanctions. The law is clear – harsh sanctions are not appropriate where the loss or destruction was the result of a "mistake." See authorities cited supra. A simple mistake is at issue here. Moreover, the mistake occurred (a) after copies of the Other Agreements had been filed with the Court and served; (b) under circumstances indicating that the intent was to preserve and present the originals, if necessary; (c) as a result of understandable

---

[12] It is ironic that Defendants, who fought to keep the record closed and to have the case decided on the merits after the August 10 session (when, because Mr. Shure had imploded, they thought they had the upper hand), now complain about having been denied evidence. The irony is compounded by the fact that the evidence about which they complain is evidence for which they did not ask in discovery.

stress, and, most important; (d) before Defendants had raised the technical argument that allegedly renders the originals relevant. Indeed, before the loss, Defendants' expert case did not involve even copies of the Other Agreements, much less the originals. Indeed, it was not until over two months after the loss that Defendants first requested the originals and claimed they are relevant. A finding of bad faith warranting severe sanctions is simply not possible.

### 2.    An Adverse Inference Is Not Warranted[13]

Under the principles related above, Defendants would have a case for a permissive adverse inference only if they had shown, among other things, (a) that Harte-Hanks had notice of the relevance of the originals of the Other Agreements, and (b) that they have been prejudiced as a result of the loss of the originals. To determine whether Defendants have made this showing it is necessary to consider precisely what Defendants say they hoped to show via the originals and when they made this hope known.

Defendants intended to have Mr. Tytell compare various characteristics of the paper of the originals of the Other Agreement with the paper of the original Dall'Acqua Agreement. The argument is that the paper (or at least some of it) should match because Ms. Dernoga printed all of the agreements at or about the same time. Defendants' complaint, therefore, is about the loss of the paper of the originals of the Other Agreements, not about the loss of their content.[14]

---

[13]    Because Defendants have filed (albeit a day late) a demand for a trial by jury, what they seek is a very early ruling that the jury should be instructed that they may (the inference is permissive) draw an adverse inference from the fact of the loss of the originals of the Other Agreements. (The specific inference, assuming one is called for, which Harte-Hanks denies, is discussed below.) If the Court is inclined not to deny the motion outright, Harte-Hanks would urge it at least to wait until the evidence is in at trial to assess whether the instruction should be given.

[14]    Notably, Defendants' argument assumes the authenticity of the Other Agreements. Presumably, this means that Defendants will stipulate that all of Ms. Dernoga's other charges executed their Confidentiality/Non-Disclosure agreements during the same week of January 2002. This should shorten the trial proceedings substantially.

Harte-Hanks first had an inkling that this was Defendants' intent and that Defendants were interested in the originals of the Other Agreements in October. Before then, Harte-Hanks did not know that Defendants were interested in the originals or, more broadly, in paper used by Ms. Dernoga in January 2002.[15] (Indeed, it appears that Defendants themselves developed their interest in the paper in October, for, as described above, they (a) did not request via Rule 34 the production of the originals of the Other Agreements or any other paper from January 2002, (b) their expert reports before Mr. Tytell's of October 22 say nothing about paper comparison, and (c) Defendants first asked for originals on October 19.) The properly-framed question as to notice is whether Harte-Hanks knew that Defendants considered the paper of the original Agreements – the only evidence that has been lost – to be relevant. The answer to this question is no. While the suggestion that Harte-Hanks was not on notice is somewhat counter-intuitive because copies of the Other Agreements were in evidence, the suggestion is correct, owing to the purpose for which the originals allegedly were wanted. Consider other evidence of the exact same ilk. Defendants presumably could conduct the same comparison with other documents Ms. Dernoga printed on or about January 25, 2002. By Defendants' logic, Harte-Hanks would be guilty of spoliation if it destroyed or lost even a single such document after this case was filed.

Defendants also have not shown prejudice, for three reasons. First, the negative finding that Defendants hoped Mr. Tytell would come up with probably would not have been admissible. Without knowledge of precisely when and under what circumstances the Dall'Acqua Agreement and the Other Agreements were printed (which knowledge is not available), a negative finding by Mr. Tytell would not be probative because he would not have, and could not have, controlled for,

---

[15]    The crucial documents in Harte-Hanks's view were the documents bearing Mr. Dall'Acqua's signature and the trial exhibits, which it has handled with extraordinary care.

among other things, (a) variations within shipments and even reams of paper, (b) the re-supply of Ms. Dernoga's printer, and (c) the use of alternative printers. (The same is not true, however, for a positive finding: If the paper of any of the documents Ms. Dernoga printed on or about January 25, 2002, matches the paper of the Dall'Acqua Agreement, the match is proof that the Dall'Acqua Agreement was printed on or about January 25, 2002. As noted, Mr. Robillard found many such matches.)

Second, Defendants' claim that they have been prejudiced flies in the face of the fact that their experts repeatedly opined "to the highest degree of certainty" without ever having seen the originals of the Other Agreements.

Third, the alleged prejudice can be cured.[16] Other documents printed by Ms. Dernoga on and around January 25, 2002, are available. Mr. Tytell thus can have his "appropriate documents reliably dated from early January 2002 through the time the [Dall'Acqua Agreement] was first presented[, which] might reveal when this brightly fluorescent paper was in use in the office that produced the [Dall'Acqua Agreement]."[17]

---

[16]    As this Court (and the First Circuit affirming this Court) held in Jackson, where the alleged prejudice is curable, sanctions are inappropriate, particularly where, as here, the "destruction" was not in bad faith.

[17]    Notably, Mr. Tytell does not and cannot say that he needs the originals of the Other Agreements in particular. Because some variation in the paper is to be expected, the comparison is probative only if the paper of no documents from the time period matches the paper of the Dall'Acqua Agreement. Mr. Tytell can have access to sufficient paper from the time period to determine whether there is no match. Notably, were Defendants to insist that all of the paper from the period is necessary, this would merely prove Harte-Hanks's point about lack of notice: Did Harte-Hanks have a duty to preserve all of the paper from that period even though paper did not become an issue until October 22?

## Conclusion

For the foregoing reasons, Defendants' motion for sanctions should be denied. Under the circumstances presented, sanctions would subvert the "truth-finding process," Jackson, 721 F. Supp. at 1414, in which we are engaged.[18]

Dated: November __, 2004

Respectfully submitted,

HARTE-HANKS, INC.,

By its attorneys,

s/David B. Chaffin
David B. Chaffin
BBO No. 549245
Kathleen A. Kelley
BBO No. 562342
HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
(617) 330-5000

422004.1109

[18] Were the Court inclined not to deny the motion outright and not to wait until the evidence is in to decide whether the jury should be instructed that it may draw an adverse inference, Harte-Hanks would ask that it (a) consider that the only permissive adverse inference that could be drawn under these circumstances is that the paper of the originals of the Other Agreements did not match the paper of the Dall'Acqua Agreement and (b) not foreclose Harte-Hanks from offering proof of the matches that Messrs. Robillard and Richards have found.