# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 04 CV 11548 DPW |
| ) | |
| CHARLES R. DALL'ACQUA and ) | |
| PROTOCOL MARKETING GROUP, ) | |
| ) | |
| Defendants. ) | |

**DECLARATION OF KATHLEEN A. KELLEY**

I, Kathleen A. Kelley, under the penalties of perjury, state:

1. I am an attorney, residing and licensed to practice in the Commonwealth of Massachusetts. I represent plaintiff, Harte-Hanks, Inc. ("Harte-Hanks"), in this action.

2. In September, Defendants served three separate requests for the production of documents (totaling 51 individual requests) and two sets of interrogatories on Harte-Hanks. Defendants did not inquire about and/or request the originals of the Other Agreements. On the contrary, only "copies" of confidentiality/non-disclosure agreements were requested (and then, not the Other Agreements in particular). Document Request No. 6 specifically requested "[c]opies of all Confidentiality/Non-Disclosure Agreements executed by employees of Harte-Hanks from July 2001 to the present." The defendants certainly never requested any "appropriate documents reliably dated from early January 2002 through the time the Questioned Document was first presented," as Mr. Tytell suggests would be relevant to his analysis.

3. By letter dated October 19, 2004, Angela Lackard, co-counsel for Defendants, requested, **for the first time**, that Harte-Hanks produce the originals of the Other Agreements. Attached hereto as Exhibit A is a true and correct copy of Ms. Lackard's October 19, 2004 letter.

4. At the time, the deadline for service of document requests had long passed, and the parties were in the midst of a standstill for the purposes of discussing settlement. Accordingly, no response to the October 19 letter was required.

5. Still, on October 20, 2004, Mr. Chaffin and I called Ms. Lackard about the request. We knew, of course, that the call could lead to disclosure of the loss of the originals of the Other Agreements.

6. Mr. Chaffin reminded Ms. Lackard that the time for posing discovery requests had passed and that there was a standstill in effect, and he asked why Ms. Lackard had requested the originals of the Other Agreements.

7. Ms. Lackard at first indicated only that Mr. Tytell "wanted to take a look at other agreements signed around the same time [as the Dall'Acqua Agreement]," and later added that Mr. Tytell was "looking at the paper in connection with other paper."

8. Ms. Lackard said that she had anticipated that under the circumstances the originals would not be provided, and she said that she had written the letter so as to preserve the ability to seek to supplement Mr. Tytell's report.

9. Ms. Lackard then began to question Mr. Chaffin and me about the whereabouts of the originals of the Other Agreements, and Mr. Chaffin responded.

10. Ms. Lackard eventually asked: "Where are the originals now?" In response, Mr. Chaffin said, in words or substance, that Ms. Lackard should consider, in assessing the veracity

of Mr. Chaffin's prior statements to her that the Dall'Acqua Agreement is genuine, that the following information, while not required, was being provided: Whereupon he told her that the originals of the Other Agreements had been lost by Ms. Dernoga in connection with her trip to Boston to attend the hearing.

11. Attached hereto as Exhibit B is a true and correct copy of the preliminary report of Peter Tytell, dated October 7, 2004, which was provided to Harte-Hanks in the context of settlement talks.

SIGNED UNDER THE PENALTIES OF PERJURY
ON THIS 15th DAY OF NOVEMBER, 2004.

_____
Kathleen A. Kelley

422003.111304

EXHIBIT A

# MELICK, PORTER & SHEA, LLP

Counsellors at Law

28 State Street
Boston, Massachusetts 02109-1775
(617) 523-6200
Fax (617) 523-8130
www.melicklaw.com

Richard J. Shea
Robert F. Powers
John K. Rooney, III *(DC & NH)
William D. Chapman
Michael J. Mazurczak *(WI)
Robert T. Tram
William L. Keville, Jr.
Michael K. Byrne
Andra A. Sumbuey
Amy B. Goganian
Robert W. Healy
Jennifer D. Hardy
Alice J. McCarthy
Carly K. Wee *(NY)
Angela L. Lackard
Musreen R. Lane *(NH)
Christine C. Hashian
Adam M. Gutbin *(RI)
T. Doe Urbanski *(RI)
Megan E. Kures
John B. DeWick
Matthew Gryspruszewicz
Margaret M. Carleen
Cheryl Mancuso
Kerry D. Florio
Paul T. Tetrault
Jessica M. Farrelly *(FL)

Of Counsel
Thomas W. Porter, Jr.

*Also Admitted

Two Richmond Square - Suite 104
Providence, Rhode Island 02906
(401) 941-0909
Fax (401) 941-0200

65 Main Street
Plymouth, Massachusetts 02360
(508) 746-5976

October 19, 2004

**BY FAX**
(617) 330-1996

Mr. David Chaffin
Ms. Kathleen Kelley
HARE & CHAFFIN
160 Federal Street, 23rd Floor
Boston, MA 02110-1701

Re: *Harte-Hanks, Inc. v. Protocol Marketing Group and Charles Dall'Acqua*
Civil Action No. 04-CV-11548

Dear Counsel:

We request that the plaintiff furnish the defendants and their handwriting expert with all *original* confidentiality/non-disclosure and non-compete agreements signed by the following individuals: Janine Clark, Elaine Demoga, Glen Hecht, Charles Howard, Fred Leary, David Schultz, Rich Schwartz, Kevin Sweeney and Johanna White. Given the court's order to produce our Final Report from our experts by this Friday, October 22, 2004, or show cause why we cannot, we require these documents immediately in order to be able to comply with the court's order.

Once these documents are delivered to our office today, we will forward them to our handwriting expert in New York via overnight courier for his sole examination. These original documents will be transferred back to your office on October 22, 2004, along with the original exhibits, per the court's order. We will use the utmost care in handling these documents and no destructive testing will be performed, per the Stipulation.

Please do not hesitate to contact us should you have any questions. We appreciate your prompt response to this request.

Very truly yours,

John F. Rooney, III
Angela L. Lackard

EXHIBIT B

PETER V. TYTELL  
DOCUMENT EXAMINER

116 FULTON STREET  
SUITE 2W  
NEW YORK, NY 10038–2712  
TEL: 212/233-5333  
FAX: 212/233-5336  
E-MAIL: TYPETER@AOL.COM

October 7, 2004    DRAFT

Preliminary Report to

Daniel J. Winters, Esquire  
Jenner & Block LLP  
One IBM Plaza  
Chicago, IL 60611-7603

Re: *Harte-Hanks, Inc. v. Charles R. Dall'Acqua and Protocol Marketing Group*

At your request I have been conducting an examination and comparison of an agreement along with known writings of Charles R. Dall'Acqua for the purpose of determining whether or not the signature (and the date) on the agreement in question were written by the Charles R. Dall'Acqua of the knowns. This examination is based on over three decades of study and experience in the field of forensic document examination.[1]

I. QUESTIONED DOCUMENTS

A two-page Confidentiality/Non-Disclosure Agreement previously marked with a label on the first page as Plaintiff's Exhibit 1 (the "Questioned Document"). On the second page of the Questioned Document in black ink (the "Questioned Signature") with the date *1/25/02* in black ink below it (the "Questioned Date"). Another signature and date appear on the second page in light purple ink; a name is also written at the top of the first page in light purple ink.

When received for examination the two pages of Questioned Document were attached with a staple at the top, approximately 1½ inches from the left edge of the paper; the numerous empty staple holes in the upper left corner of each page indicated that they had apparently been stapled, unstapled, and restapled a number of times prior to submission. The Questioned Document was unstapled for non-destructive instrumental indentation examination and was not restapled; the removed staple was retained.

Based on an initial examination of the original in question, it was determined that the questioned signature and questioned date provided sufficient material for a full examination.

---

[1] A copy of my professional resume, including a list of matters where I have appeared as an expert witness, is appended as Exhibit 1.

Re *Harte-Hanks v. Dall'Acqua, et al.*      – 2 –      DRAFT     October 7, 2004

## II. KNOWN DOCUMENTS

Originals and photocopies[2] of various documents were submitted for comparison as samples of normal course of business handwriting (including *inter alia* signatures and dates), acknowledged by or otherwise attributable to Charles R. Dall'Acqua (the "Knowns"). The Knowns are dated 7/23/93 to 11/18/03, and can be summarized as follows:[3]

    Items previously marked as Defendant's Exhibit D-3 (22 items), dated from 10/1/01 to 7/24/03.

    Items previously marked as Plaintiff's Exhibits P-7-A through P-7-C and P-10-A through P-10-T (23 items), dated 7/23/93 to 11/18/03.

    Cancelled checks (200 items), dated 9/17/01 through 5/2/02.

Inter-comparison of the non-request, normal course of business signatures revealed no significant differences. The Known dates and other writings were reviewed for internal consistency and any significantly inconsistent material was not considered further in comparison with the questioned date.

The non-request, normal course of business standards provided sufficient comparable signatures and other appropriate known writing of Charles R. Dall'Acqua for a full examination.

## III. PURPOSES OF THE EXAMINATION

To determine, if possible, whether or not the Charles R. Dall'Acqua of the Knowns signed the Questioned Document.

To determine, if possible, whether or not the Charles R. Dall'Acqua of the Knowns wrote the date in black ink on the Questioned Document.

## IV. NATURE OF THE EXAMINATION

The nature of the examination was non-destructive The questioned and known documents were studied at various degrees of magnification with the aid of a stereoscopic microscope and hand magnifiers utilizing transmitted, incident, and oblique illumination as appropriate. Light sources of various spectral characteristics, including long-wave and short-wave ultraviolet radiation; specialized viewing filters, a special purpose closed circuit television system sensitive to the near infrared region of the spectrum for viewing reflected infrared and infrared luminescence (Visual Spectral Comparator, VSC-1) were also employed as needed. An electrostatic detection device (ESDA) was used for instrumental indentation examinations.

During this examination different aspects of the problem presented were analyzed. During each phase, the reliable principles and methods of forensic document examination were applied in accordance with the standard practices and procedures of the field.[4]

---

[2] As used here the term "photocopy" can include copies made with a variety of processes on "office copier" type machines, as well as telefacsimiles, microfilm blowbacks, etc.

[3] A more detailed list of the Knowns is appended as Exhibit 2.

[4] A leading standard in the field is ASTM E2290, *Standard Guide to Examination of Handwritten Items*. Rather than repeat the appropriate text of the standard in the body of this report, a copy of E2290 is attached as Exhibit 3. The elements of the writing considered in the examination, comparison, and evaluation of the questioned and known signatures and dates are among the features listed in the Note in § 7.12.4.

ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL

Re *Harte-Hanks v. Dall'Acqua, et al.*  — 3 —   DRAFT   October 7, 2004

## V. FINDINGS

### The Known Signatures of Charles R. Dall'Acqua

The several hundred known signatures of Charles R. Dall'Acqua reviewed were dated over a period of almost sixteen years, beginning fourteen years before the 1/25/04 date of the Questioned Document. The examination revealed a rapidly written stylized signature, rather than a completely legible writing out of the name.

Of course, Charles R. Dall'Acqua is capable of writing his name relatively legibly in a hand printed style, and may even use this style of printing occasionally to sign a check, as seen below.[5]



Ck. 1485, dated 1/2/[02]

Review of the many Knowns indicates that the use of this style of signature is the rare exception rather than the rule and is of little, if any, use for comparison in this matter. Moreover, as a methodological matter, forensic document examiners compare like with like; it would be inappropriate to compare separately written characters with a connected cursive style signature.

As is seen in the writing of many people, the signature of Charles R. Dall'Acqua has changed over the years, but even the signature with the earliest date among the Knowns is simplified and abbreviated with only a few readily legible characters.



Ex. P-10-I — Agreement, as of 1/25/88

---

[5] This signature is enlarged approximately twice life size, as are the other illustrations in this series. Tables with similarly enlarged illustrations of the Known Signatures and the relevant Known Dates arranged in chronological order are attached as Exhibit 4 and Exhibit 5, respectively. These tables cover the items marked as Plaintiff's and Defendant's exhibits as well as the additional checks dated in January and February 2002.

ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL

Re *Harte-Hanks v. Dall'Acqua, et al.*  — 4 —  **DRAFT**  October 7, 2004

Over time the rapid execution of the signature was further facilitated by greater simplification to the point that it resembles several abbreviations or initials rather than a full signature.



Ex. P-10-F — Registration Form, dated as faxed 9/2/03

During the period of interest the signature appeared as a *Ch* for the first name, a sometimes legible middle initial *R*, and for the last name a large stylized formation resembling a capital *Y* at the top and a small *q* at the bottom.



Ex. P-10-C — Memo, dated 12/5/01

As with any person's signature, there is variation between individual examples of Mr. Dall'Acqua's signature, for instance connecting the middle initial to the final formation in a Known dated two days later than the signature illustrated above.



Ex. P-10-G — Ætna form, dated 12/7/01

This variation involves modifying a letter form to increase speed through continuity of movement, even if it compromises legibility. It is an example of the writer's habitual trend to ever more rapid execution of the signature.

Re *Harte-Hanks v. Dall'Acqua, et al.*      – 5 –                    DRAFT    October 7, 2004

### Comparison of the Questioned and Known Signatures

Although the Questioned Signature has some resemblance to Charles R. Dall'Acqua's known signatures in its overall appearance, it is significantly different in the more subtle details of its execution.

One of the axioms of forensic document examination is that the simulation of a signature involves a balance between form and speed. Achieving a satisfactory pictorial resemblance to a genuine signature requires painstaking copying or tracing of the model signature. The resulting lack of natural speed and fluency can be seen in the final product. Lines are wavy and tremulous instead of even and firm, because they have been laboriously drawn; this can be especially evident in stroke that should be long, smooth curves. There may also be indications of abnormal hesitations or pen lifts as the writer (or rather drawer) considers the next movement. These are some of the faults that are collectively referred to as "poor line quality". An increase of speed can smooth out the stroke and improve the line quality, but the difficulty of accurately reproducing the model signature will increase as the simulator moves from drawing to writing. This usually results in a greater departure from the habitual forms of the genuine writing and a concomitant loss of pictorial similarity.

At first glance the Questioned Signature may not appear to be written slowly overall; however, in a number of places abnormally slow execution has produced the tell tale signs of poor line quality. Many of the known signatures are written with various forms of pens using fluid ink. Some of these known signatures have line widths similar to or greater than the line width of the questioned signature, but unlike the smooth execution of those known signatures there are several places in the questioned signature where the lines are not smooth.

In the illustration of the Questioned Signature below (approximately five times life-size), note the uneven nature of long curved or straight lines indicated by the arrows:

1. The back of the C.
2. The up-stroke stem of the R.
3. The principal down-stroke of the last name.



ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL

Re *Harte-Hanks v. Dall'Acqua, et al.*  — 6 —  DRAFT  October 7, 2004

The waviness in the line of the principal down-stroke of the second name of the questioned signature is in marked contrast to the smooth curves found in the Knowns.



| Questioned — Ex. P1, dated 1/25/02 | Known — Ex. P10-G, dated 12/7/01 |

Examination of the principal down-stroke of the second name of the Questioned Signature (on the left) shows that it is formed with a carefully drawn line that is significantly uneven in the crooked lower portion where it bends to the right (*as indicated by the arrow*). This is in contrast to the rapidly written smooth curve typical of the known signatures, as seen in the down-stroke illustrated on the right. This contrast can be more easily seen in the illustration above, which shows an enlarged images (about ten times life size) of the down-stroke from the Questioned Signature and from a Known with two superimposed lines flanking each of them. Holding this page with the illustration nearly flat so that it is possible to look down the length of each edge can also aid in viewing this feature.

ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL

Re *Harte-Hanks v. Dall'Acqua, et al.*   – 7 –   DRAFT   October 7, 2004

In addition to the flaws of line quality noted above, comparison of the Questioned Signature with the Knowns revealed significant differences, including two in the formation of the *Ch* combination that is the first name of the Questioned Signature, illustrated below (approximately five times life size).



4. There is a marked discontinuity or "bump" in the connecting stroke of the *C* to the *h*. This is unlike any *Ch* combination found among the several hundred contemporaneous Known Signatures, where this connecting stroke is characterized by smooth continuous movement.

5. The closed retrace of the transition from the down-stroke of the staff of the *h* into the convex upstroke of the arc. In the Knowns this transition is open and the upstroke tends to be concave.

The degree to which these features of the Questioned Signature are at variance with the writing habits prevalent in the Knowns can be seen in the comparison of the Questioned Signature with a few of the contemporaneously dated Knowns illustrated below with arrows pointing to the relevant areas (images twice life-size).



Ex. P-1 Agreement, dated 1/25/02



| Ex. P-10-D Enrollment Form dated 12/7/01 | Ex. P-10-G Ætna form dated 12/7/01 | Ex. D-3-A Check #1459 dated 12/18/54 (*sic*) | Ex. P-10-T Agreement, as of 1/8/02 |

A review of the much larger collection of Known Signatures in Exhibit 4 will provide abundant examples of these and other significant differences between the Questioned Signature and the habitual signature writing style of Charles R. Dall'Acqua.

### Ink Examination

The Questioned Signature and the Questioned Date were written with black non-ballpoint ink. Other entries on both pages of the Questioned Document were written with a light purple non-ballpoint ink.

**ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL**

Re *Harte-Hanks v. Dall'Acqua, et al.*  — 8 —  DRAFT    October 7, 2004

The ink line width of Questioned Signature and of the Questioned Date do not show any dramatic variations that could be attributed to horizontal diffusion into the paper because of inhomogeneous formation of the paper sheet or to inconsistent ink metering from a faulty writing instrument. However, some strike-through of the black ink was observed on the reverse of the second page (i.e., black fluid ink soaking into and through the paper to appear on the reverse of the sheet). No strike-through of the light purple non-ballpoint ink was noted.

Many of the Knowns were written with non-ballpoint ink of various kinds. Unlike the questioned writing, however, all writing in fluid inks found in the Knowns is characterized by good line quality, smooth curves, and rapid execution without any of the defects noted in the writing on the Questioned Document. This writing in the Knowns tends to illustrate that Charles R. Dall'Acqua is quite a competent writer with this kind of pen. Further, the interaction of these fluid inks with the various grades of paper in the Knowns did not result the pattern of ink strike-through seen in the Questioned Document. It would, therefore, not be correct to attribute any and all defects in line quality in the Questioned Signature or Questioned Date merely to an interaction of the ink and paper without noting that abnormally slow writing could be a major factor.

The ink lines of the Questioned Signature and of the Questioned Date were compared using non-destructive optical methods, both non-instrumental visual examinations with dichroic filters and examination in the infrared region of the spectrum using specialized video equipment. The comparison of the ink of the Questioned Signature and of the Questioned Date by the optical techniques employed in this examination revealed no significant inexplicable differences and there is significant agreement in all observable aspects of the results. It was concluded that the ink of these entries match at this level of analysis. However, these results only mean that the ink of these entries are of the same formula or of two similar formulas with the same nonvolatile components. It is possible that other, destructive analytical techniques might be able to further differentiate the samples. This conclusion does not eliminate the possibility that the ink of the entries are from different manufacturing batches or from different writing instruments.

Given the ink match and the usage of difference colors of ink in the context of the Questioned Document, the Questioned Date was examined under a working hypothesis that it had been written by the same individual who wrote the Questioned Signature.

### Comparison of the Questioned and Known Dates

Like the known signatures, the known dates are smoothly and rapidly executed, as can be seen in those illustrated below, taken from Plaintiff's Exhibit 10. The tendency to finish the diagonals and stems of the numerals *1* and *7* with a tailing hook to the right is a sign of rapidity and continuity of movement in the writing.

| Ex. P-10-C — Memo, dated 12/5/01 | Ex. P-10-D — Enrollment Form, dated 12/7/01 | Ex. P-10-G — Ætna form, dated 12/7/01 |
| --- | --- | --- |
| 12/5/01 | 12/7/01 | y agree to the condi  12/7/01 |

ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL

Re *Harte-Hanks v. Dall'Acqua, et al.*      – 9 –      **DRAFT**    October 7, 2004

The line quality of the Questioned Date is significantly different from the Knowns, just as was seen in the Questioned Signature. Indeed, the Questioned Date is perhaps even more awkwardly executed than the Questioned Signature.

In the five times life size images below the slow, the overall lack of continuity of movement and the labored quality of the execution of specific portions of the Questioned Date are evident. The lower image of the reverse of the page shows where ink has penetrated all the way through the paper; this pattern of ink strike-through is generally indication of slow pen movement. (The lower image has been laterally reversed to more easily see the relation of the ink seepage to slowly drawn areas of the Questioned Date.)

A. Both diagonals are slowly executed straight lines (rather than rapidly written strokes tending to curve to the right); they lack the rapid terminals of the Knowns. The pen hesitated so long at the end of the first diagonal that ink seeped through the paper.

B. The bowl of the numeral 5 has poor line quality. The abnormally slow writing has also resulted in ink seeping through the paper.





Re *Harte-Hanks v. Dall'Acqua, et al.* — 10 —   DRAFT   October 7, 2004

As with the Questioned Signature, in addition the poor line quality of slow pen movement, the Questioned Date exhibits significant departures from other writing habits typical of the Knowns. These include two indicated by arrows in the illustration below (image five times life size, like the images in the preceding illustration).

C. The numeral *1* lacks a terminal hook or even a slight bend at the end. It also is noticeably shorter than the other numerals.

D. The second diagonal stops well above the printed baseline; the diagonals of the known dates generally go through or at least touch the baseline.



Of course, the appropriate comparison material for the writing of a date consists of dates written contemporaneously with the one in question. A few such examples from the collection Knowns appear with the Questioned Date in the illustration below with arrows pointing to the two particular areas mentioned above (images twice life-size).



ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL

Re *Harte-Hanks v. Dall'Acqua, et al.*     – 11 –     DRAFT     October 7, 2004

A review of the much larger collection of Knowns in Exhibit 5 will provide abundant examples of these and other significant differences between the Questioned Date and the habitual manner that Charles R. Dall'Acqua writes dates.

### Other Findings

Preliminary examinations using side lighting grazing the surface of the paper revealed apparent indentations of writing on both pages of the Questioned Document. Examination with the ESDA (a non-destructive instrumental technique to visualize indented impressions) on each sheet of paper after unstapling yielded images of the latent impressions. The particulars of these results have been communicated previously.

## VI. CONCLUSIONS

Initial findings from examination of the material submitted to date lead to the following preliminary determinations:

The black non-ballpoint ink of the Questioned Signature matches the black non-ballpoint ink Questioned Date at this level of analysis; that is, the ink of these two writings could not be differentiated by the suite of optical techniques used in this examination.

Examination, comparison, evaluation of the Questioned Signature (as well as of the Questioned Date) on page 2 of the Questioned Document (Ex. P-1) along with the appropriate known writings of Charles R. Dall'Acqua reveal instances of the features generally associated with simulated or imitated writing: a combination of slow writing leading to poor line quality, especially where the questioned item most resembles the Knowns, along with a departure from the writing habits evident in the Knowns where there is are more rapid execution.

Pending final evaluation, these significant findings lead to the preliminary determination that neither the Questioned Signature nor the Questioned Date are the normal writing of Charles R. Dall'Acqua as reflected in the contemporaneous Knowns, but rather are simulations. It should be noted that in the opinion terminology used by forensic document examiners[6] this represents highest degree of confidence expressed by an examiner in handwriting comparisons.

Should presentation of these findings be required, illustrative charts demonstrating the bases for these determinations can be prepared.

Respectfully submitted,

Peter V. Tytell

---

[6] ASTM E1658 *Standard Terminology for Expressing Conclusions of Forensic Document Examiners.*

ATTORNEY WORK PRODUCT—PRIVILEGED & CONFIDENTIAL