## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HARTE-HANKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No.  04-11548-DPW |
| v. | ) | |
| | ) | |
| CHARLES R. DALL=ACQUA and | ) | |
| PROTOCOL MARKETING GROUP, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>DEFENDANTS CHARLES R. DALL=ACQUA=S AND PROTOCOL SERVICES, INC.=S AMENDED ANSWER AND DEFENDANT DALL'ACQUA'S COUNTERCLAIMS</u>

Defendants Charles R. Dall=Acqua (ADall=Acqua@) and Protocol Services, Inc.

(AProtocol@)[1] (referred to collectively as ADefendants@) answer the Complaint and Demand for

Trial by Jury filed by Harte-Hanks, Inc. (AHarte-Hanks@ or APlaintiff@) as follows:

### Jurisdiction and Venue

1.      Defendants admit the allegations contained in Paragraph 1 of the Complaint.

2.      Defendants admit the allegations contained in Paragraph 2 of the Complaint.

### Factual Allegations

3.      Upon information and belief, Defendants admit the allegations contained in Paragraph 3

of the Complaint.

4.      Defendants admit the allegations contained in Paragraph 4 of the Complaint.

5.      Defendants admit the allegations contained in Paragraph 5 of the Complaint.

6.      Defendants admit the allegations contained in Paragraph 6 of the Complaint.

---

[1] Defendant Protocol Services, Inc. is incorrectly identified as Protocol Marketing Group in the Complaint.

7.   Defendants lack sufficient information to admit or deny the allegations contained in Paragraph 7 of the Complaint, and, accordingly, deny the allegations contained in Paragraph 7 of the Complaint.

8.   Defendants deny the allegations contained in Paragraph 8 of the Complaint.

9.   Defendants deny the allegations contained in Paragraph 9 of the Complaint.

10.  Defendants deny the allegations contained in Paragraph 10 of the Complaint.

11.  Defendants admit that the quoted language appears in Paragraph 10 of Exhibit A of the Complaint (the APurported Dall=Acqua Agreement®), but denies any further allegations of Paragraph 11 of the Complaint.

12.  Defendants admit that the quoted language appears in Paragraph 12 of the Purported Dall=Acqua Agreement, but denies any further allegations of Paragraph 12 of the Complaint.

13.  Defendants admit the allegations contained in Paragraph 13 of the Complaint.

14.  Defendants admit the allegations contained in Paragraph 14 of the Complaint.

15.  Upon information and belief, Defendants admit the allegations contained in Paragraph 15 of the Complaint.

16.  Defendants lack sufficient information to admit or deny the allegations contained in Paragraph 16 of the Complaint, and, accordingly, deny the allegations contained in Paragraph 16 of the Complaint.

17.  Defendants lack sufficient information to admit or deny the allegations contained in Paragraph 17 of the Complaint, and, accordingly, deny the allegations contained in Paragraph 17 of the Complaint.

18.  Defendants deny the allegations contained in Paragraph 18 of the Complaint.

2

19.     Defendants admit the allegations contained in Paragraph 19 of the Complaint.

20.     Defendants admit the allegations contained in Paragraph 20 of the Complaint.

21.     Defendants admit the allegations contained in Paragraph 21 of the Complaint, except Defendants deny that Martus began work at Protocol in May 2004.

22.     Defendants lack sufficient information to admit or deny the allegations contained in Paragraph 22 of the Complaint, and, accordingly, deny the allegations contained in Paragraph 22 of the Complaint.

23.     Defendants admit the allegations contained in Paragraph 23 of the Complaint.

24.     Defendants admit the allegations contained in Paragraph 24 of the Complaint.

25.     Defendants admit the allegations contained in Paragraph 25 of the Complaint.

26.     Defendants admit the allegations contained in Paragraph 26 of the Complaint.

27.     Defendants admit that the June 17, 2004 letter to Paul Steven Hacker (AHacker@) contains the quote referenced in Paragraph 27 of the Complaint, but deny that the assertions in the letter written by Susan C. Levy concerning the Purported Dall=Acqua Agreement are false.

28.     Defendants admit the allegations contained in Paragraph 28 of the Complaint.

29.     Defendants admit the allegations contained in Paragraph 29 of the Complaint, except Defendants deny that Ms. Levy Athreatened@ anyone.

30.     Defendants admit the allegations contained in Paragraph 30 of the Complaint, except Defendants deny that the assertion that the Purported Dall=Acqua Agreement was Aforged and unauthorized@ is false.

31.     Defendants deny the allegations contained in Paragraph 31 of the Complaint.

**<u>COUNT I</u>**

32.     Defendants repeat and incorporate by reference herein their answers to Paragraphs 1 -31 above.

33.     Defendants deny the allegations contained in Paragraph 33 of the Complaint.

34.     Defendants deny the allegations contained in Paragraph 34 of the Complaint.

35.     Defendants deny the allegations contained in Paragraph 35 of the Complaint.

**<u>COUNT II</u>**

36.     Defendants repeat and incorporate by reference herein their answers to Paragraphs 1 -35 above.

37.     Defendants deny the allegations contained in Paragraph 37 of the Complaint.

38.     Defendants deny the allegations contained in Paragraph 38 of the Complaint.

39.     Defendants deny the allegations contained in Paragraph 39 of the Complaint.

**<u>COUNT III</u>**

40.     Defendants repeat and incorporate by reference herein their answers to Paragraphs 1 -39 above.

41.     Defendants deny the allegations contained in Paragraph 41 of the Complaint.

42.     Defendants deny the allegations contained in Paragraph 42 of the Complaint.

43.     Defendants deny the allegations contained in Paragraph 43 of the Complaint.

44.     Defendants deny the allegations contained in Paragraph 44 of the Complaint.

45.     Defendants deny the allegations contained in Paragraph 45 of the Complaint.

**<u>COUNT IV</u>**

46.     Defendants repeat and incorporate by reference herein their answers to Paragraphs 1 -45 above.

47.    Defendants deny the allegations contained in Paragraph 47 of the Complaint.

48.    Defendants deny the allegations contained in Paragraph 48 of the Complaint.

49.    Defendants deny the allegations contained in Paragraph 49 of the Complaint.

## AFFIRMATIVE AND OTHER DEFENSES

For their Affirmative and Other Defenses, Defendants state the following:

50.    Plaintiff≡s claims fail to state a claim upon which relief can be granted.

51.    The signature of Dall≡Acqua on the Purported Dall≡Acqua Agreement is a forgery and the

Purported Dall≡Acqua Agreement is unenforceable.

WHEREFORE, Defendants Charles R. Dall≡Acqua and Protocol Services, Inc.

respectfully request that the Complaint be dismissed with prejudice, and with costs

awarded to Defendants.

## COUNTERCLAIMS

Plaintiff-in-counterclaim Charles R. Dall'Acqua ("Dall'Acqua"), by his attorneys,

respectfully brings these counterclaims against defendant-in-counterclaim Harte-Hanks, Inc.

("Harte-Hanks") and hereby alleges as follows:

### NATURE OF ACTION

1.  This is a civil lawsuit seeking damages resulting from Harte-Hanks' unfair competition.

### PARTIES

2.  Plaintiff Dall'Acqua is a citizen of Maryland.  Dall'Acqua is the president and chief executive

officer of Protocol.  From 1980 until March 2004, Dall'Acqua was a senior vice-president at

Harte-Hanks.

3.  Defendant Harte-Hanks is a publicly-traded Delaware corporation with its principal place of

business in San Antonio, Texas.  Harte-Hanks is listed on the New York Stock Exchange.

## OTHER KEY PLAYERS

4. Protocol Services, Inc. is in the business of providing marketing services which assist clients in interacting with its customers.

5. Richard Hochhauser is the president and chief executive officer of Harte-Hanks.

6. Dean Blythe is the chief financial officer of Harte-Hanks. Prior to becoming CFO, Blythe served as Harte-Hanks' general counsel.

7. Elaine Dernoga is an executive assistant at Harte-Hanks. Until March 2004, Dernoga served as Dall'Acqua's assistant. Dernoga allegedly countersigned the forged agreement.

## JURISDICTION AND VENUE

8. The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a)(1) because there exists complete diversity of citizenship between the plaintiff and defendant and the amount in controversy exceeds $75,000.

9. Venue in this Court is proper, pursuant to 28 U.S.C. § 1391(a)(1) as the conduct giving rise to this action occurred primarily in the Commonwealth of Massachusetts.

## BACKGROUND

**Protocol Searches for New CEO**

10. In the late 2003, Protocol began searching for a new president and chief executive officer. Protocol engaged the services of Spencer Stuart, an executive search firm, to assist in this process. As part of its search, Spencer Stuart identified Charles Dall'Acqua as a potential candidate.

11. At the time, Dall'Acqua was senior vice-president of Harte-Hanks. In this position, Dall'Acqua was one of Harte-Hanks' top five executives. Dall'Acqua reported directly to Richard Hochhauser, Harte-Hanks' president and chief executive officer.

12. As part of its candidate profile, Spencer Stuart confirmed that Dall'Acqua did not have any restrictive covenants with Harte-Hanks.

13. Beginning in early 2004, various Protocol executives and board members interviewed Dall'Acqua regarding the Protocol position. During these interviews, Dall'Acqua confirmed he did not have any restrictive covenants with Harte-Hanks.

14. As part of its consideration of Dall'Acqua, Protocol conducted an extensive due diligence process. This due diligence included interviews with numerous high-ranking current and former Harte-Hanks representatives. Protocol's due diligence found:

   (a)    Dall'Acqua started worked at Harte-Hanks in 1980, and steadily rose within the ranks to become a "strong number two" in the company, beneath Hochhauser.

   (b)    Dall'Acqua was a highly-regarded, hard-working, loyal and dedicated employee of Harte-Hanks.

   (c)    Hochhauser was viewed as an "extremely difficult" person for whom to work. Despite Hochhauser's temperament, Dall'Acqua was credited for his ability to maintain a good relationship with him and to "handle[] him well."

**Harte-Hanks Terminates Dall'Acqua**

15. On March 1, 2004, Dall'Acqua was called into a meeting with Hochhauser and Dean Blythe (at the time, Harte-Hanks' general counsel). Hochhauser falsely accused Dall'Acqua of having accepted a job with a printing company in Baltimore, Maryland and soliciting Harte-Hanks' employees to join him. Dall'Acqua denied the accusations, and explained to Hochhauser that he didn't have another job and hadn't solicited any employees.

16. At no time during the March 1, 2004 meeting did Hochhauser or Blythe say anything to Dall'Acqua regarding the existence of any restrictive covenant limiting Dall'Acqua's ability to solicit Harte-Hanks employees.

17. On March 4, 2004, Hochhauser telephoned Dall'Acqua and informed him that he was being terminated.

18. During the March 4, 2004 telephone conversation, Hochhauser did not say anything regarding the existence of any restrictive covenant limiting Dall'Acqua's ability to solicit Harte-Hanks employees.

19. On March 5, 2004, Blythe telephoned Dall'Acqua and offered him a six-figure severance package conditioned on his signing a non-competition and non-solicitation agreement. Not wanting any restrictions on his future employment options, Dall'Acqua rejected this offer.

20. In the days and weeks after Dall'Acqua's termination, contrary to what invariably happens where such an agreement exists, Harte-Hanks never sent a letter to either Dall'Acqua or his new employer Protocol asserting the existence of any restrictive covenant limiting Dall'Acqua's ability to solicit Harte-Hanks employees.

**Protocol Hires Dall'Acqua and Executes Employment Contract With Him**

21. Upon learning of Dall'Acqua's termination, Protocol contacted a senior Harte-Hanks human resources manager to inquire regarding the development. This senior Harte-Hanks manager explained:

> (a) "Charles was great but he got no bonus and was doing all the heavy lifting. [Hochhauser] and he were essentially at total odds and it was clearly not Charles' doing by any means."
>
> (b) There remained a "wealth of good feelings still within the company" for Dall'Acqua.
>
> (c) Dall'Acqua possessed "the highest level of personal integrity," was "highly admired within the company" and was an "arbiter of [Harte-Hanks'] corporate culture."

22. The senior Harte-Hanks human resources manager also reviewed Dall'Acqua's personnel files and confirmed that it accurately reflected the information provided by Dall'Acqua regarding his

employment at Harte-Hanks. The human resources manager said nothing indicating Dall'Acqua was subject to any restrictive covenant.

23. Thereafter, Protocol hired Dall'Acqua.

24. On March 25, 2004, Protocol and Dall'Acqua entered into a valid and binding employment agreement. Pursuant to this contract, Dall'Acqua agreed to serve as Protocol's president and chief executive officer. The contract further provided that Dall'Acqua would faithfully perform and discharge such duties and responsibilities consistent with such positions. For example, Dall'Acqua's job responsibilities included working to improve and advance the business and interests of Protocol. In addition, Dall'Acqua had hiring responsibilities.

**Harte-Hanks Produces Alleged Non-Solicitation Agreement**

25. On June 8, 2004, for the first time, Harte-Hanks sent a letter to Dall'Acqua complaining that he was violating an alleged non-solicitation agreement purportedly dated January 25, 2002 (hereinafter the "alleged agreement" or "the forged agreement").

26. On information and belief, Harte-Hanks forged the alleged Dall'Acqua agreement with the intent to interfere with the rights of Protocol under its employment contract with Dall'Acqua and to gain an unfair competitive advantage over Protocol in the marketing services industry.

27. Dall'Acqua had never seen this alleged agreement before, and stated that it did not contain his signature. Protocol's counsel informed Harte-Hanks as such in a letter dated June 17, 2004.

28. Protocol retained a board-certified handwriting expert, Ellen Mulcrone Schuetzner, to compare the signature and handwritten date appearing on the alleged agreement against various known signatures of Dall'Acqua. Schuetzner concluded the signature was not genuine, but rather a simulation.

29. Protocol also retained a second handwriting expert, Peter Tytell, to examine the alleged agreement. Tytell is a nationally-renowned, board-certified document examiner with over 30 years experience in the field. Tytell compared the alleged agreement with hundreds of known writings of Dall'Acqua. Based on his review, Tytell concluded "with the highest degree of confidence" that neither the signature nor the date ("1/25/02") on the alleged agreement was authentic. Like Schuetzner, Tytell concluded they were simulations.

**Harte-Hanks "Loses" Critical Original Documents**

30. Protocol sought to compare the paper characteristics of the alleged agreement with the non-solicitation agreements of other Harte-Hanks executives allegedly processed and countersigned by Elaine Dernoga the week of January 21, 2002. Protocol believed such a comparison would reveal that the alleged agreement would not match the paper characteristics of any of those other allegedly contemporaneous documents.

31. In response to Protocol's request, Harte-Hanks belatedly confessed that it "lost" the other original agreements. Apparently, Dernoga "lost" the original documents while preparing to fly from Baltimore to Boston in connection with the Court's preliminary injunction hearing. (And, when asked about the whereabouts of the documents at the hearing, Dernoga failed to inform the Court that they had been "lost.")

32. By "losing" these documents, Harte-Hanks has hindered Protocol's ability to collect additional proof to reinforce the mounting evidence that the alleged agreement is a forgery.

**Harte-Hanks Sues Protocol**

33. On June 8, 2004, Harte-Hanks threatened to sue Protocol (and Dall'Acqua) if it refused to abide by the terms of the forged agreement.

34. In response, Protocol informed Harte-Hanks that the alleged agreement was not authentic. Protocol further notified Harte-Hanks that it would pursue its legal remedies if Harte-Hanks persisted in attempting to enforce the forged agreement.

35. On July 12, 2004, Harte-Hanks filed a complaint against Protocol (and Dall'Acqua) in the United States District Court for the District of Massachusetts (Civil Action No. 04-11548-DPW). Harte-Hanks' complaint was premised on the alleged breach of the forged agreement. Harte-Hanks also filed an emergency motion for a preliminary injunction seeking to prevent Protocol (and Dall'Acqua) from exercising its right to employ whoever it considered the best qualified employees to work for it.

36. The federal court action remains pending as against Dall'Acqua (defendant Protocol is to be dismissed).

**COUNT I**
**(Unfair Competition)**

37. Dall'Acqua repeats here and incorporates by reference the allegations of Paragraphs 1 through 36 as if fully set forth herein.

38. Harte-Hanks has engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of its business in violation of Mass. Gen. Laws. ch. 93A, § 2(a). This conduct has included:

    a.    Forging Dall'Acqua's signature on the alleged agreement;

    b.    Threatening Dall'Acqua if he did not comply with the forged agreement and refrain from soliciting Harte-Hanks employees;

11

       c.      Instituting and maintaining legal proceedings against Dall'Acqua (and his new employer) premised on the forged agreement;

       d.      "Losing" critical documents during the pendency of this litigation;

       e.      Accusing Dall'Acqua in a public forum of violating a forged agreement;

       f.      Using this litigation as a means to intrude on Dall'Acqua's privacy and to pursue a personal vendetta against him by, for example, serving a subpoena on his fiancé (now wife), seeking access to his divorce files and otherwise inquiring into Dall'Acqua's personal life;

       g.      Making accusations against Dall'Acqua regarding his personal life.

39. Harte-Hanks, by its wrongful conduct, has and continues to interfere with the employment relationship between Dall'Acqua and Protocol.

40. Harte-Hanks, by its wrongful conduct, has and continues to interfere with Dall'Acqua's ability to lawfully compete with Harte-Hanks in his capacity as Protocol's president and CEO.

41. By instituting the instant litigation, and destroying relevant evidence, premised on the forged agreement, Harte-Hanks was acting for an ulterior and illegitimate purpose -- namely, to undermine Dall'Acqua's ability to compete freely against Harte-Hanks, to improperly distract Dall'Acqua's attention away from Protocol legitimate business objectives, and to unfairly gain a competitive advantage in the marketing services industry.

42. Harte-Hanks' conduct occurred primarily and substantially within the Commonwealth of Massachusetts.

43. Harte-Hanks' unfair and unethical conduct was willful and knowing in violation of Mass. Gen. Law ch. 93A, § 9.

44. Dall'Acqua has suffered damages as a result of Harte-Hanks' conduct.

**WHEREFORE,** Dall'Acqua respectfully requests that this Court:

1.    Award Dall'Acqua his actual, compensatory and consequential damages consistent with his proof at trial in such sum, in excess of $75,000, as will compensate Dall'Acqua for the injuries alleged herein, plus interest and costs;

2.    Award Dall'Acqua treble damages based on Harte-Hanks' willful and knowing misconduct;

3.    Award Dall'Acqua his attorneys' fees and costs; and

4.    Grant Dall'Acqua such other and further relief as the Court deems just.

Respectfully Submitted,

CHARLES R. DALL'ACQUA

By:    _____/s/ John F. Rooney, III_____
John F. Rooney III
Angela L. Lackard
MELICK, PORTER & SHEA, LLP
28 State Street
Boston, MA  02109
(617) 523-6200

Susan C. Levy
Daniel J Winters
JENNER & BLOCK LLP (No. 05003)
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

Dated:  November 17, 2004