UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| HARTE-HANKS, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CHARLES R. DALL'ACQUA and )<br>PROTOCOL MARKETING GROUP, )<br>)<br>Defendants. )<br>) | Civil Action No. 04 CV 11548 DPW |

**OPPOSITION TO EMERGENCY**
**MOTION FOR PROTECTIVE ORDER**

Plaintiff, Harte-Hanks, Inc. ("Harte-Hanks"), submits this opposition to Charles Dall'Acqua's Emergency Motion for Protective Order.

**Preliminary Statement**

Mr. Dall'Acqua seeks a protective order with respect to two document subpoenas. One of the two was issued months ago, to a third-party, from the United States District Court for the District of Maryland. The recipient of the subpoena did not object to it, and Mr. Dall'Acqua did not seek any sort of relief as to it until now. The documents it seeks are either relevant or reasonably likely to lead to the discovery of admissible evidence. The second subpoena was issued more recently, also from the United States District Court for the District of Maryland. It also seeks documents that are relevant or reasonably likely to lead to the discovery of admissible evidence.

Under these circumstances, the motion is partially untimely, probably in the wrong court, and wholly without merit. Moreover, Mr. Dall'Acqua filed the motion without complying with Local Rule 37.1. The motion should be denied.

## Facts And Procedural History[1]

**Background**

In this case in particular, credibility is key. To decide the central issue – whether Mr. Dall'Acqua signed the Dall'Acqua Agreement – the jury will have to decide whether it is Mr. Dall'Acqua or someone (or ones) at Harte-Hanks who has been and is lying. Because credibility is so important, it is a focus of Harte-Hanks's discovery efforts. Harte-Hanks has endeavored to check every assertion Mr. Dall'Acqua has made under oath.

**Mr. Dall'Acqua's Testimony**

During the August hearing, Mr. Dall'Acqua twice made an issue of his 2002 divorce:

1. When asked about his emotional state in January 2002 – a factor that, as even Mr. Dall'Acqua's own expert admits, has relevance to handwriting analysis – Mr. Dall'Acqua said that he was "pretty stress-free" because his divorce was "over":

> Q. Now, sir, were you under some personal stress at this time, January of 2002?
>
> A No.
>
> Q Not at all?
>
> A. Not at that point. **My divorce was over and I was pretty stress-free.**

---

[1] This Statement of Facts and Procedural History is based on and supported by items filed with or entered by the Court (referenced by Docket Number, where applicable) and accompanying declarations of David B. Chaffin ("Chaffin Dec.") (Exhibit 1 hereto) and Kathleen A. Kelley ("Kelley Dec.") (Exhibit 2 hereto).

2

(August 12 Tr. at 66, Docket No. 29) (emphasis added).

   2. When asked about his commitment to Harte-Hanks, Mr. Dall'Acqua **volunteered**[2] that his position with Harte-Hanks had broken up his marriage:

   A. I don't have a problem answering that question. I have never put my self-interest ahead of that company. I have given that company absolutely everything for 23 years. I think I'm a bit of an anomaly in the business world. I worked seven days a week. I traveled five days a week most times. **I ruined my marriage because of that company.** And nobody is ever going to accuse me of never putting that company first.

(August 12 Tr. at 84, Docket No. 29) (emphasis added).[3]

---

[2] The question that preceded the quoted testimony – "Would it be fair, sir, that with that mindset [a blanket refusal to sign any sort of restrictive covenant], you were putting your interest ahead of Harte-Hanks?" – drew an objection by Mr. Dall'Acqua's counsel. The objection was sustained. Mr. Dall'Acqua volunteered the quoted testimony after the objection had been sustained. (August 12 Tr. at 84, Docket No. 29.) He had not been asked about his divorce.

[3] After Mr. Dall'Acqua volunteered the quoted testimony, the undersigned attempted to challenge Mr. Dall'Acqua's claim with respect to the marriage through the question about which Mr. Dall'Acqua makes so much in the Motion for Protective Order. (August 12 Tr. at 84, Docket No. 29.) Notably, Mr. Dall'Acqua, while quoting and criticizing the attempted challenge, fails to mention the testimony that precipitated it.

 Mr. Dall'Acqua also criticizes Harte-Hanks's counsel for issuing a subpoena to Valerie LeBan, Mr. Dall'Acqua's new wife, for documents and a deposition just before her wedding. But he tells only part of the story. The subpoena was issued in good faith. It was issued because it was reasonably thought that Ms. LeBan, a former Harte-Hanks employee, might have information concerning, for example, Mr. Dall'Acqua's claim that he had been dissatisfied with Harte-Hanks and its CEO in early 2002. It was also thought that she would be in an excellent position to be able to identify Mr. Dall'Acqua's signature (lay identifications of signatures being forceful evidence of genuineness) or that she might testify that Mr. Dall'Acqua had admitted to her that he had signed the Dall'Acqua Agreement. It was also thought that she might have samples of Mr. Dall'Acqua's signature. The only hint of bad faith with respect to the subpoena of Ms. LeBan comes from the Dall'Acqua side of this litigation. In August, Mr. Dall'Acqua told Ms. Gray and two other Harte-Hanks employees (whom he encountered at Logan Airport) that he and Ms. LeBan were to marry on September 25. Harte-Hanks's counsel scheduled the deposition for the week before the wedding in order to minimize any argument as to the spousal privilege. The purpose behind this scheduling was communicated to Mr. Dall'Acqua's counsel. The weekend before the deposition was to take place, and after Mr. Dall'Acqua's counsel were advised of the concern with privilege, Mr. Dall'Acqua went out of his way to call a Harte-Hanks employee to report that he was on his honeymoon in Hawaii. In other words, it appears that the wedding was moved up a week and that Mr. Dall'Acqua was intent on making sure Harte-Hanks was aware of it. Since the foregoing is not particularly relevant to the issue at bar, and so as not to clutter the record, declarations confirming these facts have not been provided. Harte-Hanks will gladly supplement the record if the Court wishes to pursue whether Mr. Dall'Acqua changed the date of his wedding in order to avoid having Ms. LeBan testify without

3

**The Relevance Of And Efforts
To Obtain The Divorce Records**

Particularly in view of Mr. Dall'Acqua's testimony, Harte-Hanks suspected, when it developed its discovery plan, that the files on the Dall'Acqua divorce proceedings would contain useful materials. It was assumed that they would contain materials confirming or contradicting Mr. Dall'Acqua's testimony, samples of Mr. Dall'Acqua's signature during the relevant period, and perhaps materials relevant to Mr. Dall'Acqua's claim in August that he had been dissatisfied with his position at Harte-Hanks. (Chaffin Dec. at ¶ 2.)

Thus, in September, Harte-Hanks's counsel obtained a copy of all of the materials that are in the public file on the Dall'Acqua divorce. (Chaffin Dec. at ¶ 3 and at, e.g., Ex. A.) The file is incomplete, but what was available provides ammunition for cross-examination:

- Contrary to Mr. Dall'Acqua's sworn testimony that he was "pretty stress-free" in late January 2002 because the divorce was "over," the materials in the divorce file show that the divorce was bitter, and that in late January 2002, Mr. Dall'Acqua was on the eve of the trial of the divorce. (Other materials in the file suggest that Mr. Dall'Acqua may have had good reason to be very anxious about the trial.)

- Contrary to Mr. Dall'Acqua's sworn testimony that the divorce was "over" in January 2002, the judgment for divorce is dated March 18, 2002.[4]

---

the benefit of the spousal privilege.

[4] Harte-Hanks's 16th interrogatory asked Mr. Dall'Acqua to "state the basis for your contention that your employment with Harte-Hanks ruined your marriage." Mr. Dall'Acqua initially refused to respond to this interrogatory. (Chaffin Dec. at Ex. B.) Pursuant to the Court's instructions, Mr. Dall'Acqua served amended and supplemental responses to Harte-Hanks's interrogatories on November 26. (The responses are still inadequate, and, unfortunately, a motion to compel is likely.) This time he responded, admitting, conveniently, that his testimony in August had been wrong:

> . . . Dall'Acqua's formal divorce proceedings were not final until February 2002. At the preliminary injunction hearing, in response to questions from Harte-Hanks's attorney, Dall'Acqua testified that his divorce was over as of January 2002. Immediately following this testimony, Dall'Acqua realized he meant to say he was separated at the time, and immediately asked his attorney whether the record should be clarified as to the timing of his separation and divorce.

(Chaffin Dec. at Ex. C.) This admission exemplifies the frivolity of the Motion for a Protective Order (and the

- Contrary to Mr. Dall'Acqua's clam that he was "pretty stress-free" in January 2002, materials in the file appear to indicate that he offered evidence during the divorce trial that he had been under stress and that he had been taking Prozac as a result.

- Contrary to Mr. Dall'Acqua's claim that he had been mis-treated by Harte-Hanks, the financial information on file indicates annual earnings in excess of $1 million.

- Contrary to Mr. Dall'Acqua's claim that his job with Harte-Hanks had ruined his marriage, the divorce court referred to other specific causes of the dissolution of the marriage.

(Chaffin Dec. at ¶ 3 and Ex. A.) As noted, the public file on the Dall'Acqua divorce is incomplete; for example, it does not contain the trial transcript or the transcript of Mr. Dall'Acqua's deposition. Harte-Hanks wishes to review these to confirm the points of impeachment mentioned above and to investigate, among other things, other such points. (Chaffin Dec. at ¶ 5.)

Accordingly, on September 17, 2004, Baltimore counsel for Harte-Hanks caused a subpoena to be served on George Z. Petros, counsel for Mr. Dall'Acqua's ex-wife. Notice of the service was provided to Mr. Dall'Acqua's counsel in this case. The subpoena was issued from the United States District Court for the District of Maryland and required the production of documents on or before September 27, 2004. (Chaffin Dec. at ¶ 6 and Ex. D.)

After the subpoena was served, the undersigned spoke with Mr. Petros more than once. In addition to choice words concerning, among other things, Mr. Dall'Acqua's testimony during the divorce proceedings, Mr. Petros expressed some concern about burden and privilege. The undersigned indicated that Harte-Hanks was very interested in obtaining the documents, that the

---

hypocrisy of Mr. Dall'Acqua's spoliation motion). The timing of the admission to coincide with the instant motion also raises serious questions. Furthermore, Mr. Dall'Acqua still has it wrong. As noted above, the judgment for divorce is dated March 18, 2002.

5

undersigned would work with him to lessen his burden, and that privileged materials were not sought. Mr. Petros did not serve an objection to the subpoena. (Chaffin Dec. at ¶ 7.)

In late September, the parties agreed to a 30-day standstill. Mr. Petros was advised of the standstill and told that he could hold off on producing documents for the time being. (Chaffin Dec. at ¶ 8.)

After the standstill expired, Harte-Hanks attempted to renew contact with Mr. Petros, unsuccessfully. Thus, on November 17, 2004, Harte-Hanks filed in the United States District Court for the District of Maryland a Motion to Compel and/or Motion to Show Cause seeking production on November 30 of the materials covered by the subpoena to Mr. Petros (the "Motion to Compel"). The Motion to Compel was accompanied by a motion for an order to shorten the time to respond to the motion. This procedure was utilized because (a) Mr. Petros had not objected to the subpoena, (b) Mr. Petros had ignored multiple telephone calls and correspondence seeking compliance, and (c) as of November 17, the pretrial conference was only weeks away. The next day, United States District Judge Garbis granted the motion to shorten time, directing that any response be filed on or before November 24. That day, Mr. Dall'Acqua (by Jenner & Block, who have withdrawn from this case) filed a motion for reconsideration of the grant of the motion to shorten time, pointing out that by that time, the pretrial schedule had been modified. Mr. Dall'Acqua sought until December 1, 2004, to respond to the Motion to Compel. Harte-Hanks did not oppose the motion for reconsideration. On Monday, November 22, Judge Garbis granted the motion for reconsideration, on the condition that Mr. Dall'Acqua not "object, on deadline grounds, to discovery that may be ordered." (Chaffin Dec. at ¶¶ 9-13.)

Last evening, the undersigned received a copy of Mr. Dall'Acqua's opposition to the motion to compel in Maryland, which was filed by Jenner & Block. Therein, Mr. Dall'Acqua:

6

- • Requests that the Maryland Court defer ruling until after this Court rules on this motion.[5]

- • Claims, incorrectly, that Mr. Petros's files "have no relevance whatsoever" to this litigation.

- • Fails to mention the Joint Confidentiality Stipulation and Order.

- • Claims, incorrectly, that this Court "already admonished Plaintiff's counsel during a preliminary injunction hearing that Dall'Acqua's divorce is a 'wholly inappropriate' topic that has 'nothing to do with' the underlying litigation."[6]

(Chaffin Dec. at Ex. I at 1-2.)

Because Mr. Petros had not been honoring the subpoena, on November 18, 2004, Harte-Hanks also served a subpoena duces tecum on Ronald Naditch, counsel for Mr. Dall'Acqua in the divorce proceedings. The second subpoena also was issued from the United States District Court for the District of Maryland. Harte-Hanks seeks essentially the same documents from Mr. Naditch as are sought from Mr. Petros, including transcripts from the divorce trial, deposition transcripts, sworn statements, and any documents signed by Mr. Dall'Acqua. The return date was November 29. Mr. Naditch served no objection on or before that date. (Chaffin Dec. at ¶¶15, 16.)

**The Confidentiality Stipulation And Order**

_____

[5] Harte-Hanks is hopeful that Mr. Dall'Acqua thus is indicating that he will abide by this Court's ruling and that, if the motion to compel is denied, he will cease all efforts to prevent access to the divorce records and will instruct his divorce counsel to produce the documents. Harte-Hanks will not want to be required to litigate this issue again in Maryland.

[6] As noted above, the quoted comments by the Court related not to the divorce as a whole, but to the follow-up question concerning why Mr. Dall'Acqua's first marriage had been ruined. The Court did not rule that the divorce is entirely out of bounds, and, given Mr. Dall'Acqua's references to it, it clearly is not out of bounds. Mr. Dall'Acqua attempted to gain advantage by referring to it, twice, and he should not be permitted suddenly to declare the subject off limits and thus to avoid impeachment.

The parties have stipulated to, and the Court has entered, a Joint Confidentiality Stipulation and Order (the "Confidentiality Order"). Under the Confidentiality Order, sensitive material can be protected from any disclosure, use, or publication beyond this action. (Confidentiality Order, Docket No. 43.)

**The Motion For Protective Order And
Failure To Comply With Local Rule 37.1**

Mr. Dall'Acqua filed the Motion for Protective Order on November 23. He "requests that the discovery [represented by the subpoenas served on Messrs. Petros and Naditch] not be allowed." (Motion for Protective Order at 1, Docket No. 72.)

Before the motion was filed, Matthew Grygorcewicz, Mr. Dall'Acqua's co-counsel, called Kathleen Kelley, co-counsel for Harte-Hanks, purportedly pursuant to Local Rule 7.1. (Rule 37.1 was not mentioned.) Mr. Grygorcewicz made clear that the motion would seek to preclude all production pursuant to the subpoenas and that there was no room for negotiation. When asked for the basis for the motion, Mr. Grygorcewicz cited (a) irrelevance and (b) availability through alternative means, viz., the public record. (Kelley Dec. at ¶¶ 2 through 4.) Mr. Grygorcewicz did not say that he had been retained by or conferred with either Mr. Petros or Mr. Naditch. (Kelley Dec. at ¶ 5.)

**Argument**

**THE MOTION SHOULD BE DENIED**

A.   Introduction

At issue are two subpoenas issued from the United States District Court for the District of Maryland, not from this Court. The subpoenas seek materials related to a public divorce trial, not state secrets. The materials are sought for legitimate purposes – including to impeach Mr.

Dall'Acqua as to claims he made, under oath, in connection with the evidentiary hearing in August – and not to harass him. If the divorce-related materials that Harte-Hanks has been able to obtain thus far are any guide, the additional materials sought by the subpoenas will have value. Neither the recipient of the first subpoena nor Mr. Dall'Acqua timely objected to its service. Finally, Local Rule 37.1 has been flouted. Under these circumstances, the Motion for a Protective Order is flawed in form and substance. It should be seen for what it is – a baseless effort to deny Harte-Hanks evidence that will expose Mr. Dall'Acqua – and denied.

**B.    Operative Standards**

    **1.    Rule 26**

"Parties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party." Fed. R. Civ. P. 26(b). In this context, "relevance" is to be interpreted expansively, and the presumption is that the discovery sought should be had. See, e.g., Oppenheimer Fund, Inc. v. Sanders, 437 U.S. 340, 351, n. 12 (1978) ("The court should and ordinarily does interpret 'relevant' very broadly to mean matter that is relevant to anything that is or may become an issue in the litigation.") (emphasis added) (quoting J. Moore, Federal Practice ¶ 26.56 [1], p. 26-131 n. 34 (2d ed. 1976)); Schuurman v. Town of North Reading, 129 F.R.D. 276, 277 (D. Mass. 1991) (citations omitted).

A party seeking a protective order pursuant to Rule 26(c) bears "the burden of persuasion to show good cause why the [discovery] should not go forward." Sorenson v. H & R Block, Inc., 197 F.R.D. 199, 203 (D. Mass. 2000) (citing Fed. R. Civ. P 26(c)); Demers v. LaMontagne, 1999 WL 1627978 at *2 (D. Mass. 1999); and Concord Boat Corp. v. Brunswick Corp., 169 F.R.D. 44, 48 (S.D.N.Y.1996)). "To establish 'good cause' for a protective order under [Federal Rule of Civil Procedure] 26(c), '[t]he courts have insisted on a particular and specific demonstration of

9

fact, as distinguished from stereotyped and conclusory statements . . ..'" Gulf Oil Company v. Bernard, 452 U.S. 89, 102 (1981) (citing In re Halkin, 598 F.2d 176, 193 (1979), quoting 8 C. Wright & A. Miller, Federal Practice and Procedure § 2035, p. 265 (1970)).

2. **Rule 45**

Rule 45(c)(2)(B) permits a person commanded to produce and permit inspection and copying of documents to object to the production, whereupon the party that served the subpoena is not entitled to inspect and copy the documents absent an order to compel production. Fed. R. Civ. P. 45(c)(2)(B). In addition, Rule 45(c)(3)(A) and (B) empower a court by which a subpoena was issued to quash or modify the subpoena under certain specific circumstances. Fed. R. Civ. P. 45(c)(3)(A), (B). An objection to, or motion to quash or modify, a subpoena must be made or filed before the date on which production is required, and a motion to quash or modify must be made in the court from which the subpoena was issued. See, e.g., Fed. R. Civ. P. 45(c)(2)(B) (objection due on or before date for responses); United States ex. rel. Pogue v. Diabetes Treatment Centers of America, 283 F. Supp. 2d 270, 278 (D.D.C. 2002) (motion filed three months after notice of subpoena was untimely).[7] Failure to object or move on a timely basis may constitute a waiver of objections to the subpoena. See, e.g., In re Flat Glass Antitrust Litigation, 288 F.3d 83, 90 (3d Cir. 2002) (lack of motion to quash constitutes waiver of objection to subpoena).

---

[7] There is caselaw that suggests that although Rule 45 appears to require that a motion to quash or modify be filed in the district from which a subpoena issued, the court where the matter is pending also has the authority to issue protective orders relating to the subpoena and generally to control discovery. See, e.g., GFL Advantage Fund, Ltd. v. Colkitt, 216 F.R.D. 189 (D.D.C. 2003); State Control Components, Inc. v. Darkprint Imaging, 201 F.R.D. 431, 437 (M.D.N.C. 2001).

C.  **The Motion Should Be Denied**

1.  **Procedural Deficiencies**

The Motion for Protective Order suffers from three procedural defects. Under Local Rule 37.1, before a discovery motion is filed, "counsel for each of the parties shall confer in good faith to narrow the areas of disagreement to the greatest possible extent . . .," and the onus is on the moving party to arrange for the conference. In addition, the memorandum supporting a discovery motion "shall state with particularity" "the time, date, location and duration of the conference; who was present for each party; the matters on which the parties reached agreement; and the issues remaining to be decided by the court . . .." Local Rule 37.1. Mr. Dall'Acqua's counsel never convened a true Rule 37.1 conference, did not confer with Harte-Hanks's counsel in a "good faith" attempt to narrow the areas of disagreement, and did not include in the memorandum in support of the motion the requisite certificate. Instead, co-counsel for Mr. Dall'Acqua simply picked up the telephone shortly before the motion was filed, told Harte-Hanks's co-counsel what was intended, and made clear that Mr. Dall'Acqua's position was non-negotiable. Moreover, the requisite certificate is not in Mr. Dall'Acqua's papers. Without more, the motion should be denied. See, e.g., Hasbro, Inc. v. Serafino, 168 F.R.D. 99, 101 (D. Mass. 1996) (failure to confer and certify under Local Rule 37.1 warranted denial of motion to compel discovery).

Second, any motion relating to the subpoenas at issue should have been filed in Maryland. See Fed R. Civ. P. 45 (c)(3)(A).

Third, the motion, insofar as the subpoena to Mr. Petros is concerned, is untimely. The subpoena was issued in September and required production on September 27. Mr. Petros and Mr. Dall'Acqua failed to object to, or to move to quash or to modify, the subpoena before that

11

date. Any objections are waived. See, e.g., Fed. R. Civ. P. 45(c)(2)(B), 45(c)(3)(A), (B); In re Flat Glass Litigation, 288 F.3d at 90.

### 2.   Substantive Deficiencies

For the reasons discussed above, some of the materials sought from Messrs. Petros and Naditch are directly relevant, and the others are reasonably likely to lead to the discovery of admissible evidence. The publicly-available materials on the Dall'Acqua divorce do not include the items that will be necessary to complete the points of impeachment that are described above. Messrs. Petros and Naditch presumably have those items, and they should be produced. Messrs. Petros and Naditch also are likely to have samples of Mr. Dall'Acqua's signature from the relevant period. The other materials in the possession of Messrs. Petros and Naditch, including testimony and sworn statements, very well could lead to other points of cross-examination (or other substantive evidence), particularly since the Dall'Acqua divorce reached its climax during the relevant period. Here, where credibility is key and impeachment will be crucial, Harte-Hanks should be given wide latitude to identify other inconsistencies in Mr. Dall'Acqua's story. See, e.g., Santiago v. Fenton, 891 F.2d 373, 379 (D. Mass. 1989) (parties to litigation are entitled to discovery relating to "any issue in the case"). Furthermore, the materials sought from Mr. Petros are his and his client's, not Mr. Dall'Acqua's, and neither Mr. Petros nor his client has objected. Mr. Dall'Acqua should not be permitted to draw a curtain around materials that are not his, that include valuable evidence, and that may lead to more valuable evidence.

Mr. Dall'Acqua is trying to have things both ways. He levels very serious charges against Harte-Hanks but seeks to deny Harte-Hanks access to materials that will undercut his charges by exposing him as the prevaricator that he is. The subpoenas were served in good faith and, given Mr. Dall'Acqua's testimony and position, for good reason. The materials Harte-Hanks seeks are

needed, and any concern Mr. Dall'Acqua has with respect to any alleged confidentiality can be addressed through the protections of the Confidentiality Stipulation and Order. The motion should be denied.

## Conclusion

For the foregoing reasons, the Motion for a Protective Order should be denied.

Dated: December 2, 2004

Respectfully submitted,

HARTE-HANKS, INC.,

By its attorneys,

s/David B. Chaffin
David B. Chaffin
BBO No. 549245
Kathleen A. Kelley
BBO No. 562342
HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
(617) 330-5000

422004.1130