# EXHIBIT 1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HARTE-HANKS, INC., | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 04 CV 11548 DPW |
| CHARLES R. DALL'ACQUA and PROTOCOL MARKETING GROUP, | ) ) ) ) | |
| Defendants. | ) ) | |

### DECLARATION OF DAVID B. CHAFFIN

I, David B. Chaffin, state, under the penalties of perjury:

1. I am co-counsel to Harte-Hanks, Inc.

2. I believed, when I was developing Harte-Hanks's discovery plan, that the files on the Dall'Acqua divorce proceedings would contain useful materials: I assumed that they would contain materials confirming or contradicting Mr. Dall'Acqua's testimony at the evidentiary hearing, samples of Mr. Dall'Acqua's signature during the relevant period, and perhaps materials relevant to Mr. Dall'Acqua's claim that he had been dissatisfied with his position at Harte-Hanks.

3. Thus, in September, I obtained, with the assistance of Baltimore counsel, a copy of all of the materials that are in the public file on the Dall'Acqua divorce. Attached hereto as Exhibit A is an excerpt from what appears to be the transcript of the judge's bench ruling at the conclusion of the divorce trial.

4. Attached hereto as Exhibits B and C are true and correct copies of Mr. Dall'Acqua's answer and revised answer, respectively, to Harte-Hanks's Interrogatory No. 16.

5. The public file on the Dall'Acqua divorce is incomplete. It does not contain (for example) the trial or deposition transcripts. Harte-Hanks wishes to review the missing materials to confirm the points of impeachment mentioned in Harte-Hanks's accompanying memorandum of law and to investigate, among other things, other such points.

6. Accordingly, on or about September 17, 2004, Baltimore counsel for Harte-Hanks caused a subpoena to be served on George Z. Petros, counsel for Mr. Dall'Acqua's ex-wife. Notice of the service was provided to Mr. Dall'Acqua's counsel in this case. The subpoena was issued from the United States District Court for the District of Maryland and required the production of documents on or before September 27, 2004. Attached hereto as Exhibit D is a true and correct copy of the Notice of Service of Subpoena.

7. After the subpoena was served, I spoke with Mr. Petros more than once. In addition to choice words concerning, among other things, Mr. Dall'Acqua's testimony during the divorce proceedings, Mr. Petros expressed some concern about burden and privilege. I indicated that Harte-Hanks was very interested in obtaining the documents, that I would work with him to lessen his burden, and that privileged materials were not sought. Mr. Petros did not serve an objection to the subpoena.

8. In late September, the parties agreed to a 30-day standstill. Mr. Petros was advised of the standstill and told that he could hold off on producing documents for the time being.

9. After the standstill expired, Harte-Hanks attempted to renew contact with Mr. Petros, unsuccessfully. Thus, on November 17, 2004, Harte-Hanks filed in the United States District Court for the District of Maryland a Motion to Compel and/or Motion to Show Cause

seeking production on November 30 of the materials covered by the subpoena to Mr. Petros (the "Motion to Compel").

10. The Motion to Compel was accompanied by a motion for an order to shorten the time to respond to the motion. This procedure was utilized because (a) Mr. Petros had not objected to the subpoena, (b) Mr. Petros had ignored multiple telephone calls and correspondence seeking compliance, and (c) as of November 17, the pretrial conference was only weeks away. Attached hereto as Exhibit E are true and correct copies of the motion to compel and the motion to shorten the time to respond that were filed in Maryland.

11. The next day, United States District Judge Garbis granted the motion to shorten time, directing that any response be filed on or before November 24. Attached hereto as Exhibit F is a true and correct copy of the Order granting the motion to shorten the response time.

12. That day, Mr. Dall'Acqua (by Jenner & Block) filed a motion for reconsideration of the grant of the motion to shorten time, pointing out that by that time, the pretrial schedule had been modified. Mr. Dall'Acqua sought until December 1, 2004, to respond to the Motion to Compel. Attached hereto as Exhibit G is a true and correct copy of Mr. Dall'Acqua's motion for reconsideration.

13. Harte-Hanks did not oppose the motion for reconsideration. On Monday, November 22, Judge Garbis granted the motion for reconsideration, on the condition that Mr. Dall'Acqua not "object, on deadline grounds, to discovery that may be ordered." Attached hereto as Exhibit H is a true and correct copy of the order granting the motion for reconsideration.

14. Last evening, I received a copy of Mr. Dall'Acqua's opposition to the motion to compel in Maryland, which was filed by Jenner & Block. A copy of the opposition is attached hereto as Exhibit I.

15. Because Mr. Petros had not been honoring the subpoena, on or about November 18, 2004, Harte-Hanks also served a subpoena duces tecum on Ronald Naditch, counsel for Mr. Dall'Acqua in the divorce proceedings. The second subpoena also was issued from the United States District Court for the District of Maryland. Harte-Hanks seeks essentially the same documents from Mr. Naditch as are sought from Mr. Petros, including transcripts from the divorce trial and any documents signed by Mr. Dall'Acqua. The return date was November 29.

15. I am advised by Baltimore counsel that Mr. Naditch did not serve any objection to the subpoena served on him.

SIGNED UNDER THE PENALTIES OF PERJURY
ON THIS 2nd DAY OF DECEMBER 2004.

_____
David B. Chaffin

422004.1130

4

# EXHIBIT A

```
         IN THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY, MARYLAND
- - - - - - - - - - - - - - - - -x
CHARLES DALL'ACQUA,              :
                                 :       ORIGINAL
           Plaintiff,            :
     v.                          :   Civil No. C-2001-69392
                                 :
MARIE DALL'ACQUA,                :
                                 :
           Defendant.            :
                                 :
- - - - - - - - - - - - - - - - -x   Annapolis, Maryland

                                      February 28, 2002
```

## COURT'S OPINION

WHEREUPON, proceedings in the above-entitled matter commenced.

    BEFORE:  THE HONORABLE PHILIP T. CAROOM, Judge

    APPEARANCES:

    FOR THE PLAINTIFF:

    RONALD M. NADITCH, Esq.
    49 Cornhill Street
    P.O. Box 749
    Annapolis, Maryland  21404

    FOR THE DEFENDANT:

    GEORGE PETROS, Esq.
    90 Cathedral Street
    Annapolis, Maryland 21401


                        CompuScribe
                        (301)577-5882                    EXHIBIT
                                                            1

P R O C E E D I N G S

THE COURT: Let me say initially that I do appreciate the efforts of counsel to expedite the case and finish it in the time we had, or maybe a little more than the time that we had. Since we took some time for other cases.

The Court will say at the outset that it is obvious that the parties have been separated for the period of time required by the statute and they both now agree that the marriage is over. And with the corroboration of witnesses, the Court finds it is appropriate to grant the complaint for absolute divorce.

And the Court will adopt and incorporate, but not merge, the terms of the parties' agreement which was stated at the outset relating to custody of the children, and as to the one child, Jason, who will continue to be under 18 after the next month or two, a couple of months.

The Court certainly will also adopt and incorporate, but not merge, the terms of the parties' agreement as to marital property. And as far as that goes. And will reserve continuing jurisdiction by agreement of the parties for at least 90 days. Or, if more is necessary and the parties cannot work it out, could extend it to two more by their agreement.

As to the contested issues, the Court first turns to a quick, because of the hour, analysis of the statutory factors for alimony and marital property, which are largely the same.

1   Just a couple of them are different.  Noting that the parties
2   are respectfully 47 and 45, referring to Mr. and Ms. Dell'Aqua.
3            Their health is both relatively good.  Mr. Dell'Aqua
4   takes a prescription for Prozac sometimes and complains of
5   stress.  But, obviously, he is getting along real well.  He
6   seems to be set.  Other than the several days referred to about
7   the time of the parties' separation, I never heard that it
8   caused him to lose work.  That he has, whatever that condition
9   might be, stress related condition, might be referred to as.
10           In terms of the contributions of the parties during
11  the marriage, I would have to say that Mr. Dell'Aqua has made
12  an extraordinary financial contribution.  He has worked very
13  hard.  He has been very successful.  He has earned lots of
14  money.
15           And Ms. Dell'Aqua, on her part, has, I think, worked
16  as hard in the home in establishing the lifestyle which they
17  put together in giving birth to, taking care of the two
18  children, and in many regards, operating as the social
19  secretary of the family and manager of the home, and so forth
20  for the length of the marriage.
21           And the marriage in this case was, I think, what 24
22  years?
23           MR. NADITCH:  1978.
24           THE COURT:  24 years.
25           MR. NADITCH:  Almost 24.  It is 23, I think.

jtw

4

1  THE COURT: And that is a pretty lengthy marriage as
2  they go nowadays. The Court, therefore, if I am assessing the
3  monetary/non-monetary contributions would have to say that it
4  is hard to say that one grossly outweighs the other. Although
5  one is characterized as monetary and one non-monetary.
6  In terms of the fault that leads to the demise of
7  the marriage, I have sort of the same problem in that instance.
8  The Court understands that Ms. Dell'Aqua was very much in favor
9  of having an additional child or children. And Mr. Dell'Aqua
10 was not in favor of that.
11 The Court realizes that people get married all the
12 time. And they don't have a good idea about having children,
13 unless they already have one on the way. And, that people's
14 minds also change. Over the course of a marriage you may start
15 out thinking that you want many children. And then after you
16 have a few, the reality comes to you. And I can't say that
17 means that anyone in that situation should get a divorce, or
18 vice versa.
19 They had lots of financial issues that Ms. Dell'Aqua
20 was as good at spending money as Mr. Dell'Aqua was at earning
21 it. And, it seemed to be a little bit of a race, at least in
22 Mr. Dell'Aqua's mind, as to whether he was keeping up.
23 And, again, it is unfortunate that those conflicts
24 develop. And there is also the implication from
25 Ms. Dell'Aqua's part that maybe he was getting interested in

1  other women.  I don't know exactly how all the tension arose to
2  the level that it did.  Because they both seem to be nice
3  people who, obviously, cared a great deal about one another at
4  one time.
5           But, I am not able to say that it was per se fault.
6  Those things came up.  It seems to be more like what a
7  physicalist would call a chaos theory.  That at some point the
8  differences got so great they just fragmented and broke apart.
9  So I would not find that either one was much greater in terms
10 of being at fault than the other.  That it was just a breakdown
11 that happened, unfortunately.
12          As to the standard of living established by the
13 parties during the marriage, obviously, it was increasingly
14 luxurious and a high standard as things go comparatively.
15          Although Mr. Dell'Aqua says that he didn't feel like
16 he needed as much.  We see from his actual behavior that he at
17 least needs waterfront.  He at least needs a nice house on the
18 waterfront with access for boats.  I expect that he would in
19 effect replicate the living situation that the parties have had
20 at his new waterfront property as soon as this is over, and he
21 gets around to it.
22          And, on the other hand, Ms. Dell'Aqua, if she did
23 not have a substantial monetary award, the 50/50 agreement that
24 I have heard of is something I am considering along those
25 lines.  If she didn't have that, if she didn't have any alimony

1  has in stocks and bonds, that she feels her husband should
2  pay her more money.
3          In closing, Your Honor, at the end of this case we
4  will present to the Court an analysis of Mrs. Dall'Acqua's
5  expenses, what she says they are, what we believe the
6  evidence will show they are, and then we will show you the
7  difference between the two, and I think the Court will see
8  that not only does she not need, or is she entitled to more
9  money from Mr. Dall'Acqua, but in fact, before -- before --
10 the $1,000 that he is giving her each month is taken into
11 consideration, that she shows a surplus in terms of what she
12 needs, as opposed to what she spends, and I would of course
13 ask the Court at the end of this case to make a distinction
14 between needs and what one spends.
15         MR. PETROS:  Given Mr. Naditch in opening, let
16 me --
17         MR. NADITCH:  I knew I could get him up.
18         MR. PETROS:  -- let me bring the Court back to
19 focus of the center.  The reality -- and the Court has read
20 the pleadings; I don't need to go over the essentials of the
21 marriage.  They were married in 1979.  As you know, it was a
22 long-term marriage, two children born to the marriage.
23         THE COURT:  It doesn't matter if it was two days
24 or 20 years at a PL hearing.
25         MR. PETROS:  I understand.  What does matter,

1  though, unlike what I think I just heard, is that the income
2  of Mr. Dall'Acqua has not been 300,000. The income of
3  Mr. Dall'Acqua, at least from 1998, has been more in the
4  area of $800,000, a minimum, to over $1 million in the year
5  2000, to the point that this year to date, of 2001 now -- at
6  least through May, I should say; it is the last financial I
7  have of his, May 31st -- is to a level of about 400,000
8  through May of 2001. That is the income level, Your Honor,
9  and the historical standard of living that the parties had,
10 supported by the Plaintiff's -- or the Defendant's in this
11 case -- financial statement, and not by a self-imposed
12 standard of living that Mr. Dall'Acqua has put on
13 Mrs. Dall'Acqua of $1,000 per month.
14         There are two mortgages that Mr. Dall'Acqua is
15 payint -- and footnoted on her financial statement right at
16 the very beginning -- of the family home as well as a beach
17 house. In addition to those two pieces of real property,
18 there is a parcel of real property in Baltimore that these
19 individuals have, which Mr. Dall'Acqua takes the rents from,
20 pays the obligations, and nets, I believe the evidence would
21 show, nets from that something in the neighborhood of 1500
22 or so profit per month, which he alone has had and taken the
23 benefit of. He has banked or put away into assets that have
24 been beyond the touch of Marie Dall'Acqua -- and but for her
25 freezing one account, she would have -- well, she froze one

| | | |
|---|---|---|
| **CHARLES DALL ACQUA** | * | IN THE |
| | * | |
| Plaintiff | * | |
| | * | CIRCUIT COURT |
| | * | |
| vs. | * | FOR |
| | * | |
| **MARIE DALL ACQUA** | * | ANNE ARUNDEL COUNTY |
| | * | |
| Defendant | * | |
| | * | CASE NO. C-2001-69392-DV |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## JUDGMENT OF ABSOLUTE DIVORCE

This cause having come on for hearing, testimony having been taken, it is, therefore, this ____ day of March, 2002, by the Circuit Court for Anne Arundel County, ***ADJUDGED, ORDERED and DECREED***, that the Plaintiff, **Charles Dall Acqua**, is hereby granted an Absolute Divorce from the Defendant, **Marie Dall Acqua.**

***AND IT IS FURTHER ADJUDGED, ORDERED AND DECREED:***

1. That, commencing with the payment due on March 1, 2002, the Plaintiff shall pay, directly to the Defendant, the sum of Two Thousand Dollars ($2,000) per month for the support and maintenance of Jason Dall Aqua, their minor child, which support is in accordance with the attached Maryland Child Support Guidelines schedule. This support includes the payment of approximately One Thousand Dollars ($1,000) per month by the Defendant to Indian Creek, which is a private school now attended by Jason Dall Acqua. The parties have agreed that, at the present time, it is in the best interests of the minor child to attend that private school until such time as he graduates therefrom in the spring of 2003.

2. That, with regard to alimony:

    a. Commencing with the payment due on January 1, 2002 and ending with the payment due on February 1, 2002, the Plaintiff shall pay, directly to the Defendant, the sum of Two Thousand Seven Hundred Fifty Dollars ($2,750) per month, as alimony, with credit being given to the Plaintiff for any monies already paid in accordance with this ruling.

2002 MAR 20 P 3:07

FILED

   b. Commencing with the payment due and owing on March 1, 2002, the Plaintiff shall pay, directly to the Plaintiff, the sum of Five Thousand Dollars ($5,000) per month as rehabilitative and modifiable alimony, which alimony obligation shall end and terminate upon the first to occur of the date on which the Defendant remarries, the death of either party or on March 1, 2007. This payment shall be made by the Plaintiff by direct deposit into the Defendant's account.

   c. Commencing on March 1, 2007, the Plaintiff shall pay, directly to the Plaintiff, the sum of Three Thousand Five Hundred Dollars ($3,500) per month as modifiable alimony, which obligation shall end and terminate upon the first to occur of the date on which the Defendant remarries or the death of either party. This payment shall also be made by the Plaintiff by direct deposit into the Defendant's account.

  3. That the Court adopts and incorporates, but does not merge, the agreement of the parties with regard to the joint custodial arrangement that counsel for the parties recited on the record at the time of the trial, the details of which agreement are to be contained in a formal written agreement which shall be presented to the Court no later than thirty (30) days after the date of this Judgment of Divorce.

  4. That the Court adopts and incorporates, but does not merge, the agreement of the parties with regard to the disposition and division of property which was contained on the 9-207 form that was admitted as an exhibit at the time of the trial and any other property that the counsel for the parties recited on the record at the time of the trial, the details of which agreement are to be contained in a formal written agreement which shall be presented to the Court no later than thirty (30) days after the date of this Judgment of Divorce.

  5. That, in the event that the parties are unable to agree on the precise terms of a written agreement embodying the agreements which were recited on the record by their counsel at the time of the trial, the court reserves jurisdiction over all matters related to marital property for a period of no less than ninety (90) days after the date of this Judgment.

  6. That, in the event that the Defendant elects not to purchase the Plaintiff's equity interest in the marital or family home of the parties in which the Defendant and the minor child of the parties now reside, the Defendant and the minor child shall have the exclusive right to use and occupancy of that marital or family home until the first to occur of the date on which the Defendant

remarries, Jason attains the age of eighteen (18) or March 1, 2005. Upon the first to occur of the named terminal events, the marital or family home shall be sold in accordance with the terms of the agreement relating thereto which was recited by counsel for the parties on the record at the time of the trial. Upon the first to occur of the named terminal events, the marital or family home shall be sold in accordance with the terms of the agreement relating thereto which was recited by counsel for the parties on the record at the time of the trial.

    7.    That, as part of any monetary award to be paid to the Defendant in accordance with the agreement of the parties that was recited on the record, the Plaintiff shall be required to pay the Defendant the sum of Seven Thousand Two Hundred Twenty Six Dollars ($7,226), representing one half (½) of the costs associated with his purchase of the property on Sonne Lane and the costs of removing the home which was contained on that property.

    8.    That, with regard to the issue of the value of the airline or hotel points which each party has accumulated during the course of the marriage, the court finds that the value assigned by each party on the 9-207 form submitted as an exhibit at the time of the trial to his or her points shall be the value used by the parties in determining the amount of the monetary award that the Plaintiff shall be required to pay to the Defendant.

    9.    That, within ten (10) days after the date of this Judgment of Divorce, the Plaintiff shall pay the Defendant the sum of Five Thousand Dollars ($5,000) as an additional contribution toward her counsel fees, both for the efforts of the Defendant's counsel prior to and at the time of the trial and for efforts that may be required after the date of the trial with regard to certain accounting and tracing issues that still remain unresolved. The court retains jurisdiction with regard to the amount of the fees to which the Defendant's counsel is entitled to receive and, if no agreement can be reached on the accounting or tracing issues and a hearing is required on said issues, the court reserves the right to consider whether or not it would be appropriate to award additional fees to the Defendant in the event that the court finds that there have been substantial assets of the Plaintiff that were not revealed to Defendant prior to the trial.. The parties agree to make every reasonable effort

to resolve all such accounting or tracing issues as soon as possible, but not later than ninety (90) days after the date of this Judgment of Divorce. If those issues are not resolved within ninety (90) days, the court reserves the right to request that an additional hearing be set.

10. That the court finds that the 102,000 unexercised options of the Plaintiff that were granted to him prior to the date of the trial (February 28, 2002) from the company for which he works (Harte-Hanks) are marital property.

    a. The Court finds that these unexerciseable options are deferred compensation for the Plaintiff.

    b. The Court awards the Defendant one half (½) of these currently unexerciseable options if, as and when the Plaintiff is able to exercise them.

    c. The Plaintiff shall be obligated to exercise one half (½) of the said options promptly after he is permitted to do so and to transfer the net stock received as a result thereof to the Defendant after deductions for taxes and the cost of exercising the options.

    d. The Plaintiff shall promptly inform the Defendant as, if and when he is permitted to exercise and or all of the currently unexerciseable options to which reference has been made herein.

11. That this Court expressly retains jurisdiction over the minor child of the parties and that all provisions of this Judgment pertaining to custody, visitation and support are subject to the further Order of this Court.

12. That the Court expressly retains jurisdiction over the matters concerning the Qualified Domestic Relations Orders that may be required to effect the transfer of various retirement accounts in the name of one party or the other, to which reference was made at the time of the trial and that all provisions of this Judgment pertaining to said Orders be, and the same are hereby, declared to be subject to the further Order of this Court.

13. If the Plaintiff is in arrears more than thirty (30) days with regard to the payment of child support or alimony, he shall be subject to earnings withholding. The Plaintiff is required to notify this Court within Ten (10) days of any change of address or employment so long as this Support Order is in effect. Failure to notify the Court of a change of address or employment will

subject the Plaintiff to a penalty not to exceed Two Hundred Fifty Dollars ($250.00), and may result in the Plaintiff's not receiving Notice of Proceedings for Earnings Withholding;

14. That the Plaintiff shall pay the open costs of these proceedings.

_____
JUDGE

READ AND CONSENT TO AS TO FORM AND SUBSTANCE:

_____
RONALD M. NADITCH
Attorney for Plaintiff

_____
GEORGE PETROS
Attorney for Defendant

**STATE OF MARYLAND, ANNE ARUNDEL COUNTY, to wit:**

I Hereby Certify that the foregoing is a true copy of Judgment of Court passed in the above entitled cause in the Circuit Court for Anne Arundel County.

In Testimony Whereof, I hereto set my hand and affixed the seal of the Circuit Court for Anne Arundel County this _____ day of _____, 2002.

_____, *Clerk*

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 04-11548-DPW |
| | ) |
| CHARLES R. DALL'ACQUA and | ) |
| PROTOCOL MARKETING GROUP, | ) |
| | ) |
| Defendants. | ) |

### CHARLES R. DALL'ACQUA'S OBJECTIONS AND
### RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

Defendant Charles R. Dall'Acqua ("Dall'Acqua"), by his attorneys, hereby objects and responds to Plaintiff Harte-Hanks, Inc.'s First Set of Interrogatories as follows:

### GENERAL OBJECTIONS

1. Dall'Acqua objects to these interrogatories on the grounds that they exceed the maximum number of interrogatories a party may serve under Rule 33(a) of the Federal Rules of Civil Procedure. In particular, including all discrete subparts as well as the interrogatories included in its "Monitoring Interrogatories," Harte-Hanks has submitted well in excess of the permitted twenty-five (25) interrogatories.

2. Dall'Acqua objects to these interrogatories to the extent they seek information which is within the attorney-client privilege, the attorney work product privilege or any other recognized privilege or immunity. Dall'Acqua and his counsel hereby assert such privileges and immunities and will not produce any such protected information.

3. Dall'Acqua objects to these interrogatories, including the definitions and instructions, to the extent they seek to impose discovery obligations on Dall'Acqua greater than