UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| HARTE-HANKS, INC., | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 04 CV 11548 DPW |
| CHARLES R. DALL'ACQUA, | ) | |
| Defendant. | ) | |

## **UNOPPOSED MOTION FOR LEAVE TO AMEND COMPLAINT**

Plaintiff, Harte-Hanks, Inc., respectfully moves, pursuant to Rule 15(a) of the Federal

Rules of Civil Procedure, to amend its complaint, principally in order to add a claim arising out

of recent events and circumstances.

A copy of the proposed First Amended Complaint is attached hereto as Exhibit A.

The grounds for this motion, which Mr. Dall'Acqua does not oppose, are set forth in the

accompanying memorandum of law.

WHEREFORE, Harte-Hanks requests leave to amend its complaint.

Dated: December 23, 2004

HARTE-HANKS, INC.,

By its attorneys,

s/David B. Chaffin
David B. Chaffin
BBO No. 549245
Kathleen A. Kelley
BBO No. 562342
HARE & CHAFFIN
160 Federal Street
Boston, MA 02110
(617) 330-5000

## <u>CERTIFICATION OF CONSULTATION</u>

Pursuant to Rule 7.1(A) of the Local Rules of this Court, I certify that I conferred with opposing counsel in an attempt to narrow or resolve the issue presented by this motion and that opposing counsel indicated, on December 22, 2004, that Mr. Dall'Acqua does not oppose this motion.

<u>s/David B. Chaffin</u>
David B. Chaffin

422004.1223

EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| _____ )<br>HARTE-HANKS, INC., )<br> )<br>       Plaintiff, )<br> )<br>v. )<br> )<br>CHARLES R. DALL'ACQUA, )<br> )<br>       Defendant. )<br>_____) | Civil Action No. 04 CV 11548 DPW |

## FIRST AMENDED COMPLAINT

Harte-Hanks, Inc., as and for its First Amended Complaint, alleges:

### Jurisdiction and Venue

1.    The Court has jurisdiction of this matter pursuant to 28 U.S.C. § 1332(a)(1) because (a) there is diversity of citizenship between the plaintiff and the defendant, and (b) the amount in controversy exceeds $75,000.

2.    Venue in this Court is proper, pursuant to 28 U.S.C. § 1391(a)(2), as the conduct giving rise to this action occurred, and will continue to occur, primarily in the Commonwealth of Massachusetts.

### Factual Allegations

**The Parties**

3.    Plaintiff, Harte-Hanks, Inc. ("Harte-Hanks"), is a Delaware corporation with a principal place of business in San Antonio, Texas. Harte-Hanks conducts business and maintains

an office and employees in the Commonwealth of Massachusetts. Harte-Hanks is a worldwide

direct and targeted marketing company.

4.       Upon information and belief, defendant Charles Dall'Acqua is and at all relevant

times has been a resident of Annapolis, Maryland. Dall'Acqua is the Chief Executive Officer

("CEO") of Protocol Services, Inc. ("Protocol"). Upon information and belief, in his capacity as

CEO of Protocol, Dall'Acqua has conducted substantial activities in the Commonwealth of

Massachusetts, including the solicitation of at least one Harte-Hanks employee for employment

at Protocol.

**The Agreement Between Harte-**
**Hanks And Defendant Dall'Acqua**

5.       Dall'Acqua was employed in Maryland by Harte-Hanks, in various positions, from

approximately 1982 to March 2004, when he was terminated. Before he was terminated,

Dall'Acqua was a Senior Vice-President and was one of the top five executives of the company.

6.       In or about January 2002, in an effort to ensure that all employment records and

agreements were consistent throughout a major division of the company and were in compliance

with company policy, Harte-Hanks undertook a review of all such records and agreements.

7.       On or about January 25, 2002, in connection with this review and pursuant to

Harte-Hanks's standard practice and policy, Dall'Acqua was asked to sign and did sign a

Confidentiality/Non-Disclosure Agreement (hereinafter the "Agreement"). A true and correct

copy of the Agreement is attached hereto as Exhibit A.

8.       By and through paragraph 5 of the Agreement, Dall'Acqua agreed that he would

"not at any time during or for a period of two years subsequent to [his] employment with Harte-

Hanks attempt directly or through others to influence any employee of Harte-Hanks to terminate their employment with Harte-Hanks or to recruit Harte-Hanks employees for other employment."

9.      By and through paragraph 10 of the Agreement, Dall'Acqua agreed that "the obligations under this agreement shall survive after the termination of [his] employment relationship with Harte-Hanks."

10.      Paragraph 10 of the Agreement provides that "[i]n the event of a breach or threatened breach of this agreement, Harte-Hanks shall be entitled to a preliminary and/or permanent injunction restraining such breach."

11.      Paragraph 12 of the Agreement provides that the "Agreement shall be interpreted in accordance with the laws of the state where [defendant Dall'Acqua was] employed without giving effect to its conflict of law principles."

12.      On or about March 5, 2004, Dall'Acqua's employment with Harte-Hanks was terminated.

**The Relationship Between And Among Harte-Hanks,
John Martus, Joel Bakal, and Deb Kennedy**

13.      John Martus is a former Harte-Hanks employee.

14.      In late 2003, while Martus was working at Harte-Hanks's Baltimore office, Harte-Hanks offered him a promotion to a new position within the Company, with an increase in salary and benefits.  The offer was conditional on Martus's relocating to Massachusetts, at Harte-Hanks's expense.  Martus accepted the offer, moved to Massachusetts (at Harte-Hanks's expense), and began to work at Harte-Hanks's offices in Billerica.

3

15.    On or about October 10, 2003, Martus executed a Non-Compete Agreement with Harte-Hanks.  A true and correct copy of Martus's Non-Compete Agreement is attached hereto as Exhibit B.

16.    By and through paragraph 2 of the Non-Compete Agreement, Martus agreed that

For so long as Employee [Martus] is employed by Employer [Harte-Hanks] and for a period of one (1) year after the termination of Employee's employment for any reason whatsoever, whether voluntary or involuntary, Employee shall not, without prior written consent of Employer, directly or indirectly, whether as an employee, officer, trustee, consultant, owner, partner, coventurer, agent, advisor or otherwise, render services to any "competing organization" that does or seeks business (whether by soliciting customers of Employer or otherwise) in any of the businesses engaged in by Employer in which Employee worked or was involved at Employer.  For purposes of this agreement, a "competing organization" shall be any business involved in the same or substantially similar business as Employer or which competes in any way with the business of Employer, either directly or indirectly as a contractor or subcontractor.

17.    By virtue of his position as Controller, Martus had access to and knew proprietary and confidential information concerning Harte-Hanks's business, including information concerning employee salaries, product and service costs, and pricing.

18.    Joel Bakal is a former Harte-Hanks employee.  Until August 2004, Bakal was the Chief Financial Officer of Harte-Hanks Transportation Services, Inc. ("HTS"),  a subsidiary of Harte-Hanks.

19.    Until recently, Deb Kennedy was a sales representative for Harte-Hanks.

20.    On or about October 10, 2003, Kennedy executed a Non-Compete Agreement with Harte-Hanks.  A true and correct copy of Kennedy's Non-Compete Agreement is attached hereto as Exhibit C.

4

21.    By and through paragraph 2 of the Non-Compete Agreement, Kennedy agreed that

For so long as Employee [Kennedy] is employed by Employer [Harte-Hanks] and for a period of one (1) year after the termination of Employee's employment for any reason whatsoever, whether voluntary or involuntary, Employee shall not, without prior written consent of Employer, directly or indirectly, whether as an employee, officer, trustee, consultant, owner, partner, coventurer, agent, advisor or otherwise, render services to any "competing organization" that does or seeks business (whether by soliciting customers of Employer or otherwise) in any of the businesses engaged in by Employer in which Employee worked or was involved at Employer.  For purposes of this agreement, a "competing organization" shall be any business involved in the same or substantially similar business as Employer or which competes in any way with the business of Employer, either directly or indirectly as a contractor or subcontractor.

22.    By virtue of her position, Kennedy had access to and knew proprietary and confidential information concerning Harte-Hanks's clients, product and service costs, and pricing.  **Dall'Acqua's Breaches Of His Own Agreement**

23.    Upon information and belief, in or about April-May 2004, Dall'Acqua contacted Martus at Harte-Hanks's offices in Billerica, Massachusetts, and/or Martus's home and solicited Martus to leave the employment of Harte-Hanks and to become a Massachusetts employee of Protocol.

24.    Upon information and belief, Dall'Acqua solicited Martus by telephone and/or e-mail on several occasions while Martus was located in Massachusetts.  Further, upon information and belief, Martus was interviewed by the Massachusetts-based Controller of Protocol and visited Protocol's Massachusetts facility.

25.    Dall'Acqua's solicitation succeeded.  Martus resigned from Harte-Hanks and began work at Protocol in or about May 2004.  Upon information and belief, Martus is still employed at Protocol.

5

26.    Upon information and belief, in or about mid-2004, Dall'Acqua contacted Bakal at HTS/Harte-Hanks's offices in Deerfield Beach, Florida, and solicited Bakal to leave the employment of HTS/Harte-Hanks and to become an employee of Protocol.

27.    Dall'Acqua's solicitation succeeded.  Bakal resigned from HTS/Harte-Hanks and began work at Protocol in or about August 2004.  Upon information and belief, Bakal is still employed at Protocol.

28.    Upon information and belief, in or about the summer/fall of 2004, Dall'Acqua contacted Kennedy and solicited Kennedy to leave the employment of Harte-Hanks to become an employee of Protocol.

29.    Upon information and belief, at least two communications between Dall'Acqua and Kennedy occurred after this Court had entered a preliminary injunction prohibiting Dall'Acqua from soliciting Harte-Hanks employees.

30.    Upon information and belief, the purpose of those communications was to solicit Kennedy to work for Protocol.

**Kennedy's Termination By Harte-Hanks, Employment
By Protocol, And Direct Violations Of Her Non-Compete**

31.    Kennedy was terminated by Harte-Hanks in or about October 2004.  Kennedy began working at Protocol in or about October 2004.

32.    On or about November 9, 2004, Kennedy corresponded with a current Harte-Hanks customer for the purpose of securing that customer's business for Protocol.  Attached hereto as Exhibit D is a true and correct copy of that Kennedy correspondence.

33.     Upon information and belief, Kennedy, since joining Protocol, has engaged in other efforts to secure the business of other Harte-Hanks customers.

**Harte-Hanks's Post-Martus Solicitation
Communications With Dall'Acqua**

34.     Harte-Hanks learned of Dall'Acqua's solicitation of Martus and of Martus's employment by its competitor Protocol on or about May 24, 2004.

35.     By letter dated June 8, 2004, Paul Steven Hacker, Vice-President, Legal and Secretary of Harte-Hanks, notified Dall'Acqua that his actions with respect to Martus were in direct violation of the Agreement.  A true and correct copy of the June 8, 2004 letter is attached hereto as Exhibit E.

36.     Mr. Hacker's June 8 letter also informed Dall'Acqua that, in the event of any further breaches, Harte-Hanks would pursue all available legal remedies for all breaches.

37.     On or about June 17, 2004, Mr. Hacker received a letter from Susan C. Levy of the Chicago law firm of Jenner & Block.  A true and correct copy of Ms. Levy's letter is attached hereto as Exhibit F.

38.     Ms. Levy indicated that her firm had been retained to represent Dall'Acqua and Protocol.

39.     Ms. Levy indicated that Dall'Acqua "ha[d] advised [her firm] that [the Agreement] was never presented to him for signature, he did not sign and would not have signed this document, and his purported signature on this document was forged and unauthorized."  The assertions concerning the Agreement are false.

40.    Ms. Levy also wrote, "neither Mr. Dall'Acqua nor Protocol intends to abide by any term of this purported agreement."

41.    Ms. Levy also threatened that "[i]f Harte-Hanks tortiously interferes with any of [defendants'] rights [with respect to employees] on the basis of this questionable document, [Dall'Acqua and Protocol] will seek all appropriate legal relief."

42.    Dall'Acqua thus indicated, based on a false assertion that the Agreement was "forged and unauthorized," that he has no intention of honoring the Agreement.

**Harte-Hanks's Post-Kennedy Solicitation
Communications With Dall'Acqua**

43.    In November 2004, Harte-Hanks advised Dall'Acqua's counsel, through a statement in open Court, that it might be amending its complaint herein to add a claim related to Ms. Kennedy's breach of her Non-Compete Agreement and Dall'Acqua's participation in same. Nevertheless, Kennedy continues to be employed by Protocol.

**Dall'Acqua's Wrongful Conduct With Respect To
Martus And Kennedy's Non-Compete Agreements**

44.    Upon information and belief, Dall'Acqua was aware in April-May 2004 that Martus was bound by a Non-Compete Agreement with Harte-Hanks.  Upon information and belief, Dall'Acqua knew when he offered employment to Martus that his employment by Protocol was proscribed by the Non-Compete Agreement.

45.    Upon information and belief, Dall'Acqua was aware before he hired her that Kennedy was bound by a Non-Compete Agreement with Harte-Hanks.

**Dall'Acqua's Wrongful Conduct With Respect To Harte-Hanks**

8

46.    Upon information and belief, in or about February 2004, Dall'Acqua instructed his assistant at Harte-Hanks, Elaine Dernoga, to conduct research concerning the compensation of marketing executives.

47.    Upon information and belief, Mr. Dall'Acqua wanted the research for his negotiations with Protocol.

48.    Ms. Dernoga conducted the research.  At all relevant times, Ms. Dernoga was paid and employed by Harte-Hanks.

## COUNT I
### (Breach of Contract)

49.    Plaintiff repeats and incorporates by reference herein the allegations in paragraphs 1 through 48 above.

50.    The Agreement is an enforceable contract.

51.    Dall'Acqua breached the Agreement by soliciting Martus, Bakal, and (upon information and belief, Kennedy for employment at Protocol.

52.    Plaintiff has suffered and will continue to suffer damages as a result of Dall'Acqua's breaches.

## COUNT II
### (Intentional Interference With Contractual Relations)

53.    Plaintiff  repeats and incorporates by reference herein the allegations in paragraphs 1 through 52 above.

54.    Martus and Kennedy's Non-Compete Agreements are enforceable contracts that precluded and preclude Martus and Kennedy from working for Protocol.

55.    Upon information and belief, when Dall'Acqua solicited and hired Martus and Kennedy, he was aware of their Non-Compete Agreements and was aware that they preclude Martus and Kennedy from working for Protocol.

56.    By recruiting, hiring and continuing to employ Martus and Kennedy notwithstanding this knowledge, Dall'Acqua has acted in an improper manner and intentionally interfered, and continues to interfere, with Harte-Hanks's advantageous contractual relationships with Martus and Kennedy.

57.    Dall'Acqua's interference with Harte-Hanks's contractual relationships with Martus and Kennedy was done with a wrongful motive, including to exploit, among other things, the confidential and proprietary information concerning Harte-Hanks that Martus and Kennedy possess and unfairly to compete with Harte-Hanks.

58.    Harte-Hanks has suffered and will continue to suffer damages as a result of defendants' wrongful interference.

## Count III
## (Breach of Fiduciary Duty)

59.    Plaintiff repeats and incorporates by reference herein the allegations in paragraphs 1 through 58 above.

60.    Dall'Acqua, an officer and Senior Vice-President of Harte-Hanks, owed Harte-Hanks a fiduciary duty through and including March 5, 2004.

61.    Dall'Acqua breached his fiduciary duty to Harte-Hanks by using Harte-Hanks's resources, including, but not necessarily limited to, an employee, to assist him in his negotiations with Protocol.

10

62.    Plaintiff has suffered damages as a result of Dall'Acqua breaches of his fiduciary duty.

WHEREFORE, Harte-Hanks respectfully requests:

1.    On Count I, judgment in its favor in an amount to be determined at trial, as well as such other relief as is just and proper;

2.    On Count II, judgment in its favor in an amount to be determined at trial, as well as such other relief as is just and proper; and

3.    On Count III, judgment in its favor in an amount to be determined at trial, as well as such other relief as is just and proper.

Dated: December __, 2004                    Respectfully submitted,

                                            HARTE-HANKS, INC.,

                                            By its attorneys,


                                            _____
                                            David B. Chaffin
                                            BBO No. 549245
                                            Kathleen A. Kelley
                                            BBO No. 562342
                                            HARE & CHAFFIN
                                            160 Federal Street
                                            Boston, MA 02110
                                            (617) 330-5000


422004.1217

11