# EXHIBIT C

**Forensic Science Applications**

Examination of Questioned Documents

# REPORT

| | |
|---|---|
| TO: Ms. Kathleen A. Kelley<br>Hare & Chaffin, Attorneys at Law<br>160 Federal Street<br>Boston, Massachusetts 02110 | DATE: December 16, 2004<br><br>FSA   #447B-F |

Re:   Harte-Hanks, Inc. v. Charles R. Dall'Acqua

**EVIDENCE RECEIVED:**   On October 13, 2004 via Federal Express, on October 28, 2004 via Federal Express and on November 9, 2004 from a representative of your office and on November 11, 2004 via Federal Express

**Specimens:**

<u>Specimens Received October 13, 2004</u>

K1-61 to K1-66    Six (6) documents, both original and copied, bearing the known signatures of Charles R. Dall'Aqua

<u>Specimens Received October 28, 2004</u>

K2-1 to K2-2    Two (2) multi-page sets of documents from the files of Harte-Hanks, Inc. Note: These specimens are a representative sample of several sets of documents submitted for examination.

<u>Specimens Received October 29, 2004</u>

K3-1 to K3-8    Eight (8) documents, some multi-paged, from the files of Harte-Hanks, Inc.

FSA Report #447B-F
Page 2 of 33

<u>Specimens Received November 9, 2004</u>

| | |
|---|---|
| K1-67 to K1-266 | Two hundred (200) cancelled checks, dated September 17, 2001 through May 2, 2002, bearing the known signatures of Charles R. Dall'Aqua |
| K1-267 to K1-310 | Thirty-one (31) documents, both copied and original, from the files of Harte-Hanks, Inc. bearing the known signatures of Charles R. Dall'Aqua. Note: Specimens K1-268, 274, 278, 288 and 290 to 299 were not used. |

<u>Specimen Resubmitted November 9, 2004</u>

| | |
|---|---|
| Q1 | A two (2) page Harte-Hanks, Inc. Confidentiality/Non-Disclosure Agreement, dated January 25, 2002 bearing a questioned "Charles R. Dall'Aqua" signature on the second page. |

<u>Specimens Received November 11, 2004</u>

| | |
|---|---|
| K4 | A copy of a Harte-Hanks, Inc. "fax" cover sheet, dated June 1, 2004 |
| K5-1 and K5-2 | A copy of a two (2) page letter from your office, dated July 13, 2004 |

### RESULTS OF EXAMINATION

<u>Request</u>

I was requested to conduct a comparison between the paper used to create specimen Q1 and papers from the files of Harte-Hanks which are dated contemporaneously to the questioned document and to report on the findings of the indented writing examination that I had previously conducted. I was also requested to comment on the findings and conclusions expressed in the reports of Mr. Peter V. Tytell, dated October 22, 2004 and of Ms. Ellen Mulcrone Schuetzner, dated October 22, 2004.

Please refer to my prior report, dated September 7, 2004 for the listing of evidence and to that report's attachments to view a specific specimen. I have attached copies of the recently submitted specimens for your reference. Please note that specimen numbers K1-268, 274, 278, 288 and 290 to 299 were not used. The previous report ended with Figure (15). I have begun numbering figures in this report at (16).

Report #447B-F
Page 3 of 33

Paper Examination

Paper comprising specimens K2-1, K2-2 and K3-1 to K3-8 were compared to the paper used to create specimen Q1 by means of non-destructive techniques. The examinations were limited to the paper's physical and optical properties as well as manufacturing markings that were discernible. The properties that I intercompared included:
- physical dimensions of length, width and thickness
- color when compared in a side-by-side fashion
- degree of fluorescence when exposed separately to both short wave and long wave ultraviolet light sources
- the degree of opacity/translucence when lighted from below including the degree of uniformity of fibers throughout the paper
- a side-by-side comparison under magnification of the "wire" pattern created during the paper manufacturing process

During my examination, I did not detect any significant differences when comparing these papers; none of the papers contained a watermark or unique identifying features. My findings at the level of the intercomparisons performed suggest that the questioned paper and the paper from the contemporaneously prepared Harte-Hanks, Inc. files belong to the same class of paper. It should be noted that instrumental and chemical techniques, some being destructive and beyond the level of my scrutiny, may separate these groups of papers into different classes.

Indented Writing Examinations

As I related to you in my September 7, 2004 report, I had previously conducted non-destructive tests to visualize indentations that were present on the pages of specimen Q1. The examinations were conducted on August 5, 2004 and that day may have been the first time that they were examined using an electro-static detection type device.

Some indentations found on specimen Q1 correspond in part to the handwritten date "6/1/04" and the handwritten names "Faye Sewall" and "Elaine Dernoga" appearing on specimen K4. Other indentations found on specimen Q1 correspond, in part, to handwritten entries on specimens K5-1 and K5-2 which include the signature of "Charles M. Shure", the date "7/15/04" and hand printed entries associated with paragraph three (3) of K5-2. Additionally, two (2) sets of initials appearing on K5-2, possibly those of Charles M. Shure, are also indented on specimen Q1.

Indented writings not associated with any source document are partially readable including the numerals, "210 ? 299139", the partially hand printed name ____A KELLE__ and the handwritten phrase, "I needed". No other indentations that I can read are present.

FSA Report #447B-F
Page 4 of 33

The indentations that I've described were detected on both pages of specimen Q1 while some are more clearly read on the front page, others are more readable on the signature page. I have attached photocopies of both of the indented writing lifts that I made from specimen Q1 and copies of specimens K4, K5-1 and K5-2.

Handwriting Examination (Opinion)

The examinations of the newly submitted known signatures of Charles R. Dall'Aqua (K1) found on the documents from the normal course of business records and on his personal bank checks do not alter my previous opinion. As I expressed in my last report, the evidence rather strongly points toward the fact that Charles R. Dall'Aqua prepared the questioned signature present on specimen Q1, and it continues to be my opinion that Dall'Aqua probably wrote his signature on the questioned document. Also, the new evidence cannot change the qualification of my conclusion, because the reasons for the qualification are based on the questioned signature itself and not the known writing samples.

The additional signatures of Dall'Aqua do provide excellent examples of his range of variation with regard to the structure of letters, examples of varying line quality and examples of individualizing characteristics not clearly seen in his previously examined known writings. Photomicrographs illustrating some of these traits are provided during my discussion of the reports of Mr. Tytell and Ms. Schuetzner.

## Background

Before reviewing the details of Mr. Tytell's report, it is important that you have some background information, so you might understand the parameters under which a questioned document examiner makes judgments. In this regard, I'll discuss significant difference, eliminations and the effects of wide tip fluid ink pens on writing.

"Significant Difference"

Significant difference is a term that is not to be used without considerable caution by a document examiner, because its accepted use denotes the presence of a writer other than the one purported to have made the writing. Therefore, before it is used in handwriting examinations, there must be clarity on what constitutes a significant difference. The following are five (5) definitions of "significant difference" of which Mr. Tytell and Ms. Schuetzner are sure to be familiar, since the definitions are quoted from source entities of which they are members or of which they have knowledge.

FSA Report #447B-F
Page 5 of 33

## Definitions

1. *significant difference, n* – an individualizing characteristic that is structurally divergent between handwritten items, that is outside the range of variation of the writer, and that cannot be reasonably explained.

   A. Source – ASTM Designation E 2290-03

2. *significant dissimilarity* – a repeated individualizing characteristic which is different between two or more handwritten items and which is outside the demonstrated range of variation of the writer.

   A. Source – ASTM Standard Guide for the Examination of Handwritten Items; written under the Jurisdiction of ASTM Committee E-30

   Note: This definition may be in an earlier version of the standard cited in 1.

3. *significant difference, n* – An individualizing characteristic that is structurally divergent between handwritten items, that is outside the range of variation of the writer, and that cannot be reasonably explained.

   A. Source – American Board of Forensic Document Examiners; Daubert Reference Guide

4. *Fundamental difference*: an identifying characteristic in one body of writing which is non-accidental and is pictorially and/or structurally divergent from the corresponding characteristic in another body of writing, and is outside the range of variation of the writer. Determination of a fundamental difference may not be possible when one or more of the bodies of writing appear to be intentionally or unintentionally distorted, (syn., Significant difference).

   A. Source – TWGDOC SOPs and Terminology Draft Guideline (#10)
      Page 6

5. *Definition*: In a comparison of questioned and known writings, a fundamental difference in a (questioned) writing is a disparity in one of its discriminating elements, within the elements of style.

   A. Source – <u>Handwriting Identification: Facts and Fundamentals</u>, Roy A. Huber and A.M. Headrick

FSA Report #447B-F
Page 6 of 33

In reading these definitions, the central theme is the same; but since Mr. Tytell and Ms. Schuetzner cite the American Society for Testing and Materials (ASTM) guideline, I will use the limits of this definition for any discussion of significant differences.

To be structurally divergent, a difference must be obvious and outside the range of variation for the writer. Subtle differences relating to the execution of the writing do not rise to the level of being a significant difference, because this type of difference can be a function of the writing conditions and are frequently seen within the variation of the same writer or are caused by some unknown factor. In the following discussions, I will explain which of the perceived "significant differences" detailed by Mr. Tytell and Ms. Schuetzner are truly significant and which are subtle, and if either is based on the evidence.

Mr. Tytell and Ms. Schuetzner place considerable emphasis on subtle differences which relate to the execution of the writing that are not within the domain of being a significant difference when considering the definition.

Eliminations

Frequently in practice the question is asked, "Can a conclusion of non-identity ever be reached in handwriting comparisons?" The fact that this question is presented for contemplation indicates that there may be barriers to such an opinion. It is my opinion that under certain circumstances, it is possible to reach such a conclusion; but extreme diligence is necessary, and the evidence must be precise, obvious and demonstrable. Subtle features of handwriting that denote dissimilarity are important but are not necessarily the deciding factor of elimination, because they are usually based on writing execution and are subject to the whims of writing conditions. Line quality is one such feature which is often cited as being significantly different but is a characteristic that can be dramatically affected by writing conditions.

Importantly, when an obvious significant difference is found, and it is based on a structural divergence, it should be repeated in the writing. What then can be said about a signature that has but a few letter characters with no chance to exhibit a repeated characteristic? In my mind, the answer to this question is that the conclusion should be qualified and not one that is definitive.

Wide Tip/Fluid Ink Pens

In my first report, I told you that my conclusion was qualified in part because of the type of ink used to prepare the questioned signature. The reasons for such a qualification are further defined below.

FSA Report #447B-F
Page 7 of 33

Based on my experience and training with wide tip fluid ink pens and their use on various types of paper, I can state the following:
- the ink bleeds into paper fibers often seeping from one line of ink to other nearby lines; thereby reducing the apparent distance between the lines
- any hesitation in the line of writing is most obvious, because the ink continues to flow while the pen rests
- pen lifts are more apparent with this type of ink, because when the pen retouches the paper to continue its progress extra ink is added to the line
- the bleeding of the ink from its initial point of contact into the sides of the lines creates an appearance of unevenness sometimes masking the true line quality
- the ink will naturally follow prominent fibers in the surface of the paper
- the ink tends to pool at places where the pen slows to make an abrupt turn but the pooling is also dependent on the speed of writing
- the ink frequently causes bluntness of beginning and ending strokes
- examinations using transmitted light helps resolve many issues caused by this type of ink
- writing conditions can dramatically affect the written product
- good judgment on the part of the examiner is necessary and qualified opinions are generally required
- observable detail of writing decreases as tip size and ink fluidity increase
- some inks bleed to the back side of the paper more than other inks
- the type of paper has an effect on the final appearance of the writing

### Report of Peter V. Tytell (10/22/04)

I have reviewed the report of Mr. Tytell and provide the following comments. With regard to his paper examinations and indented writing examination, my findings pertaining to those subjects are listed above.

Signature and Date Examination

On Page 4 of his report, Mr. Tytell relates that he noted significant differences in basic writing habits during the analysis, comparison and evaluation of the questioned writings and the knowns. He states, "**Among the significantly different elements of the writing are alignment; arrangement, relation to the baseline; continuity of movement; direction of strokes; formation; freedom of execution; line quality; method of production; positioning; pressure; proportion; rhythm; size; skill; slant or slope; spacing; speed; initial, connecting and terminal strokes; and range of variation.**"

FSA Report #447B-F
Page 8 of 33

Mr. Tytell cites the 22 discrete significantly different elements listed above; yet, in his descriptions, he details only a few while concentrating mostly on "line quality".

It is because he does not delineate each of the "significantly different elements" that I am limited to addressing those described on Pages 7 through 12. Should Mr. Tytell supplement his report and choose to describe in detail the numerous other significant differences he lists on Page 4, I am prepared to demonstrate and articulate why each of his differences falls within the natural range of Charles R. Dall'Aqua's writing and/or may be a function of writing conditions.

Known Signatures

Beginning on Page 4, Mr. Tytell discusses Dall'Aqua's known writings illustrating changes in Dall'Aqua's signatures over the years and also depicts variations. In this discussion, Mr. Tytell comments that it is "inappropriate" to compare separately written characters with a connected cursive style of signature. In this regard, on many occasions, I have seen writings of individuals whose characteristics overlap from one style of writing to the next (i.e. cursive to composite styles). And although considerably less weight is placed on such observations, it is not totally inappropriate, and no examiner should ignore what could be a trait of the writer because it is found in a different style of the same writer.

With regard to the discussion of the known samples by Mr. Tytell, I agree with the general assessment that as time has passed Dall'Aqua's writing has shown changes in letter formations, etc., but that does not mean that he does not occasionally revert to some earlier characteristics just as most other mature writers. Therefore, the body of known writings from the earliest available for this examination to the most recent are appropriately considered when examining Dall'Aqua's known writings for range of variation.

Range of Variation

Figures 16 and 17 provide you with examples of unusual forms of Dall'Aqua's signatures which are part of his wide range of variation. The point made by these illustrations is that with signatures like those of Dall'Aqua's, an examiner of questioned documents must be extremely careful when placing too much emphasis on certain features only to later find an ever widening range of variation.

FSA Report #447B-F
Page 9 of 33

The Back of the "C"

Mr. Tytell points out what he considers to be "poor line quality" at the back of the "C". In my earlier comments, I explained that line quality is considered to be an element of execution subject to writing conditions of which Mr. Tytell cannot have knowledge. Regardless of Mr. Tytell's knowledge of the conditions and his emphasis on line quality as a significant difference, please refer to Figures 18 and 19 for examples of poor line quality regarding the letter "C" in Dall'Aqua's known writings. You'll note, in many instances, the poor quality of the writing appears in the same general area as that highlighted with an arrow on Page 7 of Mr. Tytell's report. For comparison purposes, I've included microphotographs of the questioned "Ch" combination.

The Up-Stroke Stem of the "R"

Mr. Tytell also avows that the back of the letter "R" is not smooth and placed an arrow showing the area of significant difference. Again, this is an issue of line quality and does not fit the definition of "significance". In my previous report, I provided you with examples of known "R"s of Dall'Aqua's that were not "smooth". In my opinion, this trait is caused by the type of pen being used and its interaction with the paper fibers.

In my examination I found that the letter "R" of the questioned signature shows speed, pressure changes and a prominent internal path exhibiting an even distribution of writing fluid from the beginning to the end of the letter. There are no hesitations, pen lifts, or touch ups. The line quality is appropriate given the nature of the writing instrument and paper.

I refer you to Figure 20 which depicts different views of the "R" as seen with transmitted light as well as reflected light. You can note a prominent internal line of ink, and how the ink has bled into the surrounding fibers. Also note how the ink's relative amount does not change at the top of the "R" where the pen's direction is abruptly changed. This is a free and quick movement also exhibited by Dall'Aqua. It is the speed of the stroke which gives it a natural appearance and no "splotching" of ink is recorded. If there are any areas of this letter "R" that would be difficult to simulate, they would be located at the abrupt changes of pen direction at the peak and when the line changes direction for the ending stroke. In these areas the ink is distributed as would be expected in normal writing.

Note in the letter "R" from K1-276 depicted in Figure 20 you can see the result of an added stroke with a pen that has a free flowing ink and is the type of characteristic not seen in the questioned "R".

FSA Report #447B-F
Page 10 of 33

"The Principal Down Stroke of the Last Name

Mr. Tytell again uses line quality as a significant difference when he describes what he detects as "waviness" to the of the principal down stroke of the second name. Mr. Tytell would have you believe that all of Dall'Aqua's known signatures contain this long smooth, gently arced down stroke that Mr. Tytell exhibits in a photograph on Page 8.

Please see Figure 21 which contains some known signatures that exhibit a compound curve for the down stroke and some with less than the perfect symmetry that he represents as typical of the known writings.

Mr. Tytell describes the down stroke as a carefully drawn line yet does not reflect on the pen pressure change that is apparent between the down stroke and the following up stroke that gives the whole character a quality of naturalness having been written with speed. In my experience, it is considerably more difficult to simulate abrupt turns of the pen and complex designs than it is a gentle arcing curve. In this signature, there are no suggestions or indications that the writer had any such problem. If the line is so slowly drawn, why isn't there a "pool" of ink deposited at the very bottom of this character where it abruptly turns upward? The line is not broken nor is there hesitation or a lifting of the pen. The ink is distributed as evenly as would be expected with this type of pen and the character finishes with flair (a long tapering line up to the right).

Given the evidence which shows Dall'Aqua has a variety of ways to make the final character of his name, the even depositing of ink along a prominent internal ink path, and with no knowledge of writing conditions, I can place no confidence in Mr. Tytell's estimation that this is a "carefully drawn line" nor is it significantly different.

Discontinuity or "Bump" in the Connecting Stroke of the "C" to the "h"

In my previous report, I described the bump between the letter "C" to the letter "h" as a dissimilarity. I expressed little concern about this dissimilarity and certainly did not consider it a significant difference. In fact, I pointed out the tendency for Dall'Aqua to sometimes end the letter "C" when seen alone with an extension of the final portion of the letter.

This type of characteristic could be a significant difference if it were found to be repeated in questioned writings and not present within the range of variation for the known writer, because it relates to the structure (i.e. connections). Mr. Tytell reports he examined "several hundred known" signatures of Dall'Aqua and did not find this trait. Therefore, such a characteristic is either relatively rare, accidental or could be a significant difference.

FSA Report #447B-F
Page 11 of 33

Figure 22 illustrates four (4) signatures found within the known samples which have such a "bump" in the stroke between the letters. These samples demonstrate that this "bump", although rare in Dall'Aqua's writings, is within his range of variation, is not accidental and is not a significant difference. Given this evidence Mr. Tytell is now in a position of at least wondering how the "forger" came about choosing a signature for a model that contained the "bump" when so many others were available without the "bump" and how the "bump" was simulated in such a convincing manner.

Down Stroke Forming the Staff of the "h" (Straight)

The potential for this characteristic being defined as a significant difference like the stroke between the "C" and "h" is strong, because, if repeated and if accurate, it would be in the realm of structure as opposed to execution. There is considerably more to discuss on the "straightness of the "h"", but before doing so, please refer to Figure 23 which illustrates the straightness of the down stroke of the "h" in the known sample in relation to the perceived straight down stroke of the questioned "h".

Once you view Figure 23, I direct your attention to Figure 24 which begins with photographs of the area in question using transmitted light (back lighting). What this type of an examination reveals is that the staff is not straight to the very bottom as asserted by Mr. Tytell but has a slight bend beginning at a point adjacent to the top of the peaked arch of the "h" and curving toward the line that goes up to make the arch.

This is significant in relation to Mr. Tytell's findings in two (2) respects. First, the line is not completely straight as he declares, and second, which is far more important, this unusual bending of the line of the questioned sample is seen within the known samples as demonstrated by the examples in Figure 24. I should again note to you that this type of characteristic is within Dall'Aqua's normal range of variation. It is not seen in every signature just as some of his "h"s are slightly curved top to bottom, some are straighter (Fig. 23) and others exhibit an unusual bend within the line itself. Based on these findings, I cannot distinguish the "straightness" of the "h" as a significant difference, and Mr. Tytell should again contemplate how the "forger" was able to detect two (2) unusual characteristics: the "bump" and the bent "h" and be able to imitate them in a manner that appears natural without stopping to touch-up his/her work of art.

Transition from Down Stroke of the Staff of the "h" into the Arc is Closed

Mr. Tytell reports that the closed retraced area is a significant difference. This would be a disparity that relates to the structure; and, if true, might be a significant difference if it was repeated and was not found in the known writer's range of variation. He also discusses the upward stroke being convex whereas the knowns tend to be concave.

FSA Report #447B-F
Page 12 of 33

Please see Figure 25 which will show you several tight retraces in the upstroke of the "h" within Dall'Aqua's known samples. In some of these samples the "h" retraces are not closed completely; however, I have no doubt that if they were written with a fluid type ink, such as the one used for the questioned sample, they would appear to be more tightly closed. This is so, because the ink would migrate outward from the point of contact filling the open space between the down stroke of the staff and the upstroke toward the arch of the "h".

Now please turn your attention to Figure 26 which begins with a depiction of the "h" using back lighting. When viewed in this fashion, the prominent internal ink path of the pen point is more obvious allowing you to see that the ink has migrated to the side of the upstroke of concern and has almost met the ink migrating from the down stroke of the staff line creating a perception of closure, yet truly once having had a space as you see in some of the known samples.

Also contained in Figure 26 are photomicrographs that relate to the significant difference described by Mr. Tytell in the letter "h" concerning its convex shape. The meaningfulness of any observation concerning this stroke being concave or convex is doubtful, since the known samples contain signatures that exhibit concave, convex and straight lines. These figures clearly demonstrate that the characteristics Mr. Tytell describes are not differences but are handwriting similarities.

Questioned and Known Dates

Mr. Tytell devotes three (3) pages of his report to the comparison of the questioned and known dates. He begins his discussion again with the issue of line quality which I will not address any further other than to refer you to my earlier comments and to Figure 27. This figure depicts a known sample (K1-308) which was apparently written with a wide tip fluid ink pen. I say apparently, because I do not have access to the original document. However, as in the questioned date, you can note the loss of detail when such a pen is used. In fact, even when viewing an original ink document (K1-288B), you will note the absence of the "terminal hooks" on which Mr. Tytell relies to make his proof.

Figure 27 also illustrates a view of the questioned date with transmitted light. Neither the diagonal first line nor the second diagonal line is straight as Mr. Tytell claims. Both are slightly bent as are others in the known samples. Certainly some are more bent than others but a "which is straighter" argument is of no consequence to my findings.

Continuing your inspection of Figure 27, you will note two (2) photomicrographs of dates written by Dall'Aqua. The "1/17/01" date is found on a "fax" copy but has sufficient resolution to show height relationships; the "4/1-4/7" is original ink. You'll note that in both of these specimens, the diagonal line is above the printed baseline in a similar fashion to the questioned date's second diagonal. Mr. Tytell's claim that the second

FSA Report #447B-F
Page 13 of 33

diagonals of Dall'Aqua's touch or are below the baseline can be dismissed, and so can his description of this trait in the questioned date being a "significant departure", because although not often seen this trait is within Dall'Aqua's range.

He also places relevance on the vertical size of the number "1" seen in the first position of the questioned date. The bearing of his observation is disputed given the various sizes of the number "1" as seen in K1-305A. Overall there is no significance to any of the findings Mr. Tytell discusses with regard to the questioned date.

Mr. Tytell's Conclusion (Handwriting)

I do not believe that the evidence supports the most definitive type of conclusion that Mr. Tytell has reached. As I've demonstrated, those few structurally divergent characteristics that he has relied on in his explanations are not true differences but are found within the range of variation of Charles R. Dall'Aqua's known writings. In fact, some of the characteristics are relatively rare events, at least, in relationship to the body of known signatures that we have from Dall'Aqua to date. Taking the "Ch" combination alone, we see the:

- "Ch" connecting stroke "bump" (Figure 22)

- the bend in the descending line of the "h" (Figure 24)

- the convex shape to the upward movement of the "retrace" toward the arch of the "h" (Figure 25)

- the slight distortion to the downward curve of the "C" (Figures 18 and 19)

All of these characteristics are interspersed throughout the known writing and admittedly are not seen very often. Therefore, for another person to have prepared this signature, he/she would have had to have the uncanny luck to find a signature for a model that had all of these characteristics or had the wherewithal and knowledge to search through Dall'Aqua's known signatures to find obscure characteristics. Once that was accomplished, then be able to put pen to paper and imitate these very characteristics in a natural manner. And if that wasn't a large enough task, the writer would then finish the signature incorporating all of the similarities that I described in my report all while using a pen whose writing characteristics quickly betray any suggestion of unnatural writing, such as hesitations, pen lifts, or touch ups.

Even by chance alone, assuming no search was done by the simulator for unique features, it is not at all likely that the simulator's rendition would include seldom seen characteristics spread throughout the range of Dall'Aqua's signatures.

FSA Report #447B-F
Page 14 of 33

Simulated signatures are examined and detected on a daily basis by questioned document examiners. They frequently bear indications of the forgery which relate to the execution of the writing. Indications, such as poor line quality, pen lifts, hesitation, and touch ups are commonly seen. But the examiner must also be able to find significant differences that relate to structure before the signature can be deemed not genuine. The indications merely point the way or provide suggestions, but it is actual fundamental differences relating to structural habits of the writer that raise the evaluation from suspicion to varying degrees of certainty. Mr. Tytell has no valid reason based on structurally divergent characteristics outside the range of variation of Dall'Aqua's to offer his most definitive opinion.

This leaves the issue of the line quality of writing on which Mr. Tytell dwells, and, as I'll tell you one more time, it can be a function of writing conditions which can and often does relate to the type of pen being used. Additionally, the questioned writing bears no hesitations, pen lifts or touch ups.

### Report of Ellen Mulcrone Schuetzner (10/22/04)

Much of what I have to comment on concerning Ms. Schuetzner's report has already been discussed in my review of Mr. Tytell's findings and conclusion; however, certain subjects that she raises can be reviewed.

Ms. Schuetzner maintains she conducted her examinations by following the ATSM "Standard Guide for Examination of Handwritten Items", and she cites and relies on Roy A. Huber and A. M. Headrick's text Handwriting Identification: Facts and Fundamentals which is also referenced in the ASTM guide. In this regard, Ms. Schuetzner does not explain the position of Huber and Headrick pertaining to elimination. They say on Page 56 of their book, **"because an elimination is such an all-encompassing statement it has been recommended that the conclusion, when expressed should always be qualified"**. This reasoning comes after their discussions on Page 55 where they say, **"Eliminations are general and speculative"**.

Although Ms. Schuetzner uses qualifying terminology in her conclusion by stating **"The examiner found no evidence to indicate that the person who prepared the known Charles Dall'Aqua signatures on Exhibits K-1 to K-33 executed the Charles Dall'Aqua signature on Exhibit Q-1"**, she does not explain the meaning of the word "indicate". This term when used in accordance with the ASTM guide should be further defined as a very weak opinion and statements should be offered to insure no misinterpretations are made concerning the degree of certainty that it represents.

Ms. Schuetzner also reports that she evaluated the evidence using Huber and Headrick's twenty-one (21) discriminating elements of handwriting and provides quotes from their text to convey the importance of her findings. However, Ms. Schuetzner does not provide Huber's and Headrick's rationale concerning the elements of handwriting as they are divided into groups of "style" and "execution" nor does she provide a definition of a "fundamental difference" as it relates to these groups of elements.

FSA Report #447B-F
Page 15 of 33

On Page 47 of Huber's and Headrick's book, there is a section entitled, **"What Is a Fundamental or Significant Difference in Writing?"**. On the next page after some explanation, the authors state, **"We also find that of these 21 discriminating elements, at least 17 of them may be segregated into one of two prime groups. First there are seven elements of style .... Second, there are 10 elements of execution ........"**. The authors then move to tell the reader that **"Fundamental differences, then will be disparities, which are dissimilarities that occur with respect to the elements of style rather than the elements of execution,"**.

Huber and Headrick couldn't be any more clear on the subject: Fundamental differences relate to elements of style, not elements of execution. I prefer to discuss structural differences as being significant, but that's a matter of terminology not meaning.

In the following paragraphs, I will explain which of the differences reported by Ms. Schuetzner pertain to elements of style and which to elements of execution. Regardless of the types of differences, I will then provide you with demonstrative information that will dispel any notion of significant differences.

## Copy Exam

Connecting Stroke between "C" and "h" (small hump) **(copy exam)**

As I said when reviewing Mr. Tytell's report this characteristic could be a significant difference if it were repeated and not represented in the known samples. Huber and Headrick would classify this as an element of style; and, therefore, could be a fundamental difference. However, please see Figure 22 and consider the same information I provided earlier.

At Least Two (2) Pen Lifts **(copy exam)**

This type of divergence if present is not a characteristic relating to style and therefore by definition cannot be a fundamental or significant difference even if found to be true. See Huber and Headrick, Page 120 re: "Line Continuity".

Additionally, this absolute assertion which is based on the vagaries of an examination of a photocopy is beyond the limits of any qualified document examiner, because the examiner could not know if what seems to be a pen lift is a reproduction flaw resulting from the copying process. You should seek to see the very <u>same</u> document that Ms. Schuetzner examined to conduct her initial examination.

Interestingly, this "design difference" of at least two (2) pen lifts was not mentioned in her first report on this matter which was based on "copies" of the questioned document which she now includes in her narrative. I do not refer you to any figures that I have

FSA Report #447B-F
Page 16 of 33

prepared, because these same subjects are repeated with regard to what Ms. Shuetzner found when she examined the original document.

Height of Middle Initial **(copy exam)**

This subject will be covered regarding Ms. Schuetzner's finding of the original document.

## Examination of Original Questioned Signature

Ms. Schuetzner lists differences including "line quality", "pen lifts", "blunt beginning and ending strokes". According to the source she relies on, Huber and Headrick state these "significant" characteristics are elements of execution not elements of style; and, therefore, by definition are not significant differences/fundamental differences. See Huber and Headrick, Pages 113, 118 and 120 and the previous discussion of fundamental differences.

Blunt Beginning and Ending Strokes "C" **(Original)**

Although Ms. Schuetzner says "blunt beginning and ending strokes were found in the beginning of the "C", I can find only a beginning stroke for the questioned "C" which is no doubt blunt. However, as I related to you and described in my prior report, this is a habit of Dall'Aqua's. Please refer to the numerous figures that depict known letters "C" created with different types of pens and for the most part you will find bluntness to the beginning stroke.

Blunt Beginning and Ending Stroke "R" **(Original)**

The beginning of the letter "R" is a classic illustration of what Hilton refers to in his paper on the subject of "Effects of Writing Instruments on Handwriting Details". Hilton states that "square or wedged shaped initial strokes are common". These comments are made in reference to fiber-tip pens. Although I cannot say for certainty that the ink on specimen Q1 is the product of a fiber-tip pen, it does share characteristics. With regard to the ending of the "R" which is slightly rounded, please refer to Figure 12 (prior report) for an example of Dall'Aqua's writing.

Blunt Beginning of the Last Name **(Original)**

Please refer to Figure 13 (prior report) and Figure 28 (K1-61) for examples of a blunt beginning stroke to Dall'Aqua's last name.

FSA Report #447B-F
Page 17 of 33

<u>Pen Lift "R" (**Original**)</u>

Again, even if true, this fails to meet the criteria to be a significant difference, because it is an element of execution. However, more importantly, as I discussed when reviewing Mr. Tytell's finding, there is not a pen lift present in the "R". Please see my previous comments about this subject and Figure 20.

<u>Pen Lift – Bowl of the "Q" (**Original**)</u>

For the same reasons as before, this cannot be a significant difference even if accurate, because it's a function of execution not style.

Ms. Schuetzner's finding on this matter is obscure, because when commenting on her examinations concerning the copy of the questioned signature she is concise and clear stating that a pen lift was found in the **"bowl of the Q"**. You've read my thoughts on the appropriateness of such a finding on a photocopy but quite confounding are her comments concerning the original ink signature. When she reports with regard to the bowl of the "Q", she states **"there is an <u>indication</u> that there is a retracing of the stroke back to the left. This retracing <u>may</u> indicate that there is a pen lift between the bowl of the "Q" and the staff."**. This language is typical of what is seen in qualified statements where the evidence is barely persuasive. It is very different from what she reports concerning the copy, which should have less specificity than the original document. However, my finding remains as it has been; there is no pen lift in the bowl of the "Q" at any location.

Please refer to Figure 28. You will see the "Q" exposed with transmitted light as well as the "Q" viewed from the back side of the paper. The ink line follows a prominent internal path. There are no hesitations, no touch ups, no pen lifts. The only retrace is located where the line continues after leaving the bowl rising to the right top of the letter and back downward to make the long descending stroke.

If there had been a retrace and pen lift at the bowl's intersection with the staff, the extra ink caused by the pen retouching the paper would be obvious. The ink has been distributed into the fibers just as I would expect given the ink and paper.

The varying changes in pressure along the entire length of the signature becomes very obvious when the questioned signature is viewed from the back side with transmitted light. You'll note slightly more ink on each down stroke. You can determine this by observing the subtle changes in gradations of color and very slight width difference. This is what gives the entire signature a naturally written appearance. Had the pen been lifted and retouched the back side view, such as the one on Figure 28 would have revealed the flaw. Also a slow drawn appearance would be most obvious in this view, because there

FSA Report #447B-F
Page 18 of 33

would be no pressure and speed changes as the signature progressed and thus a constant heavy black line would be present.

Bottom of "Q" (**Original**)

Ms. Schuetzner states on Page 5 that **"there is a heavy ink deposit that may indicate pen lift and/or hesitation"**. This is another qualified statement without such a reference and again is an issue of execution and not style. Regardless of any qualification, there is no heavy ink deposit at the bottom of the "Q". (See Figure 28.)

I only note an appropriate change in ink amount as the pen slows to make the movement from the heavier pressured down stroke to the lighter pressured up stroke toward the ending. The ink line at the bottom of the "Q" intersects the machine printed capital letter "S" in the word, "Signature". This does not obscure my view of the ink of this character nor should it confuse anyone regarding the amount of ink present.

Height of the "R" off the Baseline (**Original**)

Ms. Schuetzner calls our attention to what she considers to be an "alignment" difference of significance. This type of difference is also one of execution and not style and therefore, not a significant difference. Her sources include a study of "McClary" quoted by Huber and Headrick and also a quote from Wilson R. Harrison. By responding to her finite declaration, I do not mean to give it credence, but I am providing you with examples of Dall'Aqua's signatures that match her upper limit of **"approximately 2 millimeters"** above the baseline and thus negate her claim. See Figure 29.

Overall Handwriting Conclusion

The comments that I made regarding "simulations" at the end of the review of Mr. Tytell's report apply equally to Ms. Schuetzner. Like Mr. Tytell, her evaluation rests heavily on traits that are a function of execution as opposed to discrete structural differences. The only structural difference that she does note is, in fact, a similarity. ("C" to "h" bump)

I particularly disagree with Ms. Schuetzner's methodology of relying on a photocopy to try to detect a simulated forgery.

Portions of Ms. Schuetzner's report are ambiguous and possibly contradictory. For example, on Page 5, she describes three pen lifts ("R", bowl of "Q" and bottom of "Q") while using some qualifying words, such as "may" and "indicate". Yet on Page 8, she makes a definitive statement that two pen lifts are present without saying which of the three she is referring to. Ms. Schuetzner also states, **"Some of the known signatures were also prepared with a fluid ink pen, similar to the questioned signature,**

FSA Report #447B-F
Page 19 of 33

**however tapered beginning and ending strokes were found"**. This statement is particularly important because of the emphasis she places on "bluntness" in her findings. However, she told the Honorable Judge Woodlock on August 12, 2004 when discussing the known signatures, **"I found both blunt and tapered strokes in the fluid ink signatures I examined"**.

Ms. Schuetzner failed to include factors in this report that she described in detail in her second report and when testifying on August 12, 2004. She does not mention the "h" retrace; the "h" under curve; "C to h" space; short descending stroke of the "Q"; or the straightness of the ending stroke ("Q"). Also she does not explain the "other" differences recorded in her notes (testimony – 8/12/04).

Without particulars in her report, I cannot assume that she has reconsidered the reliability of her previous statements once she had the opportunity to see an expanded body of writing from Dall'Aqua; but if she persists in crediting her earlier observations, the evidence is clear and contrary to her findings.

Other Findings

I reviewed the indented writing lifts that I prepared in this matter and cannot detect the dates described in Ms. Schuetzner's report.

At this time based on my indented writing findings and because I don't have access to her "lifts", I cannot agree or disagree that specimen Q1 was an underlying document when a date of "March" or "May 2004" was handwritten on a document(s) that was atop of specimen Q1. However, I have reviewed the indented writing lifts that I developed both before Ms. Schuetzner conducted such an examination as well as those that I developed after her examination and could not find indentations like those that she reported with regard to the dates. Please see Page 3 for my findings on this subject.

## ADMINISTRATIVE

The submitted items including the resubmitted specimen Q1 are being returned personally to a representative of your office. Attached are copies of the newly submitted specimens, photocopies of the indented writing lifts from specimen Q1 and Figures 16-29. Please note the figures are offered for demonstrative purposes only, whereas the examination of the evidence was completed using the actual evidence.

_____
Alan T. Robillard