EXHIBIT E

# MELICK, PORTER & SHEA, LLP

Counsellors at Law

28 State Street
Boston, Massachusetts 02109-1775
(617) 523-6200
Fax (617) 523-8130
www.melicklaw.com

Two Richmond Square - Suite 104
Providence, Rhode Island   02906
(401) 941-0909
Fax (401) 941-6269

65 Main Street
Plymouth, Massachusetts   02360
(508) 746-5976

Richard J. Shea
Robert P. Powers
John F. Rooney, III *(DC & NH)
William D. Chapman
Michael J. Mazurczak *(WI)
Robert T. Treat
William L. Keville, Jr.
Michael R. Byrne
Andre A. Sansoucy
Amy E. Goganian
Robert W. Healy
Jennifer B. Hardy
Allen J. McCarthy
Carly K. Wee *(NY)
Angela L. Lackard
Maureen E. Lane *(NH)
Christine C. Heshion
Adam M. Guttin *(RI)
T. Dos Urbanski *(RI)
Megan E. Kures
John E. DeWick
Matthew Grygorcewicz
Margaret M. Carleen
Kerry D. Florio
Paul T. Tetrault
Jessica M. Farrelly *(FL.)
Stephen D. Eldridge

Of Counsel
Thomas W. Porter, Jr.

*Also Admitted

December 20, 2004

Mr. David B. Chaffin
HARE & CHAFFIN
160 Federal Street, 23rd Floor
Boston, MA 02110-1701

Re:   *Harte-Hanks, Inc. V. Protocol Marketing Group
      and Charles Dall'Acqua*
      Civil Action No. 04-CV-11548

Dear Attorney Chaffin:

Please find enclosed the following:

1) Supplementary Report III by defendant's handwriting expert, Ellen Schuetzner;

2) Supplemental Exhibit 2 to expert report by defendant's handwriting expert, Peter Tytell;

3) Supplemental Exhibit 4 to expert report by defendant's handwriting expert, Peter Tytell; and

4) Supplemental Exhibit 5 to expert report by defendant's handwriting expert, Peter Tytell.

If you have any questions, please do not hesitate to contact me.

Very truly yours,

Matthew Grygorcewicz

MG/kaf
Enclosure

# ELLEN MULCRONE SCHUETZNER

Forensic Document Examiner
PMB 161
6348 N. Milwaukee Avenue
Chicago, Illinois  60646-3728
(773) 774-5731

*American Academy of
Forensic Sciences
Fellow*

*American Board of Forensic
Document Examiners, Inc.
Diplomate*

December 17, 2004

Mr. Daniel J. Winters
Jenner & Block
One IBM Plaza
Chicago, Illinois  60611-7603

Re:    **Harte-Hanks, Inc v.  Charles Dall' Acqua**

## SUPPLEMENTARY REPORT III

Dear Mr. Winters,

The following described documents were submitted to the examiner.

## QUESTIONED

Q-1:    One original Harte Hanks Confidentiality/Non-Disclosure
Agreement, dated 1/25/02, bearing a questioned Charles Dall'Acqua
signature

## KNOWN

The following described documents bear signatures in the name of and purported
to be prepared by Charles Dall'Acqua.

K-1:    One copy of page 6 of an Agreement

K-2:    One copy of page 8 of an Agreement

K-3:    One copy of page 6 of an Agreement

K-4:    One copy of an Anne Arundel County Association of Realtors
Addendum/Amendment, dated 11/9/01

2

K-5:    One copy of page 2 of a Permit Agreement, dated 11/16/01

K-6:    Copies of eight (8) Harte-Hanks Direct Marketing AMD Expense
        Reports, dated 12/2/01 and 3/10/02

K-7:    One copy of a memo to Merrill Lynch, dated 9/13/02

K-8:    One copy of a memo Re: Senior Management Bonus, dated 1/29/03

K-9:    One copy of a hand printed agreement, dated 7/24/03

Six (6) original Charles R. Dall'Acqua checks, further described as follows:

|        | Check # | Date |
|--------|---------|----------|
| K-10:  | 1394    | 10/1/01  |
| K-11:  | 1411    | 11/8/01  |
| K-12:  | 1434    | 12/6/01  |
| K-13:  | 1459    | 12/18/01 |
| K-14:  | 1265    | 12/30/02 |
| K-15:  | 1267    | 1/1/03   |

K-16:   Copies of two hundred (200) Charles R. Dall'Acqua checks, dated
        9-17-01 through 5-2-02

K-17:   One original Incentive Stock Option Agreement, dated 1-25-88

K-18:   One original Non-Qualified Stock Option Agreement, dated 7-14-89

K-19:   One original Incentive Stock Option Agreement, dated 1-2-91

K-20:   One original Non-Qualified Stock Option Agreement, dated 1-1-92

K-21:   One original Non-Qualified Performance Stock Option Agreement,
        dated 1-1-93

K-22:   One original Non-Qualified Stock Option agreement, dated 1-1-93

K-23:   One original Non-Qualified Stock Option Agreement, dated 7-23-93

K-24:   One original Non-Qualified Stock Option Agreement, dated 7-24-96

K-25:  One original Non-Qualified Performance Stock Option Agreement, dated 1-78-98

K-26:  One original Non-Qualified Stock Option Agreement, dated 8-30-99

K-27:  One original Non-Qualified Stock Option Agreement, dated 1-9-01

K-28:  One original Aetna Enrollment/change Request, dated 12-7-01

K-29:  One original Non-Qualified Stock Option Agreement, dated 1-8-02

K-30:  One original Form MW 507, dated 10-4-02

K-31:  One original signature page, dated 7-19-03

K-32:  One original Meeting Registration Form

K-33:  One original Change to Coverage form, dated 11-15-03

K-34:  One copy of a Harte-Hanks fax transmittal sheet, dated 6/1/04

K-35:  One copy of a two (2) page Hare & Chaffin letter to Mr. Charles M. Shure, dated July 13, 2004

Request

It was requested that examinations be conducted to determine the authenticity of the Charles Dall' Acqua signature on Exhibit Q-1. Visual and microscopic examinations of Exhibits Q-1 and K-1 through K-33 were conducted to answer this request. These examinations were conducted following the American Society of Testing and Materials (ASTM) Guideline for the Examination of Handwritten Items.

The evidence was also evaluated using the discriminating elements of writing described in Handwriting Identification: Facts and Fundamentals, by Roy A. Huber and A.M. Headrick. The authors describe twenty-one (21) habits of handwriting that are evaluated to determine authorship of handwriting. The questioned and known signatures were evaluated using these elements of handwriting.

4

<u>Examination of handwriting</u>

In the examination of the copies of the questioned signature, the examiner found some pictorial similarities and significant differences between the questioned and known signatures. Although the design of the questioned signature attempts to mimic the design of some of the known signatures, there are design differences that indicate that the questioned signature was prepared by another writer. These design differences include dissimilarities in the design of the letterform. The following are examples of some of the design differences between the questioned and known signatures:

-In the connecting stroke of between the "C" and "h" in the questioned signature there is a small hump before the high entry to the staff of the "h" that is not found in any of the comparable known signatures. (See Attachment- Connecting Stroke)
-At least two (2) pen lifts were found in the questioned signature that were not found in the known signatures. A pen lift was found in the staff of the "R" and the bowl of the "q". (See Attachment-Pen Lifts)
-The middle initial "R" starts higher on the baseline than the known "R"s. (See Attachment-Baseline)

The pictorial similarities indicate that the writer of the questioned signature had access to a genuine Dall' Acqua signature(s). Due to the difficulty in copying all the characteristics of the genuine signature, the writer was not able to fully imitate the characteristics of the known signatures.

*If the forger is to produce a perfect freehand imitation, he must imitate all the habits and qualities of the authentic signatures while simultaneously discarding all conflicting elements of his own writing. He must discover from detailed study of the model signature that is to be imitated all its salient factors and must know enough about the corresponding characteristics of his own writing to be able to eliminate their influence in his final product. Finally, this process involves writing the signature in the same natural way as the authentic signature. Failure often results because the forger has only a superficial idea of a few characteristics of both his own writing and the writing to be simulated or because his skill as a penman fails to measure up to that of the person whose writing is being imitated.*

<u>Scientific Examination of Questioned Documents</u>, pp. 183-185
Ordway Hilton

In the examination of the original questioned signature, the examiner noted additional differences between the questioned and known signatures. These differences include quality of the writing line, pen lifts and blunt beginning and ending strokes. The following are some examples of additional differences.

-Blunt beginning and ending strokes were found in the beginning of the "C", the beginning and ending of the middle initial, the beginning of the last name. Some of the known signatures were also prepared with a fluid ink pen, similar to the questioned signature, however, tapered beginning and ending strokes were found. (See Attachment-Blunt)

-A pen lift was noted in the beginning stroke of the middle initial "R". In the straight stroke on the left side of the letter, there is a break in the line of the letter, indicating that the pen was lifted off the paper during its preparation.

-At the bottom of the bowl of the "Q" where it meets the staff of the letter, there is an indication that there is a retracing of the stroke back to the left. This retracing may indicate that there is a pen lift between the bowl of the "Q" and the staff.

-At the bottom of the descender of the "Q", there is a heavy ink deposit that may indicate pen lift and/or hesitation. The descender also bears characteristics of slowness of movement with poorer line quality. (See Attachment-Descender)

According to Huber and Headrick, there are twenty-one (21) discriminating elements of handwriting that should be evaluated in a comparison of handwriting. The questioned and known signatures were evaluated for these elements.

1.) Arrangement
2.) Class of Allograph
3.) Connections
4.) Designs of Allographs and their Construction
5.) Dimensions
6.) Slant or Slope
7.) Spacings
8.) Abbreviations
9.) Alignment
10.) Commencements and Terminations
11.) Diacritics and Puctuation
12.) Embellishments
13.) Legibility or Writing Quality
14.) Line Continuity
15.) Line Quality
16.) Pen Control

17.) Writing Movement
18.) Consistency or Natural Variation
19.) Persistency
20.) Lateral Expansion
21.) Word Proportions

Based on examination of these elements of the questioned and known signatures, the examiner found that Huber and Headrick noted an importance in the examination of the connecting strokes. They write, *"Worth noting is that in the simulation of signatures, connections may be particularly important. The simulator may copy the letter designs but overlook a reasonable duplication of the manners in which letters are connected."* Page 98    Because there is a difference in the connecting stroke between the "C" and "h" in the questioned signature and the known signatures that bear a connecting stroke between these two letters, additional consideration must be given to this difference.

*Whenever there is reason to suspect that a handwriting is a copy, the connecting strokes will amply repay close investigation. Almost invariably it will be found that whilst the copyist may have succeeded in reproducing the more obvious features of letter design, little care has been taken to introduce connecting strokes which will pass muster.*

Suspect Documents Page 321-322
Wilson R. Harrison

In the examination of the baseline habits as described under the classification of "Alignment", the examiner found a difference between the height of the middle initial "R" in the questioned and known.    In the questioned signature, the bottom of the "R" is approximately 2 mm above the baseline.   In the known signatures, the "R" usually starts at or below the baseline. Although there are some known middle initials that start above the baseline, none start more than 1 mm above the baseline. (See Attachment- Knowns) Huber and Headrick quote a study by McClary that says, *"The study confirmed that baseline alignment is a repetitious writing habit and reliable factor in handwriting comparisons for the purposes of identification or elimination. This is true more so with respect to signatures that are the more habitual of one's handwriting skills."* Page 113 Because baseline habits, like connecting strokes, may be overlooked in the copying of a signature, it is important to note the differences between the questioned and known signatures.

> *Alignment habit may be regarded as a relatively fixed characteristic of handwriting.*

> <u>Suspect Documents</u> page 335
> Wilson R. Harrison

Under the category of Commencements and Terminations, the characteristics of blunt beginning and ending strokes, pen lifts, and poorer line quality bear the indications of an attempted simulation or tracing of a genuine Dall'Acqua signature(s).

> *While it is reasonable to expect imitations will resemble in some ways the writing being imitated, they tend to deviate from the genuine in three principal respects: form, line quality, and stroke continuity.*

> <u>Handwriting Identification: Facts and Fundamentals</u> p. 289
> Roy A. Huber and A.M. Headrick

With regard to Line Continuity, Huber and Headrick write, "*Disconnections in spurious writings are much less obvious, and often patched, repaired, or retouched afterward... In the examination and study of signatures, disconnections or pen lifts are classic symptoms of simulation by tracing methods.*" Page 119  The examiner noted the two above described pen lifts in the questioned signature.  These pen lifts/pen stops were noted in the microscopic examination of the signature.


<u>Examination of Indented Impressions</u>

In the initial examination of Exhibit Q-1, the examiner noted the presence of indented impressions on the first page of Exhibit Q-1.  Indented impressions are marks left on paper from writing on previous sheets of paper.  The examiner requested that the original document be submitted for further examination.

Exhibit Q-1 was submitted to the examiner and examinations for indented impressions were conducted with an indentation materializer.  The examiner found indented impressions on both pages of Exhibit Q-1.

On Page 1 of Exhibit Q-1 on the left side of the page, the examiner found decipherable indentations that appeared to read "6/11/04", "Sewell", and "cc cc Dernoga".  On the right side of the page, decipherable impressions of the hand

printed words "other" and "said costs exceed" are present.  Toward the bottom left side of page1, there is a partial impression of a date "/04".

On Page 2 of Exhibit Q-1, the examiner found a partial impression of a date that appeared to read either "3/15/04" or "5/15/04".  The examiner also found partial impressions from the indentations that appeared on page 1 of Exhibit Q-1. Based on the indentations, it appears that page 2 was under page 1 when the indentations were made on page 1 and page 1 was under page 2 when the date indentation was made on page 2 of Exhibit Q-1.

The decipherments of the indented impressions were based on the evaluation of the mylars from the indentation materializer.  However, with the examination and comparison with the handwritten entries from Exhibits K-34 and K-35 and the indented impressions, the examiner found that the indentations that were deciphered to read "6/11/04" and "Sewell" on Exhibit Q-1 are impressions from the handwritten date "6/1/04" and name "Sowell" on Exhibit K-34.  The impressions on Page 2 of Exhibit Q-1 that were deciphered to read "3/15/04" or "5/15/04" are impressions from the second page of Exhibit K-35 that reads "7/15/04".

Conclusions

Based on the differences between the questioned and known Charles Dall' Acqua signatures it is the opinion of the examiner that the questioned Dall' Acqua signature on Exhibit Q-1 is an attempted simulation of a genuine Dall'Acqua signature(s).  The examiner found no evidence to indicate that the person who prepared the known Charles Dall'Acqua signatures on Exhibits K-1 through K-33 executed the Charles Dall' Acqua signature on Exhibit Q-1.

The examiner reserves the right to supplement this report should additional documents become available for examination.

Respectfully submitted,

Ellen Mulcrone Schuetzner

Attachments

Attachment- Connecting stroke



Arrow indicates difference in connecting stroke in questioned signature.



Attachment- Pen Lifts

Arrows indicate locations of the pen lifts in the letterforms.

Attachment- Baseline



Arrow indicates 2mm distance between the baseline and the bottom of the "R".

Attachment- Blunt



Arrows indicate blunt beginning and ending strokes in the questioned signature.

Attachment- Descender



The arrow indicates the area in the descender of the "q" with heavier ink deposit and poor line quality.

## Attachment- Knowns



Copies of six known contemporaneous checks. Note the connecting stroke between the "Ch", the height of the "R" on the baseline, and the descender of the "q".

Items previously marked as Defendant' Exhibit D-3 (22 items), dated from 10/1/01 to
    7/24/03, now denominated D-3-A through D-3-Q, as follows:

    Ex. D-3-A       Cancelled checks, as follows:

            Check #1394, dated 10/1/01

            Check #1411, dated 11/8/01

            Check #1434, dated 12/6/01

            Check #1459, dated 12/18/54 (*sic*)

            Check #1265, dated 12/30/02

            Check #1267, dated 1/1/03

    Ex. D-3-B      Copy (fax) of an Addendum/Amendment form, dated 11/09/01.

    Ex. D-3-C    Copy of a form regarding a grading permit, dated 11/16/01.

    Ex. D-3-D    Copy of a Harte-Hanks expense report form
        for the period 10/28 to 11/3, dated 12/2/01.

    Ex. D-3-E     Copy of a Harte-Hanks expense report form
        for the period 11/4 to 11/10, dated 12/2/01.

    Ex. D-3-F     Copy of a Harte-Hanks expense report form
        for the period 11/11 to 11/17, dated 12/2/01.

    Ex. D-3-G    Copy of a Harte-Hanks expense report form
        for the period 11/18 to 11/24, dated 12/2/01.

    Ex. D-3-H    Copy of a Harte-Hanks expense report form
        for the period 11/25 to 12/1, dated 12/2/01.

    Ex. D-3-I       Copy of a Harte-Hanks expense report form
        for the period 2/3 to 2/9, dated 3/10/02.

    Ex. D-3-J      Copy of a Harte-Hanks expense report form
        for the period 2/17 to 2/23, dated 3/10/02.

    Ex. D-3-K    Copy of a Harte-Hanks expense report form
        for the period 3/3 to 3/9, dated 3/10/02.

    Ex. D-3-L     Copy (fax) of a Merrill Lynch, Pierce, Fenner & Smith form,
        dated 9/13/02.

    Ex. D-3-M   Copy of a memo regarding "senior management bonus",
        dated 1/29/03, with a footer reflecting transmission on 2/13/03.

    Ex. D-3-N    Copy of a handwritten agreement, dated 7/24/03.

    Ex. D-3-O    Copy (fax) of page 6 of an agreement, undated.

    Ex. D-3-P    Copy (fax) of page 8 of an agreement, undated.

    Ex. D-3-Q    Copy (fax) of page 6 of an agreement, undated
        (copy of Ex. P-10-T).

Items previously marked as Plaintiff's Exhibits P-7-A through P-7-C and
    P-10-A through P-10-T (23 items), dated 7/23/93 to 11/18/03, as follows:

    Ex. P-7-A     Copy (fax) of a Harte-Hanks ThankQ form, dated 12/6/96.

    Ex. P-7-B     Copy (fax) of a Harte-Hanks memorandum
        from Charles R. Dall'Acqua to Elaine DeMaira, dated 2/10/97.

    Ex. P-7-C     Copy (fax) of a Harte-Hanks memorandum
        from Charles R. Dall'Acqua to Elaine DeMaira, dated 1/26/98.

    Ex. P-10-A   Harte-Hanks, Inc. Enrollment Form, dated 11/15/03.

    Ex. P-10-B   Signature page (page 26), dated 7/19/03.

Ex. P-10-C    Human Resources verification of information memo,
            dated 12/5/01.

Ex. P-10-D    Harte-Hanks, Inc. Flexible Spending Account Enrollment Form,
            dated 12/7/01.

Ex. P-10-E    PostCom memo, dated 8/20/01.

Ex. P-10-F    PostCom Board Member Meeting Registration Form,
            dated as faxed 9/2/03.

Ex. P-10-G    Ætna enrollment/Change Request form, dated 12/7/01.

Ex. P-10-H    Employee's Maryland Withholding Exemption Certificate
            (Form MW 507), dated 10/4/02.

Ex. P-10-I    HHC Holding Inc. Incentive Stock Option Agreement,
            effective as of 1/25/88.

Ex. P-10-J    HHC Holding Inc. Non-Qualified Stock Option Agreement,
            effective as of 7/14/89.

Ex. P-10-K    HHC Holding Inc. Incentive Stock Option Agreement,
            effective as of 1/2/91.

Ex. P-10-L    HHC Holding Inc. Non-Qualified Performance Stock Option
            Agreement, effective as of 1/1/93.

Ex. P-10-M    HHC Holding Inc. Non-Qualified Performance Stock Option
            Agreement, effective as of 1/7/98.

Ex. P-10-N    HHC Holding Inc. Non-Qualified Stock Option Agreement,
            effective as of 1/1/92.

Ex. P-10-O    HHC Holding Inc. Non-Qualified Stock Option Agreement,
            effective as of 1/1/93.

Ex. P-10-P    HHC Holding Inc. Non-Qualified Stock Option Agreement,
            effective as of 7/23/93.

Ex. P-10-Q    Harte-Hanks Communications, Inc. Non-Qualified Stock Option
            Agreement, effective as of 7/24/96.

Ex. P-10-R    Harte-Hanks, Inc. Non-Qualified Stock Option Agreement,
            effective as of 8/30/99.

Ex. P-10-S    Harte-Hanks, Inc. Non-Qualified Stock Option Agreement,
            effective as of 1/9/01.

Ex. P-10-T    Harte-Hanks, Inc. Non-Qualified Stock Option Agreement,
            effective as of 1/8/02.

Cancelled checks (200 items), dated 9/17/01 through 5/2/02, as follows:

| Ck. # | Date | Ck. # | Date | Ck. # | Date | Ck. # | Date |
|-------|------|-------|------|-------|------|-------|------|
| 1367 | 9/17/01 | 1378 | 10/2/01 | 1387 | 10/6/01 | 1398 | 10/20/01 |
| 1368 | 9/22/01 | 1379 | 10/2/01 | 1388 | 10/4/01 | 1399 | 10/20/01 |
| 1371 | 10/2/01 | 1380 | 10/2/01 | 1390 | 10/15/01 | 1400 | 10/20/01 |
| 1372 | 10/2/01 | 1381 | 10/2/[01] | 1391 | 10/15/01 | 1401 | 10/20/01 |
| 1373 | 10/2/01 | 1382 | 10/2/01 | 1392 | 10/8/01 | 1402 | 10/20/01 |
| 1374 | 10/2/01 | 1383 | [10]/3/01 | 1393 | 10/15/01 | 1403 | 10/26/01 |
| 1375 | 10/2/01 | 1384 | 10/4/01 | 1395 | 11/1/01 | 1404 | 10/27/01 |
| 1376 | 10/2/01 | 1385 | 10/4/01 | 1396 | 12/1/01 | 1405 | 10/30/01 |
| 1377 | 10/2/01 | 1386 | 10/3/01 | 1397 | 10/18/01 | 1406 | 10/31/01 |

| Ck. # | Date | Ck. # | Date | Ck. # | Date | Ck. # | Date |
|-------|------|-------|------|-------|------|-------|------|
| 1407 | 11/2/01 | 1451 | 12/6/01 | 1496 | 1/23/02 | 1541 | 3/2/02 |
| 1408 | 11/4/01 | 1452 | 12/6/01 | 1497 | 1/23/02 | 1542 | 3/9/02 |
| 1409 | 11/8/01 | 1453 | 12/11/01 | 1498 | 1/23/[02] | 1543 | 3/10/02 |
| 1410 | 11/1/01 | 1454 | 12/13/01 | 1499 | 1/23/02 | 1544 | 3/8/02 |
| 1412 | 11/8/01 | 1455 | 12/15/01 | 1500 | 1/23/02 | 1545 | 3/10/02 |
| 1413 | 11/8/01 | 1456 | 12/18/01 | 1501 | 1/23/02 | 1546 | 3/11/02 |
| 1414 | 11/8/01 | 1457 | 12/18/01 | 1502 | 1/23/02 | 1547 | 3/11/02 |
| 1415 | 11/8/01 | 1458 | 12/18/01 | 1503 | 1/23/02 | 1548 | 3/11/02 |
| 1416 | 11/8/01 | 1460 | 12/18/[01] | 1504 | 1/23/02 | 1549 | 3/11/02 |
| 1417 | 11/8/01 | 1461 | 12/18/01 | 1505 | 1/27/02 | 1550 | 3/11/02 |
| 1418 | 11/8/01 | 1462 | 12/18/01 | 1506 | 2/1/02 | 1551 | [3/??/02] |
| 1419 | 11/8/[01] | 1463 | 12/19/01 | 1507 | 2/1/02 | 1552 | 3/12/02 |
| 1420 | 11/8/01 | 1464 | 12/22/01 | 1508 | 1/23/02 | 1553 | 3/13/02 |
| 1421 | 11/8/01 | 1465 | 12/22/01 | 1509 | 2/1/02 | 1001 | 3/15/02 |
| 1422 | 11/8/01 | 1466 | 12/28/01 | 1510 | 2/2/02 | 1002 | 3/15/02 |
| 1423 | 11/8/01 | 1467 | 12/28/01 | 1511 | 2/2/02 | 1003 | 3/17/02 |
| 1424 | 11/8/01 | 1468 | 12/28/01 | 1512 | 2/2/02 | 1004 | 3/17/02 |
| 1425 | 11/8/01 | 1469 | 12/28/01 | 1513 | 2/2/02 | 1005 | 3/18/02 |
| 1426 | 12/1/01 | 1470 | 12/28/01 | 1514 | 2/2/02 | 1006 | 3/18/02 |
| 1427 | 11/9/01 | 1471 | 12/28/01 | 1515 | 2/2/02 | 1007 | 3/18/02 |
| 1428 | 11/16/01 | 1472 | 12/28/01 | 1516 | 2/2/02 | 1008 | 3/18/02 |
| 1429 | 11/25/01 | 1473 | 12/28/01 | 1517 | 2/2/02 | 1009 | 3/18/02 |
| 1430 | 12/1/01 | 1474 | 12/28/01 | 1518 | 2/9/02 | 1010 | 3/18/02 |
| 1431 | 11/8/01 | 1475 | 12/28/01 | 1519 | 2/8/02 | 1011 | 3/18/02 |
| 1432 | 11/8/01 | 1476 | 12/28/01 | 1520 | 2/15/02 | 1012 | 3/19/02 |
| 1433 | 12/2/01 | 1477 | 12/28/01 | 1521 | 2/15/02 | 1013 | 4/3/02 |
| 1435 | 12/1/01 | 1478 | 12/28/01 | 1522 | 2/15/02 | 1014 | 4/3/02 |
| 1436 | 12/1/01 | 1479 | 12/28/01 | 1523 | 2/15/02 | 1015 | 4/5/02 |
| 1437 | 12/1/01 | 1480 | 2/1/02 | 1524 | 2/15/02 | 1019 | 4/5/02 |
| 1438 | 12/1/01 | 1482 | 12/28/01 | 1526 | 2/20/02 | 1020 | 4/5/02 |
| 1439 | 12/1/01 | 1483 | 1/1/02 | 1527 | 2/20/02 | 1021 | 4/5/[02] |
| 1440 | 12/1/01 | 1484 | 1/1/02 | 1528 | 2/20/02 | 1022 | 4/5/02 |
| 1441 | 12/1/01 | 1485 | 1/2/[02] | 1529 | 2/20/02 | 1025 | 4/5/02 |
| 1442 | 12/1/01 | 1486 | 1/2/02 | 1530 | 2/20/02 | 1028 | 4/14/02 |
| 1443 | 12/1/01 | 1487 | 1/5/02 | 1531 | 2/20/02 | 1031 | 4/17/02 |
| 1444 | 12/1/01 | 1488 | 1/10/[02] | 1532 | 2/20/02 | 1033 | 4/20/02 |
| 1445 | 12/1/01 | 1489 | 1/9/02 | 1533 | 2/20/02 | 1039 | 5/4/02 |
| 1446 | 12/7/01 | 1490 | 1/19/02 | 1535 | 2/20/[02] | 1041 | 5/2/02 |
| 1447 | 12/6/01 | 1492 | 1/21/02 | 1536 | 2/21/02 | | |
| 1448 | 12/6/01 | 1493 | 1/21/02 | 1537 | 2/25/02 | | |
| 1449 | 12/6/01 | 1494 | 1/22/02 | 1538 | 2/20/02 | | |
| 1450 | 12/6/01 | 1495 | 1/23/02 | 1539 | 3/1/02 | | |

Nineteen (19) additional documents previously reviewed by Plaintiff's expert (the "Additional Documents"), as follows:

A-1    HH Holdings Inc. Incentive Stock Option Agreement, effective as of 9/11/84.

A-2    HHC Holding Inc. Incentive Stock Option Agreement, effective as of 1/1/86.

A-3    HHC Holding Inc. Incentive Stock Option Agreement, effective as of 1/30/87.

A-4    HHC Holding Inc. Incentive Stock Option Agreement, effective as of 1/3/89.

A-5    HHC Holding Inc. Incentive Stock Option Agreement, effective as of 1/3/90.

A-6    HHC Holding Inc. Non-Qualified Performance Stock Option Agreement, effective as of 3/1/91.

A-7    HHC Holding Inc. Non-Qualified Performance Stock Option Agreement, effective as of 2/1/92.

A-8    Harte-Hanks Communications, Inc. Non-Qualified Stock Option Agreement, effective as of 1/3/95.

A-9    Harte-Hanks Communications, Inc. Non-Qualified Stock Option Agreement, effective as of 1/2/96.

A-10   Harte-Hanks Communications, Inc. Non-Qualified Stock Option Agreement, effective as of 1/6/97.

A-11   Harte-Hanks Communications, Inc. Non-Qualified Performance Stock Option Agreement, effective as of 1/6/97.

A-12   Harte-Hanks Communications, Inc. Non-Qualified Stock Option Agreement, effective as of 1/7/98.

A-13   Harte-Hanks Communications, Inc. Non-Qualified Stock Option Agreement, effective as of 1/12/99.

A-14   Harte-Hanks Supplemental Long-Term Disability Insurance Plan form, dated 8/14/00.

A-15   Intent to Respond, dated 9/26/01.

A-16   Confidentiality Agreement — Vendor and Caltex, Inc., dated 9/26/01.

A-17   Confidentiality Agreement — Vendor and Chevron Corporation, dated 9/26/01.

A-18   Confidentiality Agreement — Vendor and Texaco, Inc., dated 9/26/01.

A-19   Copy of a Harte-Hanks expense report form for the period 1/20 to 1/26, dated 2/2/02, stamped as received 2/6/02(copy), with initials dated 2/13/02 (copy) and an original ink signature dated 2/21/02.

Ten (10) documents purportedly prepared prior to or at the approximately the same time as the Questioned Document (the "Paper Samples"), as follows:

P-1    Printout for Vacation/Sick Allocation 1/30/01

P-2    Printout for PAGE 1, dated 24 JAN 2002 at 11:24:11

P-3    Printout of File: *c:\ADP\PCPW\ADPLOG\creatTA4.log*, dated, 01/25/2002 from 10:04:12 to 10:04:13

P-4    Printout of File: *c:\ADP\PCPW\ADPLOG\send.log*, dated, Friday, 01/25/2002 from 10:07:10 to 10:07:58

P-5    Printout of File: *c:\ADP\PCPW\ADPLOG\send.log*, dated, 01/25/2002 from 10:08:00 to 10:08:08

P-6    Printout for Manual Checks — Full Report (01/25/02)

P-7    Printout for Automatic Pay Cancellation Report (01/25/02)

P-8    Project Commitment Form for 2002 alarm system, with 1/24 in the upper right corner and a handwritten number, initials and, date 1/25/02 in red ink.

P-9    Project Commitment Form for High Speed Cut Sheet Printer w/Duplex Capability, with a handwritten 1/24 in the upper right corner, and a number, initials, and date 1/28/02 in red ink.

P-10   Printout of File: *c:\ADP\PCPW\ADPLOG\receive.log*, dated, Tuesday, 01/29/2002 from 10:05:35 to 10:06:25

| | |
|---|---|
| Ex. P-7-A<br>  ThankQ form<br>  dated 12/6/96<br>  *copy (fax)* | *12/6/96* Date |
| A-14<br>  Agreement,<br>  as of 8/14/00 | 8/14/00 |
| A-15<br>  Intent to Respond,<br>  as of 9/26/01 | 9/26/01    9/26/01 Date |
| A-16<br>  Agreement (Caltex),<br>  as of 9/26/01 | 9/26/01    9/26/01 |
| A-17<br>  Agreement (Chevron),<br>  as of 9/26/01 | 9/26/01    9/26/01 |
| A-18<br>  Agreement (Texaco),<br>  as of 9/26/01 | 9/26/01    9/26/01 |
| Ex. D-3-A<br>  Check #1394<br>  dated 10/1/01 | 10/1/01 |
| Ex. D-3-A<br>  Check #1411<br>  dated 11/8/01 | 11/8/01 |
| Ex. D-3-B<br>  Addendum/Amendment<br>  form<br>  dated 11/09/01<br>  *copy (fax)* | d conditions of th<br>11/09/01 Date |

| | | |
|---|---|---|
| Ex. D-3-D<br>Expense report form<br>for 10/28 to 11/3<br>dated 12/2/01<br>*copy* | 12/2/01 | 10/28 - 11/3 |
| Ex. D-3-E<br>Expense report form<br>for 11/4 to 11/10<br>dated 12/2/01<br>*copy* | 12/2/01 | 11/4 - 11/10 |
| Ex. D-3-F<br>Expense report form<br>for 11/11 to 11/17<br>dated 12/2/01<br>*copy* | 12/2/01 | 11/11 - 11/17 |
| Ex. D-3-G<br>Expense report form<br>for 11/18 to 11/24<br>dated 12/2/01<br>*copy* | 12/2/01 | 11/18 - 11/24 |
| Ex. D-3-H<br>Expense report form<br>for 11/25 to 12/1<br>dated 12/2/01<br>*copy* | 12/2/01 | |
| Ex. P-10-C<br>Memo<br>dated 12/5/01 | 12/5/01 | |
| Ex. D-3-A<br>Check #1434<br>dated 12/6/01 | 12/6/01 | |
| Ex. P-10-D<br>Enrollment Form<br>dated 12/7/01 | 12/7/01 | |
| Ex. P-10-G<br>Ætna form<br>dated 12/7/01 | 12/7/01 | |

| Ex. D-3-A<br>Check #1459<br>dated 12/18/54 (*sic*) | 12/18/54 |
| Ck. #1483,<br>dated 1/1/02 | 1/1/02 |
| Ck. #1484,<br>dated 1/1/02 | 1/1/02 |
| Ck. #1486,<br>dated 1/2/02 | 1/2/01 |
| Ck. #1487,<br>dated 1/5/02 | 1/5/02 |
| Ck. #1489,<br>dated 1/9/02 | 1/9/02 |
| Ck. #1488,<br>dated 1/10/[02] | 1/10/01 |
| Ck. #1490,<br>dated 1/19/02 | 1/19/02 |
| Ck. #1492,<br>dated 1/21/02 | 1/21/02 |

| | |
|---|---|
| Ck. #1493,<br>dated 1/21/02 | 1/21/02 |
| Ck. #1494,<br>dated 1/22/02 | 1/22/02 |
| Ck. #1495,<br>dated 1/23/02 | 1/23/02 |
| Ck. #1496,<br>dated 1/23/02 | 1/23/02 |
| Ck. #1497,<br>dated 1/23/02 | 1/23/02 |
| Ck. #1498,<br>dated 1/23/[02] | 1/23/01 |
| Ck. #1499,<br>dated 1/23/02 | 1/23/02 |
| Ck. #1500,<br>dated 1/23/02 | 1/23/02 |
| Ck. #1501,<br>dated 1/23/02 | 1/23/02 |

| Ck. #1502, dated 1/23/02 | 1/23/02 |
| Ck. #1503, dated 1/23/02 | 1/23/02 |
| Ck. #1504, dated 1/23/02 | 1/23/02 |
| Ck. #1508, dated 1/23/02 | 1/23/02 |
| Ck. #1505, dated 1/27/02 | 1/27/02 |
| Ck. #1480, dated 2/1/02 | 2/1/02 |
| Ck. #1506, dated 2/1/02 | 2/1/02 |
| Ck. #1507, dated 2/1/02 | 2/1/02 |
| Ck. #1509, dated 2/1/02 | 2/1/02 |

| A-19 Expense report form for 1/20 to /26 dated 2/2/02 *copy* | 2/2/02    1/20 – 1/26 |
| A-19 Expense report form for 1/20 to /26 dated 2/2/02 Reverse *copy* | 1/20    1/21    1/22    1/23    1/24    1/25    1/26 |
| Ck. #1510, dated 2/2/02 | 2/2/02 |
| Ck. #1511, dated 2/2/02 | 2/2/02 |
| Ck. #1512, dated 2/2/02 | 2/2/02 |
| Ck. #1513, dated 2/2/02 | 2/2/02 |
| Ck. #1514, dated 2/2/02 | 2/2/02 |
| Ck. #1515, dated 2/2/02 | 2/2/02 |
| Ck. #1516, dated 2/2/02 | 2/2/02 |