UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC., )<br>  )<br>Plaintiff, )<br>  )<br>v. )<br>  )<br>CHARLES R. DALL'ACQUA, )<br>  )<br>Defendant. )<br>  ) | Civil Action No. 04-11548-DPW |

### DALL'ACQUA'S MOTION TO COMPEL PRODUCTION OF ALL DOCUMENTS ELAINE DERNOGA SIGNED ON BEHALF OF DALL'ACQUA

Charles Dall'Acqua, by his attorneys, respectfully seeks entry of an Order requiring Harte-Hanks to provide substantive responses to the single document request included within his Third Request for Production of Documents. In this request, Dall'Acqua seeks all documents Elaine Dernoga signed on behalf of Dall'Acqua. These materials are critical in that there is evidence Dernoga signed Dall'Acqua's name to documents in the past and the jury may find such evidence relevant in assessing who really signed the alleged agreement at issue. Dall'Acqua's document request was properly served on September 21, 2004. Harte-Hanks, however, initially refused to respond on the grounds that the request was untimely. And, despite the significant push-back of the various pre-trial deadlines, and its own more recent supplemental discovery requests to Dall'Acqua, Harte-Hanks continues to refuse to respond or otherwise produce the requested documents.

**BACKGROUND**

Elaine Dernoga is Harte-Hanks' only witness regarding the authenticity of the alleged non-solicitation agreement at issue in this case. Dernoga does not recall anything surrounding the circumstances of the alleged execution of the agreement on January 25, 2002. [8/10/04 Trans. at 19-20, 35.] She does not recall witnessing Dall'Acqua sign the alleged agreement, counter-signing it herself, or how she came into possession of it. [Id. at 19-20, 24-25, 27, 35.]

Dall'Acqua did not sign the alleged agreement. (At trial, among other proof, Dall'Acqua will present testimony from two nationally-recognized handwriting experts who will explain that the alleged signature is a forgery.) To probe potential scenarios surrounding the circumstances of the creation of the alleged agreement, Dall'Acqua requested all documents which Dernoga signed on behalf of Dall'Acqua. [See Def. Third Req. for Prod. of Docs. (Exhibit A).] This was the only request included in Dall'Acqua's third request for production of documents, and it was properly served on September 21, 2004. [Id.]

Harte-Hanks, however, objected to this request and refused to provide any response on the grounds that it was purportedly untimely under the pre-trial schedule accompanying the old December trial date. [See 11/3/04 Pl. Resp. to Third Req. for Prod. of Docs (Exhibit B).] Despite a three-month push-back of the trial date, and other related pre-trial deadlines, Harte-Hanks continues to refuse to produce the requested documents. Nevertheless, Harte-Hanks itself served additional discovery requests well after the supposed cutoff it is now attempting to enforce against Dall'Acqua. [See 12/7/04 Pl. Second Req. for Prod. of Docs. to Dall'Acqua; 12/7/04 Pl. Second Set of Interrogs. to Dall'Acqua; see also 11/24/04 Pl. Subpoena Duces Tecum to Protocol; 11/18/04 Pl. Subpoena Duces Tecum to R. Naditch.]

## **ARGUMENT**

Dernoga has admitted that she occasionally signed Dall'Acqua's name on documents. [8/10/04 Trans. at 32-33.] She contends, however, that whenever she signed on behalf of Dall'Acqua, she did not simulate his signature, but rather spelled out all the letters and did not attempt to make the signature look like his. [Id. at 41.] She further testified that she usually included her initials whenever she signed documents on behalf of Dall'Acqua. [Id. at 34.]

Dall'Acqua requested all documents Dernoga signed on his behalf to challenge the veracity of her testimony on this important point. Dernoga's credibility is critical to this case. Dall'Acqua should not have to accept her testimony at face value. Rather, he is entitled to determine to what extent she did sign his name to documents during the course of her work for him. Moreover, the existence of other documents she signed for him similar in appearance to the signature on the alleged agreement, of course, would be highly relevant. Accordingly, these documents should be produced.

The relevance of these documents is heightened in that Dernoga's credibility has been called into question due to several recent events. *First*, when asked at the preliminary injunction hearing about the location of the other original documents allegedly executed in January 2002, Dernoga falsely represented they were in her office. We now know that Dernoga "lost" the documents sometime before the hearing, yet failed to bring this information to the attention of the Court or Dall'Acqua. [See Def. Motion for Sanctions for Spoliation of Evidence.]

*Second*, to excuse her "loss" of these original documents, Dernoga represented to the Court that she is a reticent flyer who is uncomfortable on planes. [See 11/15/04 Dernoga Aff. ("I was in some distress at the airport. I rarely travel for business, I dislike commercial flights and I did not relish the thought of flying to Logan [due to events of September 11, 2001].").] It turns

out, Dernoga is an avid flyer who regularly flies for business, leisure and with her husband on their personal Cessna. From the limited documents Harte-Hanks has produced to date, we know that two months before the trip on which she "lost" the documents, Dernoga flew to Austin, Texas for a human resources conference. [Exhibit C (regarding June 13-18, 2004 trip).] She also flew to Boston twice during the month of August 2004 in connection with this litigation. [Exhibits D-E.] In addition, Dernoga's husband is a pilot and together they own a Cessna airplane. In a personal letter to the CEO of Harte-Hanks, Dernoga wrote: "I don't know if you know this, but my husband is a pilot and we own a Cessna . . . last night I told my husband that all I want to do is go flying this weekend -- just the two of us up there against the world, no one around . . . it's a great escape." [Exhibit F (3/5/04 Dernoga e-mail to R. Hochhauser).]

       Harte-Hanks' case is unraveling. More and more inconsistencies are coming to light. Harte-Hanks should not be able to hide behind a deadline contained in a now superseded scheduling order to refuse to produce important documents.

## CONCLUSION

WHEREFORE, Dall'Acqua respectfully requests that the Court enter an Order requiring Harte-Hanks to immediately produce the documents requested in its third set of document requests.

            Respectfully submitted,

            CHARLES R. DALL'ACQUA

         By: /s/ John F. Rooney, III
            One of His Attorneys

            John F. Rooney III
            Angela L. Lackard
            Matthew Grygorcewicz
            MELICK, PORTER & SHEA, LLP
            28 State Street
            Boston, MA 02109
            (617) 523-6200

            Susan C. Levy
            Daniel J. Winters
            JENNER & BLOCK LLP
            One IBM Plaza
            330 North Wabash
            Chicago, Illinois 60611
            (312) 222-9350

Dated: January 13, 2005

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(A)(2)

I, Daniel J. Winters, counsel for Defendant in the above matter, hereby certify that pursuant to Rule 7.1(A)(2) of the Local Rules of the U.S. District Court of the District of Massachusetts, counsel for Dall'Acqua has conferred with David Chaffin, counsel for the plaintiff Harte-Hanks, Inc., in a good faith effort to resolve or narrow the issues regarding the attached motion to compel. Mr. Chaffin indicated in his letter to me dated January 10, 2005 that Harte-Hanks refuses to withdraw its objections or otherwise produce the requested materials.

/s/ Daniel J. Winters