# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| HARTE-HANKS, INC. | ) |
| Plaintiff, | ) |
| v. | ) Civil Action No. 04-11548-DPW |
| CHARLES R. DALL'ACQUA and PROTOCOL MARKETING GROUP, | ) |
| Defendants. | ) |

**CHARLES R. DALL'ACQUA'S FIRST AMENDED OBJECTIONS AND RESPONSES TO PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant Charles R. Dall'Acqua ("Dall'Acqua"), by his attorneys, hereby objects and responds to Plaintiff Harte-Hanks, Inc.'s First Set of Interrogatories as follows:

**GENERAL OBJECTIONS**

1.  Dall'Acqua objects to these interrogatories on the grounds that they exceed the maximum number of interrogatories a party may serve under Rule 33(a) of the Federal Rules of Civil Procedure. In particular, including all discrete subparts as well as the interrogatories included in its "Monitoring Interrogatories," Harte-Hanks has submitted well in excess of the permitted twenty-five (25) interrogatories.

2.  Dall'Acqua objects to these interrogatories to the extent they seek information which is within the attorney-client privilege, the attorney work product privilege or any other recognized privilege or immunity. Dall'Acqua and his counsel hereby assert such privileges and immunities and will not produce any such protected information.

3.  Dall'Acqua objects to these interrogatories, including the definitions and instructions, to the extent they seek to impose discovery obligations on Dall'Acqua greater than

those specified in the Federal Rules of Civil Procedure. Dall'Acqua will respond to these interrogatories in accordance with his obligations pursuant to the Federal Rules of Civil Procedure.

4.  Dall'Acqua objects to these interrogatories to the extent that any particular request is overly broad, vague, ambiguous, misleading, subject to differing interpretations or otherwise objectionable under the Federal Rules of Civil Procedure.

5.  To the extent that any interrogatory calls for information generally available or otherwise known to defendants, Dall'Acqua objects on the grounds that such request is unduly burdensome and oppressive.

6.  Dall'Acqua submits these answers and responses without conceding the relevancy or materiality of the subject matter of any interrogatory, and without prejudice to his right to object to any further discovery or to object to the admissibility of proof on the subject matter.

7.  Dall'Acqua's investigation continues and, therefore, his responses are preliminary. Dall'Acqua expressly reserves the right to supplement these responses as necessary after discovery closes.

8.  All of the above general objections are incorporated by reference into each and every one of the following specific responses.

## ANSWERS

1.  Please identify the person answering each interrogatory set forth below, and any persons who assisted in answering each interrogatory or who provided information used in preparing the answer, and indicate the information provided by that or those persons.

**ANSWER:** Dall'Acqua objects to this interrogatory on the grounds it seeks information protected from disclosure by the attorney-client and attorney work product privileges. Dall'Acqua further objects to this interrogatory on the grounds it is overly broad and

burdensome. Without waiving said objections, the following persons provided information in connection with these responses: Dall'Acqua and Robert Froetscher.

2. Please state the basis for your contention that the signature on the agreement that is at issue in this case is a forgery.

**ANSWER:** Dall'Acqua objects to this interrogatory to the extent it seeks information within the control of Harte-Hanks as to the circumstances of its forging of Dall'Acqua's signature on the January 25, 2002 Confidentiality/Non-Disclosure Agreement (hereinafter "the forged agreement" or "the alleged agreement"). Without waiving said objection, Dall'Acqua contends the forged agreement is not authentic because he did not sign it. Dall'Acqua incorporates by reference his affidavit and testimony at the preliminary injunction hearing as to why he could not have and would not have signed the alleged agreement. Moreover, the pre-June 8 conduct of Harte-Hanks (including its failure to reference any such agreement during its many conversations with, among others, Dall'Acqua, Protocol, or Spencer Stuart and the fact that it offered Dall'Acqua a six-figure severance package conditioned on his signing a non-solicitation agreement) establishes the alleged agreement is not authentic.

Further answering, Dall'Acqua states that his investigation continues and he reserves the right to supplement this response as necessary after the close of discovery.

3. Please set forth each and every fact and circumstance that you contend supports your allegation that the signature on the agreement at issue in this case is a forgery.

**ANSWER:** Dall'Acqua incorporates by reference his response to Interrogatory No. 2.

4. Please describe in detail the process pursuant to which you were hired by Protocol, including in your answer detailed statements, descriptions, or identifications of (a) how you first became or were identified as a candidate for the position; (b) the negotiations and/or discussions and/or communications between you and Protocol concerning your candidacy for the position with Protocol; (c) the identity of all persons who were involved in such negotiations

and/or discussions and/or communications;. (d) every representation or statement by you concerning why you were a suitable candidate and concerning the value that you potentially could bring to Protocol; (e) what was said during each negotiation, discussion, and/or communication concerning your ability to identify and/or obtain for Protocol prospective employees among Harte-Hanks's employees , and sales prospects among Harte-Hanks's customer base.

**ANSWER:** Dall'Acqua objects to this interrogatory on the grounds it is overly broad, burdensome, and seeks information more appropriately obtained via deposition discovery. Dall'Acqua also objects to this interrogatory to the extent it seeks information not in the possession of Dall'Acqua, but rather other third parties (i.e., Protocol, Willis Stein, Spencer Stuart). Dall'Acqua further objects in that much of this information may be derived or ascertained from the records previously produced by Willis Stein, BCI Partners and Spencer Stuart relating to Dall'Acqua's recruitment and hiring. Dall'Acqua, therefore, refers Harte-Hanks to those documents for the information contained therein.

Without waiving said objections, Dall'Acqua states that in January 2004, he was contacted by Spencer Stuart regarding his interest in a position with Protocol Services, Inc. Dall'Acqua responded that he was interested. On January 16, 2004, Dall'Acqua met Chris Nadherny (of Spencer Stuart) and Robert Froetscher at O'Hare International Airport to discuss Protocol and what it was looking for in a new CEO. Over the course of the next several weeks, Dall'Acqua met with numerous individuals as part of Protocol's recruiting process, including: Protocol board members Robert Froetscher, Avy Stein, Bart Goodwin, Howard Hoffman and Bob Conrads; Protocol's CFO Kurt Marhoefer; Protocol division presidents Jerry Lewis, Jeff Jarrett and Jeff Baker; and Bain & Company.

During this time, Dall'Acqua also had a number of conversations with Gil Stenholm of Spencer Stuart regarding the position at Protocol and about Dall'Acqua's desired salary and other job requirements for taking the position. On Tuesday, March 9, 2004, Messrs. Froetscher

and Stein met with Dall'Acqua to discuss Dall'Acqua's assessment of Protocol's market position and the steps he would take if he were to become Protocol's CEO. At that dinner, Messrsr. Stein and Froetscher stated their interest in having Dall'Acqua take the Protocol CEO position and described in some detail the title, roles, responsibilities, cash compensation, equity compensation and benefits associated with the position. Negotiations regarding the details of the offer continued over the following ten days. Dall'Acqua signed an employment agreement with Protocol on March 19, 2004, and started work on March 25, 2004.

Over the course of the recruiting process, Dall'Acqua represented that he believed he would be an excellent candidate for the Protocol CEO role due to, among other reasons: his extensive experience in the marketing services industry; his track record as a successful business executive; his leadership; his business management skills; and his work ethic. These qualities were confirmed by various senior Harte-Hanks executives in the course of Protocol's due diligence.

Further answering, Dall'Acqua refers Harte-Hanks to the documents previously produced by Willis Stein, BCI Partners and Spencer Stuart for additional information and details regarding the recruitment process.

5.  Please identity each and every person whom you contend participated in any capacity in the alleged forgery of your signature on the agreement at issue in this case, and, with respect to each such person, state the basis for your contention that he or she participated in the forgery.

**ANSWER:** Dall'Acqua objects to this interrogatory on the grounds it seeks information within the exclusive control of Harte-Hanks as to the circumstances of its forging Dall'Acqua's signature on the alleged agreement. Dall'Acqua, therefore, cannot respond to this interrogatory and, instead, demands that Harte-Hanks immediately identify the persons who were

involved in creating the forged agreement and disclose the circumstances surrounding the forgery.

6. Please describe in full detail the circumstances of the alleged forgery of your signature on the agreement at issue in this case.

**ANSWER:** Dall'Acqua incorporates by reference his response to Interrogatory No. 5.

7. With respect to each and every attempt you or Protocol have made since March 1, 2004, to solicit business from a party known to you to be a current or former customer or client of Harte-Hanks, please describe all information concerning, or of, Harte-Hanks that was used, referenced, or relied upon in any respect in connection with the attempt.

**ANSWER:** Mr. Dall'Acqua objects to this interrogatory on the grounds it requests information completely irrelevant to this action and not reasonably likely to lead to the discovery of admissible evidence. Subject to some explanation as to the arguable relevance of this information, Dall'Acqua will reconsider his response to this interrogatory.

8. With respect to each and every attempt you have made since January 31, 2004, to hire a current or former employee of Harte-Hanks, please identify the current or former employee and describe all information concerning that current or former employee that was used, referenced, or relied upon in any respect in connection with the attempt.

**ANSWER:** Dall'Acqua objects to this interrogatory as vague, ambiguous, and seeking irrelevant information to the extent it requests information related to Dall'Acqua's involvement while still employed at Harte-Hanks in hiring employees to work at Harte-Hanks or any conduct prior to the entry of the preliminary injunction order. Dall'Acqua further objects on the grounds that this interrogatory seeks information not reasonably likely to lead to the discovery of admissible evidence. Without waiving said objections, Dall'Acqua states that the only Harte-Hanks employees he hired to work at Protocol were John Martus, Joel Bakal and Deb Kennedy (after she was terminated by Harte-Hanks). In connection with these efforts, the only

information Dall'Acqua used, referenced or relied upon was his general knowledge of their capabilities.

9.  Please identify each person who has knowledge of the facts and circumstances relevant to this case, and, for each such person, provide a summary of his or her knowledge.

**ANSWER:** Dall'Acqua objects to this interrogatory on the grounds it is vague, ambiguous, overly broad, and burdensome. Dall'Acqua further objects on the grounds that it seeks information within the exclusive control of Harte-Hanks, including, for example, the identities of the persons involved in forging Dall'Acqua's signature on the alleged agreement. Subject to some reasonable narrowing of the scope of this interrogatory, Dall'Acqua will consider supplementing his response. Dall'Acqua also incorporates by reference his Rule 26 disclosure statement. Further answering, Dall'Acqua states that his investigation continues and he reserves the right to supplement this response as necessary after the close of discovery.

10.  Please identify each and every document relevant to the facts and circumstances at issue in this case.

**ANSWER:** Dall'Acqua objects to this request as vague, ambiguous, overly broad and burdensome. Dall'Acqua further objects on the grounds that it seeks information within the exclusive control of Harte-Hanks, including, for example, the identity of any documents relating to the forging of Dall'Acqua's signature on the alleged agreement. Subject to some reasonable narrowing of the scope of this interrogatory, Dall'Acqua will consider supplementing his response. Dall'Acqua also incorporates by reference his Rule 26 disclosure statement. Investigation continues. Further answering, Dall'Acqua states that his investigation continues and he reserves the right to supplement this response as necessary after the close of discovery.

11.  Please describe in full detail how John Martus came to be employed by Protocol.

**ANSWER:** Dall'Acqua objects to this interrogatory to the extent it seeks information relating to anything beyond Dall'Acqua's personal knowledge regarding the hiring of John Martus. Dall'Acqua further objects on the grounds that the circumstances surrounding the hiring of Martus are irrelevant to this action; the only pertinent issue is whether the alleged agreement is authentic. Without waiving said objections, Dall'Acqua states that in mid- to late-April 2004, he contacted Martus regarding possible employment with Protocol. Martus expressed interest in the position. Over the next few weeks, Dall'Acqua and Martus discussed Martus' possible employment with Protocol in the position of Controller. During one such conversation, Dall'Acqua asked Martus if he had any restrictive covenants with Harte-Hanks, and Martus informed Dall'Acqua that he had executed a confidentiality agreement with Harte-Hanks. Dall'Acqua then asked if Martus had signed any type of non-competition agreement with Harte-Hanks, and Martus stated that he did not. Martus decided to accept employment at Protocol, and began his employment with Protocol on June 15, 2004.

12. Please describe in full detail how Joel Bakal came to be employed by Protocol.

**ANSWER:** Dall'Acqua objects to this interrogatory to the extent it seeks information relating to anything beyond Dall'Acqua's personal knowledge regarding the hiring of Joel Bakal. Dall'Acqua further objects on the grounds that the circumstances surrounding the hiring of Bakal are irrelevant to this action; the only pertinent issue is whether the alleged agreement is authentic. Without waiving said objections, Dall'Acqua states that he and Bakal have enjoyed a personal and professional relationship for many years. Their personal relationship continued after Dall'Acqua was terminated by Harte-Hanks, and they spoke on occasion. During these conversations, the issue of Bakal's possible employment at Protocol arose. Thereafter, Dall'Acqua and Bakal met to discuss the specifics of Bakal's possible employment at Protocol.

In late July 2004, Bakal received an offer of employment from Protocol. Bakal accepted, and began employment at Protocol on August 23, 2004.

13.    Please describe in full detail all efforts by you to solicit any current or former Harte-Hanks employees for employment at or with Protocol.

**ANSWER:**    Dall'Acqua objects to this interrogatory as vague, ambiguous, and seeking irrelevant information to the extent it requests information regarding any conduct prior to the entry of the preliminary injunction order. Dall'Acqua further objects on the grounds that this interrogatory seeks information not reasonably likely to lead to the discovery of admissible evidence. Without waiving said objections, Dall'Acqua states that the only Harte-Hanks employees he solicited for employment at Protocol were John Martus and Joel Bakal. Dall'Acqua incorporates by reference his response to Interrogatories Nos. 11-12 for the circumstances surrounding their hiring.

14.    Please identify each person you anticipate calling as an expert witness at trial, and with respect to any person so identified, please provide a curriculum vitae and set forth the subject matter on which that person is expected to testify, the substance of the fact and opinions to which that person is expected to testify, and a summary of the grounds for each such opinion.

**ANSWER:**    Dall'Acqua may call Ellen Mulcrone Schuetzner and Peter Tytell as expert witnesses at trial to testify regarding the authenticity of the signature on the alleged agreement and the results of their forensic examinations of the alleged agreement and other related materials. Further answering, Dall'Acqua incorporates by references the Rule 26 expert reports and related materials previously produced by Schuetzner and Tytell (and any supplemental reports they may submit as new or additional information becomes available), and also Schuetzner's testimony at the preliminary injunction hearing. In addition, Dall'Acqua may call a rebuttal expert to testify at trial regarding Harte-Hanks' alleged damages and to rebut any expert

testimony from Elizabeth Becker. Dall'Acqua will disclose any necessary information regarding this expert pursuant to the schedule issued by the Court for the disclosure of rebuttal experts.

15.   Please state the basis in detail for your contention that you were unhappy in or dissatisfied with your employment with Harte-Hanks in and before January 2002.

**ANSWER:**   By January 2002, Dall'Acqua was less than satisfied with his position at Harte-Hanks. At that time, Dall'Acqua's compensation package was declining. For example, in April 2001, rather than receive a salary increase, Dall'Acqua's salary was reduced by $16,000. Also, he did not receive a bonus for 2001.

Also contributing were certain developing tensions arising between Dall'Acqua and Hochhauser relating to Hochhauser's management decisions and style. For example, there were a number of differences of opinion between Dall'Acqua and Hochhauser over the operations of the business, including the proper compensation/rewarding of outstanding employees.

Coupled with these factors, Dall'Acqua realized that he had employment opportunities elsewhere. Beginning in approximately 1998, Dall'Acqua was contacted by executive search firms to gauge his interest in other potential employment opportunities. Dall'Acqua indicated he was interested should the right position open. Over the next few years, Dall'Acqua was contacted regarding different openings. For example, in the summer/fall of 1999, Dall'Acqua was contacted by Korn Ferry International regarding the CEO position with Brand Direct. Dall'Acqua interviewed for this position in September 1999, but declined to proceed. And, in the summer/fall of 2001, Dall'Acqua was approached by Spencer Stuart regarding the CEO position at AHL Services, Inc. Dall'Acqua listened, but eventually declined to proceed. Dall'Acqua, however, directed Spencer Stuart to notify him regarding any opportunities at the

chief operating officer or chief executive officer level. In January 2002, Dall'Acqua remained open to the possibility of pursuing other employment opportunities.

For all of these reasons, Dall'Acqua was less than satisfied with his employment at Harte-Hanks. Further answering, Dall'Acqua refers Harte-Hanks to his affidavit and testimony at the preliminary injunction hearing on this subject.

16. Please state the basis in detail for your contention that your employment with Harte-Hanks ruined your marriage.

**ANSWER:** Dall'Acqua objects to this interrogatory on the grounds it is utterly irrelevant to the issues in this litigation and not reasonably likely to lead to the discovery of admissible evidence. Dall'Acqua further objects on the grounds that this interrogatory constitutes harassment and an invasion of Dall'Acqua's privacy. Dall'Acqua will not respond to this interrogatory.

Further answering, Dall'Acqua states that as of January 2000, he was separated from his then-wife. Dall'Acqua's formal divorce proceedings were not final until February 2002. At the preliminary injunction hearing, in response to questions from Harte-Hanks' attorney, Dall'Acqua testified that his divorce was over as of January 2002. Immediately following this testimony, Dall'Acqua realized he meant to say he was separated at the time, and immediately asked his attorneys whether the record should be clarified as to the timing of his separation and divorce.

17. Please state the basis in detail for your contention that you would not have asked Elaine Dernoga to meet you at the Baltimore-Washington International Airport on January 25, 2002.

**ANSWER:** Dall'Acqua incorporates by reference his affidavit and testimony at the preliminary injunction hearing on this subject.

18. Please describe in detail your conversations with Dean Blythe in March 2004.

**ANSWER:** Dall'Acqua objects to this interrogatory as vague and ambiguous in not identifying the specific conversations at issue. Without waiving said objections, Dall'Acqua states as follows regarding his March 1, 4 and 5, 2004 conversations with Dean Blythe. Dall'Acqua had been invited to have dinner with Richard Hochhauser in Manhattan on March 1, 2004, in advance of a March 2 Harte-Hanks' officers meeting. When Dall'Acqua arrived for the dinner, Blythe met him and briefed him on a conversation he was to have later that evening with Richard Hochhauser. At this meeting, Hochhauser accused Dall'Acqua of soliciting employees and seeking to take them to a new job opportunity. Hochhauser also accused Dall'Acqua of interviewing with Vertis Inc., a competitor of Harte-Hanks located in Baltimore, Maryland. Hochhauser asked Dall'Acqua to turn in his laptop computer and cell phone. Dall'Acqua returned the laptop, but retained the cell phone so as to have continued means to communicate. Hochhauser and Blythe told Dall'Acqua not to speak with anyone at Harte-Hanks and that they would get back to him with a final determination on his status within a few days.

On the evening of March 4, 2004 (the day Hochhauser called Dall'Acqua to terminate him), Blythe called Dall'Acqua and informed him that he was trying to broker a severance package for him.

On March 5, 2004, Blythe called Dall'Acqua to inform regarding the terms of Harte-Hanks' severance package for him. The terms of the severance package offered included severance for five months or until Dall'Acqua found a new job, whichever was earlier, contingent on Dall'Acqua signing a non-competition and non-solicitation agreement. Dall'Acqua declined the offer.

Further answering, Dall'Acqua incorporates by reference his affidavit and testimony at the preliminary injunction hearing regarding these conversations.

19.     Please state the basis in detail for your contention that you would never have signed any sort of restrictive agreement with Harte-Hanks in January 2002.

**ANSWER:**    Dall'Acqua had not been asked to sign any form of restrictive covenant at any time during his initial 20+ years at Harte-Hanks. He would not have signed one in January 2002.

Beginning in approximately 1998, Dall'Acqua was contacted by executive search firms to gauge his interest in other potential employment opportunities. Dall'Acqua indicated he was interested should the right position open. Over the next few years, Dall'Acqua was contacted regarding certain openings. For example, in the summer/fall of 1999, Dall'Acqua was contacted by Korn Ferry International regarding the CEO position with Brand Direct. Dall'Acqua interviewed for this position in September 1999, but declined to proceed. And, in the summer/fall of 2001, Dall'Acqua was approached by Spencer Stuart regarding the CEO position at AHL Services, Inc. Dall'Acqua listened, but eventually declined to proceed. Dall'Acqua, however, directed Spencer Stuart to notify him regarding any opportunities at the chief operating officer or chief executive officer level. By January 2002, Dall'Acqua remained open to the possibility of pursuing other employment opportunities.

Contributing to Dall'Acqua's consideration of other employment opportunities was his declining compensation package. For example, in April 2001, rather than receive a salary increase, Dall'Acqua's salary was reduced by $16,000. Also, he did not receive a bonus for 2001.

Also contributing were certain developing tensions between Dall'Acqua and Hochhauser relating to Hochhauser's management decisions and style. For example, there were a number of differences of opinion between Dall'Acqua and Hochhauser over the operations of the business, including the proper compensation/rewarding of outstanding employees.

For all of these reasons, Dall'Acqua would not have signed any sort of restrictive covenant limiting his options for changing employers in January 2002. Further answering, Dall'Acqua refers Harte-Hanks to his affidavit and testimony at the preliminary injunction hearing on this subject.

20.     Please state the basis in detail for your contention that the signature on the agreement at issue is dissimilar to and/or does not appear to be and/or does not look like your signature.

**ANSWER:**   Dall'Acqua incorporates by reference his affidavit and testimony at the preliminary injunction hearing on this issue. Further answering, Dall'Acqua refers Harte-Hanks to the expert reports and testimony of Ellen Mulcrone Schuetzner and Peter Tytell regarding the basis for his contention that the signature and date appearing on the alleged agreement are forgeries.

CHARLES R. DALL'ACQUA.

By:    /s/ John F. Rooney, III
       John F. Rooney III
       Angela L. Lackard
       MELICK, PORTER & SHEA, LLP
       28 State Street
       Boston, MA  02109
       (617) 523-6200

       Susan C. Levy
       Daniel J. Winters
       Darren M. Mungerson
       JENNER & BLOCK, LLP
       One IBM Plaza
       330 North Wabash
       Chicago, IL  60611
       (312) 222-9350

Dated: November 26, 2004

## VERIFICATION

Charles R. Dall'Acqua states on his oath that he has read the foregoing Charles R. Dall'Acqua's First Amended Objections and Responses to Plaintiff's First Set of Interrogatories and that the facts stated therein are true and correct to the best of his knowledge and belief.

_____
Charles R. Dall'Acqua

Dated: November ____, 2004