# EXHIBIT G

Case 1:04-cv-11548-DPW    Document 106-8    Filed 01/18/2005    Page 1 of 14

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| **SUMMONS** | **ALIAS - SUMMONS** (Rev.12/3/01) CCG 0001 |

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, ___LAW___ DIVISION

CALENDAR S
OTHER COMM LITIGATION

(Name all parties)

PROTOCOL SERVICES, INC.,

Plaintiff,

v.

HARTE-HANKS, INC.,

Defendant.

No. _____

TO: ~~HARTE-HANKS, INC.~~
THE CORPORATION TRUST COMPANY
CORPORATION TRUST CENTER
1209 ORANGE STREET
WILMINGTON, DELAWARE 19801

## SUMMONS

**To each defendant:**

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room __801__, Chicago, Illinois 60602

☐ District 2 - Skokie
5600 Old Orchard Rd.
Skokie, IL 60077

☐ District 3 - Rolling Meadows
2121 Euclid
Rolling Meadows, IL 60008

☐ District 4 - Maywood
1500 Maybrook Ave.
Maywood, IL 60153

☐ District 5 - Bridgeview
10220 S. 76th Ave.
Bridgeview, IL 60455

☐ District 6 - Markham
16501 S. Kedzie Pkwy.
Markham, IL 60426

You must file within 30 days after service of this summons, not counting the day of service.
IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.

NOV 22 2009
BP

**To the officer:**

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than 30 days after its date.

Atty. No.: 05003
Name: Susan C. Levy; Daniel J. Winters, JENNER & BLOCK LLP
Atty. for: Plaintiff Protocol Services, Inc.
Address: One IBM Plaza
City/State/Zip: Chicago, Illinois 60611
Telephone: (312) 222-9350

WITNESS, __NOV 19 2004__,

DOROTHY BROWN
CLERK OF CIRCUIT COURT

Clerk of Court

Date of service: __11/23/04__,
(To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____
(Area Code) (Facsimile Telephone Number)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

## IN THE CIRCUIT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| PROTOCOL SERVICES, INC., | ) | 04L 013064 |
| | ) | CALENDAR S |
| Plaintiff, | ) | OTHER COMM LITIGATION |
| | ) | |
| vs. | ) | No. |
| | ) | |
| HARTE-HANKES, INC., | ) | JURY DEMAND |
| | ) | |
| Defendant. | ) | |

### COMPLAINT

Plaintiff Protocol Services, Inc. ("Protocol"), by its attorneys, respectfully brings this complaint against defendant Harte-Hanks, Inc. ("Harte-Hanks") and hereby alleges as follows:

### NATURE OF ACTION

1. This is a civil lawsuit seeking damages resulting from Harte-Hanks' tortious interference with Protocol's employment agreement with Charles Dall'Acqua.

### PARTIES

2. Plaintiff Protocol is a privately-held Delaware corporation, with its headquarters and principal place of business in Deerfield, Illinois. Protocol is in the business of providing marketing services which assist clients in interacting with their customers.

3. Defendant Harte-Hanks is a publicly-traded Delaware corporation with its principal place of business in San Antonio, Texas. Harte-Hanks is listed on the New York Stock Exchange. On information and belief, Harte-Hanks conducts business and maintains an office and employees in the State of Illinois, including the County of Cook. On information and belief, Harte-Hanks operates in Illinois under the assumed name Harte-Hanks Direct Marketing. Harte-

Hanks is a worldwide direct and targeted marketing company. Harte-Hanks is a competitor of Protocol.

**OTHER KEY PLAYERS**

4. Charles Dall'Acqua is the president and chief executive officer of Protocol. From 1980 until March 2004, Dall'Acqua was a senior vice-president at Harte-Hanks.

5. Richard Hochhauser is the president and chief executive officer of Harte-Hanks.

6. Dean Blythe is the chief financial officer of Harte-Hanks. Prior to becoming CFO, Blythe served as Harte-Hanks' general counsel.

7. Elaine Dernoga is an executive assistant at Harte-Hanks. Until March 2004, Dernoga served as Dall'Acqua's assistant. Dernoga allegedly countersigned the forged agreement.

**JURISDICTION AND VENUE**

8. This Court has jurisdiction over Harte-Hanks pursuant to Section 5/2-209 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-209, because, among other reasons, Harte-Hanks has sufficient minimum contacts with or otherwise purposefully availed itself of the laws of the State of Illinois, committed torts against Protocol in Illinois and caused damages to Protocol that were sustained in Illinois, and does business within Illinois.

9. Venue is proper in this Court pursuant to Sections 5/2-101 and 2-102 of the Illinois Code of Civil Procedure, 735 ILCS 5/2-101 and 2-102, because, among other reasons, Harte-Hanks conducts business within the State of Illinois, including the County of Cook.

2

## BACKGROUND

**Protocol Searches for New CEO**

10. In the late 2003, Protocol began searching for a new president and chief executive officer. Protocol engaged the services of Spencer Stuart, an executive search firm, to assist in this process. As part of its search, Spencer Stuart identified Charles Dall'Acqua as a potential candidate.

11. At the time, Dall'Acqua was senior vice-president of Harte-Hanks. In this position, Dall'Acqua was one of Harte-Hanks' top five executives. Dall'Acqua reported directly to Richard Hochhauser, Harte-Hanks' president and chief executive officer.

12. As part of its candidate profile, Spencer Stuart confirmed that Dall'Acqua did not have any restrictive covenants with Harte-Hanks.

13. Beginning in early 2004, various Protocol executives and board members interviewed Dall'Acqua regarding the Protocol position. During these interviews, Dall'Acqua confirmed he did not have any restrictive covenants with Harte-Hanks.

14. As part of its consideration of Dall'Acqua, Protocol conducted an extensive due diligence process. This due diligence included interviews with numerous high-ranking current and former Harte-Hanks representatives. Protocol's due diligence found:

(a) Dall'Acqua started worked at Harte-Hanks in 1980, and steadily rose within the ranks to become a "strong number two" in the company, beneath Hochhauser.

(b) Dall'Acqua was a highly-regarded, hard-working, loyal and dedicated employee of Harte-Hanks.

(c) Hochhauser was viewed as an "extremely difficult" person for whom to work. Despite Hochhauser's temperament, Dall'Acqua was credited for his ability to maintain a good relationship with him and to "handle[] him well."

3

**Harte-Hanks Terminates Dall'Acqua**

15. On March 1, 2004, Dall'Acqua was called into a meeting with Hochhauser and Dean Blythe (at the time, Harte-Hanks' general counsel). Hochhauser falsely accused Dall'Acqua of having accepted a job with a printing company in Baltimore, Maryland (not Protocol) and soliciting Harte-Hanks' employees to join him. Dall'Acqua denied the accusations, and explained to Hochhauser that he didn't have another job and hadn't solicited any employees.

16. At no time during the March 1, 2004 meeting did Hochhauser or Blythe say anything to Dall'Acqua regarding the existence of any restrictive covenant limiting Dall'Acqua's ability to solicit Harte-Hanks employees.

17. On March 4, 2004, Hochhauser telephoned Dall'Acqua and informed him that he was being terminated.

18. During the March 4, 2004 telephone conversation, Hochhauser did not say anything regarding the existence of any restrictive covenant limiting Dall'Acqua's ability to solicit Harte-Hanks employees.

19. On March 5, 2004, Blythe telephoned Dall'Acqua and offered him a six-figure severance package conditioned on his signing a non-competition and non-solicitation agreement. Not wanting any restrictions on his future employment options, Dall'Acqua rejected this offer.

**Protocol Hires Dall'Acqua**

20. Upon learning of Dall'Acqua's termination, Protocol contacted a senior Harte-Hanks human resources manager to inquire regarding the development. This senior Harte-Hanks manager explained:

4

(a) "Charles was great but he got no bonus and was doing all the heavy lifting. [Hochhauser] and he were essentially at total odds and it was clearly not Charles' doing by any means."

(b) There remained a "wealth of good feelings still within the company" for Dall'Acqua.

(c) Dall'Acqua possessed "the highest level of personal integrity," was "highly admired within the company" and was an "arbiter of [Harte-Hanks'] corporate culture."

21. The senior Harte-Hanks human resources manager also reviewed Dall'Acqua's personnel files and confirmed that it accurately reflected the information provided by Dall'Acqua regarding his employment at Harte-Hanks. The human resources manager said nothing indicating Dall'Acqua was subject to any restrictive covenant.

22. Thereafter, Protocol hired Dall'Acqua.

23. On March 25, 2004, Protocol and Dall'Acqua entered into a valid and binding employment agreement. Pursuant to this contract, Dall'Acqua agreed to serve as Protocol's president and chief executive officer. The contract further provided that Dall'Acqua would faithfully perform and discharge such duties and responsibilities consistent with such positions. For example, Dall'Acqua's job responsibilities included working to improve and advance the business and interests of Protocol. In addition, Dall'Acqua had hiring responsibilities.

24. In the days and weeks after Dall'Acqua's termination, contrary to what invariably happens where such an agreement exists, Harte-Hanks never sent a letter to either Dall'Acqua or his new employer Protocol asserting the existence of any restrictive covenant limiting Dall'Acqua's ability to solicit Harte-Hanks employees.

5

**Harte-Hanks Produces Alleged Non-Solicitation Agreement**

25. On June 8, 2004, for the first time, Harte-Hanks sent a letter to Dall'Acqua complaining that he was violating an alleged non-solicitation agreement purportedly dated January 25, 2002 (hereinafter the "alleged agreement" or "the forged agreement").

26. On information and belief, Harte-Hanks forged the alleged Dall'Acqua agreement with the intent to interfere with the rights of Protocol under its employment contract with Dall'Acqua and to gain an unfair competitive advantage over Protocol in the marketing services industry.

27. Dall'Acqua had never seen this alleged agreement before, and stated that it did not contain his signature. In a letter dated June 17, 2004, Protocol informed Harte-Hanks that the signature was forged and unauthorized.

28. Protocol has retained two highly-credentialed, board-certified handwriting experts who have confirmed that the alleged agreement was forged. Protocol retained Ellen Mulcrone Schuetzner, to compare the signature and handwritten date appearing on the alleged agreement against various known signatures of Dall'Acqua. Schuetzner concluded the signature was not genuine, but rather a simulation. Protocol also retained Peter Tytell, who compared the alleged agreement with hundreds of known writings of Dall'Acqua. Based on his review, Tytell concluded "with the highest degree of confidence" that neither the signature nor the date ("1/25/02") on the alleged agreement was authentic. Like Schuetzner, Tytell concluded they were simulations.

**Harte-Hanks Sues Protocol**

29. On June 8, 2004, Harte-Hanks threatened to sue Protocol if it refused to abide by the terms of the forged agreement.

6

30. In response, Protocol informed Harte-Hanks that the alleged agreement was not authentic. Protocol further notified Harte-Hanks that it would pursue its legal remedies if Harte-Hanks persisted in attempting to enforce the forged agreement.

31. On July 12, 2004, Harte-Hanks filed a complaint against Protocol (and Dall'Acqua) in the United States District Court for the District of Massachusetts, Civil Action No. 04-11548-DPW ("the Massachusetts Action"). Harte-Hanks' complaint was premised on the alleged breach of the forged agreement. Harte-Hanks also filed an emergency motion for a preliminary injunction seeking to prevent Protocol (and Dall'Acqua) from exercising its right to employ whomever it considered the best qualified employees to work for it.

32. In August 2004 a preliminary injunction hearing was held in which Harte-Hanks proffered false and misleading testimony, including the false and misleading testimony of Demoga. On August 25, 2004, based on Harte-Hanks false and misleading testimony, the court issued a preliminary injunction order prohibiting Protocol and Dall'Acqua from soliciting any Harte-Hanks employees. In entering the preliminary injunction, the Massachusetts court recognized its ruling was only preliminary and not based on a full record, that it was based primarily on Dernoga's alleged credibility, and that it would grant the parties an expedited hearing.

**Protocol and the Massachusetts Court learn that Dernoga "Lost" Critical Original Documents and Dernoga testified falsely**

33. During the course of the Massachusetts Action, at the suggestion of its experts, Protocol sought to compare the paper characteristics of the alleged agreement with the non-solicitation agreements of other Harte-Hanks executives allegedly processed and countersigned by Dernoga the week of January 21, 2002. Because the experts already found that the handwriting had been forged, the experts believed such a comparison might reveal that the

7

alleged agreement might not match the paper characteristics of the other allegedly contemporaneous agreements.

34. In response to Protocol's request, for the first time Harte-Hanks belatedly confessed that Dernoga "lost" the other original agreements. Apparently, Dernoga "lost" the original documents under questionable circumstances while preparing to fly from Baltimore to Boston in connection with the court's preliminary injunction hearing. And, when asked about the whereabouts of the documents during that hearing, Dernoga falsely testified that the original documents were "likely" in her office when she knew she had "lost" them.

35. By "losing" these documents, Harte-Hanks has hindered Protocol's ability to collect additional proof to reinforce the mounting evidence that the alleged agreement is a forgery.

**Protocol is dismissed from the Massachusetts Action.**

36. On October 25, 2004, Protocol filed a motion to dismiss the action for lack of subject matter jurisdiction. Because Protocol and Harte-Hanks are both Delaware corporations, the parties are not completely diverse and, therefore, the Massachusetts court lacks jurisdiction. The Massachusetts court agreed and dismissed Protocol on November 18, 2004. The Massachusetts Action remains pending against Dall'Acqua.

### COUNT I
### (Tortious Interference)

37. Protocol repeats here and incorporates by reference the allegations of Paragraphs 1 through 36 as if fully set forth here.

38. Protocol and Dall'Acqua are parties to an employment contract pursuant to which Dall'Acqua serves as president and chief executive officer of Protocol.

8

39. Harte-Hanks had knowledge that Protocol and Dall'Acqua were parties to an employment contract pursuant to which Dall'Acqua was to serve as president and CEO of Protocol.

40. Harte-Hanks interfered with the employment contract between Protocol and Dall'Acqua through improper motives or means by, among other conduct: forging Dall'Acqua's signature on the confidentiality and non-solicitation agreement; relying on the forged agreement to severely hinder Dall'Acqua's ability to perform his duties for Protocol; destroying critical evidence relevant to this dispute; threatening to pursue and ultimately instituting wrongful legal proceedings in an attempt to enforce the invalid, forged non-solicitation agreement; and submitting false and misleading testimony to support the wrongful legal proceedings.

41. By its misconduct, Harte-Hanks has caused Dall'Acqua to fail to perform and to continue to fail to perform certain provisions of his employment contract with Protocol, including the provision that Dall'Acqua work to improve and advance the business and interests of Protocol.

42. Due to Harte-Hanks' misconduct, Dall'Acqua's attention has been unnecessarily distracted away from Protocol's legitimate business objectives.

43. By its misconduct, Harte-Hanks has interfered with Dall'Acqua's ability pursuant to his employment agreement with Protocol to hire the best people for Protocol.

44. Protocol has suffered and continues to suffer severe and substantial financial losses as a direct result of Harte-Hanks' wrongful conduct.

**WHEREFORE**, Protocol respectfully prays that this Court: (1) enter a judgment in favor of Protocol and against defendant Harte-Hanks and award Protocol actual, compensatory and consequential damages as a result of Harte-Hanks' tortious interference with contract in a substantial amount, over $30,000, as determined at trial, together with interest as it accrues on that amount; (2) enter a judgment in favor of Protocol and against defendant Harte-Hanks in the sum of all costs and reasonable attorneys' fees incurred, plus court costs; (3) enter a judgment of punitive damages in an amount as determined at trial; and (4) grant Protocol such other relief as it deems appropriate under the circumstances.

Respectfully Submitted,

PROTOCOL SERVICES, INC.

By: _____
One of Its Attorneys

Susan C. Levy
Daniel J Winters
JENNER & BLOCK LLP (No. 05003)
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

Dated: November 19, 2004

Document No. 1181809_v1

Civil Action Cover Sheet (Rev. 6/19/03) CCL 0520

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

PROTOCOL SERVICES, INC., Plaintiff,

v. No. 04L 013064
CALENDAR S
HARTE-HANKS, INC., Defendant. OTHER COMM LITIGATIO

## CIVIL ACTION COVER SHEET

A Civil Action Cover Sheet shall be filed with the complaint in all civil actions. The information contained herein is for administrative purposes only and cannot be introduced into evidence. Please check the box in front of the appropriate general category and then check the subcategory thereunder, if applicable, which best characterizes your action.

Jury Demand ☒ Yes ☐ No

(FILE STAMP)

☐ **PERSONAL INJURY/WRONGFUL DEATH**

- ☐ 027 Motor Vehicle
- ☐ 040 Medical Malpractice
- ☐ 047 Asbestos
- ☐ 048 Dram Shop
- ☐ 049 Product Liability
- ☐ 051 Construction Injuries (including Structural Work Act, Road Construction Injuries Act and negligence)
- ☐ 052 Railroad/FELA
- ☐ 053 Pediatric Lead Exposure
- ☐ 061 Other Personal Injury/Wrongful Death
- ☐ 063 Intentional Tort
- ☐ 064 Miscellaneous Statutory Action (Please Specify Below**)
- ☐ 065 Premises Liability
- ☐ 078 Fen-phen/Redux Litigation
- ☐ 199 Silicone Implant

☐ 062 **PROPERTY DAMAGE**

☐ 066 **LEGAL MALPRACTICE**

☐ **TAX & MISCELLANEOUS REMEDIES**

- ☐ 007 Confession of Judgment
- ☐ 008 Replevin
- ☐ 009 Tax
- ☐ 015 Condemnation
- ☐ 017 Detinue
- ☐ 029 Unemployment Compensation
- ☐ 036 Administrative Review Action
- ☐ 085 Petition to Register Foreign Judgment
- ☐ 099 All Other Extraordinary Remedies

☒ **COMMERCIAL LITIGATION**

- ☐ 002 Breach of Contract
- ☐ 070 Professional Malpractice (other than legal or medical)
- ☐ 071 Fraud
- ☐ 072 Consumer Fraud
- ☐ 073 Breach of Warranty
- ☐ 074 Statutory Action (Please Specify Below**)
- ☒ 075 Other Commercial Litigation (Please Specify Below**)
- ☐ 076 Retaliatory Discharge

☐ 077 **LIBEL/SLANDER**

☐ **OTHER ACTIONS**

- ☐ 079 Petition for Qualified Orders
- ☐ 084 Petition to Issue Subpoena
- ☐ 100 Petition for Discovery

** Tortious Interference with Contract

By: _____
(Attorney)          (Pro Se)

DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

1910 - No Fee Paid
1919 - Fee Paid
JURY DEMAND

(Rev. 1/12/01) CCG 0067

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

PROTOCOL SERVICES, INC.,   Plaintiff,

v.

HARTE-HANKS, INC.,   Defendant.

04L 013064
CALENDAR S
OTHER COMM LITIGATIO

No. _____

## JURY DEMAND

The undersigned demands a jury trial.

_____
(Signature)

Atty. No.: 05003
Name: Susan C. Levy; Daniel J. Winters, JENNER & BLOCK, LLP
Atty. for: Plaintiff, Protocol Services, Inc.
Address: One IBM Plaza
City/State/Zip: Chicago, Illiois 60611
Telephone: (312) 923-2985

Dated: November 19, 2004

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS